## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,
400 Sixth Street N.W.
Washington, D.C. 20001,

STATE OF CALIFORNIA
300 S Spring Street, Suite 1702
Los Angeles, CA 90013, and

STATE OF ILLINOIS,
100 W. Randolph St.
Chicago, IL 60601,

           Plaintiffs,

       v.

THE KROGER CO.
1014 Vine Street
Cincinnati, OH, 45202,

and

ALBERTSONS COMPANIES, INC.
250 E Park Center Blvd.
Boise, ID, 83706,

           Defendants.

Case No. 1:22-cv-3357

## COMPLAINT FOR EQUITABLE AND INJUNCTIVE RELIEF FOR VIOLATIONS OF SECTION ONE OF THE SHERMAN ANTITRUST ACT AND STATE ANTITRUST LAWS

Plaintiffs, the District of Columbia (the "District"), the State of California, the State of Illinois, and through their respective Attorneys General (collectively, "the States" or "Plaintiffs"), bring this civil enforcement action against Defendants The Kroger Co. ("Kroger") and Albertsons Companies, Inc. ("Albertsons"), pursuant to their federal and statutory authority, seeking equitable

and injunctive relief to enjoin Kroger and Albertsons from acting in concert with each other or with any other party in restraint of trade. This includes reducing Albertsons' ability and incentive to compete through an agreement to use a so-called "Special Dividend," which together with other merger agreement provisions will strip Albertsons of its capacity to compete pending regulatory review of its planned merger with Kroger.

## **INTRODUCTION**

Albertsons is one of the largest supermarket chains in the country, and competes in the District, California, and Illinois under multiple banners, most notably Safeway in the District, with more stores there than any other supermarket chain. On October 14, 2022, Albertsons and Kroger announced they were merging, with Kroger set to pay some $25 billion to buy Albertsons. This merger was already destined to draw regulatory scrutiny for possible antitrust violations given the size of the deal and the players—indeed, their merger agreement recognizes as much, and even provides for the creation of a holding company for the hundreds of stores the parties expect to have to divest to gain regulatory approval. But that is hardly unusual for such a "megamerger." These large transactions in America's increasingly concentrated economy are understood to require time for antitrust regulators to review all of their potential anticompetitive effects.

What is unusual is the way Defendants structured their transaction, because by the time the merger review ends—by Defendants' projections, they will not close until 2024—one of them may barely be left standing. On November 7, 2022, Defendants have arranged for Albertsons to pay $4 billion, roughly all the cash it has available to compete today, to stockholders, $1.5 billion of it from a loan it will take out. The merger agreement, now inked, limits Albertsons' ability to seek additional financing, and Albertsons' low bond ratings indicate that even if it could go out and try to raise capital, the national economic downturn will make doing so especially difficult.

Discovery may reveal that the "Special Dividend" reflects a calculated effort to leave Albertsons just battered enough for Defendants to argue later (to regulators or a court) that it is a "flailing" or "failing" firm that Kroger should be allowed to acquire lest it go out of business anyway, but still worth its hard assets and Kroger's gain from neutralizing a competitor. But whatever the motivation, the antitrust laws do not care: Defendants have an agreement that, as detailed herein, will have an anticompetitive *effect* on competition among supermarkets in the District of Columbia, California, and Illinois, and that is sufficient basis for this Court to stop the Special Dividend from being paid, and protect consumers and workers in all the States.

## PARTIES

1.  Plaintiff District of Columbia, a municipal corporation empowered to sue and be sued, is the local government for the territory constituting the permanent seat of the government of the United States.  The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia.  The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District, and is responsible for upholding the public interest.  D.C. Code § 1-301.81(a)(l).

2.  Plaintiff State of California is a sovereign state. Rob Bonta is the Attorney General of the State of California, the chief legal officer for the state, and brings this action on behalf of the people of the State of California to protect the State and its residents from Defendants' anticompetitive business practices. Cal. Const., art. V, § 13.

3.  Plaintiff State of Illinois is a sovereign state. Kwame Raoul is the Attorney General of the State of Illinois, the chief legal officer for the state, and brings this action on behalf of the people of the State of Illinois to protect the State and its residents from Defendants' anticompetitive business practices. 740 ILCS 10/7.

4.   Defendant Kroger is a publicly traded for-profit corporation, incorporated under the laws of Delaware, and headquartered in Cincinnati, Ohio. Kroger owns and operates over 2,700 grocery stores under different brand names across the United States, as well as over 2,200 pharmacies and 1,600 fuel centers. Among the brands Kroger operates are Kroger, King Soopers, and, in the District of Columbia, Harris Teeter.

5.   Defendant Albertsons is a publicly traded for-profit corporation, incorporated under the laws of Delaware, and headquartered in Boise, Idaho. Albertsons operates over 1,800 grocery stores under different brand names across the United States, as well as over 1,700 pharmacies, and over 400 fuel centers. Among the brands Albertsons operates in the District, California, and Illinois are Albertsons, Vons, and, in the District of Columbia, Safeway.

## **JURISDICTION**

6.   This Court has subject matter jurisdiction over this case pursuant to 15 U.S.C. §§ 4 and 26 and 28 U.S.C. §§ 1331 and 1337.

7.    This Court has personal jurisdiction over Kroger, and venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. §1391 because Kroger transacts business and is found within this District.

8.   This Court has personal jurisdiction over Albertsons, and venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. §1391 because Albertsons transacts business and is found within this District.

## FACTUAL ALLEGATIONS

**I.      Albertsons, Under the Safeway Banner, Competes Against Kroger's Harris Teeter and Others in the District, and Against Kroger Under Various Banners in California and Illinois.**

9.   Competition in groceries is unlike competition in most other goods and services. Food is one of humanity's few true necessities. Supermarkets give local residents access to fresh fruits and vegetables, and other grocery products, often competing against each other to provide the best value and service, and offering good, often union, jobs to workers.

10. Researchers have written extensively about the problem of "food deserts"—areas that by being more than a mere half mile from a grocery store or supermarket, together with low rates of car access and high poverty rates, merit policymakers' special attention because of their dire welfare implications for people living in them.

11. Accessibility of supermarkets on foot or by public transit for many of our neighborhoods and consumers is critical for the District's communities' health as a whole, as well as those of California and Illinois. Access to adequate high-quality food and grocery stores is already an issue for some communities in California.  For example, South Los Angeles is a food desert that has very limited access to fresh food and grocery stores. Some communities in Illinois, especially on the City of Chicago's east and south sides, are also food deserts, which severely lack access to fresh groceries.

12. The importance of the products supermarkets sell and the service and innovation they provide to District, California, and Illinois residents mean that any material reduction in a supermarket competitor's ability to compete can harm those residents in ways that are far from hypothetical. Prices can go up, and promotions can decrease, and that translates directly into the

quantity and quality of food families can put on their tables. Staffing can also decrease, leading to worse service for consumers and worse conditions for District, California, and Illinois workers.

13. Albertsons, under the Safeway banner, has more locations than any other grocery store in the District of Columbia.

14. Safeway competes with other supermarkets for consumers' dollars. For example, when Harris Teeter had a supermarket on Potomac Avenue in Southeast DC, in August 2020 Safeway renovated and expanded its Safeway supermarket on 14th Street Southeast less than half a mile away, after which the Harris Teeter closed in January of 2022.

15. Defendants also compete in Northwest DC's Adams Morgan neighborhood, where Harris Teeter operates a supermarket on Kalorama Road, a mere third of a mile from the Columbia Road Safeway.

16. District residents rely on Safeway for fresh food at affordable prices to feed themselves and their families.

17.  Each of Safeway's thirteen locations in the District runs weekly circular ads, among other promotions, to win residents' supermarket dollars.

**II.     Albertsons Currently Has Significant Liquidity, Which Is Critical Given Current Market Conditions and Albertsons' Creditworthiness.**

18. Capital is the lifeblood of business operations. Businesses need access to capital to compete in the marketplace, whether through promotional campaigns, geographic expansion, improvement of existing services, or increasing wages to attract and retain workers.

19. Capital markets are generally efficient, meaning the market is informed about which investments are likely to bring in a favorable return, and those investments will generally be able

to attract the capital they need. Certain companies may face different limitations on their access to capital, however, depending on prevailing economic conditions.

20. During economic downturn, economic research shows, companies with lower bond ratings are likely to have greater difficulty accessing capital affordably, if they can at all.

21. The United States has entered a period of economic downturn. Economists generally define a recession as "a significant decline in economic activity that is spread across the economy and that lasts more than a few months." Many economists, economic forecasters, and investors expect the United States economy to enter a recession in the coming months, other believe we are already in one.

22. Companies with lower than investment-grade bond ratings by large rating agencies like Moody' and Standard & Poor's tend to elect to have more cash on hand to ensure adequate liquidity and their ability to meet needs for capital, knowing they will have a harder time accessing capital than issuers of investment-grade bonds.

23. Albertsons' Moody's rating is Ba2, and its S&P rating is BB, which is in both cases below investment grade.

24. Albertsons currently has a market capitalization of approximately $11 billion, and reported $3.392 billion in cash, based on its most recent U.S. Securities and Exchange Commission ("SEC") 10-Q filing, as well as $652 million in net receivables. Net receivables are defined as money Albertsons is owed less whatever it expects it is owed but will never be paid.

25. Albertsons' 2022 SEC filings indicate its liquidity needs annually are approximately $6 billion.

### III.      Kroger and Albertsons Agree to Merge

26. On October 13, 2022, Albertsons and Kroger (collectively, "Defendants"), who are the two largest competitors in the sale of groceries nationally, and the first and third largest (respectively) in the District of Columbia, entered into an "Agreement and Plan of Merger By and Among Albertson Companies, Inc., The Kroger Co., And Kettle Merger Sub, Inc." ("Merger Agreement").

27. This Merger Agreement is the final and complete agreement between Defendants to consummate a merger that they had contemplated and negotiated since at least June of 2022.

28. Included in this Merger Agreement is Albertsons' commitment to issue a "Pre-Closing Dividend" (the "Special Dividend"), which the Merger Agreement defines as "one or more special cash dividends payable to holders of [Albertsons] Common Stock, [Albertsons] Preferred Stock and, by way of dividend equivalent rights, [Albertsons] Equity Awards, as applicable, in an amount not to exceed with respect to all such special cash dividends $4,000,000,000 in the aggregate."

29. As of October 28, 2022, nearly 30% of all Albertsons shares were held by Cerberus Capital Management, L.P., a private equity firm that is the largest holder of Albertsons stock and maintains a non-voting member of the board of directors of Albertsons.

30. In press releases, and in company 8-Ks filed with the U.S. Securities and Exchange Commission announcing the Merger Agreement, Defendants announced the Special Dividend, and stated that it would be paid on November 7, 2022, to record holders of Albertsons stock as of October 24, 2022.

31. Thus, Albertsons intends to pay the Special Dividend before regulatory review of Defendants' merger is complete.

32. The Special Dividend is the result of an agreement between Albertsons and Kroger. It was specifically negotiated between Defendants as part of the Merger Agreement.

33. █████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████

34. █████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

**IV.    Payment of the Dividend Would Upset the Status Quo and Infect Review of a Merger that May Harm District Consumers and Workers.**

35. This Special Dividend is *over 57 times the size of Albertsons' usual dividends*. A giveaway like this could raise concerns in numerous situations, but especially for a merger of this size in an industry like supermarkets.

36. Supermarkets are already a consolidated industry in the United States. Albertsons and Kroger are two of its largest players and historically fierce competitors in the District, California, Illinois, and numerous States.  As described above, Kroger and Albertsons have competed against each other. In the Northeast, the proposed merger halts Defendants' advances on each other's territory at roughly where the four quadrants of the District of Columbia meet.



*Source: Creditntell Report*
*Legend: Kroger stores in blue; Albertsons stores in red.*

37. Defendants claim their transaction unites "complementary" companies, but even their own map of store locations makes clear their competitive overlap in properly defined relevant antitrust markets in California, Illinois, and elsewhere:



*Source: krogeralbertsons.com*

38. Defendants recognize that their transaction will require extensive antitrust review by regulators and have provided for divestiture of hundreds of stores in their Merger Agreement, via a holding company, to address antitrust concerns.

39. The nationwide implications of the transaction deserve the fulsome analysis the Special Dividend threatens to upend. In the District, California, and Illinois, because of the essential and constant need for food, even a short-term reduction in competition in the urban neighborhoods, especially those where Kroger and Albertsons compete—at Harris Teeter and Safeway in the District, for example—can result in higher prices and reductions in quality that can significantly harm consumers' pocketbooks and their health.

40. The Federal Trade Commission and the U.S. Department of Justice often use market concentration (determined by market share) as a guide for determining whether a firm will have market power and thus have the ability and economic incentive to substantially reduce competition in a properly defined relevant antitrust market post-merger.

41. While the immediacy with which Albertsons intends to pay the Special Dividend makes a complete analysis of current market shares impossible at the filing of this Complaint, based on publicly available data from 2021 on supermarkets competing in the District, the District preliminarily estimates that Albertsons had an 19.4% share and Kroger a 13.9% share within the District of Columbia:



*Source: Washington Business Journal, Largest Grocery Retailers in Greater D.C.—*
*Ranked by Metro-area grocery sales 2021, Aug. 26, 2022.*

42. The proposed transaction would leave two large entities—Kroger and Giant—controlling most of the market:



*Source: Washington Business Journal, Largest Grocery Retailers in Greater D.C.—
Ranked by Metro-area grocery sales 2021, Aug. 26, 2022.*

43. These shares are District-wide, and the local nature of supermarket competition means that Defendants' market shares and overall market concentration are likely substantially higher in areas within the District.

44. To determine a merger's effect on market concentration, the federal agencies usually use the Herfindahl-Hirschman Index (HHI), which is calculated by summing the squares of the individual market shares of all participants.

45. The Horizontal Merger Guidelines, published by the two agencies and regularly cited by courts reviewing merger challenges, consider a post-merger HHI of over 2500, with a merger-related increase in HHI of more than 100 points, to presumptively create or enhance market power, demanding close scrutiny. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963).

46. The 2021 data available to the District indicate that this proposed Merger would lead to a post-merger HHI of 2524, an increase of 541 from the pre-merger HHI of 1983, in the District of Columbia.

47. Not all supermarkets are adequate substitutes in the eyes of all consumers, however. For example, Wegmans may have a significant market share if one looks at District-wide shares (which, as detailed herein, likely understate concentration in smaller relevant geographic markets), but there is only one Wegmans in the District, and it is in American University Park, a neighborhood without meaningful Metro access. Thus, Wegmans will not meaningfully discipline a post-merger price increase by Kroger in the Adams Morgan Harris Teeter or the Adams Morgan Safeway, assuming it even keeps both open. Similarly, Albertsons' pre-merger share District-wide likely understates its market power now because many District residents have fewer meaningful substitutes to which they could turn today or while the merger is reviewed.

48. Additionally, District residents depend on employment by these companies.  The reduced need for employees and suppressed wages from reduced competition for labor by these employers following a merger would also constitute a significant competitive harm. The speed at which Albertsons has decided to complete payment of this Special Dividend has rendered impossible any meaningful review, but organizations knowledgeable about labor conditions, including the UFCW Local 400 (which represents Safeway workers in the District), have raised substantial concerns that this dividend will make it more difficult for Albertsons to compete for labor, by reducing Albertsons' ability to offer wage increases, pensions, or store improvements.

49. Albertsons' current contribution to the prevailing competitive dynamic among District supermarkets is, as shown by its market presence, and the jobs it provides, critical. That, together with the fact that the proposed merger increases market concentration to presumptively

anticompetitive levels under at least one defined relevant antitrust market, demonstrates that this merger demands deliberate scrutiny from enforcers.

50. These facts also highlight the risk of anticompetitive effects should Albertsons' competitiveness be compromised in any way during the merger's review, regardless of whether the merger (a) closes, or (b) does not close, but the Special Dividend leaves Albertsons a distinct but weakened competitor.

51. Furthermore, Defendants currently operate competing banners with strong presences in numerous other States. In Illinois, for example, publicly available information indicates the Defendants' combined share of supermarket sales totaled about 64% in September 2022.

52. September data tracking visit share of Illinois grocery list Albertsons' banner, Jewel-Osco, as having the highest visit share in Illinois.

53. In California, Kroger owns and operates approximately 214 stores under the Ralphs banner and an additional 19 under Food 4 Less.  A majority of these stores are located in Southern California. The Albertsons Company operates approximately 579 grocery stores in California: 125 stores under the Albertsons banner, along with 26 Pavilion, 243 Safeway, and 185 Vons stores.

54. The Special Dividend payment also affects employees in California.  Kroger has approximately 26,687 employees in California.  On information and belief, there are approximately 21,000 Albertsons-connected employees in California.

55. The Special Dividend risks seriously hindering Albertsons' ability to compete with Kroger and other supermarkets in these and other States during the merger review and interfering with the merger review process.  Thus, the Court should enjoin the payment of the dividend until the District, California, Illinois, and others can complete their full review of the merger and determine whether combining Kroger and Albertsons would violate the antitrust laws.

**V.      The Agreement to Pay the Special Dividend Will Hamstring Albertsons.**

56. The agreement between horizontal competitors Kroger and Albertsons for the latter to pay the Special Dividend will weaken one of the top supermarket competitors in each of the Plaintiff States by removing substantially all of the cash it needs to operate competitively, and saddling it with $1.5 billion in new debt just to pay off Albertsons' stockholders. The agreement's likely effect will be to restrict Albertsons' ability to compete on pricing and service, by severely limiting its liquid assets and depriving it of the cash needed for competition, at a time when it will face unusual difficulty accessing capital.

57. Prior experience certainly suggests as much: ██████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████ this type of transaction is the merger, announced in 2020, of Lockheed Martin and Aerojet Rocketdyne. There, Lockheed agreed to pay $5 billion, at $56 per share. Aerojet announced with the merger a $5 per share special dividend that would discount the cash price Lockheed would make, and would occur three months from the date of announcement (providing much more time than the 3 weeks here). In 2022, more than a year after the merger was announced, the FTC moved to block that merger, and Lockheed announced the termination of the merger. Aerojet's share price has yet to recover to the price it traded at when the merger was announced, its private equity shareholders' struggle to recoup costs left Aerojet less competitive after the merger was called off, and today it seeks a new acquirer.

58. As the above example demonstrates, in the rare instances where this dividend structure is used, it may well lead to a company that is less able to compete.

59. Albertsons plans to fund the agreed-upon Special Dividend by using $2.5 billion in cash and taking on $1.5 billion in new debt.

60. This payment would eliminate more than half of Albertsons' cash and cash equivalents. Both in ordinary course documents and in its most recent 10-Q filing, Albertsons claims $3.392 billion in cash and cash equivalents the Special Dividend would reduce that available liquidity to only $0.892 billion. It would increase Albertson's net debt from $4.54 billion to $8.54 billion.

61. A lack of cash will hamper Albertsons' ability to compete in the short term. Albertsons will be unable to respond effectively to shifts in the market through promotions and advertising more generally, have less available cash to pay employee wages and benefits to retain staffing, and be unable to make necessary investments into their stores, or heavily disincentivized from doing so.

62. 

63. Even without taking on new debt for necessary repairs, incurring $1.5 billion in new debt to pay the Special Dividend will nearly double Albertsons' leverage ratio. This increase in leverage will lessen Albertson's ability to obtain more capital and make that capital more expensive, thereby hindering its operations and ability to compete.

64. The Merger Agreement's terms additionally heavily limit Albertsons' ability and incentive to make up for this lost cash through new financing.

65. The Merger Agreement generally prohibits Albertsons from incurring additional indebtedness and makes any exceptions subject to "the ordinary course of business consistent with past practice."

66. Payment of the Special Dividend is not part of Albertsons' "ordinary course of business."

67. Payment of the Special Dividend is not consistent—and, as detailed above, orders of magnitude greater than—Albertsons' past practice with respect to payments to stockholders.

68. Under Defendants' Merger Agreement, even refinancing existing debt, where the principal is over $100 million, requires Albertsons to "reasonably consult[]" Kroger, supposedly its independent competitor, first.

69. Albertsons will be particularly ill-suited to seek debt financing while antitrust regulators review the merger, both because of the restrictions Defendants agreed to in the Merger Agreement and because Albertsons' bond ratings are below investment grade. Based on Albertsons' bond rating, given the current economic downturn, it will have a harder time raising capital than other companies.

70. The Special Dividend would thus reduce Albertsons' ability to compete effectively with Kroger pending the review of the Merger Agreement and leave Albertsons a weaker competitor should the merger ultimately be blocked by regulators.

71. Even if Albertsons can recuperate this cash through the conduct of its business, money spent replenishing the amount of cash and cash equivalents and paying down principle on debt is money not spent on necessary improvements, pensions, and wages, while Albertson's competitors will remain able to make these same necessary expenditures.

72. Albertsons' reduced competitiveness will have market-wide effects. In general, economic empirical research shows that when a supermarket chain becomes significantly more leveraged, it

weakens competition among supermarket incumbents. Competition lessens across the board because competitors know that the leveraged company will have fewer resources with which to compete, and can therefore reliably pursue less "tough" competition. That is not surprising, because researchers have also found that the food retail sector has characteristics that may threaten competition, such as entry barriers, price-discrimination, collusion, and market division between competitors. Economic research also supports the proposition that increased food retailer concentration increases prices.

## VI.    The Relevant Product Markets

73. The relevant line of commerce in this action is no broader than the retail sale of food and other grocery products in supermarkets.

74. "Supermarket" means any full-line retail grocery store that enables customers to purchase substantially all of their weekly food and grocery shopping requirements in a single shopping visit, typically with at least 10,000 square feet of selling space devoted to providing offerings across many of at least the following product categories: bread and baked goods; dairy products; refrigerated food and beverage products; frozen food and beverage products; fresh and prepared meats and poultry; fresh fruits and vegetables; shelf-stable food and beverage products, including canned, jarred, bottled, boxed, and other types of packaged products; staple foodstuffs, which may include salt, sugar, flour, sauces, spices, coffee, tea, and other staples; other grocery products, including nonfood items such as soaps, detergents, paper goods, other household products, and health and beauty aids; pharmaceutical products and pharmacy services (where provided); and, to the extent permitted by law, wine, beer, and/or distilled spirits.

75. Supermarkets provide a distinct set of products and services and offer consumers convenient one-stop shopping for food and grocery products. Supermarkets typically carry more

than 10,000 different items, typically referred to as stock-keeping units (SKUs), as well as a deep inventory of those items.

76. Supermarkets compete primarily with other supermarkets that provide one-stop shopping opportunities for food and grocery products. Supermarkets base their food and grocery prices primarily on the prices of food and grocery products sold at other nearby competing supermarkets. Supermarkets do not regularly conduct price checks of food and grocery products sold at other types of stores and do not typically set or change their food or grocery prices in response to prices at other types of stores.

77. Although retail stores other than supermarkets may also sell food and grocery products, these types of stores—including convenience stores, specialty food stores, limited assortment stores, hard-discounters, and club stores—do not, individually or collectively, provide sufficient competition to effectively constrain prices at supermarkets. These retail stores do not offer a supermarket's distinct set of products and services that provide consumers with the convenience of one-stop shopping for food and grocery products. The vast majority of consumers shopping for food and grocery products at supermarkets are not likely to start shopping at other types of stores, or significantly increase grocery purchases at other types of stores, in response to a small but significant price increase by supermarkets.

VII.    The Relevant Geographic Markets

78. Discovery will permit Plaintiffs to fully define the metes and bounds of relevant geographic markets in this case. In the District of Columbia, the relevant geographic market is no larger than the District, and smaller relevant geographic markets likely exist within the District.

79. Consumers shopping at supermarkets are motivated by convenience and, as a result, competition for supermarkets is local in nature. Generally, the overwhelming majority of consumers' grocery shopping occurs at stores located very close to where they live or work.

80. In the District of Columbia specifically, many consumers are further limited in the distance they will travel to shop at a supermarket by access to public transportation, with some wards in the city having only one or two stores.

81. In response to a small but significant nontransitory increase in supermarket prices in the District of Columbia, consumers would not shift their grocery purchases to supermarkets outside the District of Columbia sufficiently to defeat the increase in prices. And in response to a small but significant nontransitory increase in supermarket prices in smaller areas within the District of Columbia that appropriate regulatory review will define, consumers would not shift their grocery purchases to supermarkets outside those smaller areas.

82. Consumers shopping at supermarkets are motivated by convenience and, as a result, competition for supermarkets is local in nature. In Illinois, many Chicago residents lack cars and must travel to grocery stores by walking or public transit, preventing them from traveling outside the community areas in which they work or live to shop at alternative grocery stores. Thus, the overwhelming majority of consumers' grocery shopping occurs at stores located very close to where they live or work.

83. Lack of broadband access may also limit the options available for some Chicago residents to shop at grocery stores via online grocery delivery services.

84. The relevant geographic markets in Illinois may include areas no larger than properly-defined neighborhoods or ward-based markets, or submarkets in Chicago, and additional urban, suburban, exurban or rural markets throughout the State.

85. The relevant geographic markets in California may include areas no larger than city and suburb markets, where many residents shop within a half mile or mile of where they live or drive short distances, although relevant geographic markets may be larger in more sparsely populated or rural areas.

## VIII. Anticompetitive Effects

86. The Merger Agreement, and specifically the payment of the Special Dividend together with other terms limiting Albertson's ability to finance its operations, will significantly reduce Albertsons' ability to compete during the pendency of regulatory review of the merger, and possibly beyond. By stripping Albertsons of necessary cash at a time when its deteriorating bond ratings will make access to capital harder for Albertsons, this agreement between Kroger and Albertsons curtails Albertsons' ability to compete on price, services, other quality metrics, and innovation. Because it increases Albertsons' leverage, empirical economics suggests this reduction in Albertsons' competitiveness will reduce the intensity of price competition market-wide.

87. As a result of this reduced competition, District of Columbia, California, and Illinois residents likely will pay more for their groceries, and enjoy fewer promotions, worse service, and fewer quality-improving investments than they would but for Defendants' agreement to pay the Special Dividend.

88. Albertsons' inability to invest in its stores and its workforce also likely will harm workers in the States, who will experience lower wage growth and worse working conditions than they would but for Defendants' agreement to pay the Special Dividend.

## COUNT I

### (Against All Defendants for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)

89. The allegations contained in paragraphs 1 through 88 are realleged as though fully restated herein.

90. The federal antitrust statutes empower the Attorneys General of the States of California and Illinois, and the District of Columbia, to bring suit as *parens patriae* to protect the public interest and the interests of their citizens. 15 U.S.C. § 1 and §15c.

91. The Parties agreement to issue the Special Dividend on November 7, 2022, will lead to a reduction in output and by Albertsons and render Albertsons less able to compete effectively with other supermarkets, including Kroger owned and operated supermarkets.

92. The Special Dividend will be issued pursuant to an agreement between the horizontal competitors of Kroger and Albertsons, and will therefore restrain trade in violation of 15 U.S.C. § 1.

93. Entry into the relevant markets would not be timely, likely, or sufficient in magnitude to prevent or deter the likely anticompetitive effects of the merger. Significant entry barriers include the time and costs associated with conducting necessary market research, selecting an appropriate location for a supermarket, obtaining necessary permits and approvals, constructing a new supermarket or converting an existing structure to a supermarket, and generating sufficient sales to have a meaningful impact on the market.

94. Defendants did not devise their strategy of using the Merger Agreement as a conduit for payment of the Special Dividend for any procompetitive purpose. Nor does the payment of the Special Dividend in the context of the merger have any procompetitive effects. Any arguable benefits of the Special Dividend are outweighed by their actual and likely anticompetitive effects.

## COUNT II

### (Against All Defendants for Violations of D.C. Code § 28–4502)

95. The allegations set forth in paragraphs 1 through 94 are realleged as though fully restated herein.

96. D.C. Code §§ 28–4502 and 28–4507 empower the Attorney General of the District of Columbia bring suit to protect the public interest and the interests of the citizens of the District.

97. D.C. Code § 28–4515 provides that courts should interpret the District of Columbia Antitrust Act in harmony with similar federal antitrust statutes.

98. The Special Dividend will be issued pursuant to an agreement between the horizontal competitors of Kroger and Albertsons, and will therefore restrain trade in violation of D.C. Code § 28–4502.

99. Entry into the relevant product markets in the District of Columbia would not be timely, likely, or sufficient in magnitude to prevent or deter the likely anticompetitive effects of the merger. Significant entry barriers include the time and costs associated with conducting necessary market research, selecting an appropriate location for a supermarket, obtaining necessary permits and approvals, constructing a new supermarket or converting an existing structure to a supermarket, and generating sufficient sales to have a meaningful impact on the market.

100.      Defendants did not devise their strategy of using the Merger Agreement as a conduit for payment of the Special Dividend for any procompetitive purpose. Nor does the payment of the Special Dividend in the context of the merger have any procompetitive effects. Any arguable benefits of the Special Dividend are outweighed by their actual and likely anticompetitive effects.

## COUNT III
### (Against All Defendants for Violations of the Illinois Antitrust Act)

101.     Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 100 above.

102.     The Special Dividend will be issued pursuant to an agreement between the horizontal competitors of Kroger and Albertsons, and will therefore restrain trade in violation of the Illinois Antitrust Act, 740 ILCS 10/3.

103.     Entry into the relevant product markets in Illinois would not be timely, likely, or sufficient in magnitude to prevent or deter the likely anticompetitive effects of the Merger. Significant entry barriers include the time and costs associated with conducting necessary market research, selecting an appropriate location for a supermarket, obtaining necessary permits and approvals, constructing a new supermarket or converting an existing structure to a supermarket, and generating sufficient sales to have a meaningful impact on the market.

104.     Defendants did not devise their strategy of using the Merger Agreement as a conduit for payment of the Special Dividend for any procompetitive purpose. The Special Dividend is not reasonably necessary to effectuate the proposed merger or any procompetitive venture or agreement.  Nor does the payment of the Special Dividend in the context of the merger have any procompetitive effects. Any arguable benefits of the Special Dividend are outweighed by their actual and likely anticompetitive effects.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs request that this Court:

a)  Adjudge that Defendants' Merger Agreement, to the extent it requires payment of the Special Dividend, violates Section 1 of the Sherman Act 15 U.S.C. § 1, D.C Code § 28–4502, and Illinois Antitrust Act 740 ILCS 10/3;

b)  Enjoin Defendants from issuing or causing to be issued the Special Dividend, pending completion of antitrust regulatory review of the Merger Agreement by all Plaintiffs; and

c)  Order such other relief as the Court determines to be just and proper.


Dated: November 2, 2022                 Respectfully submitted,

                                        KARL A. RACINE
                                        Attorney General for the District of Columbia

                                        KATHLEEN KONOPKA
                                        Senior Advisor to the Attorney General for
                                        Competition Policy


                                        */s/ Adam Gitlin*
                                        ADAM GITLIN
                                        Section Chief, Public Integrity Section
                                        adam.gitlin@dc.gov

                                        */s/ Geoffrey Comber*
                                        GEOFFREY COMBER
                                        ELIZABETH ARTHUR
                                        C.WILLIAM MARGRABE
                                        Assistant Attorneys General
                                        Office of the Attorney General
                                        400 6th Street NW, Suite 10100
                                        Washington, D.C.  20001
                                        Telephone: (202) 735-7516
                                        geoffrey.comber@dc.gov

**FOR PLAINTIFF STATE OF CALIFORNIA**

**ROB BONTA**
**Attorney General of California**
KATHLEEN E. FOOTE
Senior Assistant Attorney General
NATALIE S. MANZO
Supervising Deputy Attorney General

*/s/ Paula Lauren Gibson*
PAULA LAUREN GIBSON
Deputy Attorney General
California State Bar Number 100780
300 S Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6040
paula.gibson@doj.ca.gov

**FOR PLAINTIFF STATE OF ILLINOIS**

**KWAME RAOUL**
**Attorney General of Illinois**

*/s/ Elizabeth L. Maxeiner*
ELIZABETH L. MAXEINER
Bureau Chief, Antitrust
PAUL J. HARPER (attorney admission forthcoming)
Assistant Attorney General
BRIAN M. YOST
Assistant Attorney General
Office of the Illinois Attorney General
100 W. Randolph St.
Chicago, IL 60601
Telephone: (773) 590-6837
paul.harper@ilag.gov