## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DISTRICT OF COLUMBIA**, *et al.*,<br><br>    **Plaintiffs,**<br><br>    v.<br><br>**THE KROGER CO.**, *et al.*,<br><br>    **Defendants.** | **Case No. 1:22-cv-3357** |

## PLAINTIFFS' [REDACTED] MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A TEMPORARY RESTRAINING ORDER

Plaintiffs the District of Columbia, the State of California, and the State of Illinois ("Plaintiffs") submit this memorandum in support of their Motion for a Temporary Restraining Order ("Motion") to prevent Albertsons Companies, Inc. ("Albertsons") from issuing a "special cash dividend," announced as part of its proposed merger with the Kroger Company ("Kroger").[1] Albertsons is scheduled to issue this dividend on November 7, 2022. Unless the Court enjoins payment before then, Albertsons will pay an estimated $4 billion—an amount roughly equivalent to all of its liquid assets (including net receivables) and approximately a third of its market capitalization—to its shareholders. This payment will inhibit Albertsons' ability to compete effectively during the pendency of the merger review and beyond, with significant immediate and long-term ramifications for consumers and workers.

---

[1] In accordance with Federal Rule of Civil Procedure 65(b) and Local Rule 65.1(a), the District of Columbia gave counsel for both Defendants actual notice of the time of making this application, and provided them with copies of pleadings and papers filed in this action to date.

The proposed merger, as described in the Complaint, is between two of the largest supermarket chains in America, two companies that provide essential food to residents throughout the country, including residents in the District of Columbia, California, and Illinois. The proposed merger warrants careful antitrust scrutiny from regulators. Defendants recognize as much. Indeed, they even included a term in the merger agreement about their rights to terminate the deal based on the number of stores that they must divest to obtain antitrust regulators' approval of the merger..

The focus of the Complaint and the instant motion, however, is narrower: Plaintiffs seek an order enjoining the payment of the Special Dividend pending regulatory review of the merger, to give regulators the time they need to analyze the antitrust implications before Defendants start "scrambling the eggs" by altering Albertsons' balance sheet. In essence, because Albertsons maintains that it cannot voluntarily postpone paying the Special Dividend lest it open itself up to lawsuits by shareholders, Plaintiffs must seek an order from the Court enjoining Albertsons from doing so. That is the only way to protect Albertsons' competitiveness during the merger review and to avoid harm to consumers and workers.

Payment of the special dividend threatens significant anticompetitive harm by potentially leaving Albertsons undercapitalized (a) during the period when the proposed merger is undergoing regulatory review and (b) subsequent to the merger's being blocked or abandoned. In either case, this payout will likely impede Albertsons from competing with other supermarkets, including Kroger, leaving shoppers facing higher prices, worse services, less innovation, or even closure of their local Safeway or other Albertsons supermarket, or all of the above.

A financially crippled Albertsons would have dire consequences for District of Columbia, California, and Illinois residents, who depend on supermarkets near their homes, such as

Safeway in the District of Columbia and California, and Jewel-Osco in Illinois, for essentials such as fresh meat and produce, among other groceries. If Albertsons is strapped for cash, it will be less able to offer promotions on groceries, less able to offer quality services, and less able to maintain staffing and competitive wages and benefits for workers. Many residents of the District of Columbia and especially urban areas in California and Illinois lack access to automobiles, meaning they will not simply drive to another neighborhood if their local supermarket closes. Rather, they depend on competition between supermarkets near their homes to keep their grocery bills low. With Albertsons operating at a disadvantage created by its agreement with Kroger, that competition will lessen, in violation of Section 1 of the Sherman Act and State antitrust laws.

Both Defendants claim that issuing the dividend will not harm Albertsons' health or ability to compete. But, as shown by the States' expert, Defendants' analyses are flawed, the weight of the evidence adduced to date demonstrates otherwise, and the more prudent path is to protect competition while regulators complete their review.

A TRO is warranted because (1) Plaintiffs are likely to prevail on the merits of its Section 1 action; (2) without a TRO, the States and the public will suffer irreparable harm  from Albertsons' diminished capacity to compete with its rivals, including Kroger, and the lack of an effective remedy once Albertsons has issued the special dividend; (3) the balance of equities favors a TRO: without it, the public would likely suffer price increases and a worse customer experience from a hobbled Albertsons, while granting it would not harm either Defendant's operations or delay their merger; and (4) the TRO will further a strong public interest by maintaining competition in the grocery market.

I.    **FACTUAL OVERVIEW**

A.    **Supermarkets in the District of Columbia, California, and Illinois Serve Communities' Nutritional Needs.**

Supermarkets provide a critical service to District of Columbia, California, and Illinois residents: keeping them healthy and well-nourished by giving them access to fresh meat, produce, and other staples. Their importance is reflected in how much business they do—more than $10 billion a year in the District of Columbia alone by some estimates, if one includes everything on their shelves. *See* Compl. ¶¶41-42. In the District of Columbia, Safeway (owned by Albertsons), currently enjoys an approximately 19.4% share of that market, while Harris Teeter (owned by Kroger) controls 13.9%. Compl. ¶41. If Albertsons and Kroger merge, the combined entity would have 33.4% of sales in the District, though the combined share is likely significantly higher in relevant geographic markets that can be defined within the District. In Illinois, it would be a whopping 64%. Compl. ¶51. Defendants collectively operate over 800 stores in California. Compl. ¶53.

The governments of the Plaintiff States have been keenly focused on ensuring their residents' access to these essential items, and in eliminating so-called "food deserts," whose inhabitants encounter practically insurmountable barriers in obtaining healthy food. One key barrier is distance: because District residents and residents of urban areas like Chicago and South Los Angeles depend heavily on walking and public transportation,[2] access to healthy food means having a supermarket located near the home.

---

[2] In 2020 only 64.6% of households in the District of Columbia had a car, compared to 91.5% for the United States as a whole. Lyle Daly, "How Many Cars Are in the U.S.? Car Ownership Statistics 2022," *Fool.com*, May 18, 2022, *available at* https://www.fool.com/the-ascent/research/car-ownership-statistics.

**B.** **The Kroger-Albertsons Merger Will Leave Albertsons with Lower Liquidity and Less Access to Capital as the Nation Heads for a Recession.**

As part of their proposed merger, Kroger and Albertsons have agreed that Albertsons will provide a "special dividend" of $4 billion, (Compl. ¶28), which is more than one-third of Albertsons' total market capitalization of approximately $11 billion. Compl. ¶24. Nearly one-third of this payment will go to Albertsons' largest shareholder, the private equity firm Cerberus Capital Management, L.P. *See* Compl. ¶29. The funds for the dividend will be from $2.5 billion of Albertsons' cash and $1.5 billion in new debt, *id.* ¶59, leading Albertsons' cash and cash receivables of approximately $4 billion, *id.* ¶56, to drop to $1.5 billion. The dividend would likewise cause its net debt to increase from $4.54 billion to $8.54 billion. *Id.*

Replacing cash with debt typically harms a firm's credit rating, making borrowing more expensive. Recessions also make borrowing more expensive, and firms generally respond to recession warning signs by holding more cash and less debt. Decl. of Michael Weisbach ("Weisbach Decl.") ¶¶ 9, 12-13, 22. There have been recent warning signs that a recession is on the horizon, and Albertsons can expect that an economic downturn will only make borrowing more expensive Weisbach Decl. ¶15, 21-23.

## II.   ARGUMENT

**A.**   **Plaintiffs Meet the Legal Standard For Preliminary Relief.**

Section 16 of the Clayton Act authorizes courts to issue temporary restraining orders to prevent "threatened loss or damage" from a violation of Section 1 of the Sherman Act. 15 U.S.C. § 26; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969) (injunctive relief is available "even though the plaintiff has not yet suffered actual injury"). Plaintiffs are entitled to a temporary restraining order upon establishing that (1) they are likely to succeed on the

merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Costa v. Bazron*, 456 F. Supp.3d 126, 133 (D.D.C. 2020) (citing *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)). "The purpose of a temporary restraining order is to preserve the status quo for a limited period of time until the Court has the opportunity to pass on the merits of the demand for a preliminary injunction." *Barrow v. Graham*, 124 F. Supp. 2d 714, 715–16 (D.D.C. 2000). When the immediate need to obtain relief means that as a practical matter the court lacks the facts "fully to assess the merits of the parties' respective positions, a TRO may issue to preserve the status quo and to prevent imminent harm until a hearing on the request for a preliminary injunction may be held." *Id.* at 716.

Here, each factor strongly supports granting a TRO. First, Plaintiffs are substantially likely to prevail on the merits because Defendants' horizontal agreement to issue the special dividend is likely to lessen competition in supermarkets in the District of Columbia, California, and Illinois. Second, if the issuance of the dividend is not enjoined, the States and the public will be irreparably harmed by a reduction in competition, as well as increased prices, and reduced quality and innovation, if not *de facto* exit from the market by the closure of certain Albertsons stores altogether, as well as the right of the public for regulators to meaningfully review a proposed merger that its parties acknowledge has implications for competition. Third, the balance of equities favors a TRO, because Plaintiffs and their residents have a paramount interest in the accessibility and competitive pricing of essential food products, and the TRO will simply maintain the status quo until a preliminary injunction hearing can be held. Fourth, the TRO will further the public interest by enabling Plaintiffs to preserve competition that will be lost if the dividend is paid.

**B.** **Plaintiffs Are Likely to Prevail at Trial in Establishing That Albertsons'
Issuance of the Special Dividend Violates Section 1 of the Sherman Act and
Their State Antitrust Laws.**

Defendants' horizontal agreement for Albertsons to issue the dividend will likely lead to
Albertsons competing less vigorously for supermarket customers in the District, Illinois,
California, and elsewhere and higher prices, inferior services, and reduced innovation.
Albertsons' payment of the Special Dividend is therefore an unreasonable restraint of trade. 15
U.S.C. § 15.

Section 1 of the Sherman Act outlaws "[e]very contract, combination . . . or conspiracy"
that unreasonably restrains trade. 15 U.S.C. § 1. Restraints may be unreasonable *per se* or under
a truncated or full rule-of-reason analysis, but in every case "the criterion to be used in judging
the validity of a restraint on trade is its impact on competition." *NCAA v. Bd. of Regents of Univ.
of Okla.*, 468 U.S. 85, 104 (1984).

Section 1, like its State analogues, focuses on the economic effect of a practice. But a
plaintiff need not prove that the harm is already occurring, only that there is a threat it will occur
if the court does not act. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) (attempts to "prevent
the risk of competition . . . constitute[] the relevant anticompetitive harm"); *see also Sullivan v.
Nat'l Football League*, 34 F.3d 1091, 1097 (1st Cir. 1994) ("[A]n action harms the competitive
process 'when it obstructs the achievement of competition's basic goals—lower prices, better
products, and more efficient production methods.'"); *United States v. Brown Univ.*, 5 F.3d 658,
674 (3d Cir. 1993) (Section 1 violation can be established without proof of "higher price or
lower output" because "actual dollar amount effects do not necessarily reflect the harm to
competition which Congress intended to eliminate in enacting the Sherman Act").Defendants'

agreement to hamper Albertsons' ability to compete by making it cash-poor violates Section 1

and state antitrust laws under any analytical framework the Court uses to analyze the restraint.

1. <u>**Under a "Quick Look" Analysis, Plaintiffs Are Likely to Establish that the Special Dividend Is An Unreasonable Restraint on Trade.**</u>

Albertsons' issuance of the special dividend merits only a "quick look" to condemn it,

because "an observer with even a rudimentary understanding of economics could conclude that

[it] would have an anticompetitive effect on customers and markets." *California Dental Ass'n v.

F.T.C.*, 526 U.S. 756, 770 (1999). The dividend strips Albertsons' of nearly all its cash-on-hand

during an economic downturn, when it will be difficult for the company to obtain additional

capital.  Weisbach Decl. ¶¶ 22-23, 31-32.  There is no ambiguity about the effect of paying the

Special Dividend on Albertsons' competitiveness—there is no competitive benefit to Albertsons

as a company, let alone to consumers and workers, that may be weighed against the Special

Dividend's anti-competitive effect on Albertsons' cash flow and ability to vigorously compete.

There is only one economic effect: consumers and workers lose. Thus, "no elaborate industry

analysis is required to demonstrate" the anticompetitive character of the agreement here.

*California Dental Ass'n*, 526 U.S. at 770 (quoting *FTC v. Indiana Federation of Dentists*, 476

U.S. 447, 459 (1986)) (cleaned up).

The mechanism by which the dividend will harm competition is straightforward. To pay

for it, Albertsons will draw down its cash reserves and take on more debt. Under normal

circumstances, this would be expected to cause market perceptions of its creditworthiness to

drop, making borrowing more expensive. Albertsons has, moreover, taken this step as the

economy appears headed for a recession, which in itself tends to make borrowing more

expensive, and harder for companies like Albertsons that cannot issue investment-grade

securities. Weisbach Decl. ¶¶ 15, 21-23. Thus, Albertsons' agreement with Kroger could

severely constrain Albertsons' liquidity and access to the capital it needs to compete. Without cash, Albertsons cannot advertise, promote, and increase the services at, refurbish, or reorganize stores to make them more attractive to consumers, or support customer loyalty programs. Weisbach Decl. ¶¶ 16, 21.[3] As a substitute for credit, it would have to rely on higher prices to raise cash for reinvestment, harming consumers. It may have to close stores, leaving customers with fewer choices and, as a result, higher prices from remaining incumbents, inferior selection and quality, or both.

Established economic theory applied to Albertsons' balance sheet shows the company is at risk of not being able to respond to consumer demand due to its agreement with Kroger to wipe out Albertsons' cash holdings. Thus, "the plan" to pay out the $4 billion "is inconsistent with the Sherman Act's command that price and supply be responsive to consumer preference," and the Supreme Court has "never required proof of market power in such a case." *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 110 (1984). *NCAA* and the quick-look framework embodied in it are appropriate here because (1) there is no upside to Albertsons, as noted above, (2) the restraint's mechanism is straightforward, and (3) the merger agreement constrains its parties much in the same way the agreement at issue in *NCAA* did. Albertsons cannot make its prices "responsive to demand" if it has no cash and its pricing is instead driven by desperation to remain a going concern. *Id.* at 109-110.

Further, as detailed in the Complaint, the merger agreement imposes numerous restrictions on Albertsons' ability to take out new loans to meet the unusual pressure the Special

---

[3] *See also* Judith A. Chevalier, "Capital Structure and Product-Market Competition: Empirical Evidence from the Supermarket Industry," *Am. Econ. Rev.*, Vol. 85, Issue 3 (June 1995), 415, 433 ("The results of this paper strongly suggest that product-market competition changes when firms radically increase their leverage.").

Dividend will put on its balance sheet. *See* Compl. ¶¶64-68. Even refinancing Albertsons'
existing debts now requires, beyond a specified threshold, consultation with Kroger. *Id.* ¶62.
That is, pursuant to agreement, horizontal competitors will consult on how and whether one
competitor should refinance debt so it can continue to compete with the other, after their
agreement deprived that company of all the cash it had available to compete. This setup does not
describe a restraint meriting searching antitrust review; a quick look suffices to condemn it.

### 2.  Even Under a Full Rule-of-Reason Analysis, Plaintiffs Are Likely to Prove the Special Dividend Constitutes an Unreasonable Restraint on Trade.

The Special Dividend fails scrutiny under a full rule-of-reason analysis as well. The
analysis proceeds via a burden-shifting framework, where the plaintiff bears the initial burden of
showing that the challenged restraint on trade is likely to have an anticompetitive effect in a
relevant market. *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2160 (2022) (citation
omitted). A showing of potential effects is sufficient. *See FTC v. Activis, Inc.*, 570 U.S. 136, 157
(2013) (payment that likely seeks to prevent the risk of competition constitutes a relevant
anticompetitive harm). If the plaintiff meets that burden, the defendant must then come forth
with a pro-competitive justification for the restraint. *Alston*, 141 S. Ct. at 2141 (citation omitted).
Upon that showing, the burden shifts back to the plaintiff to demonstrate that the procompetitive
benefits could be reasonably achieved through less anticompetitive means. *Id.* (citation omitted).

Here, the agreement between these horizontal competitors for Albertsons to greatly
reduce its available cash and increase its debt likely will result in Albertsons' inability to
effectively compete at the same level absent the Special Dividend, resulting in higher prices and
less choice for consumers.  The inquiry ends there, because Defendants cannot meet their burden
to demonstrate a procompetitive justification for the dividend.

With respect to market definition, although discovery will allow Plaintiffs to seek information they would normally have accessed in a pre-suit merger investigation but for Defendants' decision here to leapfrog that investigation and pay the Special Dividend, the Complaint defines supermarkets in a manner consistent with other antitrust litigation concerning the provision of groceries. *Compare* Compl. ¶¶65-69 *with* Compl. ¶¶9-13, *In re The Golub Corp.*, No. C-4753 (FTC Nov. 5, 2021); *see also Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 & n.2 (7th Cir. 1989) (for purposes of summary judgment on Sherman Act Section 2 claim, Kroger agreed to "supermarkets" as product market, which definition excluded small markets and convenience stores). Defining the appropriate product market is a heavily factual inquiry, *Am. President Lines, LLC v. Matson, Inc.*, 2022 WL 4598538, at *5 (D.D.C. Sept. 30, 2022) (citing *FTC v. Facebook, Inc.*, 560 F. Supp.3d 1, 13 (D.D.C. 2021)).

Plaintiffs would establish the existence of highly local relevant geographic markets likely much smaller than the respective States and even the District of Columbia, such that the shares stated in the Complaint, though large, likely understate market concentration. These markets are local because consumers tend to want and need to buy food near where they live or work. Many urban residents do not own cars and rely instead on public transportation and walking to shop. Research on food deserts reflects this reality. Tracts in urban areas where a significant portion of the population lives more than a mile from supermarkets are considered to be "low-access."[4]

Thus, many District of Columbia, California, and Illinois residents would not "practically turn" to supermarkets even in another neighborhood, let alone another state, "for alternative

---

[4] *See, e.g.*, Alana Rhone, et al., "Understanding Low-Income and Low-Access Census Tracts Across the Nation Subnational and Subpopulation Estimates of Access to Healthy Food," U.S. Dep't of Ag., Economic Research Service, May 2019, *available at* https://www.ers.usda.gov/webdocs/publications/93141/eib%20209%20summary.pdf.

sources" of groceries. *See FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1073 (D.D.C. 1997) (quoting *Morgenstern v. Wilson*, 29 F.3d 1291, 1296 (8th Cir. 1994)). For such residents, the closure of a local supermarket would leave them at the mercy of any remaining supermarket in that neighborhood, which would be free to charge supracompetitive prices.

 Plaintiffs are likely to meet their burden at the first step of any rule-of-reason framework because damaging Albertsons' ability to compete is anticompetitive, as explained *supra.* The inquiry can end here, because Defendants appear unable to point to a procompetitive justification for payment of the agreed-upon dividend. The most obvious goal of the dividend is Albertsons' desire to enrich its shareholders. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████ .[5] ████████████████████████

███████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████That is merely a strategy for its shareholders' growth, not Albertsons' growth or Albertsons' competitiveness. In sum, Defendants have not offered and cannot offer a pro-competitive justification for the dividend because there is none.

---

[5] Unless otherwise noted, all exhibits are to the Declaration of Adam Gitlin submitted herewith.

### C. **Payment of the Special Dividend Threatens Irreparable Harm.**

Plaintiffs have moved for preliminary relief because they have apprehended a potential injury to competition at its outset, and "[i]n the antitrust context, '[r]easonable apprehension of threatened injury' can constitute irreparable harm." *United States v. Trib. Publ'g Co.*, No. CV1601822ABPJWX, 2016 WL 2989488, at *2 (C.D. Cal. Mar. 18, 2016) (quoting *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985)) (issuing temporary restraining order on *ex parte* motion). ██████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ Thus, only a court order will stop the dividend. Absent one, consumers could face higher prices and lower quality from a weakened Albertsons during merger review, and after merger review if Defendants' deal is not consummated for whatever reason.

First, the dividend would alter Albertsons' capital structure in a way that will harm its ability to compete with other grocers on price during the pendency of regulatory authorities' review of the Proposed Merger ████████████████████████████████████████

██████████████████ This period of consumer harm could last two years: the merger agreement contemplates the closing occurring as late as January 13, 2024, with a possibility of it being extended up to an additional 270 days. Ex. 8 (Agreement and Plan of Merger by and Among Albertsons Companies, Inc. The Kroger Co. and Kettle Merger Sub, Inc., Oct. 13, 2022) ("Merger Agreement") § 8.1(e). Second, should Defendants abandon the merger or should the merger be blocked, that less favorable capital structure will serve as a continuing impediment to Albertsons' ability to compete, resulting in continued consumer harm. Overpayments by

consumers in either period constitute irreparable harm, and Defendants cannot seriously argue that the dividend could later be returned to Albertsons, no-harm-no-foul. *See Staples*, 970 F. Supp. at 1091 (finding, in challenge to merger under Section 7 of the Clayton Act, that "[t]hese higher charges could never be recouped even if the administrative proceeding resulted in a finding that the merger violated the antitrust laws.").

The experience of Aerojet Rocketdyne after a lawsuit by the Federal Trade Commission led Lockheed Martin to abandon a takeover attempt is instructive. In 2020, the parties announced their plans to merge.[6] In connection with that planned merger, Aerojet Rocketdyne, the target, announced that it would pay a $5 per share special dividend that, as is the case here, was not conditioned on the deal closing.[7] Aerojet Rocketdyne paid the dividend on March 24, 2021.[8] Later, following an investigation, the FTC moved to block the merger and the parties ultimately abandoned it.[9] Aerojet's share price has yet to recover, and it is soliciting new purchasers because it has not recovered its competitive position. Compl. ¶53.[10]

Thus, if history is any guide, once the Special Dividend is paid, it will become impossible to structure a sufficient remedy to alleviate any anticompetitive effects that may result.

---

[6] Aerojet Rocketdyne, "Aerojet Rocketdyne to be Acquired by Lockheed Martin in $5.0 billion All-Cash Transaction," *available at* https://www.rocket.com/article/aerojet-rocketdyne-be-acquired-lockheed-martin-50-billion-all-cash-transaction (accessed Oct. 31, 2022).
[7] *Id.*
[8] Aerojet Rocketdyne, "Aerojet Rocketdyne Pays Previously-Declared Special Dividend," *available at* https://www.rocket.com/article/aerojet-rocketdyne-pays-previously-declared-special-dividend (accessed Oct. 31, 2022).
[9] https://www.ftc.gov/news-events/news/press-releases/2022/02/statement-regarding-termination-lockheed-martin-corporations-attempted-acquisition-aerojet; *see also* Compl., *In re Lockheed Martin Corp., et al.*, No. 9405 (FTC), *available at* https://www.ftc.gov/system/files/documents/cases/d09405lockheedaerojetp3complaintpublic.pdf.
[10] David Carnevali, "EXCLUSIVE Rocket maker Aerojet solicits acquisition offers -sources," *Reuters*, Oct. 25, 2022, *available at* https://www.reuters.com/markets/deals/exclusive-rocket-maker-aerojet-solicits-acquisition-offers-sources-2022-10-25/

**D.  The Balance of Equities Favors a Temporary Restraining Order**

Defendants will not suffer any serious harm if payment of the dividend is temporarily enjoined, but Plaintiff States and their residents will suffer serious harm if it is not; the balance of equities strongly favors Plaintiffs. *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citation omitted). Preliminary relief simply would maintain the status quo until regulatory authorities can complete their review of the merger. This delay would not interfere with Defendants' proposed merger. And in the case of Albertsons, it would leave the company with greater cash reserves than it would otherwise have. ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████

**E.  Preliminary Relief Advances the Public Interest**

Lastly, preservation of Albertsons as a well-capitalized supermarket that is able to compete with its rivals in the District of Columbia, California, Illinois, and elsewhere furthers the public interest. The public interest is served by ensuring that there are no unreasonable restraints on competition. *Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*, 295 F.Supp.2d 75, 96 (D.D.C. 2003); *F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 173 (D.D.C. 2000) ("There is a strong public interest in effective enforcement of the antitrust laws . . . .").

**F.  Defendants' Arguments Are Unavailing.**

Defendants will surely trot out before the Court the arguments they used to try to assuage ████████████ the court of public opinion) that, notwithstanding this massive cash grab and a looming if not already active recession, Albertsons will retain appropriate liquidity and access to capital.  Defendants will also claim that the Special Dividend's placement in the merger

agreement and the fact that it was a negotiated term of that agreement is mere coincidence and does not point to concerted action, because Albertsons planned to issue some return to its stockholders regardless.  Neither argument is persuasive.

First, as to liquidity, Dr.  Michael Weisbach, a preeminent economic and corporate finance expert, has submitted a declaration explaining why Albertsons condition is not nearly as rosy as Defendants have claimed. Dr. Weisbach explains, and corroborates the Complaint's well-founded allegations about, how Albertsons has below-investment-grade bond ratings, and the implications of such ratings on Albertsons' ability to maintain liquidity and access capital markets in the coming months of economic downturn, especially after having taken on another $1.5 billion in debt to fund the Special Dividend. Weisbach Decl. ¶ 30. Further, even if Albertsons could ordinarily access capital after paying the $4 billion special dividend, Defendants' merger agreement expressly constrains Albertsons' ability to seek new financing. Weisbach Decl. ¶¶ 18-21.

Second, as to concerted action, Albertsons and Kroger negotiated a merger agreement that expressly addresses Albertsons' commitment to pay a "Pre-Closing Dividend" of up to $4 billion. Albertsons has also essentially admitted that it is paying the special dividend as part of its merger agreement with Kroger. An October 14, 2022 press release on Albertsons' website announcing the special cash dividend states: "The Special Dividend has been declared in connection with the Company entering into an Agreement and Plan of Merger, dated October 13, 2022 by and among the Company, The Kroger Co. and Kettle Merger Sub, Inc."[11] Even if Albertsons first contemplated paying a special dividend to shareholders before it entered into

---

[11] https://www.albertsonscompanies.com/newsroom/press-releases/news-details/2022/Albertsons-Companies-Announces-Special-Dividend-in-Connection-with-Signing-of-Merger-Agreement/default.aspx.

merger negotiations with Kroger, as it has publicly claimed, such fact could not immunize its horizontal agreement with a competitor that effectuated it. As the Complaint notes, this dividend is markedly different than Albertsons' historic returns to shareholders; indeed, it is 57 times larger than its historic annual return.  Compl. ¶35. The unprecedented size of the dividend seriously undercuts any suggestion that Albertsons' announcement of the special cash dividend alongside its announcement of a proposed merger with Kroger is mere coincidence, rather than a material part of its merger negotiations with Kroger.  Rather, it was part of an agreement that contains multiple other terms that work together with the Special Dividend to constrain Albertsons (Compl. ¶¶64-68), and that falls squarely within Section 1 and its state-law counterparts.

## III. <u>CONCLUSION</u>

For the foregoing reasons, the Court should temporarily restrain Albertsons from issuing its special dividend, pending a hearing on Plaintiffs' forthcoming motion for a preliminary injunction.

Dated: November 2, 2022                Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

KATHLEEN KONOPKA
Senior Advisor to the Attorney General
for Competition Policy

*/s/ Adam Gitlin*
ADAM GITLIN
Section Chief, Public Integrity Section

*/s/ C. William Margrabe*
C. WILLIAM MARGRABE
GEOFFREY COMBER
ELIZABETH ARTHUR

Assistant Attorneys General
Office of the Attorney General
400 6th Street NW, Suite 10100
Washington, D.C.  20001
(202) 735-7516
will.margrabe@dc.gov

**FOR PLAINTIFF STATE OF CALIFORNIA**

**ROB BONTA**
**Attorney General of California**
KATHLEEN E. FOOTE
Senior Assistant Attorney General
NATALIE S. MANZO
Supervising Deputy Attorney General

*/s/ Paula Lauren Gibson*
PAULA LAUREN GIBSON
Deputy Attorney General
California State Bar Number 100780
300 S Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6040
paula.gibson@doj.ca.gov

**FOR THE STATE OF ILLINOIS**

**KWAME RAOUL**
**Attorney General**

/s/ *Elizabeth L. Maxeiner*
ELIZABETH L. MAXEINER
Bureau Chief, Antitrust
PAUL J. HARPER*
BRIAN M. YOST
Assistant Attorney General
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
(773) 590 6837
paul.harper@ilag.gov

*Counsel for the Plaintiff State of Illinois*
* Attorney admission forthcoming

## CERTIFICATE OF SERVICE

This will certify that a true and correct copy of the foregoing redacted Memorandum of Law in Support of the Plaintiffs' Motion for a Temporary Restraining Order was served upon counsel for defendants, below, by electronic mail.

Sonia Pfaffenroth
Michael Bernstein
Matthew Shultz
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington, DC 20001
*Counsel for Defendant Kroger Company*

George Paul
Douglas Jasinski
White & Case LLP
701 Thirteenth Street NW
Washington, DC 20005

-and-

Ted Hassi
Leah Martin
Debevoise & Plimpton LLP
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004

*Counsel for Defendant Albertsons Companies, Inc.*

November 2, 2022                    */s/ Adam Gitlin*
                                    ADAM GITLIN