# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA,
STATE OF CALIFORNIA, and
STATE OF ILLINOIS,

                Plaintiffs,

v.

THE KROGER CO., and
ALBERTSONS COMPANIES, INC.,

                Defendants.

Case No. 1:22-cv-3357-CJN

## DEFENDANT THE KROGER CO.'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

## **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ......................................................................................................... 1

II.     STATEMENT OF FACTS ........................................................................................... 2

III.    STATEMENT OF THE ISSUE .................................................................................... 5

IV.     ARGUMENT ............................................................................................................... 5

        1.      Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits ................. 6

        2.      Plaintiffs Cannot Demonstrate Irreparable Harm ................................................ 15

        3.      Plaintiffs' Request Is Neither Equitable Nor in the Public Interest ...................... 16

V. CONCLUSION ..................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Maricopa Cty.*,
457 U.S. 332 (1982)................................................................................12

*Asa Accugrade Inc. v. Am. Neumatic Ass'n*,
370 F.Supp.2d 213 (D.D.C. 2005) ..........................................................12

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................10, 11

*BookXchange FL, LLC v. Book Runners, LLC*,
No. 19 CV 506, 2019 WL 1863656 (N.D. Ill. Apr. 25, 2019)..................6

*Broadcast Music, Inc. v. CBS*,
441 U.S. 1 (1979)....................................................................................11

*California Dental Ass'n v. F.T.C.*,
526 U.S. 756 (1999)................................................................................12

*Dial a Car, Inc. v. Transp. Inc.*,
884 F. Supp. 584 (D.D.C. 1995) ...............................................................6

*Gross v. Wright*,
185 F. Supp. 3d 39 (D.D.C. 2016) ..........................................................12

*GTE New Media Servs., Inc. v. Ameritech Corp.*,
21 F. Supp. 2d 27 (D.D.C.1998) ...............................................................6

*Maas v. Maas*,
161 N.E.3d 863 (Ohio Ct. App. 2020) ......................................................9

*Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*,
700 F. Supp. 588 (D.D.C. 1988) ...............................................................6

*In re: McCormick & Co., Inc.*,
217 F. Supp. 3d 124 (D.D.C. 2016) ........................................................10

*Mediacom Commc'ns Corp. v. Sinclair Broad. Grp., Inc.*,
460 F. Supp. 2d 1012 (S.D. Iowa 2006) .................................................16

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)..................................................................................7

*NCAA v. Alston,*
    141 S. Ct. 2141 (2021) ...................................................................................12, 16

*Ohio v. Am. Express Co.,*
    138 S. Ct. 2274 (2018) ......................................................................11, 12, 13, 14

*Ostrzenski v. Columbia Hosp. for Women Found.,*
    158 F.3d 1289 (D.C. Cir. 1998) (per curiam) ...........................................................7

*Procaps S.A. v. Patheon, Inc.,*
    845 F.3d 1072 (11th Cir. 2016) ...............................................................................8

*Toscano v. Pro. Golfers Ass'n,*
    258 F.3d 978 (9th Cir. 2001) ...................................................................................8

*Trump v. Thompson,*
    20 F.4th 10 (D.C. Cir. 2021) ....................................................................................6

*Vantico Holdings S.A. v. Apollo Management, LP,*
    247 F. Supp. 2d 437 (S.D.N.Y. 2003) ....................................................................10

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................................5, 15

**Statutes**

740 ILCS 10/(3) ...........................................................................................................6

DC Code 28-4502 ........................................................................................................6

Sherman Act § 1.................................................................................................. *passim*

The Kroger Co. ("Kroger") respectfully submits this Memorandum in Opposition to the Motion for a Temporary Restraining Order ("TRO") submitted by the District of Columbia, the State of California, and the State of Illinois ("Plaintiffs").

## I.   <u>INTRODUCTION</u>

Kroger entered into an Agreement and Plan of Merger ("Merger Agreement") with Albertsons Companies, Inc. ("Albertsons") on October 13, 2022.  But this lawsuit is not about the Merger Agreement or the contemplated acquisition of Albertsons by Kroger.  Rather, Plaintiffs ask this Court to take the unprecedented step of invoking Section 1 of the Sherman Act and analogous provisions under DC and Illinois law to enjoin the payment of a special dividend that Albertsons unilaterally declared and plans to issue to its shareholders ("Pre-Closing Dividend"). The propriety of the Pre-Closing Dividend is for Albertsons alone to determine, exercising its fiduciary duty to its shareholders, and presents a question governed by Delaware corporate law, not federal or state antitrust laws.

Kroger had, and has, nothing to do with the Pre-Closing Dividend. Kroger did not conceive of, encourage, design, or require the Pre-Closing Dividend as part of its deal with Albertsons.  The authority to declare and pay the Pre-Closing Dividend rested, and continues to rest, solely with Albertsons.  The Pre-Closing Dividend is not "a condition" of the Merger Agreement, nor does the Merger Agreement require Albertsons to declare or issue the Pre-Closing Dividend.  Indeed, Plaintiffs' selective quotation of the relevant provisions of the Merger Agreement in their conclusory allegations is telling.  Albertsons made clear to Kroger from the beginning of discussions that it intended to pay a special dividend to its shareholders whether or not it engaged in any transaction. The Merger Agreement thus merely contemplates the possibility that Albertsons might pay the Pre-Closing Dividend and contains terms adjusting the merger price if it did so.

Whatever Plaintiffs' view of the merits of Albertsons' decision to pay the Pre-Closing Dividend, there was no (1) agreement or conspiracy (2) to restrain trade.  That is fatal to Plaintiffs' claims.  There was no agreement to issue the Pre-Closing Dividend because there was no joint decision; Albertsons unilaterally decided what it wanted to do, told Kroger, and the Merger Agreement included contract terms reflecting the possibility that Albertsons might pay a Pre-Closing Dividend.  Albertsons was free to decline to pay some or all of the Pre-Closing Dividend to its shareholders without consequence; the Merger Agreement does not dictate a dividend, or its timing or amount.  And Plaintiffs offer no plausible allegations, let alone evidence, that the payment of the Pre-Closing Dividend would negatively impact competition, customers, prices, employees, or any other party.  Indeed, Plaintiffs would have the Court believe that Kroger entered into an economically irrational conspiracy in which it obligated itself to pay almost $25 billion for — and then intentionally weaken — the Albertsons' business.

Plaintiffs fail to satisfy any of the factors required for this Court to issue a TRO.  Plaintiffs cannot demonstrate a likelihood of success on the merits (i.e., that there is an agreement to engage in conduct that would harm competition in a well-defined antitrust market), any irreparable harm (i.e., significant harm to competition resulting from that conduct), that the balance of equities weighs in Plaintiffs' favor, or that a TRO is in the public interest.

## II.   <u>STATEMENT OF FACTS</u>

Kroger, an Ohio Corporation, was founded in 1883.  Kroger is a leading food retailer, but its business also includes robust retail pharmacies and fuel centers.  Decl. of Gary Millerchip ("Millerchip Decl.") ¶ 3.  Kroger operates in a fiercely competitive environment under a variety of banner names and formats, including supermarkets, seamless digital shopping options, price-impact warehouse stores, and multi-department stores.  Kroger also operates various

manufacturing facilities that produce high quality private-label products that provide extraordinary value for its customers.  *Id.* ¶ 4.

On October 13, 2022, Kroger entered into the Merger Agreement with Albertsons.  *Id.* ¶ 5. Kroger strongly believes that the proposed merger would combine two complementary organizations, bringing benefits to consumers, associates, and communities alike.  Kroger knew, however, that the transaction would be subject to an extensive regulatory clearance process, and it expects to make divestitures as a part of that process.  *Id.* ¶ 7.  Kroger is confident that the Federal Trade Commission, the Attorney General for the District of Columbia, and state attorneys general, including the California and Illinois Attorneys General, will engage in a robust review of the proposed transaction.  Kroger is committed to working cooperatively in that process to secure the necessary approvals for the transaction.  *Id.*

Contrary to Plaintiffs' allegations, the Pre-Closing Dividend is not "the result of an agreement between Albertsons and Kroger" nor was it "specifically negotiated between Defendants as part of the Merger Agreement."  Compl. ¶ 32.  From the beginning of the discussions between Kroger and Albertsons, Albertsons made it clear that it intended to declare and pay the Pre-Closing Dividend regardless of whether or not there was a transaction with Kroger.  Millerchip Decl. ¶ 12.  The authority to declare and pay the Pre-Closing Dividend rests solely with Albertsons. The Merger Agreement neither requires nor authorizes Albertsons to pay the Pre-Closing Dividend, and Kroger has no right under the Merger Agreement to force Albertsons to pay the Pre-Closing Dividend.  *Id.* ¶ 13.  Rather, the Merger Agreement contemplates the fact that Albertsons could unilaterally and independently declare a Pre-Closing Dividend, and addresses the impact of such a dividend by providing for a dollar-for-dollar reduction in the price paid to Albertsons' shareholders by Kroger if Albertsons paid the dividend.  *Id.*

With respect to Albertsons' possible Pre-Closing Dividend, Kroger had to ensure: (1) that the merger consideration paid by Kroger would be adjusted to account for the value of the Pre-Closing Dividend and (2) that the Pre-Closing Dividend would not have a deleterious effect on the financial strength and stability of Albertsons.  *Id.* ¶ 14.  As to the former, the Merger Agreement defines "Common Merger Consideration" to mean "(i) an amount in cash equal to (a) $34.10 *minus* (b) the per share amount of the Pre-Closing Dividend payable to each holder of Company Common Stock . . . ."  *Id.* ¶ 16.  That construct is the only reason the Merger Agreement even mentions the Pre-Closing Dividend.

As to the latter, Kroger's management and Board have a fiduciary duty to Kroger's shareholders to ensure the Albertsons business would be as strong and financially sound at closing as it was when Kroger agreed to pay almost $25 billion to acquire it.  *Id.* ¶ 17.  Kroger has no interest in an Albertsons business that is financially or competitively "battered."  Compl. at 3.  To the contrary, Kroger has every financial and economic incentive to ensure the competitiveness of the business it agreed to acquire, including ensuring that Albertsons remains viable over the extended time period between now and closing.  Millerchip Decl. ¶ 17. Indeed, the strategic rationale for the proposed merger depends on integrating an operationally and competitively vibrant Albertsons business into Kroger in order to better serve customers throughout the country. *Id.*

Given all of these considerations, the management and Board of Kroger determined that it was consistent with their fiduciary duties to enter into the Merger Agreement notwithstanding the fact that Albertsons could unilaterally declare a Pre-Closing Dividend of up to $4 billion.  *Id.* ¶ 19. Albertsons announced the Pre-Closing Dividend alongside the Merger Agreement — necessitated by the fact that the Merger Agreement includes mechanics for accounting for the dividend — but

that announcement did not transform Albertsons' unilateral decision to declare and pay the dividend into an agreement with Kroger to do so.

In declaring a Pre-Closing Dividend, Albertsons stated that it intended to pay the dividend on November 7, 2022.  Again, the Merger Agreement did not require Albertsons to pay the Pre-Closing Dividend at all, much less on November 7, 2022 or any other date.  On November 3, 2022, the King County Superior Court in Washington issued a temporary restraining order enjoining Albertsons from paying the Pre-Closing Dividend until after it holds a preliminary injunction hearing scheduled for 10:00 a.m. (PST) on November 10, 2022.

## III.    STATEMENT OF THE ISSUE

Whether the Court should deny Plaintiffs' motion for a TRO where (1) Plaintiffs are unlikely to succeed on the merits because (a) there is no agreement between Kroger and Albertsons to issue the Pre-Closing Dividend; and (b) Plaintiffs failed to plead sufficient facts to demonstrate that the Pre-Closing Dividend would constitute an unlawful restraint of trade; (2) Plaintiffs failed to show irreparable injury in the absence of a TRO; (3) the equities do not favor extraordinary relief; and (4) the public interest would not be served by such relief.

## IV.    ARGUMENT

The requirements that a party must meet to obtain a TRO are stringent because a TRO is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Accordingly, the party seeking preliminary relief must: "(1) establish a likelihood of 'succe[ss] on the merits'; (2) show 'irreparable harm in the absence of preliminary relief'; (3) demonstrate that the equities favor issuing an injunction; and (4) persuade the court that 'an injunction is in the

public interest.'"  *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (quoting *Winter*, 555 U.S. at 20).  Plaintiffs do not satisfy any of these requirements.

### 1.    Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits

Plaintiffs' novel attempt to use federal and state antitrust laws to enjoin the payment of a dividend by a company fails because Plaintiffs do not properly state a cognizable antitrust claim, much less offer evidence demonstrating that they are likely to win any of their speculative claims. To state a claim under Section 1 of the Sherman Act,[1] Plaintiffs must plead sufficient facts to establish that Defendants (1) "entered into some contract, combination, conspiracy or other concerted activity" that (2) "unreasonably restricts trade in [a] relevant market."  *Dial a Car, Inc. v. Transp., Inc.*, 884 F. Supp. 584, 591 (D.D.C. 1995).

*__First__*, Plaintiffs claim that Kroger and Albertsons had a "horizontal agreement to issue the special dividend," Pls.' Mot. for TRO at 6, but the facts clearly indicate that no such agreement exists.  Rather, the decision to pay the Pre-Closing Dividend was a unilateral decision made by Albertsons prior to entry into the Merger Agreement and without regard to whether the transaction

---

[1] The analysis of Plaintiffs' federal antitrust claim guides the analysis of Plaintiffs' state-law claims under DC Code 28-4502 and 740 ILCS 10/(3).  Because the language of DC Code 28-4502 parallels Section 1, courts analyze claims under DC Code 28-4502 as following federal antitrust claims under Sec 1. *See, e.g.*, *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F.Supp.2d 27, 45 (D.D.C. 1998) ("Because these provisions essentially track the language of §§ 1, 2 of the Sherman Act, respectively, much of the analysis for federal antitrust claims will provide much force in the context of these provisions.").  Similarly, "except where the language and structure of the Illinois Act indicate that a different result was intended, Sherman Act Section 1 cases will be followed by the Illinois courts when construing Section 3(2)," the section under which Plaintiffs purport to bring their Illinois antitrust claim. 740 Ill. Comp. Stat. Ann. 10/3.  Accordingly, Kroger analyzes Plaintiffs' Section 1 arguments; the analysis of the state law claims necessarily follows. *See Mazanderan v. Indep. Taxi Owners' Ass'n, Inc.*, 700 F. Supp. 588, 591 n. 9 (D.D.C. 1988) ("Analysis of plaintiff's state antitrust claim [under DC law] necessarily follows that of the federal claim …"); *BookXchange FL, LLC v. Book Runners, LLC*, No. 19 CV 506, 2019 WL 1863656, at *4 (N.D. Ill. 2019) (plaintiff's failure to state a claim under the Sherman Act, "in turn, dooms its claim under the Illinois Antitrust Act").

with Kroger was entered into.  Millerchip Decl. ¶ 12.  The absence of concerted action is fatal to Plaintiffs' claims.

For their claims to succeed, Plaintiffs must present direct or circumstantial evidence that Defendants "had a conscious commitment to a common scheme designed to achieve an unlawful objective," which Plaintiffs allege is the payment of the Pre-Closing Dividend.  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).  Thus, in Section 1 cases, plaintiffs are required to present evidence "that tends to exclude the possibility" that the defendants acted to address legitimate business concerns.  *Id.*; *see also Ostrzenski v. Columbia Hosp. for Women Found.*, 158 F.3d 1289, 1290 (D.C. Cir. 1998) (per curiam).

Plaintiffs have failed to show that Kroger and Albertsons entered into any kind of anticompetitive agreement.  The only evidence Plaintiffs cite is:

- The Pre-Closing Dividend was addressed in slide decks regarding the transaction presented to the Kroger and Albertsons boards, Compl. ¶ 33;
- The Pre-Closing Dividend is referenced in the Merger Agreement, Pls.' Mot. for TRO at 5, 16;
- The Pre-Closing Dividend was announced in press releases announcing the merger, Pls.' Mot. for TRO at 1; and
- The size of the Pre-Closing Dividend, Pls.' Mot. for TRO at 16.

None of these facts — viewed individually or collectively — are sufficient to show an agreement between Kroger and Albertsons to pay the Pre-Closing Dividend, let alone an agreement to "hamper Albertsons' ability to compete."  Pls.' Mot. for TRO at 8.  Plaintiffs first rely on what they apparently believe is "direct" evidence of an agreement — the fact that the Pre-Closing Dividend was addressed in presentations to each company's board of directors and referenced in the Merger Agreement.  *See* Pls.' Mot. for TRO at 5, 16; Compl. ¶ 33.  But the Merger Agreement does not include any provision whereby Kroger and Albertsons agree that Albertsons must issue the Pre-Closing Dividend; in other words, Kroger has no claim of breach

7

regardless of whether Albertsons issues, doesn't issue, or changes the amount of the dividend. That is dispositive.  Because the decision to declare and pay the Pre-Closing Dividend was made unilaterally, and independently, by Albertsons, there is no concerted action.  *See Monsanto*, 465 U.S. at 761 ("[i]ndependent action is not proscribed" by Section 1); *City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 130 (D.D.C. 2006) (denying preliminary injunction in Sherman Act case where plaintiffs failed "exclude the possibility that the defendants acted independently").

Moreover, the fact that the Merger Agreement mentions the Pre-Closing Dividend does not transform Albertsons' independent action into a concerted action.  As other courts have observed, "the simple existence of the contract . . . standing alone" is not sufficient to "satisfy the concerted action requirement." *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1081 (11th Cir. 2016); *Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 984 (9th Cir. 2001) (no concerted action where defendants "had no involvement in the establishment or enforcement of the allegedly anticompetitive" conduct).  If the rule were otherwise, "contractual partners would potentially be on the hook for any future conduct the other party engages in under color of the contract."  *Procaps*, 845 F.3d at 1081.  Such a result would dramatically and inappropriately expand the reach of the Sherman Act.

Indeed, Plaintiffs' own evidence belies any suggestion that the Pre-Closing Dividend resulted from concerted action.  A banking presentation prepared for Kroger to discuss Albertsons' proposed dividend explained that "Albertsons was considering several options to return value to shareholders, with a special dividend among them."  Ex C. to the Gitlin Decl. at 144.  Critically, the presentation noted that Albertsons was considering the dividend alongside different strategic transactions, only one of which was a transaction with Kroger.  *Id.*  This confirms that Albertsons alone determined to pay the dividend and that Kroger understood that Albertsons planned to issue the dividend *regardless* of whether a merger occurred. Kroger had no desire to include the dividend

in the merger.  To the contrary, the banking presentation illustrates that Kroger's involvement was merely to evaluate the dividend's effects to determine the circumstances in which it would still make sense to pursue the transaction if Albertsons decided to pay the dividend.  *Id.* at 147.  Among other things, Kroger needed to assure itself that Albertsons' plan to pay the dividend, when to pay it, and how to finance it, did not jeopardize the merger's value to Kroger.  *Id.* at 145–51.  As directors of an Ohio corporation, the members of Kroger's board of directors have a fiduciary duty (under Ohio law) not to "waste" Kroger's "corporate assets."  *Maas v. Maas*, 161 N.E.3d 863, 876 (Ohio Ct. App. 2020).  Accordingly, in entering into the Merger Agreement with Albertsons, the Kroger board owed a duty to Kroger shareholders to ensure that Albertsons, during the period between signing and closing of the transaction, would not take any action — e.g., paying a value-destructive Pre-Closing Dividend — that would harm the value of the Albertsons business.

Plaintiffs also fail to provide circumstantial evidence of an agreement between Kroger and Albertsons to pay the Pre-Closing Dividend.  The main "circumstantial" evidence Plaintiffs cite is a press release describing the Pre-Closing Dividend as being paid "in connection" with the merger. Pls.' Mot. for TRO at 16.  But this statement simply summarizes the Merger Agreement.  And the text of the Merger Agreement plainly does not require Albertsons to declare or pay the Pre-Closing Dividend; commensurately, Kroger would have no contractual recourse if Albertsons decided not to do so.  Indeed, the Merger Agreement references the Pre-Closing Dividend only as a matter of accounting — the Merger Agreement caps the Pre-Closing Dividend at $4 billion and requires that Kroger's purchase price be reduced by the amount of any Pre-Closing Dividend Albertsons decides to pay.  *See* Millerchip Decl. ¶¶ 9-11.  In other words, the Pre-Closing Dividend is "in connection with" the merger only insofar as Albertsons made the unilateral decision to declare it, and the Merger Agreement accommodates that decision.  The Merger Agreement does not reflect Kroger's

agreement that it should be paid (or should not be paid) — the dispositive factor for antitrust purposes.

Plaintiffs also place weight on the "unprecedented size of the dividend" and suggest "it was part of an agreement that contains multiple other terms that work together with the Special Dividend to constrain Albertsons." Pls.' Mot. for TRO at 17. But Plaintiffs fail to explain why it would make economic sense for Kroger to enter into such an agreement. To the contrary, Kroger has a strong economic interest in maintaining the financial and competitive viability of Albertsons. *See Vantico Holdings S.A. v. Apollo Management, LP*, 247 F. Supp. 2d 437, 453, 458-59 (S.D.N.Y. 2003) (denying TRO where plaintiffs produced no evidence that defendant would risk its investment in a competitor by attempting to "sabotage" its business).

Indeed, consistent with its fiduciary duties, Kroger obtained several contractual provisions in the Merger Agreement to ensure that Albertsons would maintain the competitiveness of its business during the period between signing and closing of the transaction, including: (i) as a condition to Kroger's obligation to consummate the transaction, that no material adverse effect with respect to Albertsons shall have occurred (Merger Agreement § 7.3(a)); (ii) that Albertsons conduct its business in the ordinary course of business consistent with past practice (*id.* § 6.1(a)); and (iii) that Albertsons use commercially reasonable efforts to preserve its business organizations, goodwill, and material assets, and maintain its rights, franchises, and existing relationships with customers, suppliers, employees, business associates, and other persons with which Albertsons has material business dealings (*id.*). These provisions of the Merger Agreement — which Plaintiffs ignore — demonstrate the economic realities of the transaction. *See In re: McCormick & Co., Inc.*, 217 F. Supp. 3d 124, 132 (D.D.C. 2016) ("Following *Twombly*, courts dismiss Section 1 complaints when there is an independent business justification for the observed conduct and no

basis for rejecting it as the explanation for the conduct."). Simply put, Albertsons and Kroger never agreed, in the Merger Agreement or elsewhere, to harm Albertsons' ability to compete.

Plaintiffs in antitrust cases are required to make more than conclusory allegations of an agreement; they must plead sufficient facts that plausibly support the inference of concerted action. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Here, Plaintiffs fail to plead any facts from which the court could plausibly infer that Kroger played any role whatsoever in Albertsons' unilateral decision to issue the Pre-Closing Dividend. Contrary to Plaintiffs' unstated assumption, the mere existence of the Merger Agreement does not establish concerted action; on the contrary, Plaintiffs must prove that the Merger Agreement terms related to the Pre-Closing Dividend constitute concerted action under settled antitrust law. Plaintiffs failed to meet that burden, and their antitrust claims against Kroger fail for that reason alone.

***Second***, Plaintiffs fail to properly plead the elements of an unreasonable restraint of trade claim under a *per se*, a "quick look," or a rule-of-reason approach. Although Plaintiffs reference the *per se* standard in their motion, they do not attempt to allege that an agreement to issue a Pre-Closing Dividend is *per se* unlawful. Nor could they. *Per se* treatment is limited to restraints that "always or almost always tend to restrict competition and decrease output." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) (quoting *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723 (1988)). The Supreme Court has repeatedly held that "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations." *See, e.g.*, *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 9 (1979). As a result, Supreme Court has placed only a few manifestly anticompetitive business practices — namely, price fixing, bid rigging, and market allocation — into the *per se* category. A company's unilateral decision to issue a Pre-Closing Dividend is not among those practices.

11

Instead, in an attempt to sidestep their obligation to plead actual facts to support their claims, Plaintiffs ask the Court to adopt the "quick look" approach to analyze their claims. However, this approach is only permissible when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999). If an arrangement "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition," more than a "quick look" is required. *Id.* at 771. Courts have been crystal clear that neither the *per se* nor quick look analysis are appropriate in novel scenarios, such as the one Plaintiffs present. *See, e.g.*, *White Motor Co. v. United* States, 372 U.S. 253, 263 (1963); *Arizona v. Maricopa Cty.*, 457 U.S. 332, at 349-51 n. 19 (1982). Accordingly, this case also is inappropriate for an abbreviated "quick look" analysis. *See NCAA v. Alston*, 141 S. Ct. 2141, 2155-56 (2021).

Finally, in antitrust cases, courts presumptively apply the rule of reason analysis, which requires a "fact-specific" assessment of "market power and market structure ... to assess the [restraint]'s actual effect" on competition. *Am. Express Co.*, 138 S. Ct. at 2284. Plaintiffs must show that Defendants' actions "targeted, or 'had an actual adverse effect on[,] competition as a whole in the relevant market'." *Gross v. Wright*, 185 F. Supp. 3d 39, 49 (D.D.C. 2016) (quoting *Asa Accugrade Inc. v. Am. Neumatic Ass'n*, 370 F.Supp.2d 213, 215 (D.D.C. 2005). The failure to allege facts to establish that the "market as a whole has suffered an anti-competitive injury … alone is fatal" to a Sherman Act claim. *Asa Accugrade*, 370 F.Supp.2d at 216.

Proving that a restraint would have substantial anticompetitive effects requires either evidence of actual competitive harm, which Plaintiffs concede they cannot show, or "proof of market power plus some evidence that the challenged restraint harms competition." *Am. Express*

*Co.*, 138 S. Ct. at 2284.  If "the exercise of market power is not plausible, the challenged practice is legal." *Alston*, 141 S. Ct. at 2160 (quoting 7 Areeda & Hovenkamp, Antitrust Law ¶1507a, p. 444 (4th ed. 2017)).

Plaintiffs set out the standard for a rule of reason claim but then fail to plead the requisite facts to satisfy that standard — namely, facts supporting a finding of anticompetitive effects or Defendants' market power in a cognizable relevant market.  *See* Pls' Mtn. for TRO at 10 (citing *Alston*, 141 S. Ct. at 2160).  Plaintiffs' bald, conclusory assertion that Albertsons will be unable to "effectively compete at the same level absent the Special Dividend," Pls. Mtn. for TRO at 10, is supported by no actual evidence or plausible allegations that the Defendants will acquire market power or harm competition as a result of the Pre-Closing Dividend.

Plaintiffs' only discussion of market power in their Complaint is to lay out a superficial case as to what they believe may be the likely impact of the *merger* in the District of Columbia, Illinois, and California.  Compl. ¶¶ 35–55.  Plaintiffs attempt to import the analytical framework used to review mergers — summing Kroger's and Albertsons' market shares and performing an HHI calculation — to purportedly show market power.  Plaintiffs, however, are not challenging the merger in this suit.  Plaintiffs are challenging the Pre-Closing Dividend, which they have no evidence (or factual allegations) will result in creating or enhancing Kroger's market power.  *See* Compl. ¶ 41 (showing Kroger with a 13.9% market share in D.C.).

Moreover, "without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition." *Am. Express*, 138 S. Ct. at 2285. Plaintiffs' allegations regarding purported "relevant geographic markets" are vague and untethered to reality suggesting, for example, that an appropriate relevant geographic market is "no larger than the District" — meaning a District resident in Navy Yard might regularly travel to Tenleytown to purchase bread.

13

Compl. ¶ 78.  Or that a consumer might shop for milk anywhere in Los Angeles.  *Id.* ¶ 84 ("The relevant geographic markets in California may include areas no larger than city and suburb markets.").  And competition in Illinois should be measured statewide from Chicago to Carbondale.  *Id*. ¶ 51 (estimating statewide Illinois shares resulting from the merger).  But the relevant market must be defined more concretely, and failure to do so is fatal.  *See Am. Express*, 138 S. Ct. at 2285 ("[C]ourts usually cannot properly apply the rule of reason without an accurate definition of the relevant market"); *see also Malaney v. UAL Corp.*, 434 F. App'x 620, 621 (9th Cir. 2011) (affirming denial of a preliminary injunction where plaintiff failed to demonstrate a national market for air travel).

The only fact Plaintiffs allege that is purportedly relevant to a competitive effects analysis is that Albertsons will have less "available cash" after it pays the Pre-Closing Dividend.  Pls. Mtn. for TRO at 10.  But Plaintiffs fail to adequately allege how Albertsons having less liquidity will harm competition, relying instead on impermissible inferences and speculation.  *See Am. Express*, 138 S. Ct. at 2288 ("This Court will not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level.") (internal quotation marks omitted).  In fact, no economic theory states that the payment of dividends (of any size) without more, detracts from a company's ability to compete.

Indeed, Plaintiffs' speculation that the Pre-Closing Dividend is designed to weaken Albertsons is simply incorrect and implausible.  As the Merger Agreement reflects, consummating the transaction may require the divestiture of certain Albertsons and Kroger stores.  The Merger Agreement further contemplates that Albertsons may spin-off certain stores to its shareholders in connection with the transaction.  If the Albertsons business weakens during the pendency of the transaction, it may not be able to divest those stores (either to third parties or via the potential spin-

14

off) — which could imperil the entire transaction.  Thus, Kroger's economic incentives are exactly the opposite of Plaintiffs' unsupported speculation.

In sum, under any of the three analytical approaches, Plaintiffs fail to adequately allege an antitrust claim under Section 1.

### 2.      Plaintiffs Cannot Demonstrate Irreparable Harm

Plaintiffs also cannot demonstrate that a TRO is needed to prevent immediate or substantial harm to competition.  *Winter*, 555 U.S. at 20.

Plaintiffs present a circular theory of irreparable harm.  Having based the alleged merits of their case on the assumption that the Pre-Closing Dividend lessens competition, Plaintiffs argue that their residents will be irreparably harmed by that alleged reduction in competition.  Because Plaintiffs have failed to show that the Pre-Closing Dividend will negatively impact competition, they lack any viable theory of irreparable harm.  Moreover, the payment of the Pre-Closing Dividend will not affect Plaintiffs' (or the Federal Trade Commission's) ability to review the merger and ensure it does not harm competition.

To the extent Plaintiffs speculate that the Pre-Closing Dividend is a ploy through which Kroger seeks to weaken Albertsons so that it can employ a "failing firm" defense during the merger review process, Compl. at 3, Kroger understands that Albertsons has offered to stipulate that it will not invoke the "failing firm" in defense of the proposed merger.  Kroger likewise has no intention to, and will not, argue that Albertsons is a "failing firm" as a defense during the merger review process.  As the terms of the Merger Agreement establish, Kroger's interest is in ensuring that Albertsons remain viable and healthy until the acquisition closes, whether or not the Pre-Closing Dividend is paid.  Plaintiffs have pleaded no facts to plausibly suggest that the Pre-Closing

Dividend is intended to destroy Albertsons as a viable competitor or that Kroger would stake the fate of a $25 billion transaction on such an unusual and rarely successful theory.

### 3.     Plaintiffs' Request Is Neither Equitable Nor in the Public Interest

While Kroger is agnostic about whether Albertsons pays the Pre-Closing Dividend, let there be no mistake:  Plaintiffs' motion is a thinly veiled attempt to use the antitrust laws to prevent a publicly traded company from returning money to its shareholders.  And, as a consequence, just days before Albertsons is set to pay that dividend, Plaintiffs' motion threatens to injure all Albertsons shareholders and any market participant who acted in reliance on Albertsons' declaration of dividend.  *Mediacom Commc'ns Corp. v. Sinclair Broad. Grp., Inc.*, 460 F. Supp. 2d 1012, 1029 (S.D. Iowa 2006) ("[T]he public interest would not be served by preventing the free market from taking its natural course.").  If governments (and individual plaintiffs) are allowed to weaponize antitrust law to seek judicial review of every such business decision, our nation's economy would grind to halt.  *See Alston*, 141 S. Ct. at 2263-64 ("[J]udges make for poor central planners and should never aspire to the role.") (internal quotation marks omitted).

## **<u>CONCLUSION</u>**

For these reasons, Plaintiffs' request for a Temporary Restraining Order should be denied.

Dated: November 4, 2022

Respectfully submitted,

By:  ___*s/ Mark A. Perry*_____
      Mark A. Perry
      Drew Tulumello
      Jeffrey Perry
      WEIL, GOTSHAL & MANGES LLP
      2001 M Street NW, Suite 600
      Washington, DC  20036
      Phone: (202) 682-7511
      Fax: (202) 857-0940
      E-mail:  mark.perry@weil.com

      Adam B. Banks  (*pro hac vice*)
      WEIL, GOTSHAL & MANGES LLP
      767 Fifth Avenue
      New York, NY 10153
      Phone : (212) 310-8000
      Fax : (212) 310-8007
      Email : adam.banks@weil.com

     ___*s/ Michael B. Bernstein*_____
      Matthew M. Wolf (*pro hac vice*)
      Michael B. Bernstein
      Sonia K. Pfaffenroth
      Jason Ewart
      ARNOLD & PORTER KAYE SCHOLER LLP
      601 Massachusetts Avenue NW
      Washington, DC 20001
      Phone: (202) 942-5000
      Fax: (202) 942-5999
      E-mail:  michael.b.bernstein@arnoldporter.com
            matthew.wolf@arnoldporter.com
            sonia.pfaffenroth@arnoldporter.com
            jason.ewart@arnoldporter.com

      Attorneys for Defendant The Kroger Co.

17