**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**DISTRICT OF COLUMBIA,** *et al.*,

                 *Plaintiffs*,

**v.**

**THE KROGER CO.,** et al.,

                 *Defendants*.

---

**CIVIL ACTION**

**Case No. 1:22-cv-3357-CJN**

**DEFENDANT ALBERTSONS COMPANIES, INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO THE
<u>PLAINTIFF STATES' MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

RELEVANT FACTUAL BACKGROUND.............................................................. 4

ARGUMENT ............................................................................................................ 6

I.      THE PLAINTIFF STATES BEAR A HEAVY BURDEN OF SHOWING THAT
        PAYMENT OF THE SPECIAL DIVIDEND SHOULD BE RESTRAINED.................. 6

II.     THE PLAINTIFF STATES HAVE NOT DEMONSTRATED A LIKELIHOOD
        OF SUCCESS ON THE MERITS. ......................................................................... 6

A.      The Plaintiff States Cannot Establish A Violation of Section 1 Of The Sherman
        Act. ......................................................................................................................... 7

        1.   There Is Neither An "Agreement To Pay The Dividend" Nor An "Agreement
             To Weaken Albertsons." ............................................................................. 7

        2.   Payment Of The Special Dividend Will Not Leave Albertsons Unable To
             Effectively Compete Or Otherwise Restrain Trade Or Competition. .......................... 12

B.      The Plaintiff States Cannot Establish A Violation Of State Antitrust Laws...................... 16

III.    THE PLAINTIFF STATES CANNOT DEMONSTRATE IRREPARABLE
        HARM. ................................................................................................................. 16

IV.     THE BALANCE OF THE EQUITIES AND PUBLIC INTERESTS DO NOT
        FAVOR PRELIMINARY RELIEF....................................................................... 18

CONCLUSION....................................................................................................... 20

## **TABLE OF AUTHORITIES**

**CASES**

*Adirondack Transit Lines, Inc. v. Greyhound Lines, Inc.*,
   No. 1:22-CV-1662-RCL, 2022 WL 2452597 (D.D.C. July 1, 2022) ....................................17

*Altschuld v. Raimondo*,
   No. 21-CV-02779 (TSC), 2021 WL 6113563 (D.D.C. Nov. 8, 2021) ...................................6

*Arizona v. Maricopa Cty.*,
   457 U.S. 332 (1982)...........................................................................................................12

*Ark. Dairy Co-op Ass'n, Inc. v. USDA*,
   573 F.3d 815 (D.C. Cir. 2009) .............................................................................................7

*Atl. Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*,
   295 F. Supp. 2d 75 (D.D.C. 2003) ......................................................................................16

*Baks v. Centra, Inc.*,
   1997 WL 819130 (Del. Super. Dec. 15, 1997) ....................................................................18

*Boffa Surgical Group LLC v. Managed Healthcare Associates Ltd.*,
   47 N.E. 3d 569 (Ill. App. Ct. 2015) ....................................................................................16

*Butler v. Georgetown Univ.*,
   No. 22-CV-1517 (TSC), 2022 WL 1773479 (D.D.C. June 1, 2022).....................................7

*California ex rel. Harris v. Safeway, Inc.*,
   651 F. 3d 1118 (9th Cir. 2011) ...........................................................................................12

*Chaplaincy of Full Gospel Churches v. England*,
   454 F.3d 290 (D.C. Cir. 2006)........................................................................................6, 16

*Cobell v. Norton*,
   391 F.3d 251 (D.C. Cir. 2004) .............................................................................................6

*Copperweld Corp. v. Independence Tube Corp.*,
   467 U.S. 752 (1984)............................................................................................................7

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) .............................................................................................6

*Grand Metropolitan Public Ltd. Co. v. Pillsbury Co.*,
   558 A.2d 1049 (Del. Ch. 1988)...........................................................................................18

*Heart 6 Ranch, LLC v. Zinke*,
   285 F. Supp. 3d 135 (D.D.C. 2018) ......................................................................17

*In Anadarko Petroleum Corp. v. Panhandle E. Corp.*,
   545 A.2d 1171 (Del. 1988) ...................................................................................18

*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016) .........................................................................8

*In re Sunstates Corp. S'holders Litig.*,
   C.A. No. 13284, slip op. (Del. Ch. Apr. 18, 2001) ...............................................18

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) .................................................................................8

*Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*,
   933 F. Supp. 3d 58 (D.D.C. 2013) .........................................................................6

*Mazanderan v. Indep. Taxi Owners' Ass'n*,
   700 F. Supp. 588 (D.D.C. 1998) ..........................................................................16

*Mexichem Specialty Resins, Inc. v. EPA*,
   787 F.3d 544 (D.C. Cir. 2015) ..............................................................................16

*Monsanto Co. v. Spray-Rite Service Corp.*,
   465 U.S. 752 (1984) .....................................................................................7, 8, 11

*NCAA v. Bd. of Regents*,
   468 U.S. 85 (1977) ...............................................................................................12

*Petty v. Am. Fed'n of Gov't Emps.*,
   No. CV 21-3161 (CKK), 2021 WL 5991734 (D.D.C. Dec. 17, 2021) ...................17

*Procaps S.A. v. Patheon, Inc.*,
   845 F.3d 1072 (11th Cir. 2016) .............................................................................8

*Schindler Elevator Corp. v. WMATA*,
   514 F. Supp. 3d 197 (D.D.C. 2020) (D.C. Cir. Oct. 22, 2021)...............................6

*Shelley v. Am. Postal Workers Union*,
   775 F. Supp. 2d 197 (D.D.C. 2011) ......................................................................20

*State of Washington v. Albertsons Companies, Inc.*,
   No. 22-2-18046-3 SEA (Wash. Super. Ct. Nov. 3, 2022) ......................................3

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006)..................................................................................................12

*Unsuck DC Metro v. Wash. Metro. Area Transit Auth.*,
   No. 20-7051, 2022 WL 683403 (D.C. Cir. Feb. 11, 2022).......................................................7

*Wilmington Trust Co. v. Wilmington Trust Co.*,
   15 A.2d 668 (Del. Ch. 1940)................................................................................................18

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).........................................................................................................6, 16

**STATUTES**

District of Columbia Antitrust Act, D.C. Code § 28–4052 ....................................................15, 16

Illinois Antitrust Act, 740 ILCS 10/3 ...................................................................................15, 16

Sherman Antitrust Act Section 1, 15 U.S.C. § 1......................................................................7

Defendant Albertsons Companies, Inc. ("Albertsons" or the "Company") hereby submits this brief in opposition to the Motion for a Temporary Restraining Order (DE 3) ("TRO Motion") filed by the District of Columbia, State of California, and State of Illinois (together, the "Plaintiff States").

## PRELIMINARY STATEMENT

The Plaintiff States' Motion to enjoin a special dividend duly approved by the board of directors (the "Board") of Albertsons should be denied. The Plaintiff States' request is founded on the fundamentally misguided and incorrect assertion that the Company's payment of a special dividend to its shareholders (the "Special Dividend") will impair the Company's ability to compete while its proposed merger (the "Merger") with The Kroger Co. ("Kroger") is under antitrust review. That is not the case. Albertsons is a thriving business. It expects to have over $75 billion in revenues in fiscal 2022, following a strong $71.9 billion performance in fiscal 2021. It is well-capitalized, with limited debt and ample free cash flow. Albertsons is in a strong position financially – more than strong enough to return $4 billion to shareholders without delay. The Special Dividend's size reflects the Company's strength, not an attempt to weaken it, as the Plaintiff States mistakenly claim.

The Plaintiff States' attempt to enjoin Albertsons from returning capital to its shareholders via the Special Dividend is extraordinary and unprecedented. Based on nothing but speculation, hyperbole, and a generic expert report lacking any Company-specific analysis, they ask this Court to displace the independent and carefully considered business judgment of the Company's Board (with advice from two expert financial advisors), and strip Albertsons' shareholders of their contractual and statutory right to payment of a duly declared dividend. The Plaintiff States cannot point to any precedent supporting such drastic intervention. It has no basis

in law or in the facts of the Company's financial performance, and is not necessary to preserve the Plaintiff States' antitrust review of the Merger.  Moreover, the claim the Plaintiff States allege – that Albertsons and Kroger have agreed to competitively harm Albertsons by paying the Special Dividend in violation of the Sherman Act – is baseless, disproven by a simple review of the Merger Agreement, and non-sensical. Albertsons cannot be certain the Merger will be approved by antitrust regulators and would not sabotage its ability to operate independently as a result.  Nor would it make sense for Kroger to willingly pay nearly $25 billion to acquire Albertsons if it were unable to effectively compete in the markets it serves.

The Plaintiff States focus on the Special Dividend's sticker price, and assert without basis that its size creates an imminent threat to competition that must be restrained. But whether a dividend payment is detrimental to the Company's ability to compete is not judged in a vacuum. It is judged in the context of the Company's financial condition. As Albertsons' CFO's sworn testimony shows, Albertsons has ample resources to permit it to return capital to its shareholders via a dividend *without* impairing its competitiveness in any alleged market and *without* creating any risk of insolvency. It is "not a close call," Declaration of Sharon McCollam ("McCollam Decl.") ¶ 30, and the Plaintiff States' arguments to the contrary are baseless and premised on misunderstandings of the facts.

The Plaintiff States' theory that Albertsons' return of capital to shareholders somehow has bearing on the Plaintiff States' antitrust merger review is also incorrect. Although the Special Dividend and the Merger were announced simultaneously, and Kroger took the Special Dividend into account in calculating its purchase price, the Board considered and approved payment of the Special Dividend and the Merger separately. Whether and when to pay the Special Dividend is a decision that Albertsons made and had the authority to make on its own; Kroger did not

participate.  No agreement with Kroger, including the Merger Agreement, requires Albertsons to pay the Special Dividend. The Special Dividend and the Merger function wholly independently of each other. The Special Dividend was declared on October 13 and would have been paid on November 7[1] to all of Albertsons' shareholders as of the record date *regardless* of whether the Merger receives regulatory approval and is consummated. The Special Dividend is in no way conditioned on the Merger's closing. The Merger was also approved on October 13 and announced on October 14, but is subject to extensive antitrust review. The Board carefully considered the Special Dividend's effect on the Company's balance sheet and its ability to operate between announcement and closing of the Merger, whether the Merger is or is not consummated. Albertsons is confident in its financial future and that paying the Special Dividend will not interfere with its ability to compete in its ferociously competitive industry.

Delaying payment of the Special Dividend harms Albertsons and disrupts securities markets. Critically, for this Court's analysis, once a dividend has been duly declared by the board of directors of a Delaware corporation – as it has here – the Company owes a contractual debt to pay it, and its shareholders may sue to collect it. That means the preliminary relief the Plaintiff States seek exposes the Company to claims by shareholders who purchased Albertsons' stock before the record date with an expectation that they would receive their share of the Special Dividend.  The requested relief also does not in any way "improve" or "preserve" Albertsons' financial condition as the Plaintiff States suggest.  Instead, the Special Dividend will remain a

---

[1]    As disclosed in the Parties' Joint Status Report dated November 4, 2022 (DE 30), on November 3, 2022, the Superior Court of Washington for King Country granted the State of Washington's Motion for Temporary Restraining Order enjoining Albertsons from issuing its Special Dividend.  That court's order will remain in effect through November 10, 2022. *See* Order Granting Pl.'s Mot. for TRO, *State of Washington v. Albertsons Companies, Inc.*, No. 22-2-18046-3 SEA (Wash. Super. Ct. Nov. 3, 2022). If this order expires on November 10 and no preliminary injunction is entered in Washington state court, the Special Dividend will be paid as soon as possible thereafter.

liability on Albertsons' balance sheet that is due and owing, meaning Albertsons must reserve for it, and – so long as it remains unpaid – it will continue to generate additional legal exposure for the Company.  Indeed, if anything were to hurt Albertsons' ability to compete, it is the Plaintiff States' efforts (in concert with other state regulators) to delay payment of the Special Dividend and the growing harm those efforts are imposing on the Company.

In their haste to enjoin the Special Dividend, the Plaintiff States show no regard whatsoever for the business judgment of the Board, the Company's strong post-dividend financial position, or the significant disruption such extraordinary intervention would have on Albertsons, its shareholders, and its business. Nor do they offer a viable basis to believe an injunction is necessary to preserve the Plaintiff States' antitrust review of the Merger. The balance of equities weighs heavily against issuance of a TRO, and any such extraordinary relief to enjoin payment is not in the public interest. The TRO Motion should be denied.

## RELEVANT FACTUAL BACKGROUND

A full recitation of the relevant facts is set forth in the accompanying Declaration of Sharon McCollam, Albertsons' President and CFO. The Special Dividend was approved after a broad-ranging strategic review that began in November 2021 and was publicly announced in February 2022. Each option Albertsons considered during that review, begun long before Kroger and Albertsons commenced discussions relating to the Merger, likely would have resulted in returning capital to Albertsons' shareholders. *See* McCollam Decl. ¶¶ 11–13.

One strategic alternative Albertsons considered to return capital to shareholders was to repurchase shares. The Board, advised by management and consulting financial professionals, considered options to pay amounts even larger than $4 billion to shareholders. *Id.; see also* Gitlin Decl. Ex. 2, at ACI_DCCID-0000076.  Albertsons carefully assessed the effect such a return of

capital to its shareholders would have on its balance sheet, and its advisors provided it benchmarks to assess the Company's resulting liquidity ratio as compared to its peers. McCollam Decl. ¶ 14; *see also* Gitlin Decl. Ex. 2, at ACI_DCCID-0000082-88.

Another strategy Albertsons considered was the sale of the Company. By mid-June 2022, discussions with Kroger were ongoing. The Board narrowed Albertsons' strategic alternatives to two: (1) a sale of the Company to Kroger, or (2) a share repurchase/tender offer, Gitlin Decl. Ex. 2, at ACI_DCCID-0000076, ultimately settling on the former. Because the sale to Kroger is not expected to close until 2024 and therefore would not offer Albertsons shareholders any near-term liquidity, the Company made clear in its discussions with Kroger that it expected to return capital to all Albertsons shareholders on a shorter time horizon. In particular, it planned to do so in the form of a dividend promptly following a merger agreement signing. McCollam Decl. ¶ 21.

Accordingly, it was understood that whether Kroger acquired Albertsons or not, Albertsons would return capital to its shareholders. *Id.* ¶ 21. In other words, if there were no Merger, Albertsons still would have returned at least $4 billion to its shareholders. In its earliest discussions with Kroger, Albertsons told Kroger that whether it acquired Albertsons or not, Albertsons intended to return capital to its shareholders. *Id.* Accordingly, when Kroger made its initial offer to Albertsons, Kroger took the position that *if* a Kroger-Albertsons transaction were to be announced, and *if* Albertsons (and Albertsons alone) elected to pay the Special Dividend, the per share merger consideration would need to be reduced by an amount equivalent to that Special Dividend. *Id.* ¶ 21; *see also* McCollam Decl. Ex. A. The Merger Agreement reflects that position. *Id.*. ¶ 24. Albertsons ultimately decided to pay a $6.85 per share Special Dividend to its shareholders with payment occurring on November 7. *Id.* ¶ 1.

## ARGUMENT

**I.     THE PLAINTIFF STATES BEAR A HEAVY BURDEN OF SHOWING THAT PAYMENT OF THE SPECIAL DIVIDEND SHOULD BE RESTRAINED.**

A temporary restraining order is an "extraordinary and drastic remedy" that should be granted sparingly. *Jack's Canoes & Kayaks, LLC v. Nat'l Park Serv.*, 933 F. Supp. 3d 58, 75 (D.D.C. 2013) (citation omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).   A party seeking a temporary restraining order bears the burden of demonstrating that: "(1) it has a substantial likelihood of succeeding on the merits; (2) it will suffer irreparable harm if the injunction is not granted; (3) other interested parties will not suffer substantial harm if the injunction is granted; and (4) the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Preliminary relief is "never awarded as of right," *Winter*, 555 U.S. at 24, and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).   A movant's failure to establish the required elements for preliminary relief mandates denial of the motion. *Altschuld v. Raimondo*, No. 21-CV-02779 (TSC), 2021 WL 6113563, at *2 (D.D.C. Nov. 8, 2021) ("[E]ach [preliminary injunction] factor must still be present").   Here, the Plaintiff States cannot establish that *any* of the elements required to win a temporary restraining order are satisfied – much less all of them – and the TRO Motion should be denied as a result.

**II.    THE PLAINTIFF STATES HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.**

To secure a temporary restraining order, the Plaintiff States "must show . . . a *substantial* likelihood of success on the merits." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (emphasis added) (internal quotation omitted).   If they cannot show a substantial likelihood of success on the merits, the Plaintiff States are "not entitled to any relief, let alone the extraordinary remedy" of a temporary restraining order. *See Schindler Elevator Corp. v. WMATA*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020), *aff'd* No. 21-7008, 2021 WL

4928730 (D.C. Cir. Oct. 22, 2021).  Here, the Plaintiff States' TRO Motion "is doomed for a . . . fundamental reason: [Plaintiff States] fail[] to state a valid cause of action." *Butler v. Georgetown Univ.*, No. 22-CV-1517 (TSC), 2022 WL 1773479, at *3 (D.D.C. June 1, 2022); *see also Unsuck DC Metro v. Wash. Metro. Area Transit Auth.*, No. 20-7051, 2022 WL 683403, at *2 (D.C. Cir. Feb. 11, 2022) ("[W]ithout a cause of action, [Plaintiff] cannot ultimately succeed on the merits of its suit." (citation omitted)); *Ark. Dairy Co-op Ass'n, Inc. v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009) (same).

A.    **THE PLAINTIFF STATES CANNOT ESTABLISH A VIOLATION OF SECTION 1 OF THE SHERMAN ACT.**

The Plaintiff States purport to challenge the Special Dividend as a violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The elements of a Section 1 claim include: (1) the existence of an agreement, contract, combination, or conspiracy among two or more persons or entities, (2) that unreasonably restrains trade or competition. TRO Motion at 7. The Plaintiff States cannot establish that Albertsons' independent decision to pay the Special Dividend as the culmination of a capital return strategy it began evaluating long before Kroger ever expressed interest in acquiring Albertsons constitutes an "agreement" with Kroger that unreasonably restrains trade. Indeed, it is black letter law that "[i]ndependent action is not proscribed" by Section 1 or its state analogues. *Monsanto Co.*, 465 U.S. at 761; *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (Section 1 "does not reach conduct that is wholly unilateral.").

1.    **There Is Neither An "Agreement To Pay The Dividend" Nor An "Agreement To Weaken Albertsons."**

There is a fundamental mismatch between the "agreement" as alleged and the Plaintiff States' purported evidence of that agreement. The Plaintiff States appear to allege two variations of the alleged agreement.  The first is an "agree[ment] that Albertsons will provide a 'special

dividend' of $4 billion." TRO Mot. at 5. The second is an "agreement to hamper Albertsons' ability to compete by making it cash-poor."  *Id.* at 7-8; *see also* Complaint (DE 1) at 3 (the agreement "reflects a calculated effort to leave Albertsons just battered enough for Defendants to argue later that it is a 'flailing' or 'failing' firm that Kroger should be allowed to acquire lest it go out of business anymore"). But the Plaintiff States' evidence is the Merger Agreement itself and the accompanying press release. TRO Motion at 5, 16. Evidence of one does not prove the other. *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1081 (11th Cir. 2016) ("[A] contract can serve as the basis for a Section 1 claim only if it embodies an agreement to unlawfully restrain trade.").

To establish the requisite illegal agreement, "there must be direct or circumstantial evidence that reasonably tends to prove that [the parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984). The Plaintiff States do not allege circumstantial evidence, instead relying solely upon what they (incorrectly) believe is direct evidence – the Merger Agreement and Albertsons' accompanying press release. But direct evidence must be "explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 58 (D.D.C. 2016) (quotation and citations omitted). Direct evidence "usually take[s] the form of an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy." *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-29 (7th Cir. 2010). Albertsons and Kroger never agreed, in the Merger Agreement or elsewhere, that Albertsons "will provide" the Special Dividend, let alone agreed "to hamper Albertsons' ability to compete by making it cash poor."

The Plaintiff States have fundamentally misread the Merger Agreement; it is not the "smoking gun" that they think it is.  *See In re Domestic Airline Travel Antitrust Lit.*, 221 F. Supp. 3d at 58 (direct evidence is "extremely rare" and "is usually referred to as the 'smoking gun'") (citation omitted)). As Albertsons' CFO has explained under oath, there is ***nothing*** in the Merger Agreement that requires Albertsons to pay the Special Dividend. McCollam Decl. ¶ 23. And there certainly is nothing in the Merger Agreement whereby Albertsons agreed to make itself "cash poor" and "battered."  The Board separately approved the Proposed Merger and the payment of the Special Dividend, Kroger did not participate in the decision to pay the Special Dividend, the Special Dividend is not contingent on the Proposed Merger closing, the payment of the Special Dividend was not done at Kroger's request, and was not intended to facilitate or affect the Proposed Merger. McCollam Decl. ¶¶ 16, 20, 22-23, 25, 29.

The Merger Agreement addresses the Special Dividend in just two respects:

***First***, because Kroger plans to acquire Albertsons, including its assets and liabilities, Kroger made clear that it had every incentive to ensure the Special Dividend does not impair Albertsons' ability to operate competitively during the potentially significant interval between the Merger Agreement signing and closing. Kroger made clear to Albertsons that it wanted to ensure that payment of the Special Dividend would not harm the Company. Among other things, Kroger sought and received assurances in Section 6.1 of the Merger Agreement that Albertsons would not materially change the nature or quality of its business before the Merger closes. And Section 6.1(e) ***allows*** but does not ***require*** the Company to pay the Special Dividend before the Merger closing. *Id.* ¶¶ 22-23, 27; *see also* Gitlin Decl. Ex. 8 at 60.

***Second***, Kroger also made clear that it had an interest in ensuring that the purchase price that it will pay for Albertsons fairly reflects any Special Dividend; accordingly, it included a

mechanism to adjust the per-share purchase price. If Albertsons elected to pay the Special Dividend, the per-share purchase price Kroger will pay is reduced, on a dollar-for-dollar basis, to account for the precise value of the capital that the Company elects to return to shareholders via the Special Dividend. McCollam Decl. ¶¶ 24, 26; *see also* Gitlin Decl. Ex. 8 at 3.

This share price adjustment provision simply adjusts the price per share paid if the Merger closes. It does not make closing in anyway dependent on, or driven by, payment of the Special Dividend. To the contrary, the Merger Agreement provides that whether or not the Company pays the Special Dividend, Kroger and the Company would be obligated to consummate the Merger. Consummation of the Merger depends solely on the satisfaction of the conditions to closing contained in Article VII of the Merger Agreement, and those conditions to closing are not dependent on or related to the Special Dividend. McCollam Decl. ¶ 25; *see also* Gitlin Decl. Ex. 8 at 82-83.

Thus, far from pushing Albertsons to pay a dividend that would put it in immediate danger of financial failure and resulting liquidation such that Albertsons could be positioned as a "failing firm", Kroger sought only to confirm that any Special Dividend would be (i) appropriately sized, and (ii) subtracted from the purchase price. *Id.* ¶ 28.

The Plaintiff States also misconstrue Albertsons' press release. *See* TRO Mot. at 16. It is evidence of neither version of Plaintiff States' alleged agreement. The "connection" between the Special Dividend and the Merger that Albertsons referred to in that press release was how Kroger's purchase price would be adjusted downwards by Albertsons' independent decision to pay the Special Dividend, as described above. It is not an admission that Albertsons entered into an agreement with Kroger to pay the Special Dividend, let alone an admission of an imagined

intent to weaken Albertsons.  And Albertsons adamantly denies the Plaintiff States' suggestion otherwise.  *See id.*

To the extent that the Plaintiff States assert that the Merger Agreement and press release are circumstantial evidence, that too fails because they do not evidence what the Plaintiff States must prove. The Plaintiff States must prove "a conscious commitment to a common scheme designed to achieve an unlawful objective," *Monsanto Co.,* 465 U.S. at 764, and they do not even come close. What have the Plaintiff States proved? An agreement to merge, wherein the consummation of that merger is contingent upon antitrust review. McCollam Decl. ¶ 17. But the mere signing of a merger agreement is not a Sherman Act Section 1 violation, as the Plaintiff States do not (and cannot) contest. *See* TRO Mot. at 3 (describing the narrow focus of this action on the Special Dividend, not the Proposed Merger itself). And even if this Court finds that Albertsons and Kroger agreed to pay the Special Dividend (which they did not), that too is insufficient. There is no "unlawful objective" about a company paying a dividend that is permissible under its governing state's corporate law. *See infra* 12-15 (discussing how the payment of the Special Dividend is lawful under Delaware corporate law).

The Plaintiff States allege, but fail to offer a single shred of evidence to support their claim, that the "unlawful objective" of the alleged "common scheme" is the purported competitive harm to Albertsons that will follow the payment of the Special Dividend and leave it "just battered enough for Defendants to argue later that it is a 'flailing' or 'failing' firm that Kroger should be allowed to acquire lest it go out of business anymore." TRO Mot. at 7-8; Compl. at 3. But merely saying so does not make it true. And the Plaintiff States' assumption is expressly contradicted not only by logic, but by Albertsons' CFO's sworn testimony.  *See* McCollam Decl. ¶¶ 56-58. As she attests:

> It is not in ACI's or Kroger's interest to weaken the Company's competitive strength while the Proposed Merger is pending regulatory review.  The grocery industry is intensely competitive. Given the risk that the Proposed Merger will not be consummated, it would not make sense for ACI to harm its own competitive position and risk falling behind its competitors such as Amazon, Walmart, Costco and others.  Nor would it make sense for Kroger to pay $24.6 billion for a competitively weakened ACI; again, Kroger will need the full strength of the combined company to compete with Amazon, Costco, Wal-Mart, and many others in the industry.

*Id.* ¶ 57.

As the Plaintiff States have failed to allege an agreement that could be violative of the Sherman Act, the Plaintiff States' federal antitrust law claim fails here.

### 2.     Payment Of The Special Dividend Will Not Leave Albertsons Unable To Effectively Compete Or Otherwise Restrain Trade Or Competition.

To establish likelihood of success on the merits, the Plaintiff States must also credibly allege – and show a likelihood of proving – an unreasonable restraint of trade or commerce, evidenced by an impact on competition. *See NCAA v. Bd. of Regents*, 468 U.S. 85, 98, 104 (1977) ("[E]ssential inquiry" is what "impact on competition" the alleged restraint has).  In applying this standard, the Plaintiff States' reliance on the "quick look" or *per se* analysis is novel and misplaced. The rule of reason is the presumptive analysis, and must apply to unique fact patterns like this. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Courts have been crystal clear that the *per se* or "quick look" analysis are inappropriate in novel scenarios. *See, e.g.*, *Arizona v. Maricopa Cty.*, 457 U.S. 332, at 349-51 n. 19 (1982); *California ex rel. Harris v. Safeway, Inc.*, 651 F. 3d 1118, 1123 (9th Cir. 2011). Regardless, the Plaintiff States cannot bear their burden to show any unreasonable restraint on trade because the Special Dividend will not detrimentally impact Albertsons' ability to compete.

After payment of the Special Dividend, Albertsons will have more than sufficient resources to compete vigorously, continue with its current strategic and operating plans, and honor its agreements with the unions and its commitments to its associates to increase wages. McCollam Decl. ¶¶ 9, 53, 55, 66. Albertsons estimates its liquidity needs over the next 12 months to be approximately $10.0 billion (inclusive of the Special Dividend). *Id.* ¶¶ 60-61. After payment of the Special Dividend, Albertsons will have ample cash resources – $500 million in cash, $2.5 billion available under its already existing asset-based lending facility, and projected annual revenues of $75 billion – to meet those needs. *Id.* ¶¶ 45-46. These annual revenues generate free cash flow significantly above Albertsons' annual operational costs, even taking into account the Special Dividend. *Id.* ¶ 63. And the risk of rising interest rates does not pose a significant risk to the Company due it its use of fixed rate borrowings. *Id.* ¶ 64. Accordingly, Albertsons will be able to pay for necessary capital improvements and pensions and will continue to pay the same wages with or without the Special Dividend. *Id.* ¶ 65-66.

The Plaintiff States' argument to the contrary is based on incorrect assumptions, including a failure to appreciate that the Company included the Special Dividend in its projected $10 billion liquidity needs; and a complete disregard for the free cash flows produced by the more than $75 billion in projected annual revenues. *Id.* ¶¶ 46, 51-53, 60-62. The Plaintiff States' expert opinion from Prof. Weisbach, predicated on these mistaken facts and discussing corporate finance in the abstracted – without any consideration for Albertsons' specific financial situation –does not come close to carrying the Plaintiff States' burden. As demonstrated in the expert declaration of Professor Smith, submitted herewith, Prof. Weisbach's opinion lacks any serious financial analysis of Albertsons' financial condition, and fails to even consider the fact that Albertsons generates free cash flow as a result of its substantial operating revenues, which are

projected to exceed $75 billion next year, or the fact that after paying the Special Dividend, the Company will have access to approximately $3 billion in liquidity.  Declaration of Professor David C. Smith ("Smith Decl.") ¶¶ 7, 11-17.  Professor Smith also explains that the claim that Albertsons will have difficulty raising capital is unsupported by any concrete analysis of the Company, and inconsistent with the facts, *id*. ¶¶ 8, 18-39, and that there are important business reasons for companies like Albertsons to return capital to their investors. *Id*. ¶¶ 9, 44.

Delaware corporate law – not the Sherman Act or state competition laws – sets the guidelines Delaware corporations must follow in determining whether and when they have the "surplus" required to pay a dividend. That law is clear, and the Company took it carefully into account. It permits "directors of every corporation . . . to declare and pay dividends upon the shares of its capital stock . . . [o]out of its surplus, as defined and computed in accordance with §§ 154 and 244 of this title." 8 DGCL § 170(a)(1). "Surplus" is defined by DGCL § 154, as excess of net assets over the par value of the corporation's issued stock, which is in effect the amount by which total assets exceed total liabilities.

The Company had ample surplus to pay the Special Dividend.  Based on the fair value of its assets, its DGCL "surplus" was nearly $14.7 billion – more than 3.5 times the size of the Special Dividend. In an excess of caution, Albertsons confirmed that it had ample surplus to pay the Special Dividend even if its assets were conservatively assessed at book value rather than fair market value. Even on a book value basis, Albertsons calculated its surplus to be over $4.7 billion, again, substantially in excess of the Special Dividend. McCollam Decl. ¶¶ 34-38.

The Board also carefully evaluated and determined that after paying the Special Dividend, the Company would still have more than sufficient resources to continue with its current strategic and operating plans, and compete vigorously in the marketplace whether or not

the Merger closes. *Id.* ¶ 42. These discussions occurred over a period of months during which the Company considered a variety of capital return strategies that would have returned, if anything, even more capital to the Company's shareholders than the Special Dividend. Among other things, the Board considered and confirmed that the Company would still be able to make planned investments, compared its financial metrics and debt ratio to its peers', and assured itself that the Company would remain strong and competitive post-payment, regardless of outcome on the Merger. *Id.* ¶ 43; *see also* Gitlin Decl. Ex. 3 at ACI_DCCID-00000129; Gitlin Decl. Ex. 2 at ACI_DCCID-00000084.

Albertsons did not seek new sources of capital to fund the Special Dividend. The Company has over $3 billion cash on hand of which $2.5 billion will be used to fund the Special Dividend. The Company also can access approximately $1.4 billion from its already existing asset-based lending facility. After the Special Dividend, Albertsons will have a healthy liquidity position of approximately $3 billion, consisting of $500 million in cash and $2.5 billion available under its asset-based lending facility, and continuing access to cash in the form of projected annual revenues of $75 billion. The Company will have ample free cash flow to operate and invest in its stores and meet all of its obligations – and will have a leverage ratio of just under 2.0x, well below the leverage ratios under which the Company has historically and successfully operated. *Id.* ¶¶ 44-49.

In short, the Plaintiff States' focus on the top-line number is misguided and inadequate to support the relief it seeks. The financial status of the Company as attested to by its CFO confirms the Special Dividend is not excessive, let alone anticompetitive or an unreasonable restraint on trade. And the Plaintiff States' supposed fear of a "failing firm" defense is not warranted. *Id.* ¶¶

56-58. Albertsons has no intention of invoking the "failing firm" of "flailing firm" defense and has represented as much to the Plaintiff States.

**B.** **THE PLAINTIFF STATES CANNOT ESTABLISH A VIOLATION OF STATE ANTITRUST LAWS.**

Albertsons' independent decision to pay the Special Dividend does not constitute a violation of the District of Columbia Antitrust Act, D.C. Code § 28–4052, or the Illinois Antitrust Act, 740 ILCS 10/3. The DC and Illinois state antitrust laws are virtually identical to and are construed in harmony with the Sherman Act. *See Atl. Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*, 295 F. Supp. 2d 75, 87 (D.D.C. 2003) (D.C. Code § 28–4052 "parallels § 1 of the Sherman Act"); *Mazanderan v. Indep. Taxi Owners' Ass'n*, 700 F. Supp. 588, 591 n. 9 (D.D.C. 1998) (analysis of claims brought under the D.C. Antitrust Act "necessarily follows that of the federal claim"); *Boffa Surgical Group LLC v. Managed Healthcare Associates Ltd.*, 47 N.E. 3d 569, 574 (Ill. App. Ct. 2015) (740 ILCS 10/3 is construed "in accordance with the construction given its federal counterpart, section 1 of the Sherman Act").  For the reasons described above, Albertsons has not violated Section 1 of the Sherman Act.  Accordingly, Albertsons has also not violated the District of Columbia Antitrust Act, D.C. Code § 28–4052 or the Illinois Antitrust Act, 740 ILCS 10/3.

**III.** **THE PLAINTIFF STATES CANNOT DEMONSTRATE IRREPARABLE HARM.**

The Plaintiff States likewise cannot meet the "high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  To establish irreparable harm, Plaintiff must show the injury alleged is "both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotation marks and citation omitted). A "possibility of irreparable harm" is not enough; Plaintiff

must demonstrate that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (internal citations omitted) (emphasis added). Here, Plaintiff States cannot establish that they face a likelihood of irreparable harm and the Motion for preliminary relief should be denied for that independent reason. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 ("A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."); *see also Adirondack Transit Lines, Inc. v. Greyhound Lines, Inc.*, No. 1:22-CV-1662-RCL, 2022 WL 2452597, at *13 (D.D.C. July 1, 2022) (denying preliminary relief where movant failed to prove likelihood of irreparable harm); *Petty v. Am. Fed'n of Gov't Emps.*, No. CV 21-3161 (CKK), 2021 WL 5991734, at *8 (D.D.C. Dec. 17, 2021) (same); *Heart 6 Ranch, LLC v. Zinke*, 285 F. Supp. 3d 135, 143 (D.D.C. 2018) (same).

There is no evidence to support the Plaintiff States' claim that they face a likelihood of irreparable harm. The Plaintiff States' speculation regarding Albertsons' ability to compete in the markets it serves or pay its debts in the ordinary course appears to be based almost entirely on the generic fears of their expert, Professor Weisbach.  None of that analysis is sufficiently concrete, or specific to Albertsons, to support the Plaintiff States' extraordinary request that this Court intercede in the Company's corporate governance and prohibit the return of capital from surplus.  Meanwhile, Albertsons has provided credible, sworn testimony from its CFO that the Company is in strong financial condition today and will be in strong financial condition after the Special Dividend is paid. McCollam Decl. ¶¶ 8-10, 18, 30, 42-56, 59-66. Albertsons has also submitted an expert report explaining the massive deficiencies in the generic "opinions" set forth in Professor Weisbach's report. *See generally* Smith Decl. The Plaintiff States simply have no credible basis to challenge the Special Dividend.

Albertsons will remain a separate and competitive business until the Merger closes, and it cannot close until cleared under the antitrust laws. *Id.* ¶ 17, 58. To the extent their concerns go to the Merger, the Plaintiff States will have every opportunity to conduct a full and rigorous review of the Merger through the customary and well-established process, and may seek to enjoin the Merger if they determine – after a thorough investigation – that it is likely to have anticompetitive effects. That process is more than adequate to protect the Plaintiff States' asserted interest in competition.

## IV.   THE BALANCE OF THE EQUITIES AND PUBLIC INTERESTS DO NOT FAVOR PRELIMINARY RELIEF.

The equities and relevant public interests weigh heavily against the extraordinary relief sought. The Plaintiff States have not established that they or competition broadly will suffer any harm in the absence of a TRO blocking payment of the Special Dividend. Albertsons' independent decision to issue the Special Dividend will in no way impede the Plaintiff States' investigation of the Merger or their ability to seek appropriate relief.

A TRO would, however, substantially injure Albertsons because canceling or even postponing the Special Dividend exposes Albertsons to significant claims. Under Delaware law, the declaration of an unconditional cash dividend by a corporation's board creates a binding debtor-creditor relationship between the holders of common stock on the record date and the corporation, and the corporation is liable for the amount of the declared dividend.[2] Any interference with the Special Dividend's payment after its announcement would, under Delaware law, render Albertsons potentially liable to the holders of its common stock as of the record date for the amount of the Special Dividend and subject the Board to the risk of litigation in state

---

[2]   *See In Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1175 (Del. 1988); *Grand Metropolitan Public Ltd. Co. v. Pillsbury Co.*, 558 A.2d 1049, 1061 (Del. Ch. 1988); *Baks v. Centra, Inc.*, 1997 WL 819130 (Del. Super. Dec. 15, 1997).

and/or federal court.[3] Even with an injunction in place, shareholders could argue the Company still owes the payment.   Given the extensive trading of Albertsons' stock following announcement of the Special Dividend, this exposure is potentially significant.  As a result, any restraint on payment of the Special Dividend as announced will negatively impact Albertsons' liquidity situation.  *See* Smith Decl. ¶¶ 40-41.

A TRO would also negatively impact shareholders who have traded in or held Albertsons' stock since the Special Dividend's declaration in reliance of its payment on November 7.  The average trading volume in Albertsons' stock in the twenty days preceding the announcement of the Special Dividend was 3.3 million shares per day.  Trading volume in Albertsons' stock increased significantly between the declaration of the Special Dividend and the record date, including by a factor of over 12 on October 14, as summarized below.

|  | 13-Oct-22 | 14-Oct-22 | 17-Oct-22 | 18-Oct-22 | 19-Oct-22 | 20-Oct-22 | 21-Oct-22 |
|---|---|---|---|---|---|---|---|
| Closing Price | $28.63 | $26.21 | $26.43 | $26.74 | $27.20 | $27.50 | $21.08 |
| Volume (in mm of shares) | 29.0 | 40.6 | 13.2 | 14.5 | 12.4 | 11.7 | 14.6 |
| Volume / Pre Announcement Volume (20 day average) | 8.8x | 12.2x | 4.0x | 4.4x | 3.8x | 3.5x | 4.4x |
| Trades (000 of orders) | 179 | 207 | 81 | 68 | 84 | 78 | 81 |
| Trades / Pre Announcement Trades (20 day average) | 7.6x | 3.0x | 2.5x | 3.1x | 2.8x | 3.0x | 1.6x |

Source: S&P Capital IQ (price and volume); Bloomberg (trading)

Trading in Albertsons' stock has continued to be at these elevated levels from the Special Dividend record date through November 1.  In the seven-day period between the announcement date and the record date, 136.0 million Albertsons' shares exchanged hands.  In the seven-day period between the record date and November 1, 2022, 37.4 million Albertsons shares exchanged hands. Crucially, the announcement of the Special Dividend had a very significant effect on the price of Albertsons stock, because the Special Dividend provides a return to stockholders as of the record date of October 20, 2022, but not to those acquiring shares thereafter.  As expected

---

[3]   *See In re Sunstates Corp. S'holders Litig.*, C.A. No. 13284, slip op. at 6 (Del. Ch. Apr. 18, 2001); *Wilmington Trust Co. v. Wilmington Trust Co.*, 15 A.2d 668 (Del. Ch. 1940).

given the size of the Special Dividend, the price per share of the stock was marked down by $6.85 from the close ($27.50) on October 20 to the October 21 opening price of $20.65. An improvidently granted TRO risks irreparable harm to those who have traded (potentially as high as 25% of the value of each share, based on the stock price before and after the record date) as their identity cannot readily be traced. Indeed, such a TRO would create a class of winners and losers in a multitude of ways, including:

- Sellers who transacted after the record date sold their shares too cheaply as the price per share that they transacted upon assumed that the dividend would be paid to the seller and not the buyer. In the case of an injunction, these sellers would have received a raw deal.

- Buyers who transacted after the record date bought the shares at (in a post-injunction world) artificially low prices. In the case of an injunction, these buyers will receive windfalls.

In addition to this direct financial harm, a TRO would also undermine the functioning of the public securities markets as to future trading of Albertsons' securities (and perhaps more broadly if shareholders no longer have certainty that dividends validly declared will in fact be paid).

Finally, whether Albertsons can or should pay the Special Dividend is to be decided by its Board in accordance with Delaware law and is not a question for antitrust regulators. Absent a clear showing that Albertsons' independent decision to pay the Special Dividend constitutes an *unreasonable agreement* in restraint of trade that will cause irreparable harm *to competition* or in violation of state or federal law – a showing which has not been made – the Court should not interfere with a private corporation's internal affairs. *See Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 210 (D.D.C. 2011) (denying TRO where interference with internal workings of labor unions would not serve public interest).

## **CONCLUSION**

For the foregoing reasons, the TRO Motion should be denied.

Dated this 4th day of November, 2022       Respectfully submitted,

/s/ *Edward D. Hassi*

**DEBEVOISE & PLIMPTON LLP**      **JENNER & BLOCK LLP**

| | |
|---|---|
| Edward D. Hassi | Stephen L. Ascher (admitted *pro hac vice*) |
| (thassi@debevoise.com) | (sascher@jenner.com) |
| Leah S. Martin | William S.C. Goldstein (admitted *pro hac vice*) |
| (lmartin@debevoise.com) | (wgoldstein@jenner.com) |
| 801 Pennsylvania Avenue, N.W. | 1155 Avenue of the Americas |
| Washington, DC 20004 | New York, NY 10036 |
| Tel.: (202) 383-8000 | Tel.: (212) 891-1600 |

| | |
|---|---|
| Shannon Rose Selden (*pro hac vice pending*) | Gabriel K. Gillett (admitted *pro hac vice*) |
| (srselden@debevoise.com) | (ggillett@jenner.com) |
| J. Robert Abraham (*pro hac vice pending*) | Miriam J. Wayne (admitted *pro hac vice*) |
| (jrabraham@debevoise.com) | (mwayne@jenner.com) |
| 919 Third Avenue | 353 North Clark Street |
| New York, NY 10022 | Chicago, IL 60654 |
| Tel.: (212) 909-6000 | Tel.: (212) 840-7290 |

*Counsel to Defendant Albertsons Companies, Inc.*

## **CERTIFICATE OF SERVICE**

I, Edward D. Hassi, certify that a true and correct copy of the foregoing was served upon all counsel of record via the court's CM/ECF filing system.

Dated: November 4, 2022                    Respectfully submitted,

                                                       /s/ *Edward D. Hassi*