# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

DISTRICT OF COLUMBIA, *et al.*,

        Plaintiffs,

    v.

THE KROGER CO., *et al.*,

        Defendants.

Case No. 1:22-cv-3357 (CJN)

## PLAINTIFFS' REPLY IN SUPPORT OF
## <u>MOTION FOR A TEMPORARY RESTRAINING ORDER</u>

## TABLE OF CONTENTS

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT THE MERGER AGREEMENT'S SPECIAL DIVIDEND AND ACCOMPANYING RESTRICTIONS CONSTITUTE AN UNREASONABLE RESTRAINT OF TRADE BETWEEN COMPETITORS. ................................................................................................................ 4

A. Defendants' Merger Agreement Restrains Competition through the Special Dividend and Related Terms. .............................................................................................................. 4

B. Defendants Have Waived Any Argument that Their Conduct, Taken Together, Is Not Likely to Violate the Antitrust Laws. ..................................................................... 5

C. Defendants' Engaged in Concerted Action. ....................................................... 6

D. A Quick Look Suffices to Condemn Defendants' Agreement. ........................... 10

E. Plaintiffs Will Also Likely Prevail Under the Rule of Reason. ......................... 11

II. CONSUMERS AND THE STATES WILL BE IRREPARABLY HARMED BY INCREASED PRICES, DECREASED QUALITY, AND A TAINTED MERGER REVIEW BECAUSE A WEAKENED ALBERTSONS CANNOT FULLY COMPETE. 13

III. GRANTING A TEMPORARY RESTRAINING ORDER FURTHERS THE PUBLIC'S INTEREST IN COMPETITION AND THE EFFECTIVE ENFORCEMENT OF THE ANTITRUST LAWS. ..................................................................................................... 14

IV. DEFENDANTS' COUNTERARGUMENTS ARE UNAVAILING ................................ 15

A. Speculative Fear of Shareholder Lawsuits Is No Defense to an Antitrust Violation. ........ 15

B. Albertsons' Assertions of Health Post-Dividend Overstate Both the Standard of Liability and Its Financial Outlook. ................................................................................ 18

C. Kroger Wins Whether It Acquires Albertsons or Leaves It to Struggle. ........................... 21

V. CONCLUSION ................................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                                 **Page(s)**

*Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171 (Del. 1988) .............. 17

*Baks v. Centra, Inc.*, No. 94C-01-129, 1997 WL 819130 (Del. Super. Dec. 15, 1997) .............. 18

*City of Moundridge v. Exxon*, 429 F. Supp. 2d 117 (D.D.C. 2006)................................................ 9

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995)........................ 4

*Environmental Democracy Project v. Green Sage Management, LLC*, No. 22-cv-03970-JST,
    2022 WL 4596616 (N.D. Cal. Aug. 23, 2022) ........................................................................ 17

*F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) .......................................................... 14

*F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000)................................................... 13

*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986). ...................................................... 10, 16

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997) ............................................................. 13

*Grand Metro. Pub. Ltd. Co. v. Pillsbury Co.*, 558 A.2d 1049 (Del. Ch. 1988)........................... 18

*In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934 (E.D. Tenn. 2008)...................................... 10

*In re Sunstates Corp. Shareholder Litigation, C.A.*, 2001 WL 432447 (Del. Ch. Apr. 18, 2001) ...
    ............................................................................................................................................... 17

*J.Q.R. ex rel. Rogers v. Dist. of Columbia Gov't*, No. 1:20-cv-02477 (CJN), 2022 WL 3444844
    (D.D.C. Aug. 17, 2022)........................................................................................................... 6

*Mediacom Commc'ns Corp. v. Sinclair Broad. Grp., Inc.*, 460 F. Supp. 2d 1012 (S.D. Iowa
    2006) ...................................................................................................................................... 15

*Muvvala v. Wolf*, No. 1:20-cv-02423 (CJN), 2020 WL 5748104 (D.D.C. Sept. 25, 2020)............ 4

*NaturaLawn of America, Inc. v. West Group, LLC*, 484 F. Supp. 2d 392 (D. Md. 2007)........... 17

*NCAA v. Alston*, 141 S. Ct. 2141 (2021)................................................................................. 5, 10

*Pommer v. Medtest Corp.*, 961 F.2d 620 (7th Cir. 1992) ............................................................ 16

*Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11ᵗʰ Cir. 2016) ............................................... 8, 9

*Robinson v. Dep't of Homeland Sec. Office of Inspector Gen.*, No. 20-cv-2021 (CRC), 2022 WL
    715466 (D.D.C. Mar. 10, 2022).............................................................................................. 6

*Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978 (9th Cir. 2001) ...................................................... 9

*United States v. Washington Post Co.*, 446 F.2d 1322 (D.C. Cir. 1971)..................................... 12

*United States v. Loew's, Inc.*, 371 U.S. 38, 51 (1962)............................................................... 17

*United States v. Trib. Publ'g Co.*, No. CV1601822ABPJWX, 2016 WL 2989488 (C.D. Cal. Mar.
    18, 2016) ............................................................................................................................... 12

*Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ............................................... 6

*Washington v. Albertsons Cos.*, No. 22-2-18046-3 SEA (Wash. Super. Ct., King County Nov. 3,
    2022) ....................................................................................................................................... 8

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012).................................................. 11

**Other Authorities**

Hotchkiss, Edith S., et al. (2021), "Private Equity and the Resolution of Financial Distress," The
    Review of Corporate Finance Studies, 10(4), pp. 694–747.................................................... 20

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2952 (3d ed.
    2022) ...................................................................................................................................... 12

Plaintiffs the District of Columbia, the State of California, and the State of Illinois ("Plaintiffs") submit this Reply in further support of their Motion for a Temporary Restraining Order ("Motion") to prevent Albertsons from issuing a "special cash dividend" in connection with its proposed merger with Kroger.

Defendants' Merger Agreement does three things: First, it provides for Albertsons' issuance of the Special Dividend, effectively eliminating the company's liquidity. Second, it prohibits Albertsons from seeking other sources of financing except in coordination with Kroger. Finally, it does both at a time when companies with Albertsons' bond ratings are likely to have a hard time raising capital. This combination of restrictions violates the Sherman Act and state analogues by reducing Albertsons' ability to compete, both while Defendants' merger is undergoing review, and if the merger is subsequently abandoned or blocked. The instant motion seeks a temporary restraining order because Plaintiffs are likely to prevail on this claim and, absent Court action Albertsons may pay the Special Dividend as soon as Thursday to the detriment of Plaintiffs and the public interest.

Defendants fail to show why Plaintiffs are not likely to prevail on the merits. Their briefs are in large part carbon copies of what they submitted in Washington State and fail to address the full extent of Plaintiffs' allegations here: that the payment of the Special Dividend, *together with other restrictive terms in the Merger Agreement*, will likely reduce Albertsons' competitiveness. Neither Defendant's brief mentions these terms let alone tries to refute Plaintiffs' argument that the combination of the Special Dividend and these additional restrictions are likely to reduce competition. Defendants have now waived any argument otherwise, and thus have no argument as to whether Plaintiffs will prevail on their claims, properly construed.

The harm from payment of the Special Dividend under the circumstances here will be irreparable: whatever the outcome of the pre-merger review process, Albertsons' ability to compete will be impaired, resulting in higher prices to consumers at the cash register, consumers will not be able to recoup their losses from the higher prices they paid, and they may receive worse service or suppressed innovation. There is no resetting the status quo ante that a court or anyone else could engineer.

The public interest will suffer: The public has a strong interest in vigorous competition, particularly for the sale of essential food goods.  Additionally, effective antitrust oversight requires that corporations seeking to merge refrain from taking steps that might "scramble the eggs," i.e., actions that are difficult, if not impossible, to undo. Preventing such a "scrambling" is precisely why the federal premerger notification regime exists—because policymakers have recognized that it is critical to maintain the status quo during merger review and to preserve competition in case the merger is not ultimately consummated, whether abandoned or blocked.

The balance of equities also favors Plaintiffs: The harms they will suffer are material—reduced competitiveness in Albertsons that can translate into higher prices, reduced promotions, and lower-quality service. Plaintiff States also have a right to review this merger without the process being infected by a very large payment of the Special Dividend and the resulting reduction in Albertsons' ability to compete. The only potential harms Defendants have articulated are speculation about shareholder suits and shareholder rights to payments they were promised. These are unforced errors stemming from Defendants' choice to announce a plan to issue a special dividend as part of a merger plan that dramatically reduces Albertsons' liquidity and all but strips Albertsons of its ability, technical and practical, to raise capital. These harms are also likely imagined, because Defendants have pointed to no legal authority suggesting that

2

shareholders may recover against Albertsons for failing to pay a dividend that this Court has

enjoined. That is because there is no such authority, only Albertsons' unsupported admonition (at

20) to this Court "not [to] interfere with a private corporation's internal affairs," whatever the

antitrust consequences.

Defendants' other arguments in are flawed. In their briefs ("Albertsons' Opp." and

"Kroger's Opp.," respectively), Defendants raise two principal arguments. First, they claim that

the Special Dividend results from Albertsons' unilateral action, completely independent of the

Merger Agreement. This is belied by Albertsons' press release trumpeting "Albertsons

Companies Announces Special Dividend in Connection with Signing of Merger Agreement," as

well as documents presented to its board reflecting a negotiation between Defendants regarding

the amount of the dividend.  Moreover, it cannot be disputed that the Merger Agreement is

concerted action between the parties and that the Merger Agreement creates the perfect storm of

the Special Dividend plus significant restrictions on Albertsons' ability to recoup its lost cash

through other means. That combination will keep Albertsons' cash-poor during pendency of the

merger review and inhibit its ability to compete.

Second, the parties argue that Albertsons is and will remain on sound financial footing,

referring in several places to estimated revenues of $75 billion. But that is not the relevant figure,

as Albertsons' own communications with Kroger and regulators show it knows. Deducting

various costs on its balance sheet leaves Albertsons with $2.4 billion in operating income, which

combined with the $500 million in cash is less than half of the $6 billion it claims to need for its

operations. This argument also misses the point, because the Special Dividend operates in

conjunction with the Merger Agreement's other limitations on Albertsons' operations, and it is

their combined effect on Albertsons' ability to remain sufficiently capitalized and compete in an economic downturn that Plaintiffs' Motion seeks to prevent.

I.      **PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT THE MERGER AGREEMENT'S SPECIAL DIVIDEND AND ACCOMPANYING RESTRICTIONS CONSTITUTE AN UNREASONABLE RESTRAINT OF TRADE BETWEEN COMPETITORS.**

As articulated in Plaintiffs' opening brief, the traditional four-factor test for a TRO applies here. Courts in the District of Columbia Circuit continue to apply a sliding scale when evaluating TRO requests, such that "[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas" are not as strong. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995), *quoted in Muvvala v. Wolf*, No. 1:20-cv-02423 (CJN), 2020 WL 5748104 at *2 (D.D.C. Sept. 25, 2020) (Nichols, J.).  Here, a TRO is warranted because Plaintiffs make strong showings on all the elements for preliminary relief and are particularly strong on the irreparable harm and balance of equities—on the latter, there is simply no countervailing procompetitive interest on the other side of the scale.

A.      **Defendants' Merger Agreement Restrains Competition through the Special Dividend and Related Terms.**

Defendants' Merger Agreement restrains trade as follows: Albertsons and Kroger agree that Albertsons, a corporation with a below-investment-grade credit rating and anticipated cash needs for the coming fiscal year of $10 billion, McCollam Decl. ¶60,[1] may issue a $4 billion dividend, which it will fund with $2.5 billion of its cash on hand and $1.4 billion from its revolving credit facility. *Id.* ¶44. This will reduce its cash holdings to $500 million and leave it with only $2.5 billion available in the credit facility. *Id.* ¶ 45. This $3 billion total (cash and

---

[1] Albertsons projects needing $10 billion to operate in the coming fiscal year, or $6 billion if the Special Dividend is excluded. McCollam Decl. ¶59.

established credit) is far shy of the $6 billion Albertsons needs to operate. *Id.* ¶59. But the

Merger Agreement limits Albertsons' ability to raise additional money through equity offerings,

Weisbach Decl. ¶19 (citing Section 6.1 of Merger Agreement), or increased debt, *id.* (citing

Section 6.1(n)(i)), or to use its assets as collateral, *id.* (citing Sections 6.1(d)(i)). It also requires

Albertsons to "reasonably consult[]" with Kroger, a primary competitor, if it wishes to refinance

any debt over $100 million. Ex. 8 at 62 (Section 6.1).[2] The backdrop for this agreement, which

limits Albertsons' ability to raise capital in a variety of ways, is that a recession is on the horizon,

making it harder still for Albertsons to borrow. Weisbach ¶¶12, 15 & n.9. As the Complaint

summarizes, "[t]he Merger Agreement, and specifically the payment of the Special Dividend

together with other terms limiting Albertson's ability to finance its operations, will significantly

reduce Albertsons' ability to compete during the pendency of regulatory review of the merger,

and possibly beyond." Compl. ¶86.

> **B.    Defendants Have Waived Any Argument that Their Conduct, Taken
>         Together, Is Not Likely to Violate the Antitrust Laws.**

Defendants nowhere in their papers address the operational limitations the Merger

Agreement imposes on Albertsons, nor do they consider the effect of the Special Dividend

*combined with these terms*. They do not dispute that the terms of Section 6.1 of the Merger

Agreement say what they say, nor contend that, together with the Special Dividend, these terms

reduce competition from Albertsons. *NCAA v. Alston*, 141 S. Ct. 2141, 2154 (2021) (noting that

defendants did not contest that agreement facially included restrictions).

"A party implicitly concedes a point by failing to raise it in an opposition brief." *J.Q.R.*

*ex rel. Rogers v. Dist. of Columbia Gov't*, No. 1:20-cv-02477 (CJN), 2022 WL 3444844, at *3

---

[2] All exhibit citations are to the November 2, 2022 Declaration of Adam Gitlin unless otherwise noted.

n.2 (D.D.C. Aug. 17, 2022) (Nichols, J.) (citation omitted); *Robinson v. Dep't of Homeland Sec. Office of Inspector Gen.*, No. 20-cv-2021 (CRC), 2022 WL 715466, at *3 n.4 (D.D.C. Mar. 10, 2022) (citing *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014)) ("Arguments not raised in opposition to a motion are waived."). Plaintiffs' claim is pellucidly laid out in the Complaint. *See, e.g.*, Compl. ¶¶64-68 (describing and quoting relevant provisions), *Id*. ¶86 (alleging the combination "of the Special Dividend *together with other terms limiting Albertson's ability to finance its operations*, will significantly reduce Albertsons' ability to compete during the pendency of regulatory review of the merger, and possibly beyond" (emphasis added)). Plaintiffs' Motion similarly makes clear that the Special Dividend works with the Merger Agreement's "numerous restrictions on Albertsons' ability to take out new loans to meet the unusual pressure the Special Dividend will put on its balance sheet." Mot. at 9-10. Dr. Weisbach additionally quoted relevant portions of the Merger Agreement. Weisbach Decl. ¶¶18-21 (stating that "these provisions generally limit Albertsons from pursuing external sources of capital" and concluding that "Albertsons' reduced liquidity, combined with its reduced access to capital, *and limitations imposed by the merger agreement with Kroger on Albertsons' ability to pursue external financing*, in the coming months will make it more difficult for Albertsons to make investments necessary to stay competitive in the markets in which it operates" (emphasis added)). Defendants' failure to address or dispute Plaintiffs' claim that these provisions of the Merger Agreement work together to effectuate an anticompetitive effect is telling, and the Court can find a likelihood of success on the basis of waiver alone.

### C.    Defendants' Engaged in Concerted Action.

Defendants unsuccessfully attempt to disavow the agreement they clearly made, claiming that the Special Dividend is no more than Albertsons' unilateral conduct to return value to

investors. First, that argument misses the full scope of Plaintiffs' claims. Second, Albertsons'

board of directors approved the Special Dividend at the same meeting during which it declared

the Merger to be in the company's best interests and recommended the merger to its

shareholders. Ex. 8, Recitals Section. Third, both the merger and the Special Dividend were

announced on the same day in a press release titled "Albertsons Companies Announces Special

Dividend in Connection with Signing of Merger Agreement."[3] ███████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

Additionally, documents produced to the District during the course of its investigation

show how the Special Dividend and the Merger Agreement were linked in the Defendants'

discussions.[4] ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████     ████████████ ██

---

[3] https://www.albertsonscompanies.com/newsroom/press-releases/news-details/2022/Albertsons-Companies-Announces-Special-Dividend-in-Connection-with-Signing-of-Merger-Agreement/default.aspx#:~:text=The%20Special%20Dividend%20is%20payable,the%20Company%2C%20The%20Kroger%20Co.

[4] Albertsons protests that the decision to issue the Special Dividend has nothing to do with the Merger Agreement, but rather is the result of its own, longstanding "strategic review" to return capital to its shareholders. Albertsons tries to have it both ways, arguing on the one hand that the decision to issue the Special Dividend was its alone, and on the other that the Special Dividend needed to be referenced in the merger agreement to protect its interests. If issuing the dividend was in Albertsons' discretion alone, there would have been no reason to consult Kroger, much less obtain its consent.

[5] In this presentation Kroger is referred to as "Kiwi."

███████████████████████████████████████████████

██████████   ███████████████████████████████████

███████████████████████████████████████████

████████████████████████████████ The foregoing facts have already led a

Washington State court to find that the payment of the dividend constitutes an agreement likely

to reduce competition and to issue a temporary restraining order enjoining payment of the

dividend. Order Granting Pl.'s Mot. For Temporary Restraining Order, *Washington v. Albertsons*

*Cos.*, No. 22-2-18046-3 SEA (Wash. Super. Ct., King County Nov. 3, 2022), attached hereto as

Ex. A.

The extent of Kroger's negotiation of the dividend and its inclusion in the Merger

Agreement along with other bargained-for terms that effectively interact with the dividend to

keep Albertsons' cash-poor during at least the pendency of the merger review, make the facts

here easily distinguishable from the unilateral-conduct cases Defendants cite. For example, in

*Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072 (11th Cir. 2016), cited by Kroger (at 12), a joint

venture agreement was not considered evidence of concerted action to allocate markets where

the original joint venture was undisputedly procompetitive. The alleged market allocation was

only effectuated by a subsequent acquisition by one of the joint venture partners of a close

competitor of the second partner, and the second partner refused to continue with the joint

venture. *Id.* at 1080-81. This case is inapposite for several reasons. First, Albertsons' and

Kroger's Merger Agreement is not undisputedly procompetitive, but rather is undisputedly

suspect, will be subject to intense review by regulators, and the parties already contemplate and

have prepared for and announced the need to make significant divestitures. Second, there is no

subsequent unilateral action like the acquisition by only one of the joint venture partners that is

the source of the alleged anticompetitive effect.  Third, Kroger has not walked away or refused to perform the terms of the Merger Agreement.  *Id.* at 1082 ("Here, all of the alleged anticompetitive effects arose from Patheon's unilateral decision to remove the Banner assets from the market, to which Procaps never acquiesced). To the contrary, Albertsons and Kroger have both doubled down in this litigation (and that in Washington State) on their intent to get this dividend paid before regulators can even begin their required evaluation, let alone complete their review.

Plaintiffs have clearly described the mechanism through which the Merger Agreement constrains Albertsons, and there is no suggestion that either Defendant entered the Merger Agreement involuntarily or otherwise was not a conscious participant in reaching it, unlike in cases such as *Toscano v. Pro. Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001) (no concerted action where a sponsor merely agreed to sponsor an event subject to certain eligibility rules and regulations). Rather, Albertsons and Kroger are competitors agreeing to constrain the operations of one of them.

More fundamentally, Albertsons and Kroger cite cases where the plaintiff has asked the court to infer an agreement from circumstantial evidence of parallel pricing conduct.  *See* Albertsons Opp. at 8 (quoting *Monsanto*'s discussion of how price complaints alone do not lend an inference of agreement), *id.* (quoting *In re Domestic Airline Travel Antitrust Litigation*'s discussion of circumstantial evidence in the absence of explicit agreement before it denied defendants motion to dismiss), *id.* (quoting *In re Text Messaging Antitrust Litigation*'s discussion of same before similarly denying motion to dismiss); Kroger Opp. at 12 (quoting denial of preliminary injunction for alleged price-fixing conspiracy based on allegations of parallel pricing conduct in *City of Moundridge v. Exxon*, 429 F. Supp. 2d 117, 130 (D.D.C. 2006)). These cases

are inapposite here where the States can point to an explicit written agreement. *See, e.g.*, *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943 (E.D. Tenn. 2008).

    **D.**    **A Quick Look Suffices to Condemn Defendants' Agreement.**

    Defendants have executed a contract that memorializes an agreement to siphon off substantially all the liquidity of one of them, and prevent it from acquiring more, even if it could do so in a toughening economic climate, which it probably cannot. While this arrangement is "not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986). As in *Indiana Federation of Dentists*, Kroger and Albertsons are not ending all competition between them; they are limiting it in an important respect, in a way that "so obviously threaten[s] to reduce output and raise prices that" it warrants condemnation "after only a quick look." *NCAA v. Alston*, 141 S. Ct. 2141, 2156 (2021).

    Defendants, once again perhaps forgetting the differences between the complaints and TRO motions filed in this Court and in Washington State court, argue that a *per se* standard should not apply (Plaintiffs do not suggest otherwise). But, in claiming that their anticompetitive agreement is "novel" (which alone provides no basis to eschew a truncated rule of reason analysis), they miss the rationale for quick look analysis generally, and why it applies here: The question here is whether, under Sherman Act Section 1, an agreement to effectively eliminate Albertsons' liquid assets while constraining it from obtaining financing to compensate for that loss, until at least early 2024, is a reasonable restraint of trade. In support of that restraint, the parties provide no discernible procompetitive argument; Albertsons merely wants enrich its

shareholders.  Thus, it requires little if any economic analysis to establish that the restraint on balance is likely to be anticompetitive and should be enjoined.

These two companies, unless and until their proposed merger is cleared, are supposed to be totally independent competitors.  A hypothetical union that American antitrust regulators have indicated may raise significant competitive concerns—and that Defendants are confident will require divestitures of at least several hundred stores—does not establish the procompetitive underpinnings that would require a more fulsome rule of reason analysis.

### E.    Plaintiffs Will Also Likely Prevail Under the Rule of Reason.

Under the Rule of Reason, the Court's focus in evaluating Plaintiffs' likelihood of success remains the "probable effect" of Defendants' arrangement on competition. *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012). Plaintiffs need not show Albertsons will file for bankruptcy or cease to exist, only that it will likely compete less hard than it does today. Nor does the standard require that Plaintiffs show there was some malicious intent to weaken Albertsons—intent has never been the lodestar for antitrust liability. The question for the Court, as Kroger concedes, is not whether Defendants intended the Special Dividend, combined with the Merger Agreement's other restrictive terms, Albertsons' ratings, and the poor economy, to reduce Albertsons' competitiveness, but rather whether those restrictions' likely will have an "'actual effect' on competition." Kroger Opp. at 16 (quoting *Am. Express Co.*, 138 S. Ct. at 2284).

Defendants quibble with the admittedly preliminary nature of Plaintiffs' market analysis. But there is no question Defendants are head-to-head competitors—their understanding that they will need to divest numerous stores to have any chance of clearing this deal brings that point well beyond dispute. And Kroger's brief (at 13-14) wisely concedes that relevant geographic markets

are much smaller than the District itself, acknowledging that District residents closer to Navy Yard will not respond to price increases by shopping in Tenleytown. That means in neighborhoods like Adams Morgan, where Safeway and Harris Teeter are located a third of a mile away from each other, they are essentially duopolists for that neighborhood, each with market power. Once the Special Dividend is paid, Albertsons will not be able or incentivized to compete as hard in areas like that, and as the Complaint explains, competition will be reduced marketwide. Compl. ¶72. And the anticompetitive effects are plain to see: Competition requires liquidity, which the Special Dividend removes. The Merger Agreement prohibits Albertsons from seeking various forms of financing to remedy any shortfall, and in at least once instance require consultation with their competitor Kroger.

Defendants also ignore the realities of Plaintiffs' TRO Motion. *See, e.g.*, Kroger Opp. at 13.  The merger was only announced three weeks ago. Plaintiffs' evidence and analysis since the merger are necessarily preliminary, and because TROs are generally sought on short notice and in situations of great urgency, "it probably is unsound to hold" the evidence presented in support of them to "too rigorous a standard." *See* 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2952 (3d ed. 2022); *see also U.S. v. Washington Post Co.*, 446 F.2d 1322, 1325 (D.C. Cir. 1971) ("The Government does not ask us to accept its allegations, but only to afford it an opportunity to prove them."). That Plaintiffs are early in their analysis of the competitive effects does not prevent this Court from stopping them now. *Accord*, *United States v. Trib. Publ'g Co.*, No. CV1601822ABPJWX, 2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) (granting TRO motion and blocking acquisition).

II.     **CONSUMERS AND THE STATES WILL BE IRREPARABLY HARMED BY INCREASED PRICES, DECREASED QUALITY, AND A TAINTED MERGER REVIEW BECAUSE A WEAKENED ALBERTSONS CANNOT FULLY COMPETE.**

Albertsons has made clear it will immediately pay the Special Dividend absent continued enjoinment by a court. This will immediately and irreparably harm consumers and the Plaintiff States. Defendants' expert concedes Albertsons' bonds are a "speculative" investment, and its loss of cash and increase of debt come at a time when an impending recession will make those circumstances more acute. A cash-poor Albertsons will be less able to compete with Kroger and other rivals, and will need to raise prices to generate liquidity, harming consumers in the process. This harm will persist both during the pendency of merger review and after the Merger is abandoned or blocked. There is no practical mechanism for undoing this harm, *see FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1073 (D.D.C. 1997) ("These higher charges could never be recouped even if the administrative proceeding resulted in a finding that the merger violated the antitrust laws."). Even if, as a result of the merger review process, the Special Dividend is later found to violate Section 7 of the Clayton Act, the harm will already have been done. Paying it on November 10 will "prevent [Albertsons] from being reconstituted in its current state as a viable competitor" if the merger is later blocked or abandoned. *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 173 (D.D.C. 2000) (granting injunction).

Defendants argue their own irreparable harm in an attempt to balance the scales of equity (*see* Section IV.A, *infra*), namely that Albertsons may be subjected to securities lawsuits if it fails to pay the dividend it has announced.  Not only is this a harm of Defendants' own making,

but they have cited no support for the proposition that a securities suit would be credible where the dividend has been enjoined by court order.

III.     **GRANTING A TEMPORARY RESTRAINING ORDER FURTHERS THE PUBLIC'S INTEREST IN COMPETITION AND THE EFFECTIVE ENFORCEMENT OF THE ANTITRUST LAWS.**

Plaintiff States' objective in bringing this action is not only to protect consumers but to give themselves and other regulators sufficient time to investigate the merger and the Special Dividend. The public has a significant interest in a competitive market for the sale of essential food products that will ensure appropriate pricing and service. Consumers have a significant interest in not overpaying for their basic needs.  Moreover, "public interest in effective enforcement of the antitrust laws" is served by letting federal and state regulators investigate mergers *before* they begin. *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001). Denying a temporary restraining order would work counter to that public interest by permitting Albertsons—*in three days*—to overhaul completely its capital structure in connection with, and in anticipation of, a merger that may never be consummated, and whose contemplated consummation is a year or more in the future. *See* Ex. 8, Item 1.01 ("outside date" for merger of January 13, 2024). This represents a "scrambling of the eggs," an upsetting of the status quo during merger review, that injunctions under Section 16 of the Clayton Act are intended to prevent. Every step away from the status quo is one that must be walked back if the merger fails or is blocked. In the case of an Albertsons hobbled by a year of being starved of liquidity, it is unclear how the harm could be undone. *See FTC v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001) (public equity factor of Section 13(b) of FTC Act met because "if the merger were

ultimately found to violate the Clayton Act, it would be impossible to recreate pre-merger competition."). Maintaining the status quo is in the public interest.

Kroger argues that granting a TRO here would not serve the public interest because it would be "preventing the free market from taking its natural course." Kroger Opp. at 20 (quoting *Mediacom Commc'ns Corp. v. Sinclair Broad. Grp., Inc.*, 460 F. Supp. 2d 1012 (S.D. Iowa 2006). To the contrary, it is the free market that Plaintiffs are trying to protect from irreversible changes that would hamstring a critical competitor. *See id.* (noting that public interest is served by competition). The more apt quotation from Kroger's cases is that a defendant "cannot rely on its own actions to create the risk of irreparable injury which it then seeks to avoid by the issuance of a preliminary injunction." *Vantico Holdings S.A. v. Apollo Mgmt., LP*, 247 F. Supp. 2d 437, 454 (S.D.N.Y 2013).

## IV.     DEFENDANTS' COUNTERARGUMENTS ARE UNAVAILING

### A.     Speculative Fear of Shareholder Lawsuits Is No Defense to an Antitrust Violation.

To hear Defendants tell it, not paying the Special Dividend will mean Armageddon for securities markets as we know them. They argue without support that the balance of the equities tips in their favor because the Special Dividend, once promised, creates a basis for lawsuits against Albertsons if not paid. Contrary to these unsupported and speculative claims of potential legal liability flowing from Defendants' own actions, the harms to consumers and the States in the form of less competition, higher prices, and less quality and innovation, and the harms to regulators with respect to their ability to police mergers, are clear. *See* Section I, *infra.*

Defendants' baseless claims that failure to pay the Special Dividend will subject Albertsons to ruinous liability from shareholder lawsuits fail to move the needle on the scale of

equities here.[6] Albertsons would not be subject to liability for fraud under the Securities

Exchange Act, unless it knew in advance of this Court's intention to issue a TRO. *See, e.g.*,

*Pommer v. Medtest Corp.* 961 F.2d 620, 623 (7th Cir. 1992) ("The securities laws approach

matters from an *ex ante* perspective: . . . a statement true when made does not become fraudulent

because things unexpectedly go wrong . . . .").

Albertsons, however, contends that its stockholders can sue because they have rights

created by the promise to pay the Special Dividend. First of all, as *Indiana Federation of*

*Dentists* reminds us, 476 U.S. at 465, the existence some state law or policy does not, as a

general matter, shield anyone from antitrust scrutiny unless the state action doctrine applies, and

Defendants do not contend that Delaware has promulgated a policy of shareholder rights

displacing antitrust enforcement. Albertsons has not argued that the Supremacy Clause contains

a carve-out for Delaware law, or that Delaware law is an affirmative defense to a Section 1

claim. Albertsons' brief says (at 19) only that "[e]ven with an injunction in place, shareholders

could argue the Company still owes the payment." Someone also might sue Albertsons if it *does*

pay out the Special Dividend because they could argue it is "waste" by the Board. But neither

potential suit creates a right in Defendants to disregard the antitrust laws, for "the antitrust laws

---

[6] At their highest pitch, Defendants contend that accepting Plaintiffs' theory would subject every merger agreement containing provisions limiting the target's ability to encumber itself with additional debt to a Section 1 claim. *See* Kroger Opp. at 20 ("If governments (and individual plaintiffs) are allowed to weaponize antitrust law to seek judicial review of every such business decision, our nation's economy would grind to halt."). Not so. It would only do so where the merger agreement commits one of the parties to a set of conflicting imperatives that could render it less able to compete.

cannot be avoided merely by claiming that the otherwise illegal conduct is compelled by contractual obligations." *United States v. Loew's, Inc.*, 371 U.S. 38, 51 (1962).[7]

That is especially true when the bind in which Albertsons finds itself results from Defendants' own "willful acts." *NaturaLawn of America, Inc. v. West Group, LLC*, 484 F.Supp.2d 392, 403 (D. Md. 2007) (granting preliminary injunction); *see also Environmental Democracy Project v. Green Sage Management, LLC*, No. 22-cv-03970-JST, 2022 WL 4596616, at *4 (N.D. Cal. Aug. 23, 2022) ("Regardless of that magnitude, however, the Court would still find the balance of equities favors Plaintiff because Defendant's alleged harms are self-inflicted."). They have pointed to no law or fiduciary duty compelling Albertsons to declare a special dividend for payment on November 7, rather than at the Merger's closing. Albertsons cannot tip the balance of equities in its favor by kneecapping itself. *See NaturaLawn of America, Inc.*, 484 F.Supp.2d at 403 & n.2 (collecting cases in which self-inflicted harms are discounted in preliminary injunction context).

Regardless, of the four decisions of Delaware courts applying Delaware law that Albertsons cites, two just state general principles applying to shareholder derivative claims, and say nothing about how an intervening court order would affect shareholders' right to recovery. *See Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171 (Del. 1988) (stockholder's contractual right to a dividend becomes fixed upon the declaration of the dividend); *In re Sunstates Corp. S'holder Litig., C.A.*, No. Civ.A. 13284, 2001 WL 432447 (Del. Ch. Apr. 18, 2001) (authorizing transactions carried out through a company's subsidiaries could

---

[7] For the same reason, Albertsons' claim that Delaware law permits it to pay dividends out of a surplus misses the point. *See* McCollam Decl. ¶¶31-41.

give rise to shareholder derivative claims against corporation's directors for breach of fiduciary duty).

Defendants' other cases in fact support Plaintiffs.  In *Baks v. Centra, Inc.*, No. 94C-01-129, 1997 WL 819130 (Del. Super. Dec. 15, 1997), the court permitted a defense that the dividend was improperly declared and that the dividend failed to meet the financial prerequisites under 8 Del. C. §170. Thus, the *Baks* court refused to strike a corporation's defenses in an action by shareholders for payment of a declared dividend. Accordingly, Albertsons could raise the restraining order as a defense to any (still-hypothetical) action for payment of the dividend. In *Grand Metro. Pub. Ltd. Co. v. Pillsbury Co.*, 558 A.2d 1049, 1061 (Del. Ch. 1988), the court enjoined a corporation from spinning off a subsidiary because doing so would "invite chaos" in the underlying shareholder litigation, noting that the corporation's "capital structure would be permanently changed." Plaintiffs are requesting a restraining order here for the same reasons. Notably, the corporate defendant in *Grand Metro* was publicly traded, *id.* at 1051, meaning that the court granted the preliminary junction despite the fact that shares had likely changed hands in reliance on the spin-off announcement.

In sum, putting aside that dividend rights do not trump antitrust law, none of Defendants' Delaware cases support the situation here: that the dividend will have the effect of reducing Albertsons' ability to compete and thus is properly enjoined by this Court under the federal antitrust law, and Albertsons can properly claim that its payment was made impossible by Court Order.

### B.   Albertsons' Assertions of Health Post-Dividend Overstate Both the Standard of Liability and Its Financial Outlook.

Albertsons contends—as it must—that it is financially healthy even if it gives away most of its cash on hand. The question is whether Albertsons will be able and incentivized to compete

as strongly under the Merger Agreement's strictures, having paid out all its cash on hand and being restricted in further financing during a period of economic contraction, not whether Albertsons will remain solvent.

If Defendants' anticompetitive agreement is allowed to stand, Albertsons is not well positioned to cover the liquidity needs it has represented to its investors. Albertsons' projected cash needs for the coming fiscal year are $10 billion ($6 billion if the Special Dividend is excluded). McCollam Decl. ¶¶ 63-65. It claims that the Special Dividend will not affect its ability to meet these needs because it will still have $500 million in cash, $2.5 billion available under its asset-based lending facility, and annual revenues of $75 billion. *Id.* ¶¶45-46. The sum of the first two figures is obviously much less than $6 billion, so it is the last one that must make up the difference. It does not. Albertsons refers to its annual revenues as if they are uncommitted funds there for the pillaging; hardly—they are all but spoken for by Albertsons' liabilities. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ Further, Albertson' claims that it usually borrows at a fixed rate so would not be affected by the economic downturn are unavailing both because the Merger Agreement does not allow Albertsons to recoup its cash by further borrowing and because Albertsons' asset-based lending facility charges variable interest that may increase with other interest rates. Smith Decl. ¶19 ("the interest on the revolving component is [LIBOR + 1.25%-1.5%]").

In fact, Dr. Smith, Defendants' expert, concedes that "the amount of funding available to a borrower which [*sic*] a credit rating like Albertsons could be lower." Smith Decl. ¶23.[8] Smith claims instead that Albertsons can use projected revenues in the coming year to cover its

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ .

liquidity needs. But as noted above, not so. This corporate-finance sleight of hand does not stop consumers from being hurt: If Albertsons cannot cover its financial liabilities, it again will have to raise money. And if it cannot turn to capital markets, it will harvest money from consumers and workers. Dr. Smith has no adequate response to this harm.

Additionally, Dr. Smith's analysis is largely inapplicable here because, while Dr. Weisbach studied noninvestment-grade bonds like Albertsons' in times of economic downturn like now, Dr. Smith thinks his most relevant empirical work is a study of dividend recapitalizations among financially distressed firms—even though Defendants maintain again and again that Albertsons is not such a firm.[9] Dr. Smith's comparisons of Albertsons' liquidity to other firms' position misses the mark again: the question is not whether Albertsons is solvent compared to Dollar General Corporation, but whether it will have the same incentive and ability to compete without the cash on hand and in substantially more debt than it has today. He cannot (Smith Decl. ¶¶32-35) use bond prices because the question they answer is whether the market thinks Albertsons will default, not the question relevant to the Court's analysis here, whether Albertsons will be less competitive. And both he and Albertsons' CFO Sharon McCollam betray a profound misunderstanding of the Merger Agreement's restrictions on Albertsons' ability to compete in contending that Albertsons can pledge assets as collateral to access additional debt

---

[9] Hotchkiss, Edith S., et al., "Private Equity and the Resolution of Financial Distress," 10 *Review of Corporate Finance Studies* 694–747 (2021). He finds that (1) companies with private-equity backing like Albertsons have higher default rates (when in distress), and (2) they often do not in practice because their private-equity backers give them cash infusions. This is telling: Albertsons is currently backed by private-equity backers whom the market understands have long wanted to exit their stake. The Special Dividend ensures they get paid, and then there is no reason to believe they would come to its rescue when they believe the deal will close, their shares will be bought for an already-fixed price, and they can then turn that money to other pursuits.

financing should the need arise. *See* Smith Decl. ¶23 (citing McCollam Decl. ¶34). Albertsons

cannot do so under the Agreement.

     **C.**    **Kroger Wins Whether It Acquires Albertsons or Leaves It to Struggle.**

Defendants incorrectly argue that it would be implausible for Kroger to agree to cripple

an entity it intends to buy.  Not so. First of all, this argument mischaracterizes Plaintiffs'

allegations and burden—Plaintiffs must only show a probable reduction in competition, not

Albertsons' demise. Moreover, a weakened Albertsons benefits Kroger whether the merger fails

or clears.

The two companies compete directly in numerous markets geographic markets within the

District of Columbia, California, and Illinois, and Kroger would immediately reap the benefits of

having a key competitor in those areas less able to vigorously compete. If the merger ultimately

fails, Kroger continues to face less effective competition from a key player in its market.

Similarly, if the merger clears, Kroger wins: the combined entity does not need the financial

wherewithal to run the approximately 5,000 stores that the two separate entities currently run.

The Merger Agreement contemplates the divestiture of up to 650 stores. *See* Ex. 8 at 13 (defining

"Material Divestment Event").  Kroger benefits if those stores are effectively weakened before

they must be sold to a competitor or new entrant into the grocery market.

In fact, Albertsons' merger history is instructive. When Albertsons acquired Safeway in

2015, Albertsons agreed to sell off 168 stores around the country,[10] 146 of which were sold to a

new entrant, Haggen. Yet "just months after the Albertsons-Safeway acquisition, Haggen

Holdings LLC, which bought most of the divested stores, filed for bankruptcy—allowing

---

[10] FTC Requires Albertsons and Safeway to Sell 168 Stores as a Condition of Merger, Jan. 27, 2015, *available at* https://www.ftc.gov/news-events/news/press-releases/2015/01/ftc-requires-albertsons-safeway-sell-168-stores-condition-merger

Albertsons to scoop up 33 of the stores it had previously sold…"[11] at a severe discount.  In other words, if Kroger and Albertsons effectively burden a new entrant with weakened stores, they may even be able to repatriate them into the company.

Finally, there is nothing unprecedented about a corporation purchasing a struggling rival. Not all mergers involve thriving, robust companies. Competitive or not, a weakened Albertsons has numerous hard assets, from inventory to real estate, and if Kroger does not need them for operation of the post-merger entity, it can sell them and plow the proceeds back into its new slimmed-down, and much less competitively constrained incarnation.  Additionally, Kroger has effectively removed a key competitor from the landscape to its benefit and the detriment of consumers, workers, and Plaintiff States.

## V.    CONCLUSION

For the foregoing reasons, the Court should temporarily restrain Albertsons from issuing its special dividend, pending a hearing on Plaintiffs' forthcoming motion for a preliminary injunction.

---

[11] Ltr. from Elizabeth Warren to Stephen Feinberg & Frank Bruno, Nov. 3, 2022, *available at* .

Dated: November 7, 2022

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

KATHLEEN KONOPKA
Senior Advisor to the Attorney General
for Competition Policy

*/s/ Adam Gitlin*
ADAM GITLIN
Section Chief, Public Integrity Section

*/s/ Carl William Margrabe*
CARL WILLIAM MARGRABE
GEOFFREY COMBER
ELIZABETH ARTHUR

Assistant Attorneys General
Office of the Attorney General
400 6th Street NW, Suite 10100
Washington, D.C.  20001
(202) 735-7516
will.margrabe@dc.gov

**FOR PLAINTIFF STATE OF CALIFORNIA**

**ROB BONTA**
**Attorney General of California**
KATHLEEN E. FOOTE
Senior Assistant Attorney General
NATALIE S. MANZO
Supervising Deputy Attorney General

*/s/ Paula Lauren Gibson*
PAULA LAUREN GIBSON
Deputy Attorney General
California State Bar Number 100780
300 S Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6040
paula.gibson@doj.ca.gov\

**FOR THE STATE OF ILLINOIS**

**KWAME RAOUL**
**Attorney General**

/s/ *Elizabeth L. Maxeiner*
ELIZABETH L. MAXEINER
Bureau Chief, Antitrust
PAUL J. HARPER
BRIAN M. YOST
Assistant Attorney General
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
(773) 590 6837
paul.harper@ilag.gov

*Counsel for the Plaintiff States*

## CERTIFICATE OF SERVICE

This will certify that a true and correct copy of the foregoing, was served upon counsel

for defendants, below, by electronic mail.

Jason Ewart
Sonia Pfaffenroth
Michael Bernstein                                                          Andrew S. Tulumello
Matthew Shultz                                                             Mark Andrew Perry
Matthew M. Wolf                                                            Jeffrey H. Perry
Arnold & Porter Kaye Scholer LLP                                           Weil, Gotshal & Manges LLP
601 Massachusetts Ave. NW                                                  2001 M St. NW, Suite 600
Washington, DC 20001                                                       Washington, DC 20036
**Counsel for Defendant Kroger Company**


George Paul                                                                William S.C. Goldstein
Douglas Jasinski                                                           Stephen Ascher
White & Case LLP                                                           Jenner & Block LLP
701 Thirteenth Street NW                                                   1155 Avenue of the Americas
Washington, DC 20005                                                       New York, NY  10036

Ted Hassi                                                                  Miriam J. Wayne
Leah Martin                                                                Gabriel K. Gillett
Debevoise & Plimpton LLP                                                   Jenner & Block LLP
801 Pennsylvania Avenue N.W.                                               353 N. Clark Street
Washington, D.C. 20004                                                     Chicago, IL  60654
**Counsel for Defendant Albertsons
Companies, Inc.**


November 7, 2022                          */s/ Adam Gitlin*
                                          ADAM GITLIN