### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **Case No. 1:22-cv-3357 (CJN)** |
| **THE KROGER CO.,** *et al.*, | |
| **Defendants.** | |

### PLAINTIFFS' [REDACTED] MEMORANDUM OF LAW
### IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION

## Table of Contents

I.   FACTUAL OVERVIEW ................................................................................................ 3

   A.   Supermarkets in the District of Columbia, California, and Illinois Serve Communities' Nutritional Needs ................................................................................................................ 3

   B.   Defendants Have Inextricably Intertwined the Decision to Pay the Special Dividend and the Merger ......................................................................................................................... 4

      1.   Albertsons Planned a Tender Offer ............................................................................. 5

      2.   Defendants Tied the Payment of the Special Dividend to the Merger ........................ 6

      3.   Defendants Negotiated the Amount of the Special Dividend ...................................... 6

   C.   Albertsons Will Be Unable to Tap Its Annual Revenues or Its Revolver to Make Up for Reduced Liquidity and Less Access to Capital in the Current Economic Downturn ................ 7

II.   ARGUMENT ............................................................................................................... 10

   A.   Plaintiffs Meet the Legal Standard for Preliminary Relief ............................................ 10

   B.   Plaintiffs Likely Will Prevail at Trial in Establishing That Albertsons' Issuance of the Special Dividend Violates Section 1 of the Sherman Act and Their State Antitrust Laws ...... 11

      1.   Albertsons and Kroger Agreed that Albertsons Would Pay an Outsized Dividend to Its Shareholders at the Outset of the Merger Review Period. ................................................. 13

      2.   The Agreement to Pay the Special Dividend, in Combination with Related Restrictions, Will Have Anticompetitive Effects ................................................................. 14

      3.   Although Intent Is Irrelevant, Kroger Has a Clear Interest in Weakening Albertsons... ........................................................................................................................... 19

      4.   Regardless of the Standard of Review, Plaintiffs Are Likely to Establish that the Special Dividend Is an Unreasonable Restraint on Trade ........................................................ 22

   C.   Payment of the Special Dividend Threatens Irreparable Harm ..................................... 24

   D.   The Balance of Equities Favors a Preliminary Injunction ............................................ 27

   E.   Preliminary Relief Advances the Public Interest ......................................................... 28

III.   CONCLUSION ........................................................................................................... 28

## Table of Authorities

**Cases**

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014)...................................................................... 11
*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470 (9th Cir. 1985)................... 24
*Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*, 295 F.Supp.2d 75 (D.D.C. 2003) ...................................................................................................................................................... 28
*Costa v. Bazron*, 456 F. Supp.3d 126 (D.D.C. 2020) ............................................................... 11
*FTC v. Actavis, Inc.*, 570 U.S. 136 (2013)........................................................................... 12, 23
*FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447 (1986) ....................................................... 23, 27
*FTC v. Staples*, 970 F. Supp. 1066 (D.D.C. 1997) ................................................................... 25
*F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151 (D.D.C. 2000).................................................. 28
*Grand Metropolitan Public Ltd. Co. v. Pillsbury Co.*, 558 A.2d 1049 (Del. Ch. 1988) ............. 25
*In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419 (S.D.N.Y. 2015).................. 13
*In re Sunstates Corp. S'holders Litig.*, C.A. No. 13284 (Del. Ch. Apr. 18, 2001)..................... 27
*In re The Golub Corp.*, No. C-4753 (FTC Nov. 5, 2021) ........................................................... 24
*Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409 (7th Cir. 1989)..................... 24
*Interstate Cir. v. United States*, 306 U.S. 208 (1939)................................................................ 14
*Jefferis v. Wm. D. Mullen Co.,* 132 A. 687 (1926) .................................................................... 27
*Kaiser Aluminum & Chem. Corp. v. F.T.C.*, 652 F.2d 1324 (7th Cir. 1981) .............................. 20
*McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232 (1980)............................................. 20
*Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141 (2021)............................................ 23
*NaturaLawn of America, Inc. v. West Group, LLC*, 484 F.Supp.2d 392 (D. Md. 2007)............. 28
*NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984).......................................... 12, 23
*Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500 (D.C. Cir. 2016).......... 28
*Selly v. Fleming Coal Co.,* 180 A. 326 (1935)........................................................................... 27
*Sullivan v. Nat'l Football League*, 34 F.3d 1091 (1st Cir. 1994) ............................................... 12
*United States v. Brown Univ.*, 5 F.3d 658 (3d Cir. 1993)........................................................... 12
*United States v. Trib. Publ'g Co.*, No. CV1601822ABPJWX, 2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) ............................................................................................................................... 24
*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969)....................................... 10

**Constitutional Provisions**

U.S. CONST. ART. VI.................................................................................................................... 27

**Statutes**

15 U.S.C. §§ 1 - 38 ............................................................................................................... 10, 12

**Other Authorities**

Judith A. Chevalier, "Capital Structure and Product-Market Competition: Empirical Evidence from the Supermarket Industry," *Am. Econ. Rev.*, Vol. 85, Issue 3 (June 1995)...................... 16

Plaintiffs the District of Columbia, the State of California, and the State of Illinois ("Plaintiffs") submit this memorandum in support of their Motion for a Preliminary Injunction ("Motion") to prevent Albertsons Companies, Inc. ("Albertsons") from issuing a "special cash dividend" ("Special Dividend") announced as part of its proposed merger with the Kroger Company ("Kroger") and memorialized in Defendants' Agreement and Plan of Merger by and Among Albertsons Companies, Inc., The Kroger Co., and Kettle Merger Sub, Inc., Oct. 13, 2022 ("Merger Agreement"). Albertsons was originally scheduled to issue this dividend on November 7, 2022. The King County Superior Court in the State of Washington issued a temporary restraining order enjoining payment of this dividend. The restraining order was extended through December 9, 2022, while that court holds a hearing on a preliminary injunction, and may be extended again or converted into a preliminary injunction.

On November 8, this Court denied Plaintiffs' motion for a temporary restraining order ("TRO"), finding Plaintiffs had not demonstrated that Defendants "agreed" on the Special Dividend or that payment of the dividend would reduce Albertsons' liquidity and ability to compete. Following the decision of this Court, Plaintiffs have continued to investigate the circumstances surrounding the decision to issue the Special Dividend and the potential effects that its payment and other restrictions Defendants' Merger Agreement places on Albertsons are likely to have on competition, workers, and consumers, during the pendency of the merger review and beyond.

The States' additional investigation and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ reinforce what the Complaint alleged and Plaintiffs' earlier motion argued: Albertsons and Kroger agreed that Albertsons would pay an outsized dividend to its large, institutional controlling shareholders at the outset of the merger review. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████

███████████████████████████

Expert analysis and the Merger Agreement itself contradict the representations from Albertsons' CFO and Defendants' expert—on which the Court relied in denying Plaintiffs' TRO motion—that Albertsons could tap its regular annual revenues or revolving credit facility ("revolver") to restore its liquidity. In fact, even Albertsons' own projected annual revenue number and the remainder on its revolver, if it could tap it (and it cannot) will yield far less than the net income Albertsons needs to meet its own anticipated liquidity requirements. This evidence buttresses Plaintiffs' position that payment of the Special Dividend, in conjunction with the restrictions Defendants' Merger Agreement imposes on Albertsons' ability to borrow money, likely will hamper Albertsons' ability to compete with Kroger and other grocers, leaving shoppers facing higher prices, worse service, less innovation, closure of their local Safeway or other Albertsons supermarket, or all of the above. The harm will occur during the merger review, which is slated to last at least a year, and, whether or not the merger is blocked, well into the future.

With Kroger's role in the Special Dividend clarified, and Defendants' argument that Albertsons could use its annual revenues or rely on "cash" that it neither could nor would borrow debunked, the Court's rationale for denying the TRO is ripe for revisiting, and a preliminary injunction should issue.

I.      **FACTUAL OVERVIEW**

A.      **Supermarkets in the District of Columbia, California, and Illinois Serve Communities' Nutritional Needs.**

Supermarkets provide a critical service to District of Columbia, California, and Illinois residents: keeping them healthy and well-nourished by giving them access to fresh meat, produce, and other staples. Their importance is reflected in how much business they do—more than $10 billion a year in the District of Columbia alone by some estimates, if one includes everything on their shelves. *See* Compl. [ECF No. 2-1] ¶¶41-42. In the District of Columbia, Safeway (owned by Albertsons), currently enjoys an approximately 19.4% share, while Harris Teeter (owned by Kroger) controls 13.9%. Compl. ¶41. If Albertsons and Kroger merge, the combined entity would have 33.4% of sales in the District, though the combined share is likely significantly higher in relevant geographic markets that can be defined within the District. In Illinois, it would be a whopping 64%. Compl. ¶51. Defendants collectively operate over 800 stores in California. Compl. ¶53.

The Plaintiff States have been keenly focused on ensuring their residents' access to these essential items, and in eliminating so-called "food deserts," whose inhabitants encounter practically insurmountable barriers to obtaining healthy food. One key barrier is distance: because residents of urban areas like the District, Chicago, and South Los Angeles depend heavily on walking and public transportation,[1] access to healthy food means having a supermarket located near the home.

---

[1] In 2020 only 64.6% of households in the District of Columbia had a car, compared to 91.5% for the United States as a whole. Lyle Daly, "How Many Cars Are in the U.S.? Car Ownership Statistics 2022," *Fool.com*, May 18, 2022, *available at* https://www.fool.com/the-ascent/research/car-ownership-statistics.

That the merger itself may, or indeed probably will, have serious anticompetitive effects is largely beyond dispute—the parties themselves contemplate a divestiture of as many as 650 grocery stores, and the parties reserved the right to terminate the deal if even more stores need to be divested to win regulatory approval. This is unsurprising, as the proposed merger is between two of the largest supermarket chains in the United States, and in many areas, including in the District of Columbia, California, and Illinois, they compete directly to provide essential food to residents.

**B.      Defendants Have Inextricably Intertwined the Decision to Pay the Special Dividend and the Merger.**

The Court's initial finding at the TRO stage that Defendants did not agree on the dividend has proved inconsistent with other evidence. The Special Dividend is unquestionably concerted action that is part of the merger. This is why the Merger Agreement refers to it as the "Pre-Closing Dividend" and not something else. It is why the recitations of Albertsons' board's actions in approving the merger mention the Special Dividend in the same sentence as they mention the board's recommendation that the shareholders approve the merger. *See* Ex. 1 (Merger Agreement) at 1. ███████████████  ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████  Kimco Realty, one of the companies that controls Albertsons.[2]

---

[2] "Kimco to Realize Meaningful Incremental Value from Kroger-Albertsons Merger", Oct. 14, 2022, https://investors.kimcorealty.com/news-events/press-releases/news-details/2022/Kimco-to-Realize-Meaningful-Incremental-Value-from-Kroger-Albertsons-Merger/default.aspx ("The Merger Announcement further specifies that part of the cash consideration will be paid in the form of a $6.85 per share special cash dividend on November 7, 2022.").

And as a product of an agreement between Kroger and Albertsons, the form and amount of the

Special Dividend stem from the concerted action of those parties.

1.   **Albertsons Planned a Tender Offer.**

The Special Dividend did not begin as a dividend. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Albertsons originally was

contemplating nota dividend, but rather a tender offer or buyback of stock to return value to its

shareholders. Even if Albertsons first contemplated some vehicle aimed at "returning capital to

[their] shareholders," TRO Hr'g Tr. at 29:13, Albertsons settled on a dividend only after

discussion with Kroger. TRO Hr'g Tr. at 29:10-25. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ However, from the outset, ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This is the same negative impact that Plaintiffs

have sought to prevent by bringing this suit.

Kroger's agreement led Albertsons to abandon its plans, in July, to "return cash" with a

"tender offer, because that's a better way . . . than a dividend." TRO Hr'g Tr. 41:7-9. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ TRO

5

Hr'g Tr. at 41:7-9. Albertsons scrapped its preferred way of returning cash to its shareholders because of its agreement with Kroger. TRO Hr'g Tr. at 41:10-13. It did so even though, as Albertsons admitted at the TRO hearing, the former would have been the "better" way for the company to provide a return of cash to shareholders. TRO Hr'g Tr. at 41:7-9.

### 2. Defendants Tied the Payment of the Special Dividend to the Merger.

Additionally, Albertsons and Kroger specifically timed the Dividend with the merger:
██████████████████████████████████████████████████████████
██████████ but postponed doing so because the Merger Agreement was still being negotiated. TRO Hr'g Tr. at 40:8-9 (Albertsons' counsel discussing how "we thought the merger might get done this summer"). Syncing of the timing for both dividend and merger is significant:  with Albertsons' announcement of the Special Dividend, based on the companies' own arguments, came an obligation to pay it. Thus, the permissive language in the Merger Agreement became irrelevant.

### 3. Defendants Negotiated the Amount of the Special Dividend.

The merger drove not only the form and timing of the shareholder payment, but also the amount. In short, Kroger agreed that Albertsons would pay $4 billion to shareholders subject to restrictions on its ability to recoup that money through taking on more debt.

████████████████████████████████████████████ ██
██████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████
█████████████████████████ █████████████████████████

 Declaration of Michael Weisbach ("Weisbach Decl.") [ECF No. 3-2] ¶¶ 26-30, with *zero* response from either Defendant's CFO, or their expert.[3]

In short, while Albertsons may have had the initial idea of a capital return to shareholders, that idea only became (1) a dividend, ████████████████████ ████████████████ (4) with Albertsons being subject to additional restrictions on its ability to recoup the lost cash after negotiation and agreement by Kroger. Thus, the likely reduction in competition results from concerted action.

### C.   Albertsons Will Be Unable to Tap Its Annual Revenues or Its Revolver to Make Up for Reduced Liquidity and Less Access to Capital in the Current Economic Downturn.

If Albertsons pays the Special Dividend, it will not be able to remedy a liquidity crunch by tapping its revolver or through its regular annual revenues, and firms need liquidity to respond effectively to competition. Weisbach Decl. ¶¶ 16, 21.

As the Complaint explains, the Special Dividend is a payment to Albertsons' shareholders.[4] The funds for the Special Dividend will be from $2.5 billion of Albertsons' cash and $1.5 billion in new debt, Compl. ¶59. This new debt will be borrowed from the revolver,

---

[3] Citations to "Weisbach Decl." are to Professor Weisbach's November 2, 2022 declaration, while citations to "Weisbach Supp. Decl." are to Professor Weisbach's supplemental, November 30, 2022 declaration.

[4] The Special Dividend is more than one-third of Albertsons' total market capitalization of approximately $11 billion. Compl. ¶24. Nearly three-quarters of this payment will go to private equity firm Cerberus Capital Management, L.P., real estate investment trust Kimco Realty Corporation, and the three other firms that control Albertsons. *See* Compl. ¶29; Ex. 6 at 30.

██████████████████████████████████████████████████

██████████ This will cause Albertsons' cash on hand to drop to $0.5 billion. McCollam Decl.

[ECF No. 35-1] ¶44. The Dividend would likewise cause its net debt to increase from $4.54

billion to $8.54 billion. Compl. ¶60.

Albertsons knows that replacing cash with debt typically harms a firm's credit rating,

making borrowing more expensive, so making this payment would negatively affect its

creditworthiness. Recessions also make borrowing more expensive, and firms generally respond

to recession warning signs by holding more cash and less debt. Weisbach Decl. ¶¶ 9, 12-13, 22.

Albertsons can expect that an economic downturn will only make its borrowing more expensive.

Weisbach Decl. ¶15, 21-23. And Albertsons also knows it cannot issue new debt because the

Merger Agreement says so.

These difficult conditions do not change the fact that Albertsons anticipates needing $6

billion in liquidity after the Special Dividend is paid. Albertsons claims it will be able to fund

that need with its $500 million in remaining cash, $2.5 billion from the revolver, and the cash

flows from an anticipated $75 billion in revenue. Declaration of Sharon McCollam ("McCollam

Decl.") ¶¶ 45-46, 59. However, its cash flows from the past fiscal year's revenue of $71.9

billion, i.e., its net income, were only $1.6 billion. Weisbach Supp. Decl. ¶ 16. If its net income

rises at the same rate as its revenue over the next fiscal year, it would only generate $1.7 billion

in cash flows from $75 billion in revenue, meaning it would have $4.7 billion in liquidity for an

anticipated $6 billion in liquidity needs—a shortfall of over $1 billion by Albertsons' own

estimation. *Id.* ¶ 17. That projected shortfall of $1.3 billion is nearly as much as Albertsons'

*entire* 2021 net income, Weisbach Supp. Decl. ¶ 16, and about *three times* Albertson's 2019 net

income. *Id.*

Albertsons also will not be able to exhaust its revolver to shore up unexpected cash needs. According to the Merger Agreement's strictures, Albertsons cannot access its revolving credit facility to resolve a liquidity problem uniquely created by the merger. Doing so would be accessing "revolving borrowings under the Existing Credit Agreement," i.e., the revolver, but would most certainly not be "in the ordinary course of business consistent with past practice," and would therefore be prohibited. Ex. 1 (Merger Agreement § 6.1(n)(i)).



At the TRO hearing, ███████████████████████████ Albertsons has never in recent history accessed its revolver. TRO Hr'g Tr. at 61:17-23 ████████████████████████████ ██████████████████████████████ Since the hearing—████████████████████ ███████████████████████—Plaintiffs have revisited Albertsons' financial documents. ████████████████████████████████ in March 2020 Albertsons borrowed $2 billion from the revolver. According to Albertsons' 10-K:

> On March 12, 2020, the Company provided notice to the lenders to borrow $2,000.0 million under the Company's ABL Facility as a precautionary measure in order to increase its cash position and preserve flexibility in light of the uncertainty in the global markets resulting from the COVID-19 pandemic. The Company repaid the $2,000.0 million in full on June 19, 2020.

Ex. 6 (Albertsons Form 10-K for fiscal year ending Feb. 26, 2022) at 84. Thus, the liquidity Albertsons reported to the Court for February of 2020 and February of 2021 does not reflect that it used half its revolver to "preserve flexibility," i.e., to maintain liquidity in uncertain times. That decision highlights how far outside the ordinary course Albertsons' management considers use of the revolver, and how it therefore could not be a permissible use of the revolver to address the unique liquidity issues imposed by the merger. It also raises serious questions about Albertsons' argument that it can always just use revenues to address liquidity shortfalls—it certainly did not tell shareholders it would use money from its $22.8 billion revenues in early

2020 to mitigate the effects of the COVID pandemic. *See* Ex. 7 (Albertsons Form 10-Q for quarter ending June 20, 2020) at 4.

Albertsons' suggestion that it would tap its revolver also does not contend with the fiscal implications of doing so. Albertsons' interest rate on the revolver is LIBOR plus 1.25-1.5% Smith Decl. ¶19.f.i. LIBOR currently hovers around 5-6% and is one of the various standard metrics expected to increase in the coming months. *See* Jerome H. Powell, "Inflation and the Labor Market," Speech at the Hutchins Center on Fiscal and Monetary Policy, Brookings Institution, Nov. 30, 2022 (anticipating "ongoing increases" in the federal funds rate), https://www.federalreserve.gov/newsevents/speech/powell20221130a.htm. This means Albertsons' borrowing under the revolver could reach a 7% interest rate or more, and the amount it is borrowing for the Special Dividend alone will add on the order of $100 million of annual interest to its balance sheet, before any additional revolver borrowing.

## II.   ARGUMENT

### A.   Plaintiffs Meet the Legal Standard for Preliminary Relief.

Section 16 of the Clayton Act authorizes courts to issue preliminary injunctions to prevent "threatened loss or damage" from a violation of Section 1 of the Sherman Act. 15 U.S.C. § 26; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969) (injunctive relief is available "even though the plaintiff has not yet suffered actual injury"). Plaintiffs are entitled to a preliminary injunction upon establishing that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Costa v. Bazron*, 456 F.

Supp.3d 126, 133 (D.D.C. 2020) (citing *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)).

Here, each factor strongly supports granting a preliminary injunction. First, Plaintiffs are substantially likely to prevail on the merits because Defendants' horizontal agreement to issue the Special Dividend is likely to lessen competition in supermarkets in the District of Columbia, California, and Illinois. Second, if the issuance of the Special Dividend is not enjoined, the States and the public will be irreparably harmed by a reduction in competition, as well as increased prices, and reduced quality and innovation, and possibly the closure of certain Albertsons stores altogether, as well as the right of the public for regulators to meaningfully review a proposed merger that its parties acknowledge has implications for competition. Third, the balance of equities favors a preliminary injunction, because Plaintiffs and their residents have a paramount interest in the accessibility and competitive pricing of essential food products, and the preliminary injunction will maintain the status quo while regulators engage in the fulsome review of the merger Defendants clearly contemplated. Moreover, any harm to Defendants caused by issuance of the injunction would be purely self-inflicted. Fourth, the preliminary injunction will further the public interest by enabling Plaintiffs to preserve competition that will be lost if the Special Dividend is paid.

**B.**    **Plaintiffs Likely Will Prevail at Trial in Establishing That Albertsons' Issuance of the Special Dividend Violates Section 1 of the Sherman Act and Their State Antitrust Laws.**

Defendants' horizontal agreement for Albertsons to issue the dividend will likely lead to Albertsons competing less vigorously for supermarket customers in the District, California, Illinois, and elsewhere, and this reduced competition will lead to higher prices, inferior services, and reduced innovation. Albertsons' payment of the Special Dividend in conjunction with the

Merger Agreement's related restrictions on Albertsons' borrowing is therefore an unreasonable restraint of trade. 15 U.S.C. § 1.

Section 1 of the Sherman Act outlaws "[e]very contract, combination . . . or conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1. Restraints may be unreasonable *per se* or under a truncated or full rule-of-reason analysis, but in every case "the criterion to be used in judging the validity of a restraint on trade is its impact on competition." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 (1984).

Section 1, like its State analogues, focuses on the economic effect of a practice. But a plaintiff need not prove that the harm is already occurring, only that there is a threat it will occur if the court does not act. *See FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) (attempts to "prevent the risk of competition . . . constitute[] the relevant anticompetitive harm"); *see also Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1097 (1st Cir. 1994) ("[A]n action harms the competitive process 'when it obstructs the achievement of competition's basic goals—lower prices, better products, and more efficient production methods.'"); *United States v. Brown Univ.*, 5 F.3d 658, 674 (3d Cir. 1993) (Section 1 violation can be established without proof of "higher price or lower output" because "actual dollar amount effects do not necessarily reflect the harm to competition which Congress intended to eliminate in enacting the Sherman Act"). Defendants' agreement for Albertsons to pay the Special Dividend while otherwise effectively proscribing it from taking on new debt or other financial obligations will likely hamper Albertsons' ability to compete and thus violates Section 1 and state antitrust laws under any analytical framework the Court uses to analyze the restraint.

1.     **Albertsons and Kroger Agreed that Albertsons Would Pay an
Outsized Dividend to Its Shareholders at the Outset of the Merger Review
Period.**

"Horizontal agreements between competitors are considered the most potentially
pernicious" of agreements. *In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419,
447 (S.D.N.Y. 2015). The agreement subject to Plaintiffs' Section 1 claim is the Merger
Agreement itself, together with the parties' broader negotiations surrounding the Merger
Agreement's terms, including Albertsons' payment of a Special Dividend of $4 billion, Ex. 1 at
16 (defining "Pre-Closing Dividend"), and, as detailed above and below, those limiting
Albertsons' ability to raise additional money through debt and equity offerings. The evidence
weighs strongly in favor of the existence of an agreement—the direct evidence being the Merger
Agreement itself, ██████████████████████████████████████████
██████. Albertsons planned to return capital to shareholders via a tender offer stock buy-back,
which it admitted was best for the company, ████████████████████████████
████████████████████████████████████████████████████
████████████████████████ TRO Hr'g Tr. 41:7-13. Albertsons
considered making a capital return in July, but did not do so because the merger was still being
negotiated. Syncing the timing of the Special Dividend and merger announcements rendered the
permissive language in the Merger Agreement irrelevant because Albertsons considered itself
obligated to pay the Dividend once it was announced. Finally, ██████████████████
██████████████████████ the parties have never explained why the
Merger Agreement would say anything about a cap on the Special Dividend amount if Kroger
did not have a say in the matter—why not simply say the Special Dividend would be paid and
the purchase price adjusted accordingly? Especially where any increase would only *reduce*

13

Kroger's financial obligations, the Merger Agreement's inclusion of a cap on the Special Dividend makes clear that it is a product of Defendants' agreement.

The Court's finding at the TRO hearing that Albertsons had made the decision to pay back its shareholders unilaterally (TRO Hr'g Tr. at 66:19-22), based in large part on the permissive language in the Merger Agreement and that Kroger had no recourse if the $4 billion was not paid, cannot be squared with this evidence. Moreover, it is hornbook law that agreements under Section 1 are not limited to enforceable contracts entered into for consideration, but also include unenforceable mutual promises, and unilateral promises acceded to and relied upon by competitors. *See, e.g.*, *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939) ("Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act."). For example, price-fixers rarely have enforceable rights if their co-conspirators decide to cheat. Thus, even if Albertsons initially came up with the idea to return cash to its shareholders, Kroger's decision to agree to that plan and to negotiate limits on its amount and accompanying restrictions on Albertsons' borrowing brings the action appropriately within Section 1's ambit.

> **2.** **The Agreement to Pay the Special Dividend, in Combination with Related Restrictions, Will Have Anticompetitive Effects.**

The evidence and economic analysis demonstrate the anticompetitive effects of payment of the Special Dividend in the presence of other restrictive terms. Payment of the Special

Dividend will strip Albertsons of nearly all its cash-on-hand, reducing its ability to compete effectively. Weisbach Decl. ¶¶ 22-23.

At any time, Albertsons' choosing to increase its debt and decrease its cash would be expected to cause market perceptions of its creditworthiness to drop. Albertsons, however, has taken this step as the economy appears headed for or already in a recession, which in itself tends to make borrowing more expensive, compounding the difficulties of lower perceptions of Albertsons' creditworthiness, and making it harder for Albertsons, which cannot issue investment-grade securities, to obtain new capital. Weisbach Decl. ¶¶ 15, 21-23.

Further, the Merger Agreement imposes numerous restrictions on Albertsons' ability to take out new loans to meet the unusual pressure the Special Dividend will put on its balance sheet. *See* Compl. ¶¶64-68. The agreement limits Albertsons' ability to raise additional money through equity offerings, Weisbach Decl. ¶19 (citing Section 6.1 of Merger Agreement), or increased debt, *id.* (citing Section 6.1(n)(i)), or to use its assets as collateral, *id.* (citing Section 6.1(d)(i)). It also requires Albertsons to "reasonably consult[]" with Kroger, a primary competitor, if it wishes to refinance any debt over $100 million. Ex. 1 (Merger Agreement Section 6.1). That is, pursuant to agreement, horizontal competitors will consult on how and whether one competitor should refinance debt so it can continue to compete with the other, after their agreement deprived that company of all the cash it had available to compete.

Without cash, Albertsons cannot fully and effectively respond to competition through advertising and promotions; increase the services at, refurbish, or reorganize stores to make them more attractive to consumers; and may be unable to fully support customer loyalty programs.

Weisbach Decl. ¶¶ 16, 21.[5] As a substitute for credit, it would have to rely on higher prices to raise cash for reinvestment, harming consumers. It may have to close stores, leaving consumers with fewer choices and, as a result, higher prices from remaining incumbents, inferior selection and quality, or both.

Albertsons claims that it can satisfy its need for $6 billion in liquidity through its estimated $75 billion in annual revenue and/or the remaining $2.6 billion in Albertsons' revolver. TRO Hr'g. Tr. at 28:7-10 (annual revenues), 47:9-11 (revolver). The company concedes that after the Special Dividend is paid it will only have approximately $3 billion combined in cash reserves and the revolver, leaving it $3 billion short. Leaving aside that the $75 billion estimate is speculative at best, well above last year's actual revenue numbers, and will trickle in slowly during the course of the year, the math that it will lead to $3 billion in additional cash flow is specious.

Although Albertsons repeatedly invokes the high-sounding $75 billion revenue figure, it conspicuously avoids stating how to measure cash flows from that revenue or providing an estimate. The reason is that the size of those cash flows pales in comparison to revenue. Net income, unlike revenue, accounts for the costs a firm incurs to generate revenue. Weisbach Supp. Decl. at ¶16. When Albertsons makes money, it still has to pay wages, various overhead expenses, facilities maintenance costs, and so on—to wit, those revenues are not simply there for the plundering. In the past three fiscal years, Albertsons' net income has been a fraction of revenue: $1.6 billion on 71.9 billion (FY 2021), $850 million on $69.7 billion (FY 2020), and

---

[5] *See also* Judith A. Chevalier, "Capital Structure and Product-Market Competition: Empirical Evidence from the Supermarket Industry," *Am. Econ. Rev.*, Vol. 85, Issue 3 (June 1995), 415, 433 ("The results of this paper strongly suggest that product-market competition changes when firms radically increase their leverage.").

$466.4 million on $62.5 billion (FY 2019). *Id.* ¶ 16. Using Albertsons' own prior calculations of net income from revenues reveals that, even assuming the truth of the $75 billion revenue number, Albertsons will only realize approximately $1.7 billion in net income, well shy of its remaining $3 billion in liquidity needs, even based on its own estimates. *Id.* at ¶ 17. This amounts to at least $1.3 billion less that Albertsons can spend on capital improvements, better products, staffing, promotions, and other quality and innovation measures. *Id.* at ¶¶ 15-17. This shortfall is nearly equal to Albertsons' net income for fiscal year 2021, and nearly three times its net income for fiscal year 2019. *Id.*

The revolver, moreover, should not be considered available cash from a competitive standpoint, for two reasons. First, the Merger Agreement prohibits it. Ex. 1 (Merger Agreement § 6.1(n)(i)). Kroger could deny Albertsons' request to borrow from the revolver, or even sue to enforce the Merger Agreement: Suppose that Albertsons ignores the Merger Agreement's strictures and, faced with a need for cash after paying the Special Dividend, borrows from its revolver in 2023. If the merger is permitted in 2024, and Albertsons has not paid back the loan, the deal would close but Kroger would be on the hook for that balance. Thus, the revolver is only "available" insofar as Albertsons assumes it could force Kroger to absorb revolver debt that was not part of the negotiated transaction.

This highlights the greater problem with Albertsons' frantic pointing in every direction to show the Court it has potential money to tap: The parties' Merger Agreement reflects steps the parties have taken to ensure that any liquidity crisis weakens only Albertsons; Kroger is protected. Albertsons may have proffered declarations from its CFO and an economist to say it can take on new debt and new credit and otherwise totally upend its ordinary and historical

business practices, but the Merger Agreement between Defendants that is at the core of

Plaintiffs' Sherman Act claim simply does not permit it.

Even if the Merger Agreement permitted using the revolver, its variable interest rate

would make it highly unlikely that Albertsons would access it in a liquidity crunch, and

Albertsons' historic abstention from using it makes that likelihood only more remote. █

██████████████████████████████████. Two years ago, when LIBOR rates

were almost zero,[6] Albertsons did not borrow anything from its revolver, except the March 2020

loan. That is so even though the de minimis LIBOR rates would have made the borrowing

essentially free. While LIBOR rates may rise further, even prevailing LIBOR rates are far above

what they were in 2020, making it unrealistic to expect such a dramatic about-face from

Albertsons' historic prudence regarding its revolver. That will likely be even truer once $1.5

billion of it is already used to pay the Special Dividend, and the accompanying interest payments

begin.

Any defense of the Special Dividend based on Albertsons' citations to Delaware law is a

mere distraction. Albertsons has cited as evidence of its continued ability to compete that the

Special Dividend was approved by its corporate board after an examination of the company's

financial position revealed a surplus of either $14.7 billion or $4.7 billion, depending on the

method used to calculate the value of its assets. McCollam Decl. ¶¶35-36. While a surplus

calculation is required for a dividend to be legal under Delaware law, it has no bearing on the

antitrust analysis, which must focus on whether, as an economic reality (rather than one of two

---

[6] *See, e.g.*, Macrotrends, *LIBOR Rates – 30 Year Historic* Rates, accessed Nov. 30, 2022,
https://www.macrotrends.net/1433/historical-libor-rates-chart, (2020 year-end LIBOR rate of
0.16%.).

calculations looking at a balance sheet), Albertsons will be able to access sufficient liquid capital to effectively compete.

As Dr. Weisbach notes, whichever method of calculation the Court considers, neither measure of surplus provides any meaningful insight into Albertson's liquidity, because that measure "tells us nothing about how easily Albertsons can access those assets." Weisbach Supp. Decl. ¶ 9 (noting as well that "[c]ash and cash equivalents are accessible in a way that assets such as real estate and goodwill are not, but the 'surplus' calculation does not make this distinction"). Beyond this clear deficiency in using surplus as a proxy for liquidity, either surplus calculation relies on the value of Albertsons at the time the calculation was made (in this case, June 18, 2022 (McCollam Decl. ¶¶ 35-36)), without reference to Albertsons' own estimated future needs—the "figures would be the same whether Albertsons had $0 of anticipated liquidity needs in the coming year or $10 billion." Weisbach Supp. Decl. ¶ 10-11. In essence, inquiring about surplus asks the wrong question.

### 3.     Although Intent Is Irrelevant, Kroger Has a Clear Interest in Weakening Albertsons.

In addition to describing the agreement and its likely effects, the Complaint also lays out, and the evidence supports, Kroger's incentives to agree to a Dividend that weakens Albertsons during merger review. The Court indicated in its ruling on Plaintiffs' TRO motion that, while intent is not a necessary element of a Section 1 violation, it weighed on the Court's decision-making here because it seemed irrational to the Court that Kroger would agree to weaken a company it is seeking to buy. TRO Hr'g at 71. In fact, it is not irrational at all and benefits Kroger to weaken Albertsons during the pendency of the merger review, whether or not the

merger is ultimately cleared, and particularly if many stores ultimately need to be divested to a third competitor or new entrant for the merger to clear.

To be clear, agreements between horizontal competitors likely to cause anticompetitive effects are illegal regardless of the intent of the parties. *McLain v. Real Estate Bd. of New Orleans*, 444 U.S. 232 (1980). However, it is also clear that regardless of how the transaction's regulatory review shakes out, Kroger is incentivized by and benefits from an agreement that weakens Albertsons.

If the merger is consummated, acquiring a weaker Albertsons benefits Kroger, because of the strong assets it can acquire, the weak assets it may divest, and even the potential to reacquire some of those assets once any threat they once posed is neutralized. The parties anticipate that they will need to divest as many as 650 stores to have any possibility of clearing the merger through regulators. With respect to the stores and other assets Kroger gets to keep, including Albertsons' stores, equipment, and warehouses, as well as intellectual property rights to various web and mobile applications, these will have value when acquired by Kroger whatever the profitability of Albertsons as a brand. That is why it is not at all unusual, let alone irrational, for companies to buy weakened competitors: Obtain valuable assets while eliminating even a weakened competitor from the market "in effect hands over [the weakened company's] customers to the financially strong, thereby deterring competition by preventing others from acquiring those customers, making entry into the market more difficult." *Kaiser Aluminum & Chem. Corp. v. F.T.C.*, 652 F.2d 1324, 1339 (7th Cir. 1981). Albertsons certainly knows this: at

a congressional hearing on this transaction on November 29, its CEO referred to the

Albertsons/Safeway merger as one that "put two companies together, one of them struggling."[7]

       With respect to those stores that will be divested, Kroger has a great interest in these

divested stores being weaker rather than stronger when they are sold to either a current or new

competitor—they may be able to recover the capital at a discount. This is not a purely theoretical

notion; Albertsons/Safeway is again instructive. In 2014, Haggen Food and Pharmacy agreed to

purchase 146 Albertsons stores that Albertsons and Safeway agreed to divest to obtain regulatory

approval of their merger from the FTC.[8] Less than a year later, Haggen sued Albertsons for false

representations regarding Albertsons' commitment to transform the new stores into a viable

competitor, as part of a "coordinated and systemic effort to eliminate competition."[9] A week

later, Haggen filed for bankruptcy, and ultimately sold those stores that survived back to

Albertsons itself, effectively nullifying the divestiture.[10]

       If the merger is either blocked or abandoned, a weakened Albertsons will continue to be a

less potent competitor well beyond the 2024 expected closing date. Albertsons will need to spend

time and money paying down the interest and principal of the loan, and restoring cash on hand,

before being able to effectively discipline Kroger in the markets where they overlap.

---

[7] C-SPAN, Senate Hearing on Kroger and Albertsons Grocery Store Chains at 48:52 (Nov. 29, 2022), available at https://www.c-span.org/video/?524439-1/senate-hearing-kroger-albertsons-grocery-store-chains.

[8] Haggen's press release, Dec. 14, 2014 accessed at https://web.archive.org/web/20141221130658/http://www.haggen.com/press-releases/haggen-expands/

[9] Haggen's press release, Sept. 1, 2015, accessed at https://web.archive.org/web/20150907030020/http://www.haggen.com/press-releases/haggen-sues-albertsons/.

[10] Angel Gonzales, Seattle Times, *Haggen Agrees to Sell Core Stores to Albertsons for $106M*, https://www.seattletimes.com/business/retail/haggen-agrees-to-sell-core-stores-to-albertsons/.

Finally, whether or not Defendants consummate their transaction, Kroger's incentive to weaken Albertsons during the merger review, which is likely to take at least a year, is obvious. *See e.g.*, Ex. 1 (Merger Agreement § 8.1(e)). A cash-strapped Albertsons prohibited from seeking new funds will be less able to discipline Kroger on any competitive metric: price, output, investment in stores, or anything else. This means that Kroger will be able to extract supracompetitive prices and not have to invest as heavily in competing against Albertsons, leading to increased profits. Thus, during the pendency of merger review, Kroger will be financially better off due to the Special Dividend and related Merger Agreement terms.

Albertsons itself may have conflicting incentives that would lead it to accept a position where it cannot compete with as much vigor as possible. The shareholders that Albertsons insists *must* receive the Special Dividend are, by and large, the same shareholders who control Albertsons' ability to issue such dividends in the first place. Five investment firms control 75% of Albertsons common shares, and "are able to control the election of our directors, determine our corporate and management policies and determine, without the consent of our other stockholders, . . . potential mergers or acquisitions, . . . and other significant corporate transactions." Ex. 6 at 30. The Special Dividend is, above all else, a gift from those firms to themselves, at the expense of Albertsons' and "other holders of [Albertsons'] common stock." *Id.*

### 4.     Regardless of the Standard of Review, Plaintiffs Are Likely to Establish that the Special Dividend Is an Unreasonable Restraint on Trade.

Albertsons' issuance of the Special Dividend while other Merger Agreement terms prohibit it from accessing capital merits only a quick look to condemn it, because although "not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive

character of such an agreement." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 459 (1986).

The Special Dividend strips Albertsons of nearly all its cash-on-hand during an economic

downturn, when it will be difficult for the company to obtain whatever additional capital it could

even seek without violating the Merger Agreement. Weisbach Decl. ¶¶ 22-23, 31-32; Supp.

Decl. ¶¶ 3, 13-19. Even assuming the ability to use the revolver and reasonable cash flows from

revenues over the next year, Albertsons will fall short of the liquidity it has stated that it needs to

continue competing at current levels. The Court need conduct no extensive analysis to find a

reduction in competition here. Established economic theory applied to Albertsons' balance sheet

shows the company is at risk of not being able to respond as well as it can today to consumer

demand due to its agreement with Kroger to wipe out Albertsons' cash holdings. Thus, "the

plan" to pay out the $4 billion and otherwise bind Albertsons' hands "is inconsistent with the

Sherman Act's command that price and supply be responsive to consumer preference," and the

Supreme Court has "never required" more extensive analysis in such circumstances, and none is

therefore required here. *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 110 (1984).

The Merger Agreement's Special Dividend and related restrictions violate the Sherman

Act under a full rule-of-reason analysis as well. As detailed above, Plaintiffs will meet their

initial burden of showing that the challenged restraint of trade is likely to have a potential

anticompetitive effect in a relevant market. *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct.

2141, 2160 (2021); *FTC v. Actavis, Inc.*, 570 U.S. 136, 157 (2013) (potential effect on

competition sufficient). The inquiry ends there, because Defendants have identified no pro-

competitive justification for the restraint, *Alston*, 141 S. Ct. at 2141, nor did the Court's order on

the TRO identify any. Certainly, payment to Albertsons' shareholders could have been achieved

through less anticompetitive means than an agreement that cuts Albertsons off from capital

23

markets (*see id.*); at the TRO hearing Albertsons in fact characterized alternatives to the Merger

Agreement as "better" for its shareholders. TRO Hr'g Tr. 41:3-9 ("And they were considering—

as was indicated in their prior document, and as they told Kroger at the outset, they were

considering returning cash to shareholders. At the time they were considering a tender offer,

because that's a better way—that is a better way to do it at that point in time than a dividend.").[11]

A similarly less restrictive alternative: Defendants could have left Albertsons fully funded during

the merger review, and paid Albertsons' shareholders from proceeds of the sale after closing.

### C.    Payment of the Special Dividend Threatens Irreparable Harm.

Plaintiffs have moved for preliminary relief because they have apprehended a potential

injury to competition at its outset, and "[i]n the antitrust context, '[r]easonable apprehension of

threatened injury' can constitute irreparable harm." *United States v. Trib. Publ'g Co.*, No.

CV1601822ABPJWX, 2016 WL 2989488, at *2 (C.D. Cal. Mar. 18, 2016) (quoting *Am.

Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) and issuing

TRO to block merger). Albertsons has made clear that it intends—and considers itself

obligated—to pay the Special Dividend as soon as the Washington State Court injunction is

---

[11] Although market definition has not been a focus of Defendants' arguments, it bears noting that the Complaint defines supermarkets in a manner consistent with other antitrust litigation concerning the provision of groceries. *Compare* Compl. ¶¶65-69 *with* Compl. ¶¶9-13, *In re The Golub Corp.*, No. C-4753 (FTC Nov. 5, 2021); *see also Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1412 & n.2 (7th Cir. 1989) (for purposes of summary judgment on Sherman Act Section 2 claim, Kroger agreed to "supermarkets" as product market, which definition excluded small markets and convenience stores). Plaintiffs would establish the existence of highly local relevant geographic markets likely much smaller than the respective States and even the District of Columbia, such that the shares stated in the Complaint, though large, likely understate market concentration. Defendants themselves recognize some properly defined geographic markets are likely to be much more local, and therefore market power may be much higher than Plaintiffs allege. Kroger Opp. To Mot. For TRO [ECF No. 36] at 13 (noting that an appropriate market is likely more local than the whole District, because of the absurdity that a "District resident in Navy Yard might regularly travel to Tenleytown to purchase bread.").

lifted. *See* TRO Hr'g Tr.50:9 – 51:23 ("[A]s a matter of Delaware corporate law, [we] made a promise to our shareholders. The date for keeping that promise has passed."); ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Thus, only a court order will stop payment of the Special Dividend. Absent one, consumers could face higher prices and lower quality from a weakened Albertsons during merger review, and after merger review if Defendants' deal is not consummated for whatever reason.

The Special Dividend would alter Albertsons' capital structure in a way that will irreversibly harm its ability to compete with other grocers on price during the pendency of regulators' review of the Proposed Merger.[12] *See* Weisbach Decl. ¶¶31-33. This period of consumer harm could last two years: the Merger Agreement contemplates the closing occurring as late as January 13, 2024, with a possibility of it being extended up to an additional 270 days. Ex. 1 (Merger Agreement) § 8.1(e). Second, should Defendants abandon the merger or should the merger be blocked, that less favorable capital structure will serve as a continuing impediment to Albertsons' ability to compete, resulting in continued consumer harm. Overpayments by consumers in either period constitute irreparable harm, and Defendants cannot seriously argue that the Special Dividend could later be returned to Albertsons, no-harm-no-foul. *See FTC v. Staples*, 970 F. Supp. 1066, at 1091 (D.D.C. 1997) (finding, in challenge to merger under Section

---

[12] Note that to the extent Defendants rely on Delaware law to shield their actions, this fact renders that shield nugatory—a chancery court rejected the business judgement rule and enjoined corporate action in *Grand Metropolitan Public Ltd. Co. v. Pillsbury Co.*, 558 A.2d 1049, 1061 (Del. Ch. 1988) because "[the company's] capital structure would be permanently changed" by the course of conduct the company's board chose to pursue.

7 of the Clayton Act, that "[t]hese higher charges could never be recouped even if the administrative proceeding resulted in a finding that the merger violated the antitrust laws").

In response to questions by the Court at oral argument on Plaintiffs' TRO motion, Albertsons argued that it would be harmed by a TRO because, having declared the Special Dividend, a TRO would require it to keep the Special Dividend on its books as a liability, and thus to essentially set aside that money. TRO Hr'g Tr. at 50:22-51:2. But if declaring the Special Dividend resulted in a $4 billion liability appearing on Albertsons' balance sheet, then Albertsons has not shown what *additional* harm it will suffer if the Court enjoins it from paying the Dividend: Albertsons does not have access to the money either way. And Albertsons conceded that not having access to $4 billion of its otherwise available cash would materially affect its ability to borrow, TRO Hr'g Tr. at 50:23-24, and its liquidity, *id* at 51:22-52:5.

Albertsons' concession is telling: If, as Albertsons claims, it will have ample liquidity to meet its operating needs *and* pay the Special Dividend, then Albertsons should have no problem competing fully and meeting its liquidity needs for doing so even with $4 billion earmarked for the Special Dividend unpaid while this Court's injunction is in place. But it cannot be true that Albertsons will both have enough cash to cover all its needs if it pays the Special Dividend, yet also suffer harm from insufficient liquidity if the Court enjoins the Special Dividend's payment and Albertsons has a future liability on its books. It is the same $4 billion either way. The only harms Defendants can identify that are not inconsistent with their argument that Albertsons will be competitively fine after paying out all its cash are to its expectant shareholders, not Albertsons itself. Any such harms, Plaintiffs submit, are of Defendants' own making and in any event do not outweigh the competitive harms that payment of the Special Dividend would precipitate for Albertsons and millions of Americans.

Moreover, this argument is entirely out of line with relevant corporate law. Under Delaware law, only the announcement of a *lawful* dividend can create a contractual right in shareholders to be paid. *See, e.g.*, *Jefferis v. Wm. D. Mullen Co.,* 132 A. 687 (1926); *Selly v. Fleming Coal Co.,* 180 A. 326 (1935); *In re Sunstates Corp. S'holders Litig*., C.A. No. 13284, slip op. at 6 (Del. Ch. Apr. 18, 2001) ("Similarly, the declaration of a *lawful dividend* has long been understood to give stockholders as of the record date standing as creditors to sue at law for the recovery of the amount due" (emphasis added)). Thus, if the issuance of the Special Dividend at this time were held by the Court to violate the Sherman Act and thus be unlawful, no contractual obligation would exist. Defendants do not contend that Delaware has promulgated a policy of shareholder rights displacing antitrust enforcement, and therefore general Delaware corporate law cannot make an anticompetitive agreement lawful under the Sherman Act. U.S. CONST. ART. VI; *Indiana Federation of Dentists*, 476 U.S. at 465 (the existence of some state law or policy does not, as a general matter, shield anyone from antitrust scrutiny unless the state action doctrine applies). Thus, if the Court determines that Plaintiffs are likely to succeed on the merits of their claim based on the Dividend and related Merger Agreement terms, together with related circumstantial evidence, then the unlawful nature of the Dividend itself means that no contractual rights were created. Albertsons would therefore owe no debt to shareholders, and thereby need not refrain from using the $4 billion to effectively compete during the pendency of the merger review.

D.      **The Balance of Equities Favors a Preliminary Injunction**

Defendants will not suffer any serious harm if payment of the Special Dividend is preliminarily enjoined, but Plaintiff States and their residents will suffer serious harm if it is not; the balance of equities strongly favors Plaintiffs. *Pursuing America's Greatness v. Fed. Election*

*Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (citation omitted). Preliminary relief simply would maintain the status quo until regulatory authorities can complete their review of the merger. This delay would not interfere with Defendants' proposed merger. Moreover, Albertsons' previously expressed concerns that delaying or canceling the Dividend would subject it to legal liability, *see* Ex. 9 at 6, would be lessened, because that payment would now be proscribed by an order of this Court. To the extent Defendants point to additional harm that may be caused by granting Plaintiff's proposed preliminary injunction, that harm is self-imposed by Defendants' own "willful acts." *NaturaLawn of America, Inc. v. West Group, LLC*, 484 F.Supp.2d 392, 403 (D. Md. 2007) (granting preliminary injunction).

## E.  **Preliminary Relief Advances the Public Interest**

Finally, preservation of Albertsons as a well-capitalized supermarket company that can compete with its rivals in the District of Columbia, California, Illinois, and elsewhere furthers the public interest. The public interest is served by ensuring that there are no unreasonable restraints on competition. *Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.*, 295 F.Supp.2d 75, 96 (D.D.C. 2003); *F.T.C. v. Swedish Match*, 131 F. Supp. 2d 151, 173 (D.D.C. 2000) ("There is a strong public interest in effective enforcement of the antitrust laws . . . .").

## III.  **CONCLUSION**

For the foregoing reasons, the Court should preliminarily enjoin Albertsons from issuing its Special Dividend, pending review of the merger.

Dated: December 1, 2022

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

KATHLEEN KONOPKA
Senior Advisor to the Attorney General
for Competition Policy

*/s/ Adam Gitlin*
ADAM GITLIN
Chief, Antitrust and Nonprofit Enforcement Section

*/s/ Geoffrey Comber*
GEOFFREY COMBER
C. WILLIAM MARGRABE
ELIZABETH ARTHUR

Assistant Attorneys General
Office of the Attorney General
400 6th Street NW, Suite 10100
Washington, D.C. 20001
(202) 735-7516
Geoffrey.comber@dc.gov

**FOR PLAINTIFF STATE OF CALIFORNIA**

**ROB BONTA**
**Attorney General of California**
KATHLEEN E. FOOTE
Senior Assistant Attorney General
NATALIE S. MANZO
Supervising Deputy Attorney General

*/s/ Paula Lauren Gibson*
PAULA LAUREN GIBSON
Deputy Attorney General
California State Bar Number 100780
300 S Spring Street, Suite 1702
Los Angeles, CA 90013
Telephone: (213) 269-6040
paula.gibson@doj.ca.gov

**FOR THE STATE OF ILLINOIS**

**KWAME RAOUL**
**Attorney General**

/s/ *Elizabeth L. Maxeiner*
ELIZABETH L. MAXEINER
Bureau Chief, Antitrust
PAUL J. HARPER
BRIAN M. YOST
Assistant Attorney General
Office of the Illinois Attorney General
100 W. Randolph Street
Chicago, IL 60601
(773) 590 6837
paul.harper@ilag.gov

*Counsel for the Plaintiff State of Illinois*

## <u>CERTIFICATE OF SERVICE</u>

This will certify that a true and correct copy of the foregoing, was served upon counsel

for defendants, below, by electronic mail.

Jason Ewart
Sonia Pfaffenroth
Michael Bernstein
Matthew Shultz
Matthew M. Wolf
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave. NW
Washington DC 20001
**Counsel for Defendant Kroger Company**

Andrew S. Tulumello
Mark Andrew Perry
Jeffrey H. Perry
Weil, Gotshal & Manges LLP
2001 M St. NW, Suite 600
Washington, DC 20036

George Paul
Douglas Jasinski
White & Case LLP
701 Thirteenth Street NW
Washington, DC 20005

William S.C. Goldstein
Stephen Ascher
Jenner & Block LLP
1155 Avenue of the Americas
New York, NY  10036

Ted Hassi
Leah Martin
Debevoise & Plimpton LLP
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
**Counsel for Defendant Albertsons
Companies, Inc.**

Miriam J. Wayne
Gabriel K. Gillett
Jenner & Block LLP
353 N. Clark Street
Chicago, IL  60654

December 1, 2022

*/s/ Adam Gitlin*
ADAM GITLIN