# Exhibit 2

1          UNCERTIFIED DRAFT TRANSCRIPT

2

3     Deposition of: Evidentiary Hearing

4     Wednesday, December 7, 2022

5     State of Washington v. Albertsons Companies, Inc.;

6

7

8          THIS IS AN UNCERTIFIED DRAFT TRANSCRIPT!

9          PLEASE DO NOT QUOTE FROM THIS DRAFT IN PLEADINGS

10    OR ELSEWHERE.  THE CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL

11    RECORD WHICH MAY BE RELIED UPON FOR VERBATIM CITATIONS OF

12    TESTIMONY.

13

14    This realtime transcription has not been proofread.  It is
      the court reporter's uncorrected translation, a draft, not
15    the certified transcript.  It contains errors and/or
      mistranslations which may result in nonsensical word
16    combinations.  Page numbers and line numbers in this draft
      will not correspond to those in the final, certified
17    transcript.

18    This interactive realtime service is provided to you solely
      as a litigation aid and is in no way an official
19    transcript.

20    The court reporting agency and the court reporter, Tia B.
      Reidt are not responsible for the misuse of this realtime
21    draft transcript by anyone.

22

23

24

25

1      SUPERIOR COURT OF THE STATE OF WASHINGTON

2           FOR KING COUNTY

3    _____

STATE OF WASHINGTON,        )
4                           )
        Plaintiff,     )
5                           )
    v.              ) No. 22-2-18046-3 SEA
6                           )
ALBERTSONS COMPANIES, INC.;   )
7  ALBERTSON S COMPANIES      )
SPECIALTY CARE, LLC;        )
8  ALBERTSON'S LLC; ALBERTSON'S  )
STORES SUB LLC; THE KROGER   )
9  CO.; KETTLE MERGER SUB, INC.,  )
                            )
10       Defendants.    )
    _____

11

12          * VIDEOCONFERENCE *

13         EVIDENTIARY HEARING

    _____
14

15

16

     * All participants appeared via videoconference *
17

18

19

20

21

22
    DATE TAKEN:  December 7, 2022
23
    REPORTED BY:  Tia B. Reidt, Washington RPR, CCR 2798
24              Oregon # 22-0001

25

1                        APPEARANCES

2     For the Plaintiff:

3     VALERIE KAY BALCH
      ERIC S. NEWMAN
4     JONATHAN A. MARK
      WASHINGTON STATE OFFICE OF THE ATTORNEY GENERAL
5     800 Fifth Avenue, Suite 2000
      Seattle, WA 98104
6     (206) 702-0972
      Valerie.balch@atg.wa.gov
7     Eric.newman@atg.wa.gov
      Jonathan.mark@atg.wa.gov

8

9     For the Defendant Albertsons:

10    MICHAEL ROSENBERGER
      GORDON TILDEN THOMAS & CORDELL LLP
11    600 University Street, Suite 2915
      Seattle, Washington 98101
12    (206)467-6477
      Mrosenberger@gordontilden.com

13

14    For the Defendant Kroger:

15    PALLAVI MEHTA WAHI
      CHRISTOPHER M. WYANT
16    K&L GATES, LLP
      925 Fourth Avenue, Suite 2900
17    Seattle, Washington 98104
      Pallavi.wahi@klgates.com
18    Chris.wyant@klgates.com

19
      MATTHEW WOLF
20    Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP. ^ ?

21
      SONIA PFAFFENROTH
22    ARNOLD & PORTER
      601 Massachusetts Ave, NW
23    Washington, DC 20001
      (202) 942-6831
24    Sonia.pfaffenroth@arnoldporter.com

25

              ^ ?



1     DEBEVOISE & PLIMPTON LLP

2     EDWARD D. HASSI
      LEAH S. MARTIN
3     801 Pennsylvania Avenue, N.W.
      Washington, DC 20004
4     (202) 383-8000
      Thassi@debevoise.com
5     Lmartin@debevoise.com

6

7     JENNER & BLOCK, LLP
      STEPHEN L. ASCHER
      1155 Avenue of the Americas
8     New York, NY 10036
      (212) 891-1600
9     sascher@jenner.com

10

11          * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EXAMINATION INDEX

EXAMINATION BY:            PAGE



SHARON McCOLLAM


GARY MILERCHIP


DAVID C. SMITH

1          Wednesday, December 7, 2022

2          8:25 a.m.

3          -o0o-

4

5          THE COURT:  This is State versus

6    Albertsons Companies, et al., Cause Number

7    22-2-18046-3.  We're here for an evidentiary hearing as

8    part of the preliminary injunction motion, and I'll ask

9    that the parties please identify themes starting with

10   the state.

11         MS. BALCH:  Good morning, Your Honor.

12   Valerie Balch, Assistant Attorney General, appearing on

13   behalf of the State of Washington.  Also present today

14   are Holly Williams and Eric Newman.

15         THE COURT:  Good morning.

16         And on behalf of Albertsons, please.

17         MR. HASSI:  Good morning, Ted Hassi with

18   Debevoise & Plimpton on behalf of Albertsons.  With me

19   are Leah Martin with Debevoise and Stephen Ascher with

20   Jenner & Block, and I believe Mr. Rosenberger is on as

21   well.

22         THE COURT:  Good morning.

23         On behalf of Kroger?

24         (Audio interference.)

25         THE COURT:  That means you have two sources of

1    sound in your room, if it makes that horrible echo

2    sound, so one of you is going to have to keep it on

3    mute.

4           MR. WOLF:  Your Honor, while Ms. Pfaffenroth

5    works that out, I'll introduce this side.  I'm Matthew

6    Wolf, Arnold & Porter.  Sonia Pfaffenroth will be

7    dealing with the witnesses today.  I'll be talking to

8    you on Friday.  And also, of course, Ms. Wahi from

9    Washington.

10          THE COURT:  The problem might be that Gary

11   Millerchip is unmuted in your office perhaps, and so

12   that might be the source of the sound.

13          MR. WOLF:  Your Honor, he is -- he is with

14   Ms. Pfaffenroth, and I think they have a technical

15   person trying to correct that right now.

16          Mr. Millerchip will be the first witness this

17   morning, and so I think they're trying to work that

18   out.

19          MS. PFAFFENROTH:  Your Honor, can you hear

20   me now?

21          THE COURT:  Yeah, I can hear you, but when

22   you talk, it goes through Gary Millerchip's window, so

23   that just means that he is your source of sound at this

24   point.

25          MS. PFAFFENROTH:  Yes.  We are -- so I am

1    sitting a room with the witness, and we are trying to

2    avoid the circumstance that we just had with the echo.

3    So we'll be speaking through the same microphone.

4            THE COURT:  Okay.  And we'll all

5    appreciate avoiding that echo sound, I think.

6            Do we need any more introductions before

7    starting with some live testimony?

8            Hearing none, I'll ask -- if Mr. Millerchip

9    was going to be the one testifying, he needs to turn on

10   his video, please.

11           MR. MILLERCHIP:  Good morning, Your Honor.

12           THE COURT:  Morning Mr. Millerchip.  I'll

13   ask that you please raise your right hand.

14                    GARY MILLERCHIP,

15   having been first duly sworn by the Court was deposed
                         as follows:
16

17

18           THE COURT:  And, Tia, if at any time we're

19   talking too quickly for you, please start waving your

20   hand, and I'll make sure that the people slow down.  We

21   want to make as good of a record as we can, please.

22           And the other thing, we have a number of folks

23   on this call.  Most of them have been identified, but

24   there are a number of folks that are just identified as

25   observer, and that's fine.  This is a public hearing.

1          But I need to make sure that members of the

2    public knows that there is no recording of this hearing

3    allowed without permission of the Court, and no one has

4    sought my permission, so therefore, no one is allowed

5    to record this proceeding.

6          We're having a court reporter that is

7    transcribing this proceeding for us.  It's not being

8    recorded here in the courtroom.  I understand that the

9    parties have also employed their own court reporter.

10   That's fine.  They're welcome to do that.  I have given

11   them permission to do that, but that court reporter is

12   snot the official record.  The official record is going

13   to be by the Court's court reporter, and that's Ms. Tia

14   Reidt.  I'm probably pronouncing it wrong, but I'm

15   doing my best.

16          MS. GRIFFIN:  Excuse me, Your Honor.

17          THE COURT:  Kellie.

18          MS. GRIFFIN:  Ms. Reidt is the parties' court

19   reporter.  Miranda Seitz --

20          THE COURT:  Oh, where's my court reporter?

21   Where's -- where's Miranda Seitz?  I see her name, but

22   I don't see her video, and she's on mute, so I don't

23   know if she's been able to hear us this whole time.

24          COURT REPORTER MS. SEITZ:  I have been

25   able to hear you the whole time, Your Honor.  I can

```
 1    turn on my video.

 2            THE COURT:  Great.  Yeah, if you don't

 3    mind, that way I can just see if there's a problem.

 4    You can -- I'll see you waving at me or something, and

 5    I can put you up at the top here with everyone else.

 6    That would be great if you don't mind.

 7            All right.  So Miranda Seitz is our court

 8    reporter.  I apologize I got it reversed, and Tia Reidt

 9    is the party's court reporter, and I've allowed them to

10    use their court reporter, but again the official court

11    reporter is going to be from Ms. Seitz, not from their

12    court reporter.

13            All right.  I think we've gone through the

14    background here a bit of how we're going to proceed.

15            And also if at any time the parties are at a

16    section of the questioning where they expect the

17    answers to be in regards to something that has been

18    already sealed or marked confidential, we will then go

19    through the Ishikawa analysis as to that portion.

20            I have a list of folks that are entitled at

21    that point to continue to participate in this hearing.

22    If you are not on that list, we will kindly put you in

23    the breakout room and proceed with that sealed portion

24    without you.

25            And then once that sealed portion is over, we
```

1    will bring those folks who are in that breakout room

2    back into the hearing at that time, so that is how

3    we're going to proceed.

4          Anything else before we get started with

5    Mr. Millerchip's testimony?

6          MS. BALCH:  Your Honor, Valerie Balch for

7    the state.  We just have a couple of quick housekeeping

8    issues before we begin with the testimony.

9          THE COURT:  Sure.

10         MS. BALCH:  You're Honor, we would move to

11   sequester testifying witnesses under ER 615.

12         THE COURT:  That's a question I don't get

13   often.  Let me take a look to see what you're asking.

14         Okay.  When you say "sequester," you just

15   mean -- you're moving to seclude -- or exclude the

16   other witnesses?

17         MS. BALCH:  Yes, during the testimony.

18         THE COURT:  Okay.  That -- exclusion of

19   witnesses is a request I get every single trial, so

20   that I'm very familiar with.  I just had never heard

21   someone use the word "sequester" for that.

22         Are there any other witnesses that are being

23   called by the parties that are participating at this

24   point in the hearing or that are here?  If you are --

25         MR. HASSI:  Your Honor, this is Ted Hassi

1    for Albertsons.  If I guess a question I have is are

2    expert, Dr. David Smith, is present.  I assume he

3    doesn't have to be sequestered given that he's an

4    expert and not a fact witness?

5            THE COURT:  Ms. Balch, do you have a

6    position to an expert witness viewing this portion of

7    the proceedings?

8            MS. BALCH:  My understanding is that there

9    is an exception for expert witnesses who may be

10   required to hear the testimony of the other witnesses.

11           THE COURT:  Well, they certainly might be

12   questioned about what the testimony is, and so it would

13   probably be to their advantage to actually know what

14   that testimony is if they're going to be questioned

15   about it, so that would make sense for me for them to

16   be able to view this portion of the hearing.

17          So it sounds like everyone oh is on the same

18   page in that record regard.

19          Are there any fact witnesses that are present?

20           MR. HASSI:  I'll just ask Ms. McCullom

21   maybe in another conference room here at Jenner &

22   Block.  I will just ask that if that's in a room with a

23   video, that she be asked move to a room where they do

24   not have access to the hearing, so she was --

25           THE COURT:  That would be great.

1        MR. HASSI:  She was in a board meeting

2    this morning, and I just want to make sure -- she's

3    somewhere here at the firm, but I want to make sure

4    that given the need to sequester witnesses that she

5    steps out of the room where there's into video.  She's

6    not in the room here with us.

7        THE COURT:  Thank you.  I will grant the

8    request to exclude fax ones I'm not ex-including expert

9    witnesses.

10       So if you are a fact witness, please leave the

11   hearing, and wait for someone to contact you to dial in

12   when it's your turn to testify.

13       Anything else before we get started in any

14   other housekeeping?

15       MS. BALCH:  Yes, just briefly with respect

16   to the exhibits.  There are some exhibits we would like

17   to address before calling our witnesses.  We have up

18   lowed 53 exhibits to the share file site some of which

19   have a sealed version and a public version.  I want to

20   just quickly address the various exhibits, if that's

21   agreeable with the court.

22       THE COURT:  Okay.

23       MS. BALCH:  With respect to state's

24   Exhibits 1 issue 22, those were already attached to the

25   declaration of Amy Hanson in support of the state's

1    motion for the preliminary injunction, so those are

2    already part of the record before the court.

3         The state does understand the defendants have

4    some issues they want to raise with respect to

5    Exhibits 1 through 22, but I want to address the other

6    issues before we discuss those.

7         Other exhibits the state would offer at this

8    time are 23 through 49.  The state does seek a

9    stipulation from defendants as to their admission I can

10   just briefly give the court an overview of what those

11   are.

12        25, 26, 28 and 29 were awe they want indicted

13   by Albertsons as they were attached to the declaration

14   of Mr. Kellie in support of the sealing of those

15   exhibits.  Exhibits 32 through 40 were authentication

16   indicted by Kroger as they were attached to the

17   declaration of Mr. Millerchip in support of sealing

18   those documents.

19        And 23, 24, 27, 30, 31, 41 through 46, 48 and

20   49 have not yet been authenticated, but they are party

21   opponent statements.  They are business reports from

22   Kroger and Albertsons so the state would request a

23   stipulation to those -- to the admission of those at

24   this time as well.  And then just for the court's

25   information 50 through 53 are just declarations the a

1    state does not seek to admit them.  They're just going

2    to be used potentially to refresh recollections that

3    sort of thing.

4            THE COURT:  Albertsons and Kroger were

5    able to follow that because those numbers flew by me so

6    quickly, there's no way I could have possibly taken

7    those notes.

8            Do the did he haves object to the admission of

9    exhibits I believe the range was 23 to 49?

10            MS. PFAFFENROTH:  Yes, Your Honor.  I

11    think the defendants, and I'll also allow Mr. Hassi

12    speak as well.  I think the defendants object to the

13    characterization of Exhibits 1 through 22 as already

14    admitted because they were attached to the declaration

15    of (Zoom audio cutting out) -- our position is that

16    exhibits should be introduced individually in

17    connection with the witness' testimony during this

18    hearing.  Similarly, with respect to -- I do not have

19    all of the numbers that the state just listed, but the

20    fact that documents were attached to a declaration in

21    support of a motion to seal does not mean that they are

22    deemed admitted for evidentiary purposes in this

23    hearing.  They should also be admitted through a

24    witness.  I believe the defendants have also lodged

25    individual objections with respect to certain of the

1    documents identified as potential exhibits by the state

2    which are, for example, news articles or filings

3    related to other proceedings.

4         And so we do not -- we do in fact object to

5    the blanket admission of all exhibits the state has

6    uploaded to the portal.

7         MR. HASSI:  And, Your Honor, we share

8    that -- I'm sorry, Your Honor.

9         THE COURT:  No, that's okay.  Go ahead.

10        MR. HASSI:  We share in that objection.

11   There are also a number of documents where the state

12   took documents from the parties, for example, public

13   filings, excerpted them and highlighted them.

14        We think that if one is going to introduce a

15   document, one should introduce the complete document,

16   and if it's going to been an Albertsons document or a

17   Kroger document that's introduced, it should be the

18   original as opposed to pieces of it that the state has

19   chosen to highlight.

20        That said our preference would be to deal with

21   this as Ms. Pfaffenroth said with the witnesses as the

22   documents came up.  We would rather not spend a bunch

23   of time this morning when we know Your Honor has

24   limited to hear from the witnesses or who are here and

25   ready the everything.

1          We're happy to deal with these objections as

2     they arise with the witnesses and move forward with the

3     hearing.

4          THE COURT:  Well, I will give you guys the

5     same suggestion that I give in every bench trial, and

6     that is it's not helpful when people say we would like

7     to admit the following 100 exhibits, and then I never

8     hear from a witness about why those exhibits have been

9     admitted.

10         What is helpful for me is for a witness to

11    identify the exhibit, and then through questioning, for

12    the importance of the exhibit to be drawn out.

13    Otherwise, it just means that I'm spending time in

14    chambers pouring through documents and coming up with

15    my own sense of why they're important rather than

16    hearing from the percipient witness who can tell me why

17    they're important.

18         So I always have a strong preference that

19    exhibits be admitted through the normal course with a

20    witness that identifies what they are, and then there's

21    a motion at that time to admit, a request to admit at

22    that time, and then at that time I can take up any

23    specific objections that maybe apply to that particular

24    exhibit.

25         So that's my preference.  Hopefully we've got

1    time to do that for the exhibits that the state

2    believes are important for purposes of this hearing,

3    and hopefully we'll be able oh make efficient use of

4    our time.

5         We started close to 8:30.  Normally our

6    hearings start at 9:00.  I think we might be taking a

7    shorter lunch as well to maximize the time we have with

8    these witnesses, and so that would be my preference

9    since there's not an agreement by the parties as to

10   what has been admitted.

11        And I wasn't able to follow Ms. Balch's

12   recitation of what exhibits she believes were add

13   diminish or been admitted or authenticated or whatnot,

14   so at this time I'm going to ask that the state simply

15   proceed with its questioning of the witness and

16   introduce exhibits as they come up.

17        MS. BALCH:  Understood.  Thank you, Your

18   Honor.

19        And at that, I believe the state is ready to

20   call Mr. Millerchip.

21        THE COURT:  All right.  He's been sworn in

22   you may begin Ben you're ready.

23        MS. BALCH:  Thank you.

24

25             EXAMINATION

1    BY MS. BALCH:

2        RQ. Mr. Millerchip can you please state your name

3    for the record and spell it?

4        RA. Yes, it's Gary G-A-R-Y, Millerchip,

5    M-I-L-L-E-R-C-H-I-P.

6        RQ. Who is your employer?

7        RA. The Kroger Company.

8        RQ. What's your title?

9        RA. Senior vice president and chief financial

10   officer.

11       RQ. You understand we've here today to talk about

12   the negotiations between Albertsons and Kroger that led

13   up to their recently announced merger and dividend;

14   correct?

15       RA. Yes, I do.

16       RQ. Okay.

17           And you signed declarations stating you're

18   familiar with those negotiations and the terms of the

19   merger agreement?

20       RA. Yes, that's correct.

21       RQ. So those negotiations began in mid June of

22   this year, 2022, when you and Rodney McMullen met with

23   Vivek Shankar and Sharon McCollam; is that correct?

24       RA. We had had discussions earlier than that, so

25   around the end of April, we reached out to Albertsons

1    to let them know we were interested in exploring a

2    merger, but really the detailed conversations, you're

3    correct, started in June.

4         RQ. And Kroger hired Citibank and Wells Fargo to

5    assist it in evaluating that Albertsons acquisition; is

6    that correct?

7         RA. Yes, that's correct.

8         RQ. And Kroger provided those entities with data

9    and asked them to provide some analysis of it; is that

10   right?

11        RA. Yes.  We -- so before we really got into any

12   detailed analysis with Albertsons with nonpublicly

13   available information, we asked bank advisors to pull

14   together an overview of the Albertsons business from

15   publicly available information that helped us sort of

16   get to a point where we wanted -- we decided we want

17   odd to get into a deeper conversation to see if a

18   merger made sense.

19        RQ. Okay.

20             And you're familiar with the term Project

21   Acorn?

22        RA. Yes, that's the name we used for the merger

23   eventually.

24        RQ. A code name?

25        RA. Yes, exactly, yes.

1          RQ. And Acorn is a code name for Albertsons, and

2     Kettle is a code name for Kroger; is that right?

3          RA. That's correct.  And that's the Kroger's

4     documents I believe Albertsons may have used different

5     code names, but for Kroger's documents that's correct.

6          RQ. And Kroger and Albertsons negotiated the terms

7     of the merger between I think you said the end of

8     April and then October of this year, 2022?

9          RA. That was the full end to end process of time

10    we were talking to each other, that's correct.

11         RQ. And the companies made offers back and forth

12    during that time?

13         RA. That's correct.

14         RQ. Now, it was June 25th of this year, 2022, that

15    Kroger sent its first nonbinding indication of interest

16    letter to Albertsons to indicate its interest in

17    conducting a merger with Albertsons; is that right?

18         RA. That sound correct, yes.

19         RQ. And in that letter, Kroger told Albertsons

20    that it was open to having a special dividend announced

21    in conjunction with the merger; is that right?

22         RA. That's correct, yes.

23              MS. BALCH:  Your Honor, permission to

24    share screen to publish what has previously been marked

25    as Exhibit 27 to the witness.

```
 1              THE COURT:  You may.

 2   BY MS. BALCH:

 3       RQ. Mr. Millerchip, can you see my screen?

 4       RA. Yes, I can.  Yes, that's better.  It's blown

 5   up an little bit bigger now, thank you.

 6       RQ. No problem.  I can zoom in.

 7              And I'm going to quickly scan through it, just

 8   giving you a second to briefly see what is contained in

 9   this document.

10              Mr. Millerchip, you're familiar with this

11   document, aren't you?

12       RA. I am, yes.

13       RQ. This is the June 25th, 2022, offer letter that

14   Kroger refers to as a nonbinding invitation of

15   interest; is that right?

16       RA. That's correct, yes.

17              MS. BALCH:  State offers Exhibit 27 up.

18              MS. PFAFFENROTH:  No objection, Your

19   Honor.

20              THE COURT:  And did you need the other

21   person to make the record of lack of objection

22   besides --

23              MR. HASSI:  This is Ted Hassi on behalf of

24   Albertsons.  No objection to Exhibit 37 coming into

25   evidence.
```

1          THE COURT:  All right.  27 is admitted

2     without objection.

3          (Exhibit 27 received.)

4     BY MS. BALCH:

5          RQ. And, Mr. Millerchip, can you see well enough

6     to read or do I need to zoom in further they are?

7          RA. No, I can see it okay.  Thank you.  I can only

8     see the top half of the first part of the letter

9     though.

10         RQ. Okay.

11             I'm going to go ahead and scroll down, and I

12     would like to bring your attention to the second

13     paragraph.

14         RA. Yes.

15         RQ. And I would like to point your attention to

16     the third sentence.

17             Are you with me?

18         RA. Is that the sentence "We will need"?  No, I'm

19     sorry.  I can't quite see commas versus period so I

20     might not be tracking.

21         RQ. You can help you at?

22         RA. While, yes, yeah.

23         RQ. Yes, while starts the sentence and it states

24     request what time we have several questions and need to

25     learn more about the special dividend we are open to

1    having a special dividend announced in conjunction with

2    a transaction with Kroger if we should come to mutually

3    agreeable terms."

4        That's what that sentence states; correct?

5        RA. Yes.

6        RQ. And in this letter of June 25th, 2022, Kroger

7    also told Albertsons that it needed to know more about

8    the size of the dividend; isn't that right?

9        RA. Yes, that's correct.

10        RQ. It told Albertsons it needed to know more

11    about the timing of the dividend?

12        RA. Yes, that's correct.

13        RQ. And it told Albertsons it needed to know more

14    about the structure of the dividend?

15        RA. Yes, that's correct.

16        RQ. It tole Albertsons that it needed to know more

17    about the financing of the dividend?

18        RA. Correct.  Yes.

19        RQ. And it told Albertsons that it needed to know

20    machine about the liquidity involved in the dividend;

21    correct?

22        RA. That's correct, eyes.

23        RQ. So Kroger negotiated the size, the timing, the

24    structure, and the financing of the dividend because

25    Kroger had to take out a bridge loan to bridge the time

1    between the mergers signing and the mergers closing;

2    isn't that right?

3        RA. It's little broader than that, so the bridging

4    facility is to cover the whole on the purchase price

5    and then the extent to which there's a special dividend

6    paid would impact the financing Kroger would have so

7    it's one elm of the overall financing structure that

8    Kroger would need to put in place to finance the

9    merger.

10       RQ. And Kroger told Albertsons in that June 25th

11   letter that if it announced a special dividend Kroger's

12   offer's price would be reduced by the amount of the

13   dividend, isn't that right?

14       RA. Yes, that's correct.  Yes.  And there is -- I

15   don't know if it's helpful to get give a little context

16   because as I mentioned within measure I don't IRS

17   question, there were question conversations before this

18   letter which led to the letter.  And what -- maybe if

19   it's okay to share.  The first conversation with

20   Albertsons --

21       RQ. It's okay.  And your attorney will have a

22   chance to -- to ask about sort of the lead up.  I just

23   have some direct questions about this letter

24   specifically, okay?

25       RA. Okay.

1      RQ. So in the discussions leading up to this

2  June 25th letter, Albertsons had specifically mentioned

3  to Kroger the amount of 4 and a half billion dollars,

4  isn't that right?

5      RA. They had.  They mentioned up to 4 and a half

6  billion, that's right, yes.

7      RQ. Right.

8          And when Kroger sent its June 25th letter, it

9  used 4 and a half billion as an example of how much the

10  dividend would reduce the offer price by, isn't that;

11  right?

12      RA. That's correct, yes.

13      RQ. And we see that here in valuation and

14  assumptions in this paragraph, and it states, quote,

15  "Using 4.5 billion as an example, which is the amount

16  mentioned to it's, the resulting per share amount of

17  our offer price would reduce by approximately $7.76 per

18  share, implying a premium to Albertsons's shareholders

19  of 13 percent to 18 percent."

20          Did I read that correctly?

21      RA. You did, that's correct, yes.

22      RQ. And I'm going to go ahead and stop screen

23  sharing at this time.  I think I'm finished with this

24  exhibit.

25          Now, Mr. Millerchip, you would agree, wouldn't

1   you that the special did I have dents fenced in a

2   manner to essentially give Albertsons's shareholders a

3   partial payment upfront regardless of closing a merger

4   with Kroger; correct?

5        RA. That's correct.  We were -- we were advised

6   they planned to give cash back to shareholders whether

7   or not the merger transaction happened or not.

8        RQ. And the special dividend function in a manner

9   to give Albertsons shareholders that partial payment

10  upfront; correct?

11       RA. Not a partial payment for the merger, but a

12  way of returning cash to shareholders as part of their

13  overall strategic review of a plan to return cash to

14  shareholders.

15       RQ. And it your testimony today that this special

16  dividend did not function as a partial payment upfront

17  for the merger?

18       RA. That's correct, yes.  I'm saying it wasn't a

19  part payment of the merger.

20       RQ. Kroger's advisers put together a slide deck

21  called "Project Acorn preliminary discussion materials"

22  and presented it to Kroger's board of directors; isn't

23  that right?

24       RA. The June presentation, is that the one you're

25  referring to?  There were various presentations I want

1    to make sure I'm talking about the right document.

2        RQ. Sure.

3        I'll pull it up for you.

4        MS. BALCH:  Your Honor, permission to pull

5    up a redacted version of what has been privately mark

6    as Exhibit 18 at this time.

7        THE COURT:  You may.

8    BY MS. BALCH:

9        RQ. Mr. Millerchip can you see my screen?

10       RA. I can, yes.

11       RQ. Okay.

12       And I'm going to -- well, can you see that it

13   says Project Acorn preliminary discussion materials on

14   the first page?

15       RA. I can, yes.

16       Is in a date on there?  I can't see a date.

17   I'm sorry.  I want to make sure I see the frame of

18   preference because as I mentioned, there were lots of

19   documents over time that we presented to the board.  I

20   just want to make sure that I've got the right -- the

21   chronological order.

22       RQ. Well, do you recall signing a declaration on

23   November 30th of this year?

24       RA. I do, yes.

25       RQ. And do you recall attaching document

1    Exhibit 8, a redacted document, Exhibit 8 to that

2    declaration?

3         RA. Yes.  Yes.

4         RQ. Okay.

5         RA. I found the date.  This is the June document

6    so thank you, I've been able to picture it now, thank

7    you because there a multiple documents we attached to

8    our board presentations, but I'm, yes, tracking now,

9    thank you.

10        RQ. Completely understand.

11            And you recognize this to be the Project Acorn

12   preliminary discussion material slide deck you attached

13   to your declaration of November 30th of this year with

14   respect to Project Acorn; correct?

15        RA. I do, yes.  Thank you.

16            MS. BALCH:  The state offers Exhibit 18.

17            THE COURT:  Any objections?

18            MS. PFAFFENROTH:  Sonia Pfaffenroth on

19   behalf of Kroger.  No objection, Your Honor.

20            MR. HASSI:  Ted Hassi on behalf of

21   Albertsons.  No objection, Your Honor.

22            THE COURT:  All right.  Exhibit 18 is

23   admitted without objection.

24            (Exhibit 18 received.)

25   BY MS. BALCH:

1      RQ. And, Mr. Millerchip, I'm going to direct you

2  to Slide 45.

3          This slide is titled overview of proposed

4  acorn special dividend, isn't it?

5      RA. It is, yes.

6      RQ. And do you see the title called "Acorn

7  shareholder motivation?

8      RA. Yes.

9      RQ. And do you see the second bullet point?

10     RA. I do, yes.

11     RQ. Can you read that second bullet point for us?

12     RA. Yes.  Acorn shareholders will essentially

13  receive partial payment upfront regardless of closing

14  the transaction with Kroger [sic].

15     RQ. So then you will agree that Kroger understood

16  the special dividend to constitute a partial payment

17  upfront for the merger, wouldn't you?

18     RA. I think from our perspective, the way that was

19  presented and discussed was a partial payment, as I

20  mentioned there for strategic review of giving value

21  back to their shareholders because they'd announced

22  their broader strategic review back in February, and

23  the special dividend was one component, and then either

24  a merger or a recapitalization of the business through

25  new third party equity was the plan.

1          So this from our perspective was related to

2    the overall strategic review and the fact that our

3    Acorn had already said they planned to issue a

4    dividend.

5          RQ. Right.

6              And Albertsons is different from a lot of

7    other companies, isn't it?

8          RA. It's what --

9              MS. PFAFFENROTH:  Objection, Your Honor.

10             THE COURT:  Can you rephrase?  It seems

11   overly broad.

12             MS. BALCH:  No problem.

13   BY MS. BALCH:

14        RQ. Albertsons is different from a lot of other

15   companies because it's shares are overwhelmingly owned

16   by private equity firms; right?

17        RA. So as a public company, yes, that's right.

18   There are a lot of private equity firms, but to be a

19   public company with a majority of shares owned by

20   private equity, that's more unusual, yes.

21        RQ. Right.

22             And so when Kroger considered doing this

23   merger with Albertsons it recognized that insiders

24   owned 81.9 percent of the company; isn't that right?

25        RA. I don't know we knew it was 81.9, but

1    certainly the majority -- well over 70 percent was the

2    number we had in our materials.

3         RQ. I'm going to go ahead and point your attention

4    to slide number 12.  We're still on Exhibit 18 here.

5         This slide is titled "Acorn ownership

6    summary"; correct?

7         RA. It is, yes.

8         RQ. And there's a pie chart on this slide?

9         RA. Yes.

10        RQ. And do you see the red text box above the pie

11   chart?

12        RA. Yes.

13        RQ. Can you read for us what that text box says?

14        RA. Yes."  Total insiders 81.9 percent."

15        So if I could just clarify.  This deck was in

16   June.  When I said it was in the 70s, I think for

17   example, even while we were working through this

18   process, Apollo was no longer an investor in the

19   company and this had been some dilution of that, so I

20   wanted to make sure I wasn't misrepresenting the

21   information.  It did actually change over time, which

22   is why I said the 70 percent rather [indecipherable] to

23   this specific document, so I apologize.

24             (Reporter clarification.)

25             ^ (discussion off the record.)

1          THE WITNESS:  My apologies.  I was just

2    wanting to clarify that the reason I quoted the 70 plus

3    percent was that the ownership structure was changing

4    even during the time of the transaction, so I wasn't

5    trying to say this number wasn't accurate at the time

6    but it did change over time.

7          But it was certainly -- even at the time of

8    the transaction it would have well north of 70 percent

9    is what I was trying to say earlier.

10         RQ. So some of the private equity firms got out

11   between June when this slide deck was put together and

12   later when the merger was signed; is that right?

13         RA. Yeah.

14         RQ. So as of June, Kroger knew that Albertsons was

15   owned by 81.9 percent insiders?

16         RA. That's correct, yes.

17         RQ. So you would agree that if the special

18   dividend was not structured and executed properly it

19   could potentially negatively impact Albertsons's

20   standalone capital structure, wouldn't you?

21         RA. Yes.  It was certainly an initial question for

22   us when we were told they planned to do the special

23   dividend to make sure as we were contemplating the

24   merger to ensure the amount of the special dividend

25   wouldn't impact their ability to continue to be

1    successful and complete for sure.

2        RQ. Right.

3            And I'm going to point your attention to

4    Slide 54, still on Exhibit 15.

5            This slide is called key financing

6    considerations and market outlook, is it not?

7        RA. It is, yes.

8        RQ. And the last item under key risks" the bullet

9    point key risks the last item states special dividend

10   at Acorn if pursued and if not structured and executed

11   properly could potentially negatively impact acorn's

12   standalone capital structure.

13           Did I read that correctly?

14       RA. Yes, that's correct.

15       RQ. And I'm going to go ahead and stop screen

16   sharing at this time because I'm finished with

17   Exhibit 18.

18           Now, Mr. Millerchip, city group prepared for

19   Kroger a presentation with a slide deck titled project

20   Acorn discussion materials; is that correct?

21       RA. That's correct, yes.

22           MS. BALCH:  Permission to share screen on

23   exhibit number 40.

24           THE COURT:  You may.

25           MS. BALCH:  And I'm going to be sharing a

1    public version.

2    BY MS. BALCH:

3        RQ. Mr. Millerchip you recognize this document,

4    don't you?

5        RA. Yes, I do.

6        RQ. This is the slide deck I just brought up;

7    correct?

8        RA. Yes, that's right.  Yes.

9            MS. BALCH:  State offers Exhibit 40.

10           MS. PFAFFENROTH:  Sonia Pfaffenroth for

11   Kroger.  No objection, Your Honor.

12           MR. HASSI:  Ted Hassi for Albertsons.  No

13   objection, Your Honor.

14           THE COURT:  Exhibit 40 is admitted without

15   objection.

16           (Exhibit 27 received.)

17   BY MS. BALCH:

18       RQ. I'm going to point your attention to slide

19   number 3.

20           I'm going to go ahead and zoom in.

21           Can you see okay?

22       RA. Yes, I can.  Thank you.

23           MS. BALCH:  I think there's someone

24   speaking.

25           THE COURT:  Someone needs to mute, please.

1      Kellie, can you help us mute whoever is

2    talking so we can get back to the examination?

3         MS. GRIFFIN:  I've muted.

4         THE COURT:  Thank you.  Tell us when

5    you're ready.  I apologize for the interruption.

6         MS. BALCH:  Thank you, Your Honor.  No

7    problem.

8    BY MS. BALCH:

9      RQ. Mr. Millerchip, this slide is called "key

10   questions and preliminary conclusions/considerations"

11   is it not?

12     RA. It is, yes.

13     RQ. And you would agree at the time this slide was

14   recreated Kroger as the special dividend sentence a way

15   to give Albertsons's shareholders certainty that they

16   would receive part of the consideration -- the

17   transaction before the merger closed; correct?

18     RA. No, that wasn't how we viewed the special

19   dividend.

20     RQ. Do you see where it says "motivation" at the

21   top of the page?

22     RA. Yes.

23     RQ. Can you go ahead and read number one under

24   motivation?

25     RA. Sure.  A special dividend provides certainty

1    of a per accept contamination consideration of Acorn

2    shareholders.

3        RQ. So you would agree at the time this slide deck

4    was created, Kroger saw the special dividend as a way

5    to provide a certainty of consideration to Albertsons'

6    shareholders?

7        RA. No, the way that this just to help maybe the

8    context was the motivation would be Albertsons'

9    motivation not Kroger's motivation.  This slide deck

10   was set up to help us -- it was very early in the

11   process where we'd have this call where Albertsons

12   would explain they were planning to do the dividend,

13   and we weren't really familiar with it.  We had no

14   inside information on Albertsons.

15       So it was really cities outside in view

16   helping educate Kroger on why would Albertsons be doing

17   this special dividend, so the motivation was really

18   explaining what would Albertsons' motivation be, not --

19   Kroger really had no point of view on the dividend at

20   this point.

21       We were still trying to learn what was it all

22   about and how would it impact a potential pledger.

23       RQ. And speaking of the impact, do you see where

24   it says "valuation" in the center of the page?

25       RA. Yes.

1      RQ. Do you see the second to last item?

2      RA. The bullet point that starts Acorn"?

3      RQ. Yes.  Can you read that for us?

4      RA. Yes.  "Acorn shareholders will essentially

5    receive partial consideration up front regardless of

6    close of the transaction with Kettle."

7      RQ. Kroger also understood that the payment of the

8    dividend could put Albertsons in a risky position

9    between the signing the and the closing of the merger;

10   correct?

11     RA. At this point certainly before we'd had a

12   chance to review any information, yes, there was a

13   concern to make sure that this wouldn't damage the

14   ability of Albertsons to operate and complete and have

15   a strong business by the time we merged, so it was

16   definitely at this point a real consideration for us.

17     RQ. Can you read the last bullet point under

18   "valuation"?

19     RA. Yes.  "May impact the riskiness of the

20   underlying business between signing and closing."

21     RQ. I'm going to stop screen sharing at this time.

22   I'm finished with this exhibit.

23         Now, Mr. Millerchip, Citibank also prepared a

24   slide deck titled Project Acorn consolidated discussion

25   materials, didn't it?

1       RA. Yes, I think that's the document in June as

2    well that was produced more for our wider management

3    team as we were starting to bring more people in the

4    process to educate more everybody on Albertsons, that's

5    right.

6       RQ. And this is one of the documents that Kroger

7    submitted to the FTC on November 3rd of this year to

8    initiate the merger review?

9       RA. I believe that's correct, yes.

10       RQ. And it was attached to your November 30th

11    declaration; correct?

12       RA. Correct.

13          MS. BALCH:  Permission to publish a

14    redacted version of Exhibit 38.

15          THE COURT:  You may.

16    BY MS. BALCH:

17       RQ. Mr. Millerchip, this is that project Acorn

18    consolidated discussion material slide deck we just

19    discussed, is it not?

20       RA. Yes, that's correct.

21          MS. BALCH:  State offers Exhibit 38.

22          MS. PFAFFENROTH:  Sonia Pfaffenroth for

23    Kroger no objection, Your Honor.

24          MR. HASSI:  Ted Hassi for Albertsons.  No

25    objection, Your Honor.

1          THE COURT:  Objection 38 is admitted

2    without objection.

3              (Exhibit 38 admitted.)

4    BY MS. BALCH:

5        RQ. I'm going to direct your attention,

6    Mr. Millerchip, to Slide 35 of this document.  Can you

7    see it?

8        RA. It's quite small.  If you wouldn't mind

9    blowing it up for me, thank you.

10       RQ. Okay.

11             And I'm not quite at the slide I want.  It

12   was -- there we go.

13             Okay.  Can you see my screen?

14       RA. I can, yes.

15       RQ. This slide is called "preliminary transaction

16   considerations," is it not?

17       RA. It is.

18       RQ. And do you see the column titled

19   "Preannouncement"?

20       RA. Yes.

21       RQ. And that's here on the left-hand side; is that

22   right?

23       RA. Right.

24       RQ. And there are transaction considerations here

25   on row -- the very first row.

1        Do you see that?

2        RA. I do, yes.

3        RQ. And where they meet, the second bullet states,

4    quote, "Agreement on value and structure (cash/equity,

5    special dividend, et cetera)."

6        Did I read that correctly?

7        RA. You did, yes.

8        RQ. So one of Kroger's preannouncement transaction

9    considerations was to obtain an agreement on the value

10   and the structure of the transaction, which included

11   the special dividend; correct?

12       RA. Well, certain will uh as I mentioned the

13   special dividend would have an impact on the purchase

14   price so absolutely we would have to understand that to

15   be able to determine whether to move forward or not,

16   that's right.

17       RQ. I'm going to stop screen sharing at this time.

18        Now, Kroger made an offer to purchase

19   Albertsons on September 2nd of 2022; is that correct?

20       RA. Yes, that's right.

21       RQ. And that September 2nd offer factored in

22   Albertsons' issuing a dividend of up to $3 million with

23   shareholders prior to the merger closing; is that

24   right?

25       RA. That's correct, yes.

1      RQ. And Kroger's board received an update on

2  Project Acorn on October 4th, 2022; is that right?

3      RA. Yes, I believe that's right.

4      RQ. There was a slide deck prepared under your

5  supervision for that meeting; right?

6      RA. Yes.  That sounds right, yes.

7          MS. BALCH:  Permission to share screen of

8  the public version of Exhibit 33.

9          THE COURT:  You may.

10  BY MS. BALCH:

11     RQ. Can you see my screen, Mr. Millerchip?

12     RA. I can, yes, thank you.

13     RQ. This is a copy of that slide deck that we just

14  discussed, is it not?  And?

15     RA. Yes, it is.

16     RQ.

17          MS. BALCH:  State offers Exhibit 33.

18          MS. PFAFFENROTH:  On behalf of Kroger,

19  Your Honor, no objection.

20          MR. HASSI:  On behalf of Albertsons, Your

21  Honor, Ted Hassi, no objection.

22          THE COURT:  Exhibit 33 is admitted who

23  Utah objection.

24  BY MS. BALCH:

25     RQ. I would like to point you attention to

1    Slide 29, Mr. Millerchip.

2         I'm going to zoom in a little bit.

3    RA. Thank you.

4    RQ. Can you see this slide okay?

5    RA. Yes, I can.

6    RQ. This slide is titled historical offer

7    summary-Part 1."

8         Is it not?

9    RA. It is, yes.

10    RQ. And on the left-hand side column there's a row

11    for special dividend.

12         Do you see that.

13    RA. I do, yes.

14    RQ. And that line is compared across each of the

15    offers over time is it not?

16    RA. It is, yes.

17    RQ. And it shows that on the special dividend row,

18    specifically, it shows that Kroger made an offer that

19    included a dividend up to $3 million on September 2nd,

20    2022; correct?

21    RA. Yes.  Well, I think I would just qualify that

22    this was about the cap obviously from Kroger's

23    perspective on the dividend, what would be the maximum

24    amount that we would be comfortable allowing Albertsons

25    to include in the context whether we would walk away

1   from the merger or not.

2       RQ. Right.

3          That's why it says up to $3 million.

4       RA. Right.

5       RQ. If you go to the next column over it sates

6   Acorn proposal September 5, 2022, at the top does it

7   not?

8       RA. Yes.

9       RQ. And in the special dividend field it says

10  exactly $4.3 billion, does it not?

11      RA. That's right, yes, it does.

12      RQ. And if you go over one more column to the

13  right, it says Kettle proposal September 6th, 2022,

14  does it not?

15      RA. Yes.

16      RQ. And in the special dividend row it says

17  exactly $4 billion, does it not?

18      RA. That's right.

19      RQ. And there's a column that says bid-ask

20  September 13th, 2022.

21          Do you see that?

22      RA. Yes.

23      RQ. And that has different numbers for what Kroger

24  and Albertsons contemplated with respect to a special

25  dividend; is that right?

1      RA. In terms of the cap on the dividend, yes.

2      RQ. Okay.

3          And neither of those numbers says "up to" does

4  it?

5      RA. No.

6      RQ. No, it does not?

7      RA. No, it does not.

8      RQ. I'm going to turn your attention now to

9  Slide 7.  This slide is title offer summary, is it not?

10      RA. It is, yes.

11      RQ. And on September 26th, Kroger specifically

12  offered Albertsons a purchase price that factored in a

13  dividend of exactly $4 billion; correct?

14      RA. Again it factored in the cap of how much

15  Albertsons would be able to pay in a special dividend

16  as part of our agreement to the merger, yes.

17      RQ. And I'm looking at the special dividend row

18  here and I'm going across to the Kettle proposal

19  September 26th, 2022.  It shows exactly $4 billion does

20  it not?

21      RA. Yes, it does.

22      RQ. It doesn't say up to?

23      RA. That's correct it doesn't.

24      RQ. And if we go to the next column on the right

25  it's Acorn proposal September 29th and it says agreed

1    on special dividend; correct?

2        RA. Correct.

3        RQ. And if we go one more column to the right it's

4    September 30th it also says "agreed"; correct?

5        RA. Yes.

6        RQ. That was -- Kroger's proposal of

7    September 30th; Correct?

8        RA. That's correct, yes.

9        RQ. And one more column over is the 1st of

10   October, that's Acorn proposals, and it says agreed"

11   under "special dividend"; correct?

12       RA. Correct, yes.

13       RQ. So you would agree that the parties agreed on

14   a dividend of $4 billion; correct?

15       RA. That's the way I would say.  I think the

16   context of all of presentations up to this point an

17   important because we weren't agreeing to pay a dividend

18   if the dividend had been zero from the merger agreement

19   Kroger would not have affected Kroger at all.  What we

20   were agreeing with our board was to except up to a

21   $4 billion cap on the dividend and anything beyond that

22   would walk away.  That was our board's understanding

23   from are this discussion.

24       RQ. Right.

25           Because if we look here Acorn proposal of

1   September 22nd it says Albertsons wanted $4.38 billion

2   in a dividend; is that right?

3       RA. Right.

4       RQ. But Kroger --

5            THE COURT:  I apologize, counsel, what was

6   the figure?  I'm sorry, counsel.  That was 4.  what?

7            MS. BALCH:  38 billion.

8            THE COURT:  4.38?  Okay.  Thank you.

9            MS. BALCH:  No problem.

10  BY MS. BALCH:

11      RQ. And so as late as September 22nd of this year,

12  Albertsons was pushing for a bigger dividend, a

13  dividend of 4 behind $38 billion isn't that; right?

14      RA. Going up to a maximum of 4.38, yes.

15      RQ. Right.

16          So Kroger came, back and said "no, no more

17  than 4 billion"; is that right?

18      RA. That's correct, yes.

19      RQ. And that I was on September 26th?

20      RA. Yes, that's right.

21      RQ. And three days later Albertsons capitulate

22  asked said, "okay, we'll cap it at 4 billion"; is that

23  right?

24      RA. That's correct, yes.

25      RQ. And you would agree with me that Kroger's

 1    bridge loan was reduced by the cash funded portion of

 2    the special dividend, wouldn't you?

 3         RA. Kroger's bridge commitment, that's right,

 4    because the total value of the company was 20 billion.

 5    If the amount came down to call it 16 billion with the

 6    dividend but then 1 and a half billion was being

 7    borrowed on the loan facility, it took the bridge

 8    amount back to 17 and a half-ish, that's right.

 9         RQ. Right.

10         So I'm going to turn your attention to

11    Exhibit 33, slide the 2.

12         This slide is called "Financing update" isn't

13    it?

14         RA. It is, yes.

15         RQ. Okay.

16         And the first bullet point talks about that

17    bridge facility, that bridge loan; correct?

18         RA. That's correct, yes.

19         RQ. Can you read what that first bullet point

20    says?

21         RA. Yes."  Initial bridge facility of

22    $17.4 billion represents headline price of $34.10 per

23    share purchase price reduced by expected cash funded

24    portion of a special dividend of $2.5 billion.

25         RQ. So the larger the cash portion of the dividend

1   the smaller the bridge loan; right?

2       RA. That's correct.

3       RQ. So once the merger closes and Kroger acquires

4   Albertsons, Kroger is going to take on all of

5   Albertsons' debt, isn't that right?

6       RA. That's correct, yes.

7       RQ. And Kroger's purchase of Albertsons after

8   factoring in the dividend had a purchase price of

9   24.6 billion; isn't that right?

10      RA. Including the debt that would transfer over

11  from Albertsons, that's correct.

12      RQ. Right.

13      So factoring in the dividend the size of the

14  bridge loan that Kroger needed to take out was

15  $17.4 billion?

16      RA. One thing to clarify, if Albertsons didn't pay

17  the dividend the cash would still be in in the company

18  so we could.  Use that cash at the time of completing

19  the merger because Albertsons would obviously own that

20  cash, Kroger wouldn't so the bring facility like that

21  would have been like a few days of difference, if that

22  make sense, because the cash would have come to Kroger,

23  and then we would with have the reduced the bridge, so

24  it really didn't make a significant difference in

25  Kroger's debt funds in that basis.

1        RQ. So the larger the promotion offal dividend

2    that's paid this cash the less debt Kroger with us

3    going to need to take on in the bridge loan; right?

4        RA. But it would be -- just to clarify it would be

5    for a matter or days because if the cash stayed, it

6    would just mean that when Kroger got the cash as part

7    of the merger, it would just pay down the bridge three

8    or four days later.

9        So it was a matter of days difference.  It

10   wouldn't be like a meaningful difference.  I just

11   wanted to make sure I clarified that.

12       RQ. So Kroger also needed to make sure that the

13   dividend wasn't so large that it put Albertsons at

14   complete risk of failure during the pendency of the

15   merger; is that right?

16       RA. I would say even higher than that.  Kroger's

17   sort of thesis for merging is we wanted a strong

18   Albertsons that's going to grow both companies, so we

19   wanted to make sure that Albertsons would still be able

20   to compete and be able to invest in the things its

21   investing in to grow the company until the merger so

22   that was very important from our perspective.

23       RQ. And Kroger negotiated the size of the dividend

24   to ensure that Albertsons would be competitive during

25   the pendency of the merger?

1        RA. We negotiated the cap for sure to make sure it

2    couldn't be over a certain number if it -- Albertsons

3    could still have paid more but we would have caulked

4    away at least the option to walk away from the merger

5    if they paid more than the 4 billion.

6        RQ. You would agree with me the special dividend

7    was a key transaction in Kroger's purchase -- excuse me

8    a key term in the transaction of Kroger's purchase of

9    Albertsons, wouldn't you?

10            MS. PFAFFENROTH:  Objection, Your Honor.

11            THE COURT:  What is the objection?

12            MS. PFAFFENROTH:  Vague as to key.

13            THE COURT:  I'll allow the witness to

14    answer the question if he's able to.

15            THE WITNESS:  I think the way I would say

16    it would be key, it wasn't key to Kroger because our

17    position was whether the dividend was paid or not

18    didn't affect the transaction.

19        When Albertsons told us from day one they were

20    planning to pay the dividend whether or not they merger

21    with Kroger and the merger would be in addition to the

22    special dividend, it became something that we had to

23    make sure we were comfortable with because it would

24    affect the purchase price that we ended up paying and

25    it would affect potentially until we under it how our

1    finessing would work through the transaction.

2         So it was driven by Albertsons' requirement to

3    pay the dividend so it became an important

4    consideration that we had to make sure we addressed for

5    our shareholders.

6         MS. BALCH:  I'm going to stop screen

7    sharing at this time, Your Honor.  I'm done with

8    Exhibit 233.

9    BY MS. BALCH:

10        RQ. Now, Mr. Millerchip, you would agree that the

11   special dividend was referenced on a slide deck created

12   to evaluate the transaction on or about October 22nd as

13   a key transaction term, correct?

14        RA. Correct, yes.

15        MS. BALCH:  Permission to publish what's

16   previously been marked as Exhibit 35, the public

17   version.

18        THE COURT:  You may.

19   BY MS. BALCH:

20        RQ. Bear with me one moment.

21        There it goes.

22        Mr. Millerchip, can you see my screen?

23        RA. I can, yes.

24        RQ. Is this is the slide deck for Project Acorn

25   board update October 10, 2022, is it not?

1    RA. Correct, yes.

2    RQ. And this little stamp at the bottom is your

3    understanding that that stamp was created to indicate

4    it was one of the documents submitted to the FTC for

5    merger review; correct?

6    RA. Correct, yes.

7    RQ. Okay.

8         MS. BALCH:  State offers Exhibit 35.

9         MS. PFAFFENROTH:  Sonia Pfaffenroth for

10   Kroger no objection, Your Honor.

11        MR. HASSI:  Ted Hassi for Albertsons no

12   objection for Exhibit 35, Your Honor.

13        THE COURT:  Exhibit 35 is admitted without

14   objection.

15   BY MS. BALCH:

16   RQ. I would like to turn your attention to slide

17   number 13.

18        Can you see my screen okay?

19   RA. If you can blow it up a little bigger that

20   would be great.  Thank you.

21   RQ. Absolutely.

22        This slide is called "Key transaction terms"

23   is it not?

24   RA. Yes.

25   RQ. And do you see where it says "Consideration at

1    the bottom?

2        RA. Yes.

3        RQ. And in the second bullet it lists the special

4    dividend as part of consideration, does it not?

5        RA. Yes.

6        RQ. Yes, it does?

7        RA. Yes, it does.  Yes.

8        RQ. And it says that the dividend will be paid;

9    correct?

10       RA. It says "Acorn will pay a $4 billion special

11   dividend," that's correct.

12       RQ. It doesn't say "up to"?

13       RA. Right.

14       RQ. Right; it doesn't say up to?

15       RA. That's correct or yes.

16       RQ. And it uses the word "will"; correct?

17       RA. Yes.  Correct.

18       RQ. It doesn't use the word "may?

19       RA. Acorn will pay a $4 billion special dividend;

20   correct?

21       RQ. So it doesn't use the term "may" does it?

22       RA. It doesn't, no.

23       RQ. And it doesn't use the term "might "Does it?

24       RA. It does not.

25       RQ. It's unequivocal, is it not?

1      RA. It says Acorn will pay a $4 billion special

2   dividend; correct.

3      RQ. You would agree with me wouldn't you that

4   Kroger's board considered the special dividend to be

5   part of the financing structure for the transaction?

6      RA. It was a key consideration in our financing

7   structure, yes, because of the impact it had on the

8   purchase price on day one and also because depending on

9   the amount it would impact our financing of the

10   transaction.

11      RQ. And I would like to turn your attention at

12   this time to slide number 21 of Exhibit 35.

13         This slide is titled "Primary financing

14   structure and components" is it not?

15      RA. It is, yes.

16      RQ. And do you see where it says "Price per

17   share"?

18      RA. Yes.

19      RQ. And below that it says "Special dividend"?

20      RA. Yes.

21      RQ. And if you follow over to the right one column

22   it says $4 billion, does it not?

23      RA. Yes.

24      RQ. It does not use the words "up to" does it?

25      RA. No.  It just says $4 billion.

1          RQ. I'm going to stop screen sharing at this time?

2               MS. BALCH:  Your Honor, at this time the

3     state will be referring to documents that have been

4     sealed by this Court.  The state respectfully requests

5     that the Court inquire of the gallery as to any

6     objections to closing the courtroom at this time and

7     engage in the Ishikawa analysis and making any

8     necessary findings on the record before closing the

9     courtroom.

10              THE COURT:  Okay.  So -- and this is --

11    your about to reference documents that have been marked

12    as confidential or with some similar designation on the

13    parties stipulated protection order.

14              MSB WITNESS:  Yes.  And that have been

15    sealed by order of this Court.

16              THE COURT:  Okay.

17         And so the Court has previously identified

18    contents of this document as something that satisfies

19    the Ishikawa factors, which the courts used to

20    determine whether or not something should or should not

21    be subject to discloser to the members of public.  So

22    I've already found that this do you mean should not be

23    disclosed to the public and it follows then the

24    discussions regarding the contents or a document that

25    is sealed would likewise not be disclosed to public.

1          I will allow anyone present.  I think there

2    are 139 participants shown, and that would include

3    myself and the court reporters, but more particularly

4    there's a lot of other folks that are here.  If one is

5    objecting to this portion of the hearing being sealed,

6    this is your time to unmute and to voice your

7    objection.

8          I hear no objections.

9          Kellie, I'm finding that the Ishikawa factors

10   have been met because essentially incorporating my

11   prior ruling as to the sealing of this document, and no

12   one has objected to the closure of this portion of the

13   hearing.

14         So Kellie if you don't mind putting them in

15   the breakout room, everyone except for the list of

16   folks we have that's been provided by the parties who

17   are able to view and hear this portion of the hearing.

18

19

20

21

22

23

24

25





































































THE COURT:  If your ready you may question

Mr. Millerchip.

MS. PFAFFENROTH:  Thank you very much,

Your Honor.

And I would just ask -- I will be sharing some

exhibits as well during the course or my examination,

and I would ask that my colleague, Mr. Holler, be

permitted to screen share on my behalf.

THE COURT:  Sure.  Just run it by my

first, and I'm sure I'll agree.

MS. PFAFFENROTH:  Thank you, Your Honor.

1                        EXAMINATION

2      BY MS. PFAFFENROTH:

3          RQ. Good afternoon on the East Coast,

4      Mr. Millerchip.

5          RA. Good afternoon.

6          RQ. Could you at a high level describe the

7      strategic rationale for Kroger's proposed acquisition

8      of Albertsons?

9          RA. Yes, I would say there were three sort of over

10     arcing priorities when whether he decided the merger

11     was the right opportunity to move forward with the

12     Kroger.

13             First of all question leave we can serve site

14     bringing the two companies together.  We have a three

15     or four strategic priorities for delivering fresh food

16     faster to customers investing in our own private label

17     brand products and delivering more value for customers

18     and investing in technology and digital, and we believe

19     that the merger will allow us to do all these of those

20     more effectively to serve customers and grow the

21     company over time.

22             Secondly, we think there are significant

23     synergies by integrating back office functions together

24     and that will allow us to lower prices thor customers.

25             And thirdly as we think about the competitive

1    environment we face obviously intense computation from

2    large retailer like Amazon, Walmart and Costco, and we

3    believe this positions the company better to compete

4    with those companies longer term as well.

5        RQ. Thank you.

6            Mr. Millerchip.

7            State of Washington asked you a number of

8    questions about the special dividend in this case.

9            When during the deal negotiations did Kroger

10   first become aware of the special dividend?

11       RA. Right at the beginning of our conversations

12   with Albertsons so kind of just a reminder of what we

13   were aware of, we were aware Albertsons in February and

14   announced their strategic review.  We reached out to

15   them at the end of April after we'd done some of our

16   own analysis.

17           And when we reached out to them through

18   advisors and directly, they shared that they were

19   intending to pay a special dividend and sort of

20   characterized the dividend as a decision they were

21   making and considering additional strategic options for

22   creating value to shareholders, either a merger with

23   Kroger or some recapitalization of the business.

24           MS. PFAFFENROTH:  And I would like at this

25   point to revisit a few of the exhibits that Ms. Balch

1    used during her examination, specifically exhibit

2    number 27 has already been admitted into evidence.

3    Your Honor, we would like to have permission to screen

4    share Exhibit 27 with the court?

5

6            THE COURT:  You may.

7    BY MS. PFAFFENROTH:

8        RQ. And Mr. Millerchip, I'm going to direct your

9    attention to the second paragraph of this letter.

10   Perhaps we could scroll it up just slightly.

11           And Ms. Balch asked you questions about

12   specifically the latter sentences in this paragraph.

13   Could you read for the court the second sentence in

14   paragraph 2 of this letter?

15       RA. Is that from?  Start from.

16       RQ. Yes, sorry, from our?

17       RA. "From our conversations as well as these of

18   our respective advisors, we understand Albertsons'

19   intention is to declare concurrently with earnings and

20   pay a special dividend."

21       RQ. Thank you.

22           And that is as you just described your

23   understanding from the beginning of the process?

24       RA. Yes, that's correct.

25       RQ.

1      MR. HASSI:

2          MS. PFAFFENROTH:  We can take this exhibit

3      down, Mr. Holler, thank you.

4          I would now like to pull up exhibit number 40

5      with the Court's permission.  This exhibit has already

6      been admitted into evidence.

7          THE COURT:  You may.

8          MS. PFAFFENROTH:  Thank you.

9      BY MS. PFAFFENROTH:

10         RQ. Mr. Millerchip, do you recall looking at this

11     document entitled "Project Acorn discussion materials"

12     from June 2022 with Ms. Balch?

13         RA. Yes.  And this as allegation recall that

14     Citibank provided to us after we heard in Albertsons

15     they were planning a special dividend because it was a

16     little unusual and not familiar to us we asked Citibank

17     to provide us with an understanding for what it could

18     mean for a potential merger.

19         RQ. And you looked at several of the slides in

20     this deck with Ms. Balch, but I would like to direct

21     your attention to the slide -- it's the Bates number

22     ending in 605, KRFTCCID605?

23         Do you recall this slide, Mr. Millerchip?

24     RA. Yes, I do.

25         RQ. I would like to direction your attention to

1    the second bullet.

2         Could you read the second bullet into the

3    record for the court?

4         RA. Yes.  "Following discussion with Acorn's

5    advisor, Acorn is currently contemplating the following

6    options with a plan to announce by earnings many mid to

7    late July.  Number one, issue a special dividend

8    financed via debt and cash on hand, and considering 1

9    one, alongside two or three.  Number two, raise third

10   party equity or, three, a potential merger with Kettle.

11   Kettle being Kroger.

12        RQ. And what is your understanding of what the

13   meaning is of that bullet?

14        RA. It's really a reflection of what the advisors

15   are told Citi and what I was told initially when we

16   reached out to Albertsons about exploring a merger was

17   that Albertsons had indicated they -- obviously they

18   had been, as we understood it, beyond a strategic

19   review, since the latter part of 2021, so we were

20   playing catch-up when we reached out in April in the

21   sense they had already been looking at other options.

22        So when we reached out they told us they were

23   already in the phase of planning for the special

24   dividend and ---ing these additional options alongside

25   the special dividend.

1       RQ. And did Albertsons ever indicate to Kroger

2    that the payment of the special dividend was contingent

3    on the proposed transaction with Kroger?

4       RA. No, they did not.

5           MS. PFAFFENROTH:  Mr. Holler could we move

6    forward two slides, to the one ending in 2100?

7       Thank you.

8    BY MS. PFAFFENROTH:

9       RQ. And this slide is one you had already looked

10   at with Ms. Balch.  Do you remember this one,

11   Mr. Millerchip?

12      RA. I do, yes.

13      RQ. I would like to direct your attention to

14   number 5 under the heading "Precedents"?

15      RA. Yes.

16      RQ. And the specifically could you read for the

17   court the first sentence in that -- in number 5?

18      RA. Is it possible to blow it up slightly?  It's

19   quite small on my screen.

20      Thank you.

21      "The issuance of a special dividend alongside

22   a merger, "( Where the special dividend is not

23   contingent on the merger) is rare; however, it requires

24   various events to line up, i.e., desire for special

25   dividend and merger, acquisition, finance ability,

1    timing to close."

2        RQ. And is that sentence also consistent with your

3    understanding as to whether Albertsons ever indicated

4    that the payment of a dividend was contingent on the

5    proposed transaction with Kroger?

6        RA. It's consistent that they were independent

7    decisions.

8        RQ. Thank you.

9            MS. PFAFFENROTH:  Mr. Holler, we can take

10   this exhibit down.

11           Now, with the Court's position I would like to

12   pull up Exhibit 18 this has also already been admitted

13   into evidence by the state?

14           THE COURT:  You may.

15   BY MS. PFAFFENROTH:

16       RQ. And, Mr. Millerchip, do you ever recall

17   looking at this slide deck as well with Ms. Balch?

18       RA. Yes, I do.

19       RQ. I would like to director your attention the

20   page Slide 42 of this document.  It's Bates ending in 5

21   3 5.

22           Thank you.  So this is the beginning of a new

23   section in the documented entitled "Illustrative merger

24   with Acorn."

25           And I would like to flip to the following

1    page.

2         I don't believe you looked at this page with

3    Ms. Balch.  Ail I'll direct your attention again to the

4    right-hand side of the page.

5         And specifically, this is a slide deck I

6    believe now later on in June.

7         Could you read the bull let and subheadings

8    under bullet 1 under following discussion into the

9    record, please?

10        RA. 1, issues?

11        RQ. Start with following discussion.  Thank you?

12        RA. "Following discussion with ache ache's

13   advisors, Acorn is currently contemplating the

14   following options with a plan to announce by earnings

15   in late July.  Number one, issue a special dividend,

16   financed via debt and cash on hand and either number

17   two raise third party equity or, number three, a

18   potential merger with Kettle."

19        RQ. And is that a similar point as the one in the

20   deck in which we were just reviewing a similar section

21   a moment ago?

22        RA. Yeah, just to clarify the first deck was

23   Citibank our advisors providing management, I myself

24   and our team, with an understanding of the proposals

25   from Albertsons, and then this was really us updating

1    our board and making them aware of the same situation,

2    the same information.

3              MS. PFAFFENROTH:  Could you go to the

4    following slide, Mr. Holler.

5    BY MS. PFAFFENROTH:

6         RQ. Mr. Millerchip, I direct your attention now to

7    the second bullet.  Could you reed the second bullet

8    for the court?

9         RA. Yes.  "Given current liquidity available Acorn

10   is considering a special dividend with or without a

11   transaction with Kettle."

12             MS. PFAFFENROTH:  We can take this

13   document town for now.

14   BY MS. PFAFFENROTH:

15        RQ. So Mr. Millerchip, does the merger agreement

16   between Albertsons and Kroger require Albertsons to pay

17   the pre-closing dividend?

18        RA. No.  There's no requirement to pay special

19   pre-closing dividend in the merger agreement.

20        RQ. And under the merger agreement can Kroger

21   require Albertsons to pay the special dividend?

22        RA. No.  We cannot.

23        RQ. And under the merger agreement can Kroger

24   prevent Albertsons pro paying a special dividend?

25        RA. No, we can't.

1          RQ. And apart from the merger agreement is there

2    any other agreement between Kroger and Albertsons with

3    respect to the special dividend?

4          RA. No.  There isn't.

5          RQ. Okay.

6              And so if the -- there is no requirement to

7    pay the special dividend, why does the merger agreement

8    reference the special dividend?  And the merger

9    agreement I'll just clarify is referred to as the

10   preclosing effect.

11         RA. There are really three considerations that

12   meant we needed to include the impact of the special

13   dividend in the merger agreement.  The first was

14   because Albertsons when they did their strategic review

15   decided for an investor point of view, it was important

16   to announce the two together, the special dividend and

17   the merger.

18             And so because the valuation that Kroger had

19   done on the company and the amount it was going to pay

20   to its shareholders would be valued based on the assets

21   today and then subsequently there would be $4 billion

22   in the example of the cap being paid out.  That was a

23   reduction of the share price that needed to happen so

24   that Kroger wasn't paying the shareholders twice for

25   the same value.  Excuse me.

1           And secondly, it was important because from

2    Kroger's perspective the amount of dividend would

3    impact Kroger's financing on the back the back end of

4    the transaction in terms of funding the merger.

5           And we also wanted to make sure that we were

6    comfortable that given the amount of time that would

7    elapse between the merger announcement and closing,

8    that the level of the special dividend wouldn't impact

9    Albertsons' ability to continue to successfully compete

10   and operate because our investment piece is based on a

11   thriving Albertsons.

12          So all of that -- all of those were factors

13   were the reasons why it was important to include terms

14   and the in agreements.

15   BY MS. PFAFFENROTH:

16      RQ. And, Mr. Millerchip, the parties entered into

17   a merger agreement on October 13th, 2022?

18      RA. That's correct, yes.

19      RQ. And you are familiar with -- are you familiar

20   with that agreement?

21      RA. Yes, I am.

22      RQ.

23          MS. PFAFFENROTH:  Your Honor I would like

24   to ask Mr. Holler be permitted to pull up what is

25   marked as Exhibit 101.  This is a document entitled

1   "agreement and plan of merger by and among Albertsons

2   Companies, Inc., the Kroger Co and Kettle Merger Sub,

3   Inc., dated October 13th, 2022.

4          THE COURT:  You may share -- or he may

5   share screen.

6   BY MS. PFAFFENROTH:

7      RQ. And, Mr. Millerchip, is this the merger

8   agreement to which you have been referring?

9      RA. Yes, it is.

10         MS. PFAFFENROTH:  Your Honor I will ask

11  that Exhibit 101 be moved into evidence.

12         MS. BALCH:  No objection.

13         MR. HASSI:  Ted Hassi for Albertsons.  No

14  objection, Your Honor.

15         THE COURT:  The state didn't object and

16  neither did Albertsons.

17         Exhibit 101 is admitted without objection.

18         (Exhibit 101 admitted.)

19         MS. PFAFFENROTH:  Thank you, Your Honor.

20         Mr. Holler, you can pull this down and I would

21  ask that you pull up a set of demonstratives.

22         And Your Honor, the demonstratives I'm asking

23  Mr. Holler to pull up are simply blowing up several

24  sections on the merger agreement to make them easier to

25  read.

1      THE COURT:  Okay.

2         Are those going to be marked?

3      MS. PFAFFENROTH:  These do not need to be

4    marked Your Honor and I'm happy to use the merger

5    agreement itself it thought it would be easier for the

6    witness and the Court to see them on a slide pulled

7    out.

8      THE COURT:  Yeah.  The things the Court

9    sees need to be marked, so it would be better to either

10   have these marked as a demonstrative or illustrative

11   exhibit in which case the record will be clear, or use

12   the actual page in the merger agreement itself.  I

13   don't have a preference.

14     MS. PFAFFENROTH:  Your Honor, why don't we

15   go ahead and use one page from the demonstratives for

16   this purpose and we can arrange to have that marked

17   as -- I don't believe we have an Exhibit 102.

18     THE COURT:  What is the next exhibit

19   number.

20     MS. GRIFFIN:  The next exhibit will be

21   Exhibit 105.

22     THE COURT:  Next exhibit is 105:

23        105 is a demonstrative exhibit of page what --

24   what is the page number.

25     MS. PFAFFENROTH:  Yes, Your Honor.  I'm

1    going to ask Mr. Holler to pull up a single slide and

2    we can mark that and put that into the record if that's

3    easiest.

4              THE COURT:  Yeah, I just uploaded to share

5    file.

6              Go ahead and share your screen.  And what page

7    of the agreement and plan merger is this demonstrative

8    exhibit?

9              MS. PFAFFENROTH:  Yes, Your Honor, thank

10   you.

11             Mr. Holler, if you can put up the slide that

12   has both the common merger consideration and the

13   preclosing dividend on it, that would be helpful.

14   BY MS. PFAFFENROTH:

15       RQ. Mr. Millerchip, looking at the merger

16   agreement?  That is Exhibit 101 for the record, we have

17   on this slide pulled out the term "Common merger

18   consideration."

19             Are you familiar with this provision?

20       RA. Yes, I am.

21       RQ. And you were just discussing an adjustment in

22   purchase price relating to the special dividend.

23             Could you explain for the Court what this

24   provision -- how this provision relates to that?

25             RA. Yeah, it basically outlines what Kroger will

1    pay Albertsons for shareholders for Albertsons, and the

2    headline price is $34.10, and there are a couple of

3    deductions potentially from that purchase price the

4    first being the pre-closing dividend if it's paid by

5    Albertsons would you please reduce the purchase price

6    by the equivalent amount of whatever each shareholder

7    receives from that special dividend.

8         And the second would be that if SpinCo is

9    created to certain stores to be maintained by

10   Albertsons and spin to a different company because

11   those assets would also be staying with the Albertsons

12   SpinCo.  It would reduce the purchase price as well.

13        So those would be the two adjustments that

14   coupled happen to the purchase price.

15     RQ. And in the sealed portion of the proceeding

16   Ms. Balch made a reference to a question as to whether

17   there was an accounting for or about I mean,

18   administration of what would happen two the purchase

19   price if there were no special dividend paid.  Does the

20   common merger consideration in the merger agreement

21   itself cover that eventual quality?

22     RA. Yes.  If there's no dividend paid assuming

23   SpinCo is a separate calculation, but the $34.10 would

24   not change if Albertsons did not pay a dividend.

25        RQ. And the second heading on this slide is the

1   definition "Pre-closing dividend."

2        Are you familiar with the definition

3   pre-closing dividend in a merger agreement?

4        RA. Yes.

5        RQ. And could you just read into the record the

6   portion of this definition that begins "In an amount"?

7        RA. In an amount not to exceed with respect to all

8   such special cash dividends $4 billion in the

9   aggregate.

10        RQ. And that is referring to -- here it's called

11   the preclosing dividends.  Do you understand that also

12   refers to the special dividend we have been discussing

13   during the course of the examination?

14        RA. Yes, that's correct.

15        RQ. And as you just read it says "Not to exceed."

16        Ms. Balch asked you a number of questions

17   about whether various slide decks and presentations

18   that led up to this merger agreement included the words

19   "up to."

20        What is your understanding of the no not to

21   compete in this definition?

22        RA. It's essentially that throughout the process

23   and what we have obviously agreed in the merger

24   agreement was that if Albertsons paid a special

25   dividend at their own discretion beyond $4 billion,

1    Kroger would switch -- essentially would mean that we

2    could decide not to move forward with the merger if

3    they exceeded that amount.

4        RQ. Thank you.

5

6            MS. PFAFFENROTH:  Mr. Holler you can take

7    down this slide deck.

8            And I would like to at this point pull back up

9    Exhibit 35.  This was an exhibit that was admitted into

10   evidence by Ms. Balch.

11           THE COURT:  You may.

12   BY MS. PFAFFENROTH:

13       RQ. Mr. Millerchip do you recall looking at this

14   October 10th board update with Ms. Balch?

15       RA. Yes.

16       RQ. I would like to go back to a slide deck you

17   looked at with her?

18           MS. PFAFFENROTH:  Mr. Holler could I don't

19   go back to Slide 13 of the deck?  Thank you.

20   BY MR. HASSI:

21       RQ. So Ms. Balch directed your attention to the

22   penultimate bullet on the page entitled "special

23   dividend" and specifically the last sentencing, Acorn

24   will pay.  What is your understanding of this bullet

25   point as a transaction term?

1      RA. It was essentially for Kroger to summarize to

2   our board as we have been hair sharing all the way

3   through the George any that the agreement would

4   incorporate the ability for Albertsons to pay up to the

5   $4 billion dividend because if it did it would impact

6   the purchase price of the transaction and at this point

7   we're getting close to the transaction date and

8   expecting Albertsons is moving forward with the plans

9   they shared.

10     RQ. And moving forward to Slide 21, which you also

11  looked at with Ms. Balch.

12       Sorry.  Just one moment.

13       MS. PFAFFENROTH:  Apologize, Your Honor.

14  We can take this one down.

15       THE COURT:  Okay.

16       MS. PFAFFENROTH:  Could we pull up instead

17  Exhibit 33, the public version that was admitted into

18  evidence.

19       THE COURT:  You may.

20  BY MR. HASSI:

21     RQ. Mr. Millerchip do you recall also recalling

22  looking at this board deck with Ms. Balch?

23     RA. Yes, I do.

24     RQ. And I would like to go to Slide 29 of the

25  deck.  This is the Bates number ending in 940.

1        Do you recall looking at this slide

2    specifically with Ms. Balch?

3        RA. Yes, I do.

4        RQ. And Ms. Balch asked you a number of questions

5    as to whether the term "up to" was included in

6    connection with the special dividend numbers on this

7    page.

8        Do you recall that?

9        RA. Yes, I do.

10       RQ. And could you please explain your

11   understanding of what the figures on the special

12   dividend row represent in this document?

13       RA. Yeah, it really -- we had multiple decks with

14   our board with the intention here and the discussion

15   with the board was what is the number amount that

16   Kroger would be willing to include as a cap within the

17   merger agreement before it would cause Kroger to want

18   to have the option to not move forward with the merger.

19       RQ. Thank you.

20       MS. PFAFFENROTH:  Mr. Holler, you can take

21   this down now.

22   BY MR. HASSI:

23       RQ. And, Mr. Millerchip, I believe you testified

24   in response to the state's question that one of the

25   interests of Kroger was ensuring that Albertsons would

1    remain competitive -- remain a competitive entity if

2    the pre-closing dividend was paid, if the special

3    dividend was paid; is that correct?

4        RA. Yes, that's correct.

5        RQ. And why was that important to Kroger?

6        RA. I know I mentioned it earlier but the reason

7    that Kroger decided it wanted to merger with Albertsons

8    was because we believe that we can create a more

9    thriving successful company so when we're playing a

10   $25 billion price tag for the company and a 30 percent

11   premium, it's really important that the company is

12   successful and continuing to grow because if ultimately

13   the business underperforms, we've that for our

14   shareholders, so it's really important.

15       RQ. Thank you.

16         And Mr. Millerchip, you have looked at a

17   series of decks that were presented both to the board

18   and otherwise during the course of your examination

19   that ranged from June through October; is that correct?

20       RA. That's correct, yes.

21       RQ. And could you just explain to the court how

22   Kroger's understanding with respect to the potential

23   impact of the -- of a pre-closing dividend if

24   Albertsons chose to pay it evolved over time?

25       RA. Well, I think I mentioned this earlier we

1    first became aware of the dividend around April time so

2    first it was our understanding as it was un-I shall the

3    impact of it and we did a lot of work to it to

4    obviously determine how it could impact the merger.

5           And obviously we started to formulate a view

6    around we obviously wanted to the make sure it impacted

7    the purchase price because we didn't want to pay the

8    investors twice and also making sure that we did an

9    analysis of Albertsons as we got more data in a clean

10   room environment to be able to understand Albertsons'

11   financial plans, to understand how their business was

12   expected to perform in the future.

13          And so from our perspective we did a lot more

14   analysis over time with our advisors to make sure that

15   as we were negotiating with Albertsons on what the cap

16   could be on the dividend to be able to still move

17   forward with the merger making sure that we were

18   comfortable through that analysis that Albertsons

19   wouldn't be affected from a liquidity perspective and

20   would have plenty of financial flexibility to be able

21   to continue to deliver on their business plans and

22   compete in the future.

23      RQ. And, Mr. Millerchip, did any of your analyses

24   indicate that Albertsons would be weakened a competitor

25   by payment of a special dividend?

1      RA. No.  Obviously we didn't have the level of

2  access to information that Albertsons would have as the

3  management of the company, but from all the three

4  months of diligence we did and also asking our advisors

5  to provide opinion, we didn't -- we saw the company had

6  plenty of liquidity to be able to pay the dividend.

7      And we actually even stress tested the model

8  to say, What if sales were low, what if profitability

9  was lower to make sure that if different scenarios

10  played out, would they still be able to continue to

11  execute that plan and compete, and we didn't find any

12  concern with the dividend at the cap level of

13  4 billion.

14      MS. PFAFFENROTH:  No further questions,

15  Your Honor.

16      THE COURT:  All right.

17      Counsel, do you have questions for this

18  witness?

19      MR. HASSI:  Your Honor, Ted Hassi for

20  Albertsons.  We have no questions for this witness.

21      THE COURT:  Ms. Balch, any redirect?

22      MS. BALCH:  One moment, Your Honor.

23      Just briefly, Your Honor.

24      THE COURT:  Sure.

25      MS. BALCH:  And I would like to pull up

1    Slide 40.

2              THE COURT:  Okay.  Slide 40 or Exhibit 40.

3              MS. BALCH:  Sorry, Exhibit 40.

4              THE COURT:  All right.

5

6                   REDIRECT EXAMINATION

7    BY MS. BALCH:

8        RQ. Okay.

9            And we're going to go to Slide 3.

10           This is the slide you just discussed a moment

11   ago.

12       RA. So right by the slide.

13             THE COURT:  This is page 6?

14           THE WITNESS:  Yeah.

15   BY MS. BALCH:

16       RQ. Oh, I'm sorry, I'm actually going to go to

17   Slide 5, which is page 8 of the document, if that makes

18   sense, so the little number here in the bottom left is

19   the slide number that I'm going to reference.

20       RA. Yep.

21             MS. BALCH:  Oh, excuse me.  You know, Your

22   Honor, I think this is the wrong slide deck, and I

23   completely apologize for that, but I'm going to stop

24   screen sharing at the moment and see if I can sort that

25   out.

1    BY MS. BALCH:

2        RQ. Honestly, Mr. Millerchip, you may not need to

3    reference the slide because I think it's a fairly

4    pointed question?

5        A moment ago you talk about how the issuance

6    of a special dividend alongside a merger is quite rare.

7    Do you recall that discussion?

8        RA. Yes, it's quite unusual, yes.

9        RQ. Right.

10       And there was one case that Kroger was aware

11   of where this had been attempted; is that right?

12       RA. That was our bankers --s that their deck, yes.

13   I think it was Lockheed Martin if I remember correctly.

14       RQ. Right.

15       So that transaction was between Lockheed

16   Martin and a rocket manufacturer; right?  Like a rocket

17   manufacturer, correct, like rocket jet Aerodyne or

18   something to that effect.  Do you recall?

19       RA. To be honest we didn't go into details of it.

20   It was more the context in the deck because we weren't

21   familiar with how the transaction could work they did

22   that work but there was as you probably saw there were

23   no materials in the deck talking about it.  We didn't

24   really get into any of the detail unfortunately.

25       RQ. And were you aware that the parties walked

1    away from that merger deal and that that transaction

2    did not go through?

3        RA. I think it was in the footnote to the slide

4    but we didn't go into any details -- I'm not familiar

5    with the case I don't know why it didn't move forward.

6        RQ. Are you aware there was FTC action around that

7    merger?

8        RA. Again I'm sorry, I wasn't -- we didn't spend

9    any time talking about that particular case.  It was

10   more included by the bankers as a frame of reference

11   for awareness but it didn't really -- it wasn't the

12   focus of any of our conversations.

13       RQ. So you don't know of a single transaction that

14   was approved of that actually went through or I guess

15   that actually went through and was completed and

16   consummated that involved a special dividend; correct?

17       RA. We didn't get into looking for the examples,

18   that was one our bank mentioned.  I think we were just

19   trying to make sure we had a frame of reference for how

20   it could work, so I'm not aware of any, but I don't

21   know that was the brief that we looked to go and try

22   and find.

23           I think as you probably have gathered, the

24   circumstances are so unusual just because Albertsons

25   over the last few years has performed so strongly and

1    reduced debt and built up cash on the balance sheet, so

2    it's sort of post-pandemic situation, it's very -- very

3    unique in that regard too.

4        RQ. So as far as you're aware, it's unprecedented

5    for a company to pay itself a special dividend in the

6    context of a merger, correct.

7        MS. PFAFFENROTH:  Your Honor, objection.  I

8    pause, but Ms. Balch is asking Mr. Millerchip to

9    speculate.  He's already testified that he's not

10   familiar with either this case or more Generally.

11       THE COURT:  The question posed asked him, as

12   far as he was aware.  I'll allow him to answer that

13   question.  Yeah, I didn't -- I haven't asked the

14   question of our advisors other than they shared the

15   example in the deck so I'm not aware of one but I

16   haven't asked the question more broadly to block look

17   for examples so I'm not aware of one is the answer?

18   BY MS. BALCH:

19       RQ. So as far as you know, a transaction like this

20   is unprecedented?

21       MS. PFAFFENROTH:  Your Honor,

22   Mr. Millerchip has now answered the question a much of

23   times.

24       THE COURT:  I've got a clear idea of what

25   his answer is to this question.  You can ask your next

1    one, Ms. Balch.

2             MS. BALCH:  Your Honor, that's all the

3    questions I have.

4             THE COURT:  Any -- well, it's cross I

5    guess, but it's your own witness.  Ms. Pfaffenroth, any

6    more questions?

7             MS. PFAFFENROTH:  No, Your Honor, no

8    additional questions.

9             THE COURT:  From Albertsons?

10            MR. HASSI:  No, Your Honor, no questions.

11            THE COURT:  All right.  Thank you,

12   Mr. Millerchip.  You're excused at this time.

13            THE WITNESS:  Thank you, Your Honor.

14            MR. WOLF:  Your Honor, for clarification

15   in light of the exclusion order, this is Matt Wolf for

16   Kroger, does -- is the witness free to observe

17   remaining testimony given that he's not expected to be

18   called back?

19            THE COURT:  Is anyone recalling

20   Mr. Millerchip?

21            MS. BALCH:  The state will not be

22   recalling any witnesses at this time.

23            MR. HASSI:  Albertsons does not intend to

24   call Mr. Millerchip.

25            MR. WOLF:  And Kroger does not.

1        THE COURT:  All right.  I think he can --

2    he's welcome to stick around if he wants and watch.

3        MR. WOLF:  Thank you, Your Honor.

4        THE COURT:  Who is next?

5        MR. NEWMAN:  Your Honor the state calls

6    Sharon McCollam.

7        THE COURT:  I think I see her at the far

8    end of the table, but she's a little bit -- there you

9    go.  It's getting better.  Thank you, Mr. Hassi.  You

10   guys are on mute still in there, though.  And that's

11   probably purposeful while you're moving things around.

12   I just want to make sure you knew.

13       MR. HASSI:  We're unmuted now, thank you.

14       THE COURT:  All right can you please raise

15   your right hand?
                 SHARON MCCOLLAM,
16           having been first duly sworn by the
          Certified Court Reporter was deposed as follows:
17

18

19                    EXAMINATION

20

21       THE COURT:  And it was hard to hear you

22   right there.  I heard you say "I do faintly" so just

23   remember to speak louder.

24       THE WITNESS:  Thank you.

25                 DIRECT EXAMINATION

1    BY MR. NEWMAN:

2        RQ. Ms. McCollam, introduce yourself, please.

3        RA. Yes, my name is Sharon McCollam.

4        RQ. And you're the president of Albertsons?

5        RA. I am the president and chief financial officer

6    of Albertsons.

7        RQ. And --

8            THE COURT:  I'm sorry, Mr. Newman.  I'm

9    going to interrupt.  Mr. Newman, I apologize for

10   interruptions.

11           Ma'am, can you please spell your name for the

12   record?

13           THE WITNESS:  Yes, capital M small C

14   capital C-O-L-L-A-M.

15           THE COURT:  That's your last name.  What

16   was your first name, please?

17           THE WITNESS:  Sharon.  Capital S-H- --

18           THE COURT:  Spelled the traditional way?

19           THE WITNESS:  Yeah.

20           THE COURT:  All right.  Thank you for

21   that.  Appreciate it.

22           Go ahead, Mr. Newman.  I apologize for

23   interrupting.

24   BY MR. NEWMAN:

25       RQ. In your roles with Albertsons you oversaw all

1    aspects of corporate finance and strategy; right?

2        RA. Yes.

3        RQ. And you play a leading role in the development

4    of the company's growth and transformation strategies?

5        RA. That's correct.

6        RQ. And in your role you personally sign SEC

7    filings on behalf of the company?

8        RA. Yes, I do.

9        RQ. So you can speak for the company?

10       RA. Yes, I can.

11       RQ. You know that we're here to talk about a

12   special dividend, this $4 billion dividend?

13       RA. Yes, I do.

14       RQ. And if I call it "The dividend" are we in

15   agreement that's what we're talking about this 4 bill I

16   don't imagine dollar special dividend?

17       RA. Happy to agree, yes.

18       RQ. If I'm talking about something else, I'll make

19   sure I'm clear, but otherwise, when I'm talking about

20   dividens, I'm talking about this $4 billion special

21   dividend.

22       RA. Okay.

23       RQ. You submitted a declaration weeks ago now in

24   response to the state's motion for TRO; right?

25       RA. Yes.

1      RQ. And I think it's been since market marked as

2   Exhibit 53, just for the record.

3      RA. Okay.

4      RQ. But in that declaration, you said this

5   dividend is quote independent of the proposed merger.

6   Is that what you said?

7      RA. Yes.

8      RQ. Informed consent it's not independent.  It's

9   actually part of the merger agreement, isn't it?

10     RA. No, it's not.  Yes, it is in the merger

11  agreement but it is not dependent on the merger.

12     RQ. I didn't ask you if it was dependent on the

13  merger I asked you if it was part of the merger

14  agreement?

15     RA. It is mentioned in the merger agreement.

16     RQ. Sorry?

17     RA. It is mentioned in the merger agreement.

18     RQ. So your position is that it is not part of the

19  merger agreement?

20     RA. It is a right in the merger agreement.

21     RQ. Is it your position it is not a part of the

22  merger agreement?

23     RA. It is a right in the merger agreement, and if

24  you define that as part of the merger agreement then,

25  yes.

1      RQ. It is part of the merger agreement?

2      RA. It's not dependent -- the merger was not

3   dependent on the defendant.

4      RQ. So it is part of the merger agreement?

5      RA. It is in the merger agreement.  It is

6   mentioned in the merger agreement as a right.

7      RQ. It seems like we're dancing around so let's

8   look at some words that you submitted to the SEC and

9   see if you stand by your statements to the SEC.

10      RA. Okay.

11         MR. NEWMAN:  Your Honor, permission to

12   share Exhibit 22, publish Exhibit 22, which just for

13   your own sake was exhibit V to the declaration of Amy

14   Hanson but it has now been marked --

15         THE COURT:  Okay.  Of.

16         MR. HASSI:  Your Honor, the witness also

17   has paper copies of these if she wants to refer to

18   them.

19         THE COURT:  Okay.

20   BY MR. NEWMAN:

21      RQ. Do you recognize Exhibit 22?

22      RA. Yes, this is the form 10 Q that the company

23   filed with the SEC.

24      RQ. And that's a quarterly report that you're

25   required read to fi8le with the SEC?

1      RA. Yes, it is.

2      RQ. And we can scroll down to the bottom or maybe

3   not, on page 39, you signed it; right?

4      RA. Yes.

5      RQ. 10-Qs have a legal requirement of truth and

6   accuracy; right?

7      RA. Ing that is correct.

8      RQ. And this disclosure to the SEC was true and

9   accurate; right?

10      RA. Yes, it is.

11      RQ. And at the end right before your signature you

12   wrote "The information contained in the report fairly

13   represents in all material respects the financial

14   condition and results of operations of the company"

15   right?

16      RA. That is correct.

17      RQ. And then you filed it with the SEC?

18      RA. Yes.

19      RQ. Can we go up to page 19, please?  And I'm not

20   talking to you when I'm moving pages.  Somebody else is

21   moving them for me.

22         So on page 19, the third paragraph there, this

23   is note 8 so this is part of the 10 Q; right?

24      RA. Yes, it is.

25      RQ. And that third paragraph it says "In

1    connection with the merger agreement, on October 14th,

2    2022, the company declared a special cash dividend of

3    $6.85 per share."

4         That's what it says radio; right?

5         RA. Yes, it does.

6         RQ. In your defense, it doesn't say "part."  It

7    says "in connection" there; right?

8         RA. That's correct.

9         RQ. All right.

10             THE COURT:  Sorry, Mr. Newman --

11   Mr. Newman, I'm sorry.  The last thing you said at

12   least on my speaker did not come through, so I heard

13   the witness saying yes so she must have heard it but I

14   couldn't hear it in the courtroom.

15             Could you restate the last part of that

16   question, please?

17             MR. NEWMAN:  Sure.  I was just pointing

18   out, earlier I asked her if it was part of the merger

19   agreement, and this says "in connection" with the --

20   with the merger agreement, so I was just pointing out

21   that she used a different word here.

22             THE WITNESS:  Yes.

23             MR. NEWMAN:  I'm finished with this exhibit

24   for a moment.

25             And next I would like to share Exhibit 3,

1   which, again, Your Honor, us was Exhibit C to the

2   Hanson declaration, just so you can keep track of these

3   things, but it is Exhibit C -- Exhibit 3.

4           THE COURT:  Okay.

5   BY MR. NEWMAN:

6       RQ. And you recognize this document as well,

7   right?

8       RA. Yes.  This is for form 8 K file on

9   October 13th, 2022.

10      RQ. And this is a form that you gave to the SEC

11  notice of this merger agreement, right the merger --

12      RA. Yes.

13      RQ. So this is a legal notice; right?

14      RA. Yes, it is.

15      RQ. This one was signed by Juliette Pyror?

16      RA. Yes.

17      RQ. Juliette Pryor is executive vice president,

18  general counsel and secretary of Albertsons, right?

19      RA. That's correct.

20      RQ. Does she have the authority to sign on behalf

21  of Albertsons this document?

22      RA. Yes, she did.

23      RQ. And she did sign it on behalf of Albertsons;

24  right?

25      RA. Yes, she did.

1       RQ. And 8 Ks have the same requirement of truth

2   and accuracy as 10 Qs; right?

3       RA. Yes, they do.

4       RQ. Okay.

5           Now, part of -- and this one was true and

6   accurate; right?

7       RA. Yes, it is.

8       RQ. I'm assuming you reviewed this before it went

9   to the SEC as CFO; right?

10      RA. That's correct.

11      RQ. And you thought it was accurate as well?

12      RA. I do.

13      RQ. Are so attached to the 8-K was a copy of the

14  merger agreement?

15      RA. Yes.

16      RQ. And we can -- it starts on page 5, I think.

17  But also attached to Exhibit 3 on page 23 was a press

18  release; right?

19      RA. There was a press release, yes.

20      RQ. There was a joint press release between --

21  that was issued with Kroger and Albertsons; right?

22      RA. That's correct.

23      RQ. But it wasn't just an attachment.  The content

24  of the press release was actually incorporated by

25  reference into the actual (inaudible Zoom audio);

1    right?

2        RA. Yes.

3        RQ. And so it also had the same requirements of

4    truth and accuracy; correct?

5        RA. Absolutely.

6        RQ. And in the middle of that yellow paragraph

7    there, it says, I'm quoting, "as part of the

8    transaction, Albertsons Companies will pay a special

9    cash did of up to $4 billion to its shareholders,

10   right?

11       RA. Yes, that's what it's says.

12       RQ. So that's what Albertsons said to the SEC;

13   right?

14       RA. That is true.

15           MR. NEWMAN:  Your Honor the state offers

16   both Exhibit 22 and Exhibit 3.

17           MR. HASSI:  Your Honor, this is a case

18   of -- we have no objection to the actual Q coming in.

19   There's highlighting and other marks and it not clear

20   whether it's the entire document.  So we just ask that

21   the statement replace them with the actual documents as

22   filed with the SEC as opposed to excerpted highlighted

23   documents.

24           MR. NEWMAN:  Your Honor, to respond, the

25   highlighting is required by court rule that's why it's

1    highlighted.  Local Rule 7 requires that the portions

2    that are substantially relied on by the party offering

3    it be highlighted, a because it was attached to the

4    declaration of Ms. Hanson, Ms. Hanson complied with the

5    Court rule by highlighting.

6            THE COURT:  Any other modifications other

7    than highlighting certain portions.

8            MR. NEWMAN:  It is incomplete there are

9    payments missing and that was just for ease of use for

10   the Court.

11           If the Court would like, the state could also

12   in addition offer the entire document, and that is true

13   of both C and B -- or sorry, 3 and 22.

14           MR. HASSI:  Your Honor we have no

15   objection to complete documents coming in.  Of.

16           MR. NEWMAN:  But Your Honor at this point

17   the state is offering Exhibit 3 and Exhibit 322.

18           THE COURT:  Which are incomplete portions

19   of those documents; right?

20           MR. NEWMAN:  Sorry?

21           THE COURT:  Those are incomplete portions

22   of those documents, correct.

23           MR. NEWMAN:  Correct.

24           THE COURT:  I'll ask the state to place

25   move to admit, and you can -- if you need time over the

1   break you can do it we can clean this up in the

2   afternoon but I think it's important that the actual

3   form 10-Q and the form 8-K that were submitted to the

4   SEC be submitted as exhibits rather than partial forms

5   and highlighted forms.

6        So I'll -- I agree with Albertsons' counsel on

7   this one and will ask the state to simply just upload

8   those, and we'll give those new exhibit numbers.

9        When exhibit numbers would those be?

10           MS. GRIFFIN:  Those would end up being 57

11  and 58.

12           THE COURT:  All right.  So Exhibit 57 is

13  going to be complete form 10-Q and Exhibit 58 will be

14  form 8-K.

15       And I will once those are uploaded I'll

16  admit -- well, let me make sure Kroger doesn't have an

17  objection.

18       You're on mute but I can read your lips to

19  sigh you have no objections but it might be better to

20  unmute first, unless you have to go somewhere.

21       You gave me a thumbs up.  So the record will

22  reflect that Kroger is now --

23       Now you're unmuted.  Go ahead.

24           MS. PFAFFENROTH:  Yes, Your Honor.  No

25  objection from Kroger.

1        THE COURT:  All right.  And we have the

2    wonderful echo effect on that one, so we have now heard

3    it several times.

4        So no objection to 10-Q and 8-K, so

5    Exhibits 57 and 58 are admitted without objection, and

6    I'll just ask the state to upload those to share file

7    when they get a chance.

8        (Exhibits 57 and 58 received.)

9        MR. NEWMAN:  Thank you, Your Honor.

10        Your Honor, just for housekeeping, Exhibit 3

11    and Exhibit 22 have the hig8hlighting which is required

12    by Rule 7.

13        THE COURT:  I've got the declaration

14    already in the record previously submitted and

15    considered by the Court as part of the papers, so I

16    mean, I -- if I want to look at what you highlighted, I

17    can look there.

18        MR. NEWMAN:  Right.

19    BY MR. NEWMAN:

20        RQ. I want to talk about the history of -- I'm

21    done with this document.  Thank you.

22        I want to look at the history of this

23    dividend.

24        We talked about an 8-K and a 10-Q, these are

25    SEC document forms, those letters.

1      RA. Yes.

2      RQ. The and so another one is called a 10-K;

3  right?

4      RA. Yes.

5      RQ. And a 10-K is an annual report that publicly

6  traded companies file?

7      RA. That's true, yes.

8      RQ. And you're required by the SEC to file those?

9      RA. Yes, absolutely.

10      RQ. So Albertsons did their annual report back in

11  April of this year?

12      RA. That's correct.

13      RQ. I think it was April 26th does that sound

14  right?

15      RA. Yes, for the prior year, that's right correct.

16      RQ. I looked through that 10-K and I didn't see a

17  mention of this $4 billion dividend; is that right?

18      RA. That's correct.

19      RQ. So the special dividend is not mentioned in

20  there at all?

21      RA. No, it is not.

22      RQ. But there is a dividend mentioned in there,

23  and this is one of those circumstances where I'll be

24  clear about what dividend.  There is a dividend

25  mentioned in there, but it's just a regular quarterly

1    dividend; right?

2        RA. That's correct.

3        RQ. And it was $0.12 a share to be paid on

4    May 10th?

5        RA. Yes.  $0.12 as quarter.  A common dividend,

6    yes.

7        RQ. So Mr. Millerchip said they started reaching

8    out in late April to Albertsons.  Does that sound;

9    right?

10       RA. That is -- that sounds correct, yes.

11       RQ. So within days of your filing, your 10-K, you

12   heard from Mr. Millerchip?

13       RA. Through our bankers.

14       RQ. Yeah.

15         And then --

16           THE COURT:  I apologize for interrupting.

17       Is that -- is that called a 10-K or an 8-K.

18           MR. NEWMAN:  A 10-K.

19           THE WITNESS:  A ten 10-K that's a.  An

20   annual report for the company.

21           THE COURT:  There's a 10-Q, an 8-K and a

22   10-K.

23           MR. NEWMAN:  Exactly.

24           THE COURT:  Okay.

25           THE WITNESS:  That is correct.

1          THE COURT:  (Speaking simultaneously.)  I

2    just wanted to clarify for my own edification.

3          THE WITNESS:  Asa public company we're

4    required, Your Honor, to file a quarterly financial

5    statement this is a 10-Q.  On an annual basis, we're

6    required to file a 10-K.  And when we had interim

7    information to communicate to shareholders, we file an

8    8-K.

9          THE COURT:  That's helpful.  Thank you.

10         THE WITNESS:  Okay.

11    BY MR. NEWMAN:

12       RQ. So you heard from Kroger within days of filing

13    your 10-K about this possible merger?

14       RA. Their interest in obtaining more information

15    about Albertsons.

16       RQ. Right.

17         Mr. Millerchip -- the state doesn't have a lot

18    of documents between then and June but Mr. Millerchip

19    talked about a letter that Kroger send to Albertsons in

20    June kind of laying out this idea, kind of starting the

21    negotiations.  Are you familiar with that?

22       RA. That is correct.  I do recall that, yes.

23       RQ. In that letter, me mentioned that by then

24    Albertsons was thinking about doing a special dividend.

25    He mentioned it in the letter; is that right?

1        RA. That is correct.

2        RQ. The that wasn't public at the time, was it?

3        RA. That was not public.  A decision had not been

4   made at that time.  There were discussions internally

5   about a return of capital to our shareholders.  The

6   company had not determined in what form that return

7   would take.  But when the -- when Kroger reached out

8   through our bankers and they informed us as such, we

9   inform our bankers that it was our intent in the short

10  term to do a capital return to our shareholders in an

11  amount very -- in this range of 4 to $5 billion and we

12  instructed your bankers to go back to them and let them

13  know prior to any discussions that that was something

14  that they need to take into account.

15       RQ. So before -- at the time that letter was sent,

16  and in the weeks leading up to that letter because they

17  already knew it, Albertsons was looking at a special

18  dividend in the 4 to $5 billion right; right?

19       RA. We were looking at a return of capital to our

20  shareholders.

21       RQ. Yeah.

22          He used the word special dividend in the

23  letter so you kind of narrowed it down by then; right?

24  So you kind of had narrowed it down by then, right?

25       RA. We had -- we had different alternatives of

1    ways we could return it.  And how we return capital to

2    our shareholders would depend on whether or not western

3    returning the capital as a standalone public company or

4    if it was in conduction with possibly another type of

5    transaction such as an acquisition because some of the

6    alternatives to returning capital would not be

7    available to us under securities regulations if there

8    was another transaction involved.

9         RQ. So when Mr. Millerchip wrote you a letter in

10   June of this year and acknowledged that you were

11   considering a special dividend, did he make that up or

12   is that something that you told him?

13        RA. The invest.  Bankers were instructed to tell

14   them that we intended to return capital to

15   shareholders.

16        RQ. That's not what he said.  What he said was

17   special dividend.  And my question is --

18        RA. Yes.

19        RQ. -- is that what you told him?

20        RA. Yes.  So, counselor, through our investment

21   bankers, we inform them that we would be doing a return

22   of capital to our shareholders and --

23        RQ. I feel like we're talk past --

24        RA. -- and in the event that that return of

25   capital was in conjunction with another transaction the

1    form of that would be a special dividend.

2        RQ. But at that point you say it was not public

3    knowledge; right?

4        RA. Transfers not.  We had not made a firm

5    decision.

6        RQ. But you did tell your biggest competitor in

7    Washington this nonpublic information; right?

8        RA. We through our -- through our advisors, we did

9    inform them that we were considering doing a return of

10   capital to our that I holders and in the event of a

11   transaction that it would make -- it would be in the

12   form of a special dividend, yes.

13       RQ. So, yes, you did tell your competitor

14   nonpublic information; right?

15       RA. With a nondisclosure agreement, yes, through

16   our investment bankers.

17       RQ. So you gave your biggest competitor in

18   Washington nonpublic information but you're okay with

19   it because they agreed not to tell anybody; right?

20       RA. With a nondisclosure agreement, we were

21   comfortable with having a discussion about a possible

22   merger transaction and within that, we did share with

23   them that it was our consideration to be returning

24   capital to our investors, yes.

25       RQ. Have you ever reached out to a competitor

1    prior to this, have you ever reached out to a

2    competitor and told them your future business plans and

3    you were going to return capital?  Had that ever

4    happened before?

5        RA. In the context of a possible merger

6    transaction, yes.

7        RQ. No, under any circumstances had it ever

8    happened before?

9        RA. Yes, it had.

10        RQ. When else have you told your competitors

11    nonpublic information about your future plans?

12        RA. It is not -- it is through the nondisclosure

13    agreements we would have as it related to negotiating a

14    potential merger that you would share information such

15    as that.  And --

16        RQ. No, I'm asking when previously have you shared

17    nonpublic information about your company's business

18    plans with your primary competitor in Washington?

19        RA. In previous merger discussions.

20        RQ. Which ones?

21        RA. Merger discussions that transpired earlier in

22    2022 with another possible acquirer of Albertsons.

23            MR. HASSI:  And Your Honor the details of

24    those prior negotiations are under seal per our prior

25    discussions, so I just want to caution everyone that

1    we're not -- you know, we're not in an open courtroom

2    to talk about those -- the details of those prior

3    discussions.

4           THE COURT:  We can always seal the

5    courtroom and go through the Ishikawa analysis, and the

6    other thing, I have a different view of your desk over

7    there where Albertsons' counsel is and where the

8    witness is, and there shouldn't be any papers facing up

9    when a witness is testifying.  That is standard for any

10   witness.

11          It's no offense intended for this particular

12   witness, but the binder in front of her should be shut

13   for example.  There shouldn't be any papers that she

14   can review unless we make a report of what she's

15   reviewing and why.

16          MR. HASSI:  I'm sorry.  I thought it was

17   clear at the start.  The witness has a preference for

18   paper documents so the exhibits that have been

19   identified, we have a set here that are unmarked copies

20   of the paper exhibits.

21          And so if about exhibit is referred to, she

22   has the option of referring to it on paper instead of

23   on the screen.  That's -- that's what is in front of

24   her but I'm happy when she's not testifying about an

25   exhibit to take it away.

1          THE COURT:  Exactly.  That's my point.

2    But.

3          THE WITNESS:  Thank you.

4          THE COURT:  Mr. Newman, if you want to

5    continue on with the line of questioning, it sounds

6    like this would be subject to an Ishikawa analysis

7    about prior merger discussions.

8          MR. NEWMAN:  I don't need to go further

9    into that at this point other than to say...

10   BY MR. NEWMAN:

11      RQ. You had not decided on a special dividend

12   until after you started talking to Kroger; right?

13      RA. We had decide -- we were looking at

14   strategical alternatives.  We announced publicly that

15   we were looking at our strategic alternatives on

16   February 28th, 2022, in an 8-K and a press release.

17   And from that time we continued to look at all

18   strategic alternatives including a return of capital to

19   our shareholders through different possibilities

20   including dividends, tender offers and others.

21      RQ. That's not what I asked.  What I asked was you

22   had not decided on a special dividend until after you

23   started talk to Kroger; right?

24      RA. We had decided that in the event that it --

25   that the return of capital was going to be coincident

1    with another type of strategic alternative that we

2    would most likely have to pivot to a special dividend

3    because of security regulations.

4         RQ. So you didn't decide to do a special dividend

5    until after you starred talking to Kroger?

6         RA. In the form of the capital return, it pivoted

7    to the dividend because it had to, because of

8    securities regulations.

9         RQ. So you didn't decide to do a special dividend

10   until after you started talk to Kroger; right?

11        RA. Until we had another strategical alternative

12   transaction on the table.  It was not our first

13   preference to do a special dividend.

14        RQ. So you didn't decide to do a special dividend

15   until after you started talking to Kroger; right?

16        RA. We would -- that -- I'm not trying to be

17   argumentative, Counselor.  We knew that securities

18   regulations would require us to pivot to a special

19   dividend in the event that we were in a transaction of

20   some other sort at the same time that we were going to

21   return capital to our shareholders.  So the securities

22   regulations that surrounded it would pivot us to a

23   special dividend, and we were fine with that in that

24   circumstance.

25        The goal was to do a $4- to $5 billion of

1    return of capital to our shareholders, and what form it

2    took would depend on whether we were doing it a

3    sentence a standalone public company or if we were

4    doing it as part of another transaction.

5         RQ. You didn't decide to do a special dividend

6    until after you started talking to Kroger; right?

7              MR. HASSI:  Objection, Your Honor.  Asked

8    and answered.

9    BY MR. NEWMAN:

10        RQ. Most decidedly --

11             THE COURT:  It's been answered many times.

12   I'm not sure if I -- it's been asked many times I guess

13   I'm not sure -- I guess it's been answered, but I

14   understand the point Mr. Newman's trying to make, and

15   I'm not quiet sure why Albertsons seems to tap dance

16   around it, but that's my take away.

17        But before the merger with Kroger, counsel --

18   or Ms. McCollam, there were many options for returning

19   the special capital to your investors, right -- or not

20   special capital.

21             THE WITNESS:  A special dividend, yes.  A

22   return --

23             THE COURT:  Not a special dividend --

24             THE WITNESS:  Yes.

25             THE COURT:  Return of capital.  There were

1    many options to return capital to your investors;

2    right?

3              THE WITNESS:  Yes, there were.

4              THE COURT:  After you were contacted by

5    Kroger, you only pursued one of those options, which

6    was a special dividend; right?

7              THE WITNESS:  Assuming there was a

8    consummated merger agreement, yes.

9    BY MR. NEWMAN:

10       RQ. So it's dependent on --

11             THE COURT:  (Speaking simultaneously.)

12         The only thing that happened is you proceeded

13   with the merger agreement; right?

14             THE WITNESS:  We provided in the

15   negotiations with Kroger and when it came to making an

16   independent decision about returning capital to our

17   shareholders, the only -- from a skilled in the arts

18   regulations point of view, the only vehicle we had was

19   through a special dividend.  That's correct.

20             THE COURT:  It seems pretty

21   straightforward to me.  Before the discussions with

22   Kroger, you had other options on the table.  After the

23   discussions with Kroger that you were proceeding with

24   the merger, you only had one option on the table and

25   that was a special dividend, correct?

1          THE WITNESS:  Correct.

2          THE COURT:  There you go.  Mr. Newman,

3     back to you.

4     BY MR. NEWMAN:

5          RQ. So I want to go back to that quarterly

6     dividend back there -- that you paid on May 10th, the

7     $0.12 as share; right?

8          RA. Okay.

9          RQ. It was $0.12 as share; right?

10         RA. Yes, it was.

11         RQ. And now this special dividend, is $6 a share.

12    More than $6 a share.

13         RA. That's correct.  $6.85.

14         RQ. It's more than 50 times as much as the

15    previous quarter; right?

16         RA. That would be true, yes.  Mathematically

17    that's true.

18         RQ. Albertsons never I remembered a dividend that

19    big before, has it?

20         RA. No, it has not.

21         RQ. It's unprecedented, wouldn't you say?

22         RA. It was the first time that the pane would have

23    paid a dividend of that magnitude.

24         RQ. And that unprecedented amount was not declared

25    by the board until after negotiations with Kroger were

1   complete; right?

2       RA. Actually, that is true.  However, the amount

3   of capital to be returned to the shareholders had been

4   discussed as early as November '21 and the company

5   intended to return capital to its shareholders and put

6   out or spend 4 plus billion dollars in capital return

7   to our shareholders.  The company's performance had

8   been exceptionally strong over the last several years.

9   It was -- it's intent to return excess cash.  This was

10  excess cash.  Excess liquidity to its investors over

11  time.  It had not done so in years to your point, thank

12  you.  And this amount was at that level and that

13  quantum because there had not been any returns of

14  capitals to the shareholders for many years.

15      RQ. So you declared -- Albertsons declared this

16  unprecedentedly large dividend the day after it

17  approved the merger with Kroger; right?

18      RA. No, that's not correct.  The board meeting

19  was -- the approval of that dividend happened

20  subsequent to the approval of the merger, but they were

21  on the same day in the board meeting.

22      RQ. And it was declared the next day; right?

23      RA. (Speaking simultaneously.)  The next to day.

24      RQ. In a joint announcement with Kroger; right?

25      RA. That is correct.

1        RQ. That also was unprecedented, announcing a

2    dividend with your biggest competitor in Washington

3    jointly?

4        RA. It would be only in the event of the merger

5    discussion at the same time would one have had a joint

6    press release of that nature period.  So only in a

7    merger situation we would be doing any kind of a press

8    release with another company as a public company.  It

9    would be --

10        RQ. Right.

11            And it was because -- it was part of the

12    transaction; right?

13        RA. It was not part of the transaction.  It was

14    the --

15        RQ. Those were the very words that were used in

16    the disclosure; right?

17            THE COURT:  You've got to let her answer

18    the questions that you pose.  She still needs a chance

19    to answer the question.  So let her get out the answer

20    and --

21            MR. NEWMAN:  Your Honor, my concern is

22    that we have extremely limited time and she is not

23    answering the question as noted previously.

24            THE COURT:  Well you're going to quibble

25    with her about part of the transaction all you want.

1    You know what her answers are going to be.  You already

2    went through that whole scenario with her.  But ask

3    your next question, but please let her have a chance

4    even if it frustrates you that she's not answering your

5    question8 in your mind.

6    BY MR. NEWMAN:

7        RQ. You jointly disclosed the largest dividend in

8    company history with your largest competitor in

9    Washington; right?

10       RA. There was a joint press release and we did

11   announce our special dividend.  And the reason that we

12   did that in an unprecedented way, as you call out

13   unusual, was because from a securities point of view,

14   looking at it from a securities lens, there was

15   tremendous concern there could have been confusion for

16   investors.

17        So think of the headline.  I know you're very

18   familiar with the press release.  Kroger was acquiring

19   Albertsons at $34.10 a share.  But in the merger

20   agreement we had a right to declare a dividend.  And if

21   the company chose to declare that dividend, dollar for

22   dollar the amount of that dividend would be reduced

23   from the $34.10, and the fear was that the investors,

24   the common investor would see a $34.10 merger price and

25   a $6.85 dividend and believe that they were getting

1    $40.95 instead of $34.10.  That I was the highest that

2    they would get.

3         So ensure from a security's point of view that

4    that confusion did not happen, and it did not happen,

5    that was the reason for putting both announcements at

6    the same time so there was never confusion that there

7    was $40.95 available to a shareholders, and this is

8    complex.  And we were very concerned about that type of

9    confusion.

10        MR. NEWMAN:  Objection, nonresponsive and

11   move to strike the entire answer.

12        THE COURT:  I'm going to let the answer

13   stand.  Go ahead and ask your next question, please.

14   BY MR. NEWMAN:

15     RQ. You jointly disclosed with your biggest

16   competitor in Washington the biggest dividend ever paid

17   by Albertsons; right?

18     RA. That is -- that is correct.

19     RQ. And it was because it was part of this merger

20   transaction; right?

21     RA. It was because we declared it after we

22   approved the merger transaction and we were concerned

23   if we announced it without linking it that the

24   shareholders would believe that they were getting

25   $40.95 which would have been very easy for an investor

1    to do.  And to make sure that that did not happen, we

2    announced that the dividend was also being paid.  We

3    were merging, and Albertsons made the decision and

4    declared a dividend of $6.85 per share.

5              MR. NEWMAN:  Your Honor, I would like to

6    share Exhibit 57.

7              THE COURT:  You may.

8    BY MR. NEWMAN:

9        RQ. That's the 10-Q.

10       RA. Okay.

11             MR. NEWMAN:  That was the wrong exhibit.

12         So Your Honor, I planned on using Exhibit 1,

13   which was Exhibit A to the Hanson declaration, and now

14   I'm switching over which is causing the confusion.

15             THE COURT:  So this is Exhibit 1?

16

17             MR. NEWMAN:  We're trying to find the

18   whole document.

19             THE COURT:  On no worry, Mr. Newman.  Take

20   your time.

21             MR. NEWMAN:  Your Honor it would be easier

22   all of my questions are on Exhibit 1, and then we can,

23   like we did with the other two, later offer the full

24   document.

25             MR. HASSI:  We have no objection.

1           THE COURT:  What?

2           We're on Exhibit 1, which is the 10-Q for

3    February what?

4           MR. NEWMAN:  It's the 10-K I apologize.

5           THE COURT:  Oh, 10-K.  I apologize.

6    BY MR. NEWMAN:

7       RQ. Ms. McCollam you recognize this document?

8       RA. Yes, this is the form 10-K annual report of

9    the full year earnings for Albertsons for fiscal '21 of

10   the company's (inaudible Zoom audio).

11      RQ. And 10-Ks are publicly available once they're

12   filed; right?

13      RA. That is correct.

14      RQ. And they're so the SEC can keep an eye on

15   things and investors can learn about the finances and

16   the performance of the company; right?

17      RA. Yes.

18      RQ. They can also learn about some risks of owning

19   company stock in a 10-K?

20      RA. Yes.

21      RQ. And the law requires that the CFO sign the

22   10-K?

23      RA. That's correct.

24      RQ. As well as the CF -- as well as the CFO --

25          (Speaking simultaneously.)

1    RA. Yes.  Yes.  I take full ownership of the 10-K.

2    RQ. And so this particular 10-K that was filed in

3    April of this year, you specifically signed it?

4    RA. Yes, I did.

5    RQ. And it was also signed be the CEO of

6    Albertsons?

7    RA. Yes, that's correct.

8    RQ. And it has those same requirements or truth

9    and accuracy; right?

10   RA. That's correct.

11   RQ. And all of the information has to be carrot in

12   all material respects, that's what you sign at the

13   bottom; right?

14   RA. That is correct.

15   RQ. And nothing material was omitted; right?

16   RA. Not to the best of my knowledge, of course.

17   RQ. And it's not misleading to the best of your

18   knowledge?

19   RA. I did not believe it is misleading.  I do not.

20   RQ. And investors should be able to rely on a 10-K

21   in making investment decisions; correct?

22   RA. That is correct.

23   RQ. And this isn't a rubber stamp.  This is a big

24   deal.  You spent a bunch of time getting this document

25   ready; right?

1      RA. I did, yes.  The teams, they spend a lot of

2   time.

3      RQ. But spend a lot of take making sure it's right

4   because your name is at the bottom, right?

5      RA. Absolutely.  Of course I do.

6      RQ. Look at page 7 of 305.

7          MR. NEWMAN:  Your Honor, just so you know,

8   the page numbers that I'm referring to will match up

9   with new document, with the full-sized document, so I'm

10   using the page number --

11          THE COURT:  They will?

12          MR. NEWMAN:  They will, yeah.

13          THE COURT:  Okay.

14          MR. NEWMAN:  So the full document is 305

15   pages long, which is why I think Ms. Hanson trimmed it

16   back for Your Honor, so you don't have to read the 305

17   pages.

18      If you could have a moment, Your Honor.

19          THE COURT:  You may.

20          MR. NEWMAN:  And again, Your Honor, the

21   state offers Exhibit 1 with the understanding that the

22   state will later offer the full document.

23          MR. HASSI:  Albertsons has no objection to

24   the full document, Your Honor.

25          THE COURT:  All right.  That will be

1    supplemented later as Exhibit 59, I believe.

2           MR. NEWMAN:  And no objection from Kroger,

3    Your Honor.

4           THE COURT:  Okay when the state has a

5    chance to upload it, Exhibit 59 will be admitted

6    without objection.

7           We're turning to page 7?

8           MR. NEWMAN:  Sorry, page 7 of 305 of the

9    Hanson deck.

10          Sorry, Your Honor.

11          THE COURT:  No worries.

12          MR. HASSI:  I think it's page 6 of the

13   PDF, if it helps move things along.

14          MR. NEWMAN:  Apparently my version is

15   different than what is in the system here.  So we're

16   going to move around a little bit.

17          Can we go back one page so it will be 6 at the

18   bottom?

19          There we go.

20   BY MR. NEWMAN:

21      RQ. So back to you, Ms. McCollam.

22          On page 6, at the bottom there, there's a

23   bunch of stuff highlighted it says "risks related to

24   owning our common stock."

25          Do you see that?

1      RA. Yes, I do.

2          RQ. So this is telling investors risks to owning

3    Albertsons stock; right?

4          RA. That is correct.

5          RQ. And one of those risks is Albertsons' ability

6    to pay dividends to stockholders; right?

7          RA. That is correct.

8          RQ. So on April 26th, you told stockholders you

9    might be not be able to afford to pay dividends at all

10   beyond the $0.12 a share that's mentioned in the

11   document; right?

12         RA. Yes.  It does say -- it does list a number of

13   risks of owning our common stock and you would find

14   similar risk factors for most public companies.

15         RQ. We're not talking about most public companies

16   we're talking about Albertsons; right?

17         RA. Yes, we are.

18         RQ. So on April 26th of this year, you told

19   investors that one of the risks of owning Albertsons

20   stock is you may not be able to pay dividends at all;

21   right?

22         RA. That is correct.

23         RQ. All right.

24             And then within days, you start hearing from

25   Kroger; right?

1        RA. Within days of filing the 10-K?

2        RQ. Right.

3           You started hearing from Kroger?

4        RA. Yes.

5        RQ. And you spend the summer negotiating?

6        RA. That's correct.

7        RQ. And by the end of the summer in October you

8    had come to a merger agreement; right?

9        RA. That is correct.

10       RQ. And at the same time of the merger agreement

11   you announced the largest dividend the company had ever

12   paid; correct?

13       RA. Ing that is correct.

14       RQ. 50 times as the amount mentioned in this 10-K?

15       RA. That is correct.

16       RQ. And the primary change between when you told

17   stockholder or investors that one of the risks of

18   owning your stock is the company's ability to pay

19   dividends, the only thing between when you said that

20   and you paid out this unprecedented am was that you had

21   an agreement with Kroger; right?

22       RA. Potentially that is the sequence of events,

23   but it's missing a major event that was filed publicly

24   on an 8-K on February 28th, 2022.

25           The year that the company ended, as you can

1    see in this document in February of February 2022,

2    that's when our year ended, and on February 28th, we

3    announced to our shareholders that we were doing a

4    comprehensive review of strategic alternatives and that

5    this was filed in an 8-K to all of our shareholders.

6    And that gave them notice we were looking at different

7    alternatives to strategically grow the company and to

8    return capital to our shareholders, could be one of

9    those alternatives, an acquisition could be one of

10   those alternatives.

11        So in between the time that we closed our

12   year, then February 28th we told our investors that we

13   were considering doing this on February 28th.  As you

14   pointed out, this was filed in April, and we -- there

15   could have been a perception from our investors as one

16   of the strategic alternatives that we would possibly be

17   paying a dividend.  We have many share hold us call us

18   after the February 28th release and asked us whether

19   that could be one of our alternatives, of course we

20   refer them back to the press release.  But there is

21   this February 28th announcement to all of our share

22   shoulders of a pursuit of a comprehensive review of

23   strategic alternatives.

24        RQ. One of them was not a special dividend, was

25   it?

1          RA. It was a comprehensive review, and actually

2    a --

3          RQ. One of them was not a special dividend, was

4    it?

5          RA. Counselor unfortunately if you have other

6    documents that I believe were part of your document,

7    you know that it was because there was an assessment

8    done, an analysis done on whether or not the return of

9    capital should go in the form of a special dividend or

10   in the form of a tender offer or a share purchase.  So

11   it was still being considered as late as June as to

12   whether or not a special divided might be one of those

13   alternatives.

14         RQ. So you were thinking of a special dividend in

15   April of this year?

16         RA. We were thinking of all of our strategic

17   alternatives after February --

18         RQ. Were you thinking about a special dividend in

19   April of this year?

20         RA. Counselor, a special dividend was one of the

21   alternatives that was being discussed.  And it is in

22   our --

23         RQ. That's all I needed.

24             If it was being discussed, why did you not

25   disclose it in your 10-K?

1         RA. Because there are many things that are

2    discussed within a company.  We had disclosed to our

3    shareholders that it was our intent through the

4    February 28th strategic alternatives announcement, that

5    we were looking at all forms of strategic alternatives

6    for the company, and it would include a return of

7    capital to shareholders, potentially.  And within that,

8    in the finance world, dividends shared purchases,

9    tender offers, minority investment from another

10   investor, an acquisition would be a possibility, all of

11   those are possibilities.  And we tole them we were not

12   exit committing in that press release.  We were very

13   clear.  We were not committing to a time frame in which

14   we would update that, that we had a lot of work to do,

15   and that we would be pursuing that.  We also went on to

16   explain to our shareholders in another public format

17   that one of those things that we needed to do that was

18   going to take more time was an assessment of our real

19   estate assets in the company to understand the true

20   value of the assets of the company in the event that we

21   had chosen to do a real estate related transaction, and

22   that we expected that the view and that appraisal,

23   which would be a -- it's called a FIRREA appraisal.

24         Basically, it means that a financial

25   institution could use it as a valid appraisal, would

1    take several months to complete.  So if you think about

2    the time frame of February 28th as the announcement of

3    the strategic alternatives review and then the

4    engagement of the appraiser subsequent to that and the

5    process that took several months you are already

6    pushing up by that time against late April, May, and

7    that appraisal wasn't actually completed until the 1st

8    of June.

9           MR. NEWMAN:  I'm going to object as

10   nonresponsive and move to strike.

11          THE COURT:  I'm going to allow the answer

12   in.

13   BY MR. NEWMAN:

14      RQ. So somewhere in that answer did you say

15   whether or not this 10-K that has no material omissions

16   contains the words "Special dividend"?

17      RA. It does not.

18      RQ. So the special dividend ended up being

19   $4 billion; right?

20      RA. Yes, it did.

21      RQ. So if the SEC is listening today, do you stand

22   by that you were discussing the special dividend in

23   April of this year?

24      RA. Yes.  If they were standing by and listening

25   they would refer to the 8-K we filed on February 28th

1    informing our shareholders we were seeking strategic

2    alternatives.

3         RQ. Is does the 8-K mention the special dividend

4    from February?

5         RA. If we could produce that document we can read

6    the document.

7         RQ. I'm asking you if you know if the word special

8    dividend are included in that 8-K?

9         RA. I did not review the pack words in there.  It

10   was a comprehensive review of alternatives, and in the

11   financial world that would be one of the alternatives.

12            MR. NEWMAN:  Your Honor, moving to a new

13   topic, I see we're noon straight up.  Do you want to

14   stop here or keep going?

15            THE COURT:  I want to stop here.

16         I have moved my 1:00, though, in case the

17   parties wants to take advantage of starting at 1 rather

18   than 1:03 I see nodding in the affirmative so I'll see

19   you folks back as 1:00.  Same dial-in number, same

20   everything else.  So have a good lunch and see you

21   then.

22            (Pause in the proceedings.)

23            THE COURT:  We are back on the record,

24   folks.  Mr. Newman, are you ready to begin or

25   recommence your examination?

1          MR. NEWMAN:  I am, Your Honor.

2          THE COURT:  Great.  Go for it.

3          MR. NEWMAN:  Before I do that, we worked

4     out that the document differences, so the state offers

5     Exhibit 57, 58 and 59, which are the 10-Q, 8-K and 10-K

6     respectively.

7          MR. HASSI:  This is Ted Hassi for

8     Albertsons.  No objection, Your Honor.

9          MR. NEWMAN:  And no objection for Kroger.

10    This is Sonia Pfaffenroth.

11        Thank you.

12         THE COURT:  Okay.  You're seeking to admit

13    those?  Those have been admitted thanks, Mr. Newman.

14         (Exhibits 57, 58 and 59 received.)

15    BY MR. NEWMAN:

16      RQ. Getting back to that 10-K, which is

17    Exhibit 59, you said that the grocery industry is

18    highly competitive.

19      RA. Yes, it is.

20      RQ. Did you say that?  I think you said in your

21    declaration you said it was ferociously competitive?

22      RA. Yes.

23      RQ. And in your declaration you also said -- you

24    mentioned that the AG is arguing that paying the

25    special dividend will impair Albertsons' ability to

1    compete and you said quote nothing could be further

2    from the truth; is that right?

3        RA. That is correct, yes.

4        RQ. So you listed some principals competitive

5    factors in your industry in that 1010-K, and I want to

6    go through those.

7        RA. Okay.

8        RQ. And the first one was location.  Location is a

9    principal Ishikawa in your industry, isn't it?

10       RA. Yes, sir.  Your store locations.

11       RQ. And you could spend that $4 billion on

12   improving store locations, couldn't you?

13       RA. Yes, actually we do.  And included in our

14   annual operating plans, the approximately $2 million a

15   year in capital expenditures.

16       RQ. But you could spend this $4 billion that

17   you're going to take out of the company on store

18   locations if you wanted to; right?

19       RA. I could do that but we're doing both.

20       RQ. Well, we're tuck about this specific

21   $4 billion could be spent on improving store location;

22   correct?

23       RA. It could be, yes.

24       RQ. Another Ishikawa principals competitive factor

25   is quality; right?

1     RA. Yes.

2     RQ. You could spend this $4 billion on improving

3  to quality of your products; right?

4     RA. We could do that although we make major

5  investment on quality as well within our other cash

6  resources.

7     RQ. Price is a principal competitive factor?

8     RA. Yes.

9     RQ. You could spent this $4 billion on lowering

10  your prices, right?

11     RA. We do make investments in price.  Remember

12  that --

13     RQ. I'm not talking about your other investments.

14  I understand that you already have prices.  I'm asking

15  about whether or not you could spend this $4 billion

16  that you're going to take out of the company on prices?

17     RA. Yes, you could.

18     RQ. The next presence pal factor is service is a

19  principal competitive factor right?

20     RA. That is correct.

21     RQ. And you could spend this four fire on training

22  your employees or hiring more employees to improve your

23  service couldn't you?

24     RA. Yes, we make those investments, as I said.

25  But you can spend -- you might be able to spend more.

1      RQ. The next is selection.  Selection is a

2   principal competitive factor, right?

3      RA. Yes.

4      RQ. And you could spend this $4 billion on

5   improving the selection in the Albertsons and Safeway

6   stores?

7      RA. Yes, you could.  But remember this $4 billion

8   is our excess cash above and beyond all of those

9   investments we're already making.

10      RQ. You said that a few times this is your excess

11   cash.  You actually are borrowing $1.5 billion of it;

12   right?

13      RA. Yes, we have $7 billion plus in liquidity, and

14   we're using 2 and a half billion of our cash and a

15   billion and a half of our revolving line of credit to

16   leave cash on the balance sheet as you point out.

17      RQ. But not $1.5 billion in cash; right?

18      RA. No.

19      RQ. Right.

20      So it's not your excess cash.  You're

21   borrowing $1.5 billion of it; right?

22      RA. We are.  We made that decision, yes.

23      RQ. Convenience is a principal competitive factor,

24   right?

25      RA. Yes, it is.

1      RQ. You could spend in $4 billion on making the

2    customer's experience more convenient; right?

3      RA. Yes, we could.

4      RQ. And the condition of your stores is a

5    principal competitive factor?

6      RA. Yes, it is.

7      RQ. And you could spend the $4 billion on

8    improving the condition of your stores?

9      RA. Yes, we could.

10     RQ. You don't just compete with Kroger on selling

11   product.  You complete for labor as well, rights?

12     RA. Yes, we do.

13     RQ. And the labor markets getting increasing live

14   competitive?

15     RA. Yes, there is.

16     RQ. There have been sustained labor shortages?

17     RA. Yes.

18     RQ. And that's the case right now; right?

19     RA. Yes, it is.

20     RQ. If you spend this $4 billion on increasing

21   wages and on increasing benefits, you would be more

22   competitive in the labor market, wouldn't you?

23     RA. Actually we are making significant actually

24   haven't announced publicly we have announced more in

25   2021 and 2022 in labor increasing labor and benefits

1    for our associates than ever in our history.

2         RQ. If you spent this $4 billion on increasing

3    wages more and increasing benefits more, it would make

4    you more competitive in the labor market; right?

5         RA. Yes.

6         RQ. Now, Albertsons operates in a bunch of

7    multi-employer pension plans; right?

8         RA. Yes.

9         RQ. And a majority of them are under funded?

10        RA. That is correct they are union pension plans.

11   The trustees of those pension plans are actually

12   unions.

13        RQ. And they're 60 percent of them are critically

14   under funded?

15        RA. That is correct the union trustees have those

16   plans under funded.

17        RQ. Those are multiplier plans so it's not all

18   you; right?

19        RA. Oh, that's exactly right.  Yes.

20        RQ. But those pensions are what you promised your

21   employees; right?

22        RA. That is correct.

23        RQ. And if they failed --

24        RA. (Speaking simultaneously.)  And union's

25   promised the employees, yes, as part of our bargaining

1    agreements we make contributions into union pension

2    plans and those are promised to the employees as part

3    of their union grievance.

4        RQ. So you don't provide a pension, you just

5    provide the union the money?

6        RA. Today we contribute an amount to the pension

7    that is defined by our Collective Bargaining Agreements

8    and we contribute that as part of our pension and

9    health and welfare related costs associated with our

10   union bargaining agreements, yes.

11       RQ. And I think I already asked this but

12   60 percent of them are critically under funded?

13       RA. Yes.

14       RQ. And you, Albertsons, did some research to find

15   out how much of that critically under funded amount

16   could be assignable to Albertsons?

17       RA. It related to employees that we contributed

18   for over the years, and that amount is disclosed.  It

19   is not our liability, as you know.

20       RQ. It's not your liability yet because those

21   people aren't retired yet; right?

22       RA. No.  It's not our liability unless for some

23   reason, which has not happened, we chose to withdraw

24   from the multi-employer pension plan.  So -- but this

25   is not a liability of Albertsons.  This is a liability

1    of the trustees which is insured by the PBGC.

2         RQ. That's a government agency --

3         RA. (Speaking simultaneously)  guarantee, correct,

4    yes.

5         RQ. That's a government, right?

6         RA. Yes.

7         RQ. The shortfall associated with Albertsons

8    employees calculated to be about $4.9 billion; right?

9         RA. That's correct.  That's disclosed in our 10-K.

10        RQ. So --

11        RA. But that is not -- that is associated with

12   employees that worked at Albertsons, but again the

13   trustee of those pension plans are the unions

14   themselves.

15        RQ. An underfunded pension plan makes you less

16   competitive for workers; right?

17        RA. Actually, we have not found that to be a

18   competitive disadvantage because we have contributed

19   all of the money that we have been expected to

20   contribute to our pension plans and have had a history

21   of contributing.

22        RQ. But regardless of who is putting the money in

23   there, it makes you less competitive if your pension

24   plan is under funded; right?

25        RA. Counselor, we are contributing every penny

1    that we are required to contribute to our union pension

2    plans.

3         RQ. I'm not saying you're not.  What I'm saying is

4    if a pension plan is under funded and an employee is

5    looking at working at Albertsons with an underfunded

6    pension plan regardless of who easy money it is and if

7    they're looking at working at one of your competitors

8    whose -- maybe their pension plan is not underfunded,

9    that puts you at a competitive disadvantage with that

10   competitor, right?

11        RA. It could -- it is -- it is possible although

12   there are many involved in those multi-employer pension

13   plans, and at this time we have not found that to be a

14   competitive disadvantage for us in hiring the amazing

15   union employees that we have currently working in our

16   company.

17        RQ. So you haven't found that to be a problem with

18   your employees at all that the pension plan is

19   underfunded?

20        RA. (Speaking simultaneously) I joined

21   September 21.  We have not found that to be a problem

22   (inaudible Zoom audio) today.

23        RQ. I want to talk about debt risks.

24        You listed some debt risks in your 10-K;

25   right?

1          RA. Yes.  We do have a disclosure.

2          RQ. And so in the 10-K from -- which is

3    Exhibit 59, you disclosed 7.5 billion in outstanding

4    debt, does that sound; right?

5          RA. I'm not looking at the document.  If you're

6    looking at it, I'm assuming that you're pulling the

7    exact number.

8          RQ. That sounds right.  You're the CFO, right?

9          RA. (Speaking simultaneously.)  Pardon me?

10          RQ. You're the CFO.  That sounds about right;

11    right?

12          RA. Yes.

13          RQ. And in order to fund this special dividend, if

14    it goes through, you're going to borrow another 1.5;

15    right?

16          RA. Yes.  We borrowed 1.4 billion, yes.

17          RQ. So if your 10-K, you -- one of the concerns

18    you expressed with your debt load at the time was it

19    might increase your vulnerability to adverse economic

20    and industry conditions; right?

21          RA. Yes.

22          RQ. Which makes you a little bit less can

23    competitive; right?

24          RA. I think that would be true for anyone carrying

25    any debt.  And since all of my competitors carry not

1    only similar lives or debt but actually in some cases

2    machine debt, they have the same competitive -- so we

3    can say we're on equal footing in my upon.

4        RQ. So everybody has exactly the same amount of

5    debt?

6        RA. Not the same amount, no, but they all have

7    debt.

8        RQ. Right.

9            So that varies?

10       RA. It varies depending on the company.  And

11   actually in this particular case, as a percentage, we

12   have today one of the lowest net debt level ratios the

13   amount of debt we have to our EBITDA than we have had

14   in our industry because of the excess cash flows we

15   have been continuing to generate.

16       RQ. Your debt load, when you reported back in

17   April, you also reported that it could require I don't

18   wrote you to dedicate a substantial portion of your

19   cash flow from cash flow to debt servicing; right?

20       RA. If -- if the maturities were becoming due,

21   this is very long term debt.  Some of those maturities

22   are out to 2031.  And if you look at the repayment

23   schedule for that debt, it's actually quite small.  It

24   starts out at a could billion dollars in 2026 and about

25   a billion dollars a year.  I'm just rounding to the

1    nearest billion, for the years following that.  Before

2    in a company or our cash flow generation, remember

3    we're generating excess cash flow every year, and

4    assuming that we continue to do so in future with the

5    debt service is actually quite low.

6        RQ. You didn't say all that in the 10-K.  You just

7    said that you might have to dedicate a substantial

8    portion of your cash flow from operations to det

9    servicing, right?

10       RA. Actually we did say that in the 10-K.  It's in

11   numerical form.  It does show a list of debt maturities

12   in the 10-K.  The 10-K is required to disclose that.

13       It's not just a -- Mr. Newman, it's just not

14   in a paragraph similar to the risk factor which is

15   written in words.  It would be in a tabular form in the

16   10-K (speaking simultaneously.)

17       RQ. Yeah -- (speaking simultaneously.)

18       RA. And it's in a different section of the 10-K.

19       RQ. All right.  Let's just go through what your

20   wrote in the 10-K.

21       RA. Insurance.

22       RQ. So I'm looking at page 27 of 59?

23           MR. NEWMAN:  Can I share my screen,

24   Your Honor?

25           THE COURT:  You may.

1          THE WITNESS:  Okay.

2      BY MR. NEWMAN:

3          RQ. And there, at the bottom is a whole sex called

4      "Risks related to our indebtedness"?

5          RA. Yes.

6          RQ. And these risks are specific to your

7      indebtedness; right?

8          RA. Yes.  They are risks related to our

9      indebtedness and indebtedness in general, that's

10     correct.

11         RQ. And it says it could require us to dedicate a

12     substantial portion of our cash flow from operations to

13     payments on our indebtedness; right?

14         RA. That is correct.

15         RQ. And then you said, "Thereby reducing the

16     available of our cash flow to fund working capital;"

17     right?

18         RA. Yes.

19         RQ. And if that happened, you'd be less

20     competitive; right?

21         RA. In the event of a circumstance under which

22     this would happen, that is true.

23         RQ. And then you say also could reduce your

24     capital expenditures in other general corporate

25     purposes, including acquisitions; right?

1       RA. That's correct.

2       RQ. And if that happened you'd be less

3   competitive; right?

4       RA. That would be true.  That could be true,

5   unless it was an economic event that potentially

6   affected all companies similarly, similar, we could

7   point to the last pandemic or other vents, '08, pick

8   one.  But it is possible, to your point, Mr. Newman,

9   the point you're trying to make is there's a risk

10  factor that state this is, and, yes, that is a risk.

11      RQ. And the next one is it could limit your

12  flexibility of planning for or reacting to changes in

13  our business and the industry in which we operate;

14  right?

15      RA. Yes.

16      RQ. And if that happened, you would be less

17  competitive; right?

18      RA. It is -- that is true.

19      RQ. And then the next part says place us -- it

20  could place us at a great disadvantage compared to our

21  competitors that have less debt;" right?

22      RA. That is correct.

23      RQ. And then the last thing is it could limit our

24  ability to borrow additional funds; right?

25      RA. Yes.

1        RQ. And if that happened, you would be less

2    competitive?

3        RA. In the event that one of these could happen,

4    the risk factor starts out as you pointed out and read

5    to us that our indebtedness could adversely affect.  It

6    could, under extreme circumstances, but they would have

7    to be extreme.

8        RQ. It doesn't sigh extreme circumstances in these

9    debt risks you're telling investors; right?

10       RA. They weren't the word "extreme" is not this

11   there.  But in order for this to transpire based on the

12   financial worthiness of Albertsons and the strong

13   financial performance and free cash flow of the

14   company, you have to take the risk factor in

15   consideration with the actual performance of the

16   company and make an assessment on how big of a risk

17   that might be.

18       The purpose of a risk factor is to make sure

19   this again from a security's point of view is to make

20   sure your investors know when they are making an

21   investment in the company that it is not a guarantee in

22   the future that the conditions would remain exactly the

23   same as the date of their investment and you help them

24   by putting in your risk factors to be made aware of the

25   various things that could possibly happen to a company

1    under circumstances that may be unforeseen at that

2    time.

3        RQ. You actually mentioned that, so we'll get to

4    that.

5            Coming to read on page 270659 it says "In

6    addition, there can be no assurance that we will be

7    able to refinance any of our debt or that allegation

8    will be able to refinance our debt on commercially

9    reasonable term; right?

10        RA. Yes, it says that.

11        RQ. And if that happened you would be less

12    competitive?

13        RA. Yes.

14        RQ. And then it says "If we are unable to make

15    payments or refinance our debt or obtain new financing

16    under these circumstances, we would have to consider

17    other options such as sales of assets; right?

18        RA. Yes.

19        RQ. And that would make it less competitive;

20    right?

21        RA. Perhaps.  It may or may not depending on the

22    asset.

23        RQ. And then we're flipping over to page 28 at the

24    top there, sales of equity.  That would make you less

25    competitive; right?

1          RA. No, it would not.

2          RQ. Maybe not?

3          RA. It would not make you less competitive.  You

4    could raze equity.  If we had to sell equity, it would

5    reduce the value of the equity of other shareholders,

6    but that would not have a competitive impact.

7          RQ. Then last is negotiations with our lenders to

8    restructure the applicable debt.  If that became a

9    problem also it would make you less competitive; right?

10         RA. It depends on what the renegotiation might

11   look like, but it's possible.

12         RQ. And you continue "Our debt instruments may

13   restrict or market or business conditions may limit our

14   ability to obtain additional indebtedness, refinance

15   our indebtedness or use some of our options."

16         RA. Yes.

17         RQ. And that happened you would be less

18   competitive; right?

19         RA. It's possible, yes.

20         RQ. With this $1.5 billion that you want borrow to

21   pay the dividend, that would increase your indebtedness

22   by 20 percent, wouldn't it?

23         RA. Yes, approximately.

24         RQ. And it would make likelihood of all of oh

25   those bad things go up; right?

1     RA. It makes the number go up, but the cash flows

2  of the company are so substantial that in no way do I

3  believe that the bow roaring of the 1.4 billion we

4  chose to borrow related to paying the special dividend

5  that it would trigger any of these things in the

6  current situation that the company faces itself.

7     RQ. And let me see -- let me just read what you

8  said in your 10-K.  I'm still on page 28.  I'm in the

9  paragraph "we may incur substantially more debt in the

10 future," in that paragraph.

11     The last sentence says "If new indebtedness is

12 added to our and our subsidiaries current debt lifting,

13 the related risk that we and they now face would

14 increase;" right?

15     RA. Yes.  At some point when we have drawn the

16 majority of our revolver, not all of it, there is a

17 25-basis point that is one quarter of 1 percent

18 increase in the interest rate that we have to pay on

19 the ABL.  It is a very small premium at that point but

20 you have to almost borrow the majority of the resolver

21 before you actually reach that point.

22     RQ. Increasing your debt increases all of those

23 risks of becoming less competitive; right?

24     RA. Yes.  From a debt stand point in that

25 disclosure, yes.

1        RQ. I want to talk to you a little bit about

2    your -- the cash position that you reported in

3    Exhibit 59. This was before you announced the

4    dividend, obviously.

5        You warned investors that to service your

6    indebtedness, Albertsons required a significant amount

7    of cash; right?

8        RA. Yes.

9        RQ. And this dividend will reduce your cash

10   researches by more than 80 percent, won't it?

11       RA. Yes, it will.

12       RQ. And your able to make cash payments on a

13   refinance -- your indebtedness would depend on your

14   ability to generate again significant operating cash

15   flow in the future; right?

16       RA. Mr. Newman, we have $7 billion of liquidity

17   upon announcement of the dividend, and our anticipation

18   is that we operate our business, we are generating

19   substantial positive cash flow. And in the same 10-K

20   in which you're referring to, you will see that our

21   cash flow from operations in that 10-K was over 3 and a

22   half billion dollars. That was after we paid all of

23   our expense, all of our pensions, health; welfare,

24   everything in the company, our cash flow increased our

25   inventories, we had 3 and a half billion dollars, it

1    just in that one year of cash flow, which we used to

2    spend $4 billion in capital expenditures and our

3    stores, et cetera, and about 700 million or so in

4    investing which includes servicing our bet and the

5    things you're referring to, and that still left us with

6    a substantial amount of excess cash.

7         If you look at that, I think it is on the

8    actual 10-K that we filed, you can -- if you would like

9    to referring to that, we don't plead to, of course, I

10   believe it is on page 55, our page 55 of the 10-K,

11   where we discussed that vary topic, and it's summarized

12   for you in that section.  You're in the risk factors

13   here, but the actual operating performance of the

14   company is later in the 10-K document where we actually

15   had to put the financial information, and that's where

16   that can be found.

17        RQ. But you wrote here on page 28 of Exhibit 59 is

18   "Our ability to make cash payments on and to refinance

19   the indebtedness and to fund planned capital

20   expenditures will depend on our ability to generate

21   significant operating cash flow in the future."

22        RA. Yes.

23        RQ. Is that what you reported?

24        RA. Yes.  And we are generating significant

25   operating cash flows in the future and have

1    consistently been generating significant operating cash

2    flows.

3        RQ. So the next paragraph starts with -- again

4    we're on page 28 of Exhibit 59.

5        RA. Yes.

6        RQ. "Our business may not generate sufficient cash

7    flow from operations to enable us to pay our

8    indebtedness or to fund our other liquidity needs."

9        That's what your reported back in April;

10   right?

11       RA. Yes.  That is always a risk.  Something can

12   happen in the world, and that is always a risk.

13       RQ. You also reported here in your 10-K that

14   Albertsons' ability to generate cash depends on many

15   factors beyond your control; right?

16       RA. Could you direct me to where you're reading

17   from?

18       RQ. Do you remember saying that?

19       RA. In something.  I don't know if those are the

20   exact words.  If you're reading that I will go with you

21   on the language.

22       Sentimentally in the sentiment of it, yes,

23   that would be a risk that you have to always put in

24   front of an investor.

25       RQ. Okay.

1         But what you put in front of investors was

2    this ability is to a significant extent subject to

3    general economic financial competitive legislative

4    regulatory and other factors that are beyond our

5    control.

6         RA. That's correct.  That I are -- things can

7    happen that are beyond your control.  A pandemic would

8    be an example.

9         RQ. To a significant extent.  This is not

10   outlining -- you said to a significant extent, right?

11        RA. Yes.

12        RQ. And you were being straight with straight with

13   investors when you said that you weren't just covering

14   for yourself; right?

15        RA. Yes, of course.  We are making sure that it's

16   clear to investors that if you buy a share of stock

17   that if events in the world happen that were out of our

18   control there is risk in owning publicly traded -- it's

19   not just publicly traded there's a risk in owning any

20   company, yes.

21        RQ. Right.  But we're not talk about other

22   companies we're talking about Albertsons; right?

23        RA. Yes, of course, of course.  Yes.

24        RQ. So 10-Ks are not all identical.  You guys

25   don't just sign off on a form you actually put actual

1    risks in your 10-Ks, rights?

2        RA. We do.

3        RQ. Otherwise it would be silly if anybody signed

4    the same one and said there's risks in owning

5    securities, off you go, that would be silly; right?

6        RA. Yes, of course.

7        RQ. So you have to put actually risks in there?

8        RA. We do.

9        RQ. And these are the things that you personally -

10   the person who signed off on -- thought were actual

11   risks?

12       RA. I believe they are risks.

13       RQ. In your declaration you talk about the surplus

14   that this money, the $4 billion dividend, is being paid

15   out of, right?

16       RA. Yes, the liquidity, yes.

17       RQ. I think you call it an ample surplus.

18       RA. Yes.

19       RQ. And it was based on a $14.7 billion surplus;

20   right?

21       RA. Yes, that is the-- that is the Delaware

22   calculation.  That is the surplus calculation.  We are

23   a Delaware corporation, which I believe you know, and

24   it's the required calculation under Delaware

25   legislative requirements.

1      RQ. So the Delaware statute is not accounting

2    principal, it's a cap; right?

3      RA. Yes.

4      RQ. Yeah, Delaware is not telling you how to run

5    your company they're just saying you can't pay more

6    than this surplus --

7      RA. (Speaking simultaneously) Delaware said we

8    cannot pay more than a $14 billion dividend, and we

9    obviously paid a $4 billion dividend --

10     RQ. Right.  But under accounting principles,

11   that's not how you come up with your surplus, right,

12   the way Delaware --

13     RA. (Speaking simultaneously.)

14        No, the reason that the Delaware calculation

15   shows that is that it's trying to estimate the market

16   value of the company's assets, and therefore ^ the

17   calculation.

18     RQ. Well, let's take it through -- you actually

19   explain how you came one the number, the 14.7 billion

20   dollars number and I want to go through calculation?

21   So --

22     RA. Would you like to put that as an exhibit,

23   Mr. Newman.

24     RQ. Sorry?

25     RA. Would you like to put that up as an exhibit

1    (speaking simultaneously.)

2        RQ. No, I think the numbers are pretty basic,

3    so --

4        RA. Okay.

5        RQ. -- we'll just go through it.

6            So you came up with this $14.7 billion

7    surplus; right?

8        RA. Yes, 14- (speaking simultaneously.)

9        RQ. (Speaking simultaneously.)

10           The way you did it was by calculating

11   estimated payer value of Albertsons' net assets?

12       RA. Yes.

13       RQ. And then subtracting the value of its capital?

14       RA. Yes.

15       RQ. Right?

16           And that -- the value of its capital is the

17   par value of the company's common and preferred stock;

18   right?

19       RA. Yes.  It's actually taking the market price of

20   the company stock.

21       RQ. It doesn't take the market price of the

22   company stock it takes the par value of the company

23   stock; right?

24       RA. That is right.  That is correct.

25       RQ. Those are two wildly different numbers; right?

1      RA. They're wildly different, yes.

2      RQ. Okay.

3          So the capital -- so -- the par value --

4      RA. (Speaking simultaneously.)  Can we put that

5   as -- could we put the call indication up there so

6   others who aren't as familiar with it can see it as

7   well?

8      RQ. No, I'm asking you about it.  I'll just ask

9   you about it.

10     RA. Okay.

11     RQ. So the par value of Albertsons' stock is a

12  penny a share; right?

13     RA. Yes.  It's a very small number.

14     RQ. Is the market value, I looked this morning

15  when I work up you're about $21 a share, is that --

16     RA. Yes.

17     RQ. So that's like 2,100 times bigger; right?

18     RA. Yes.

19     RQ. Be you took the net assets of the company and

20  subtracted this penny a share number from it and that's

21  how you came up with this $14.8 billion --

22     RA. Actually, Mr. Newman, that is the required

23  calculation for Delaware that is required for a

24  Delaware corporation to declare a dividend, and our

25  board could not approve a dividend without that

1    calculation being presented to the board for approval.

2    This is --

3        RQ. Oh, no, I get that.  I totally understand.  I

4    totally understand that --

5        RA. -- calls for speculation.

6        RQ. What you didn't have to do was put it in your

7    declaration and send it off to the Court giving the

8    Court an impression that you actually had a $14.7

9    billion surplus; right?

10       RA. Well, actually we added something to that

11   declaration.  If you have the document in front of you,

12   you can see at the bottom of the document we did a

13   second calculation, which we took the actual financial

14   statement book value of our assets, net book value of

15   our assets which was 4.7 billion and we subtracted the

16   4 billion and we still had surplus.

17       Now, the net book value, which is known to our

18   board of directors and financial individuals is at the

19   cost of our assets.  So when you -- when you have an

20   asset on the books or a company you record that asset

21   at the actual cost of that asset.

22       As I mentioned to your earlier, we actually

23   own a substantial amount of real estate.  And that real

24   estate has been acquired over decades.  And on our

25   books, those assets including much West Coast -- you

1    pointed out in the earnings -- in the risk factors how

2    important location is, those assets are on -- many of

3    them are on the coast, and they have appreciated in

4    value dramatically.  So much so that when we did our

5    appraisal of our real estate portfolio as part of the

6    strategic alternatives process, those assets, those

7    real estate assets were valid at $13.7 billion and the

8    book value of those assets is half of that or less.

9        RQ. So when we're talking about your assets, this

10   real estate, we're talking mostly about stores; right?

11       RA. Yes.  We sewn stores, distribution centers,

12   office buildings.

13       RQ. Yeah.

14           But you're not selling those stores to pay

15   this dividend are you?

16       RA. We are not.

17       RQ. So you are kind of house poor then right you

18   own a lot of stores --

19       RA. (Speaking simultaneously.)

20           But you're -- you can't take the assertion

21   that you do not have a surplus -- that you do not have

22   access to possible forms of liquidity in the vent of an

23   unexpected moment of whatever that might be, economic,

24   whatever is out of your control, and not take into

25   account the value and the excess of assets that you

1   have that actually have immense value, and real estate

2   has immense value so --

3       RQ. Right, but if you (speaking

4   simultaneously.) --

5       RA. You can't you can't do one without the other

6   is my only point from a financial point of view.

7       RQ. But if you sell your source you can't sell

8   groceries rights?

9       RA. If you sell your stores you can lease back

10  your stores, as we -- as many retailers have done over

11  the years.  It's a very common strategy.

12          But I'm only pointing out to you that book

13  value is a -- is conservative as a call calculation you

14  can do, and our book value at market, we can take those

15  assets to market, that surplus is substantially higher

16  by billions of the dollars that's --

17      RQ. (Speaking simultaneously.)  That -- (speaking

18  simultaneously.) -- by selling your grocery stores.

19      RA. You don't need to sell them.  You can sell and

20  lease them back you can --

21      RQ. But that still requires a sale?

22      RA. Pardon me?

23      RQ. That still requires a sale to sell them and

24  lease them back?

25      RA. Yes, that doesn't mean you're closing the

1    grocery store is my point.

2         RQ. I didn't say close it.  I said sell it.

3         RA. Okay.

4            Fair.

5         RQ. Right?

6            So we talk about your finances a lot the last

7    45 minutes or so, and what I'm hearing is -- you have

8    the money, so right turn of.  You had to borrow some of

9    it but you have the money.  That's what you're saying;

10   right?

11        RA. There is no doubt in my mind that we are being

12   prudent in declare ago 4 billion dollars dividend

13   that's what I'm telling you.

14        RQ. I think you just said very similar to what you

15   said in your declaration is we have absolutely no

16   concerns about our ability to pay the special dividend.

17   Right?

18        RA. That is true, yes.

19        RQ. That's based on having the money like you --

20   you have access to the money; right?

21        RA. That is correct.

22        RQ. But it doesn't take into account how it will

23   affect your competitiveness; right?

24        RA. It absolutely takes that into account.

25        RQ. Let's go through, again -- I'm not going to do

1    them one by one but we went through a whole bunch of

2    risks of indebtedness that you included no your 10-K.

3        RA. Correct.

4        RQ. Right?

5            And we'll talk about the fact that your

6    indebtedness is going to grow with this dividend?

7        RA. Yes, for a temporary period of time, yes.

8        RQ. And that growth will increase the risks of

9    indebtedness; right?

10       RA. Yes.

11       RQ. So again, you said we have absolutely no

12   concern about out ability to pay the special dividend,

13   and my question is:  Are you saying after borrowing an

14   additional $1.5 billion to pay this dividend, you will

15   have absolutely no concern that it might increase your

16   vulnerability to adverse economic and industry

17   conditions?

18       RA. That is correct.  That looking at the

19   financial projections and looking at the trajectory of

20   the company from a financial point of view that I feel

21   very confident that we will be able to pay this

22   dividend and remain as competitive or more competitive

23   because in that consideration you asked me if I had

24   considered the competitive question.  And in the

25   projections in those projections, I have assumed

1    spending billions of dollars, 2 billion plus a year on

2    call capital expenditures on the company, significant

3    increases in wages and health and welfare benefits, et

4    cetera, significant inflationary costs.  We have played

5    all of those into our projections, thus to remain

6    competitive to all of the things you mentioned that I

7    need to do to remain competitive, I considered those.

8            And the cash flows of the company justified

9    the payment of a $4 billion special dividend to our

10   shareholders.  We are paying it out of the excess cash

11   flows we already have and expect to generates over the

12   next 12 to 24 months.

13       RQ. Now, again you gave a warning back in April?

14       RA. I did.

15       RQ. And now you want to take on 20 percent more

16   debt with this $1.5 billion.  Are you saying today you

17   will have absolutely no concern that it could require

18   you to dedicate a substantial portion of your cash flow

19   from operations to debt servicing?

20       RA. Mr. Newman, I am saying that.  I said it in my

21   declaration and I'm reiterating it here today.

22       RQ. Are you saying you have absolutely no concern

23   that the $2.5 billion in cash to pay the dividend will

24   reduce the available of funding for working capital?

25       RA. I am absolutely convinced that in my plans I

1   have already funded all of those and that is excess to

2   what I need.

3       RQ. So you have absolutely no concern about it?

4       RA. Mr. Newman, I do not have a concern at this

5   time.

6       RQ. Are you saying now you have absolutely no

7   concern that this $4 billion dividend will limit your

8   ability to make capital expenditures?

9       RA. I am saying that, yes.

10      RQ. Are you saying you have absolutely no concern

11  that this $4 billion dividend might limit your ability

12  to make acquisitions?

13      RA. I am saying that.

14      RQ. Are you saying that you have absolutely no

15  concern that this $4 billion dividend might limit your

16  flexibility in planning for or reacting to changes in

17  the industry?

18      RA. That I have control -- the points -- you're

19  reading through the risk factors and I will give you

20  all of them if I would like to save the time.  You can

21  refer to the document.  I gave you all of the risk

22  factors.  The risk factors the first sentence is it

23  could happen, and I can not argue here today that

24  something could happen in the world that could create a

25  different scenario; however, I continue to feel

1    confident, based on everything I know here today that I

2    do not have a concern about declaring and paying a

3    $4 billion dividend to my shareholders.

4              And actually I would not be concerned about

5    paying a quantum possibly even higher than that.

6              However, we tend to be a very conservative

7    company.  If you take a look at our public history, we

8    achieved or exceeded every number that we have

9    provided, and I with certainty can say to you I remain

10   committed to the declaration that I shared with you a

11   few weeks ago.

12        RQ. Do you have absolutely no concern that taking

13   an additional $1.5 billion in debt will limit your

14   ability to borrow additional funds in future?

15        RA. I feel -- I am not concerned, yes.

16        RQ. And you have absolutely --

17        RA. (Speaking simultaneously.)

18        RQ. You have absolutely no concern about your

19   ability to refinance any of your debt?

20        RA. I am not concerned.  At this time I am not

21   concerned.  I have no knowledge or anything that would

22   cause me to have a concern.

23        RQ. You have absolutely no concern your debt

24   instruments will have the potential to restrict your

25   ability to obtain additional indebtedness?

1          RA. I am not concerned at this time.  My debt

2     leverage is very low.

3          RQ. You have absolutely no concern your business

4     may not generate significant cash flow from the

5     operations to enable you to pay your indebtedness or to

6     find your other -- fund your other liquidity needs?

7          RA. Again, Mr. Newman, you are once can against

8     reading the 10-K.  I will give you -- I'm happy to

9     acknowledge all of those that I put in the 10-K and

10    own, and I can tell you as I sit here today and based

11    on what I know, I do not have a concern.

12         RQ. Do you have absolutely no concern about

13    Albertsons' ability to maintain the necessary cash flow

14    to service its debts even though it is to a significant

15    extent dependent on factors that are beyond your

16    control?

17         RA. When it becomes beyond my control, we survey

18    all of the things that we can to try to make sure that

19    we are knowledgeable about world events and things that

20    could create that sort of thing.  But even still in the

21    event we did have something that was completely beyond

22    our control, which was COVID and the pandemic, the

23    company has proven its ability to address it, pivot,

24    make changes, if fund a significant expense in 2020,

25    the company because of COVID had to spend an

1    incremental billion dollars in one year that it had no

2    idea it was going to do.

3         Half a billion of that, by the way,

4    Mr. Newman, was actually in wages.  So I'm sure that is

5    something that is intrusting to you.  And the company,

6    because it is generating excess cash flows was able to

7    do so.

8         So the company has actually even been tested

9    in one circumstance but you and I both know there are

10   many things that can happen.  But with what we have

11   visibility today and after surveying the landscape of

12   possibilities I remain committed and stand behind the

13   declaration that I made.

14        RQ. So you have absolutely no concern about

15   Albertsons' ability to maintain the necessary cash flow

16   to service its debts even though it is to a significant

17   extent dependent on factors that are beyond your

18   control?

19        RA. That is correct.

20        RQ. You have absolutely no concern that your debt

21   instruments will limit your flexibility of operating

22   your business?

23        RA. I acknowledge -- I know we're reading this

24   again.  And every one of these is a risk.  And I accept

25   that I have stated those risks.  And there is a

1    scenario that I don't know about today that could cause

2    me to tell you that I had a concern.  Since I don't

3    know of it here, it is my responsibility as the CFO of

4    this company to inform my shareholders that there are

5    possible things in the world or that could happen that

6    I do not know, and if they bought the stock and they

7    were holding the stock at the time that one of those

8    happened, this is what will happen.  That is what a

9    risk factor is.  It's warning them that something could

10   happen.  I have to make a decision about the financials

11   of our company every single day, every time I hire an

12   employee, I have to decide whether or not I think I can

13   pay their salary for the next several years; right?

14   That's a risk.  I hired them and I might not be able to

15   keep that.

16          Everyday I have to make decisions like this in

17   my role, and I at this time have no knowledge that is

18   in the backdrop at this moment that could cause me to

19   not stand behind that.  But it is possible and that is

20   why it has to be a risk factor in my 10-K.

21   Shareholders have a right to know the types of things

22   that could affect the value of their investment.

23      RQ. So you have absolutely no concern that

24   borrowing another $1.5 billion will limit Albertsons'

25   ability to maintain the necessary cash flow to service

1    its debts even though it is to a significant extent

2    dependent upon factors that are beyond your control?

3         RA. Yes, at this time I stand behind that.

4         RQ. Are you saying now after borrowing an

5    additional $1.5 billion to pay this dividend you have

6    no concern that your debt instruments will limit your

7    flexibility in operating your business?

8         RA. That is correct.  I don't in my projections I

9    have no need to access the debt market at this time.

10        RQ. And are you saying now after borrowing an

11   additional $1.5 billion to pay this dividend, you will

12   have absolutely no concern that it will place

13   Albertsons at a competitive disadvantage compared to

14   its competitors that have less debt?

15        RA. Very -- I stand behind my statement, yes.

16        RQ. So back in April you told the SEC and a bunch

17   of investors about all of those risks; right?

18        RA. Yes.

19        RQ. I didn't see in there -- I have absolutely no

20   concern about any of those risks.  You did not say

21   that; right?

22        RA. I did not say that.

23        RQ. And you're not planning on saying it next

24   rear, are you?

25        RA. I'm in the.

1        RQ. I bet all of those risk factors will still be

2    in there; right?

3        RA. I believe all of those factors will be in

4    there every year because the first sentence says "It

5    could."

6        RQ. Is but --

7        RA. And I have given you, Mr. Newman, the things

8    that are completely unknown -- unbeknownst to us today.

9    You have to use business judgment.  But what is known

10   to me today and standing at the backdrop of all of the

11   things we can think of that could affect us at this

12   moment but you and I and you don't know anymore than I

13   do and neither does anyone else on this video, we do

14   not know what we do not know, and there have been

15   surprises.  I'm going to -- I totally acknowledge where

16   you're going.  I accept what you're saying.  I do.  But

17   I at this moment stilling here looking at my

18   projections for the next three years pressure testing

19   those, talking to investment banks and other experts

20   about possible trends, possible things that could

21   happen, I do not have concerns here today and I stand

22   behind my declaration.

23       RQ. You do see where I'm going that in April you

24   gave all of these risk factors, and today you're

25   telling investors who are listening to this call --

1       RA. Yes.

2       RQ. -- that you have absolutely no concern about

3    any of those risk factors?

4       RA. Yes, I am.  And I feel very comfortable and

5    hope they are listening, actually, to this call,

6    because it is our responsibility as a public company

7    and me as the CFO of this company when an investor

8    makes an investment to make sure that we list out for

9    them all of the possibilities that could happen,

10   remember the word "could" in the event of any of the

11   things that you mentioned.  And that is being

12   transparent with investors about the risks of owning a

13   company's equity.  That is the responsibility that we

14   have of telling them that.

15      RQ. I feel like 8you were very conservative in

16   your language in the 10-K, but today you're saying that

17   you have absolutely no concerns?

18      RA. Yes.  I, at this time I have very good

19   visibility of the performance of our company.  I have a

20   very good understanding of our financials.  And in the

21   short term I feel very good about our decision to pay a

22   $4 billion dividend.

23      RQ. And the difference being --

24      RA. (Speaking simultaneously.)  Would probably say

25   to you, since you mentioned it might be on the call, I

1    think that investors have an expectation of a public

2    company to be sure that those risk factors are

3    comprehensive and thoughtful about all the possible

4    things that could cause the investment to perform

5    differently than they might have anticipated.

6        RQ. The difference between when you gave these

7    very careful warnings and now is they have a merger

8    agreement with Kroger; right?

9        RA. That is a difference.  It has nothing to do

10   with my risk factors or anything I just said.  I had

11   intended to return capital to my shareholders with or

12   without a merger earn agreement with Kroger as I

13   declared publicly that I was going to do something with

14   strategic alternatives on February 28th, 2022.  We have

15   to keep in mind I announced publicly to my investors

16   that I was seeking strategic alternatives including in

17   that document capital return strategies.  If you look

18   up capital return strategies, there's really two you

19   can do for investors.  You can do dividends or you can

20   do share repurchases, tender offers, they get called

21   different things.  But I announced in February to my

22   investors that that was our intent.  So with or without

23   Kroger, we could have this same discussion because I

24   still would have been announcing a return of capital to

25   my shareholders.  We just wouldn't have to talk about a

1    merger --

2        RQ. But we are talking about (speaking

3    simultaneously.)

4        RA. (Speaking simultaneously.)

5        RQ. But we are talking about a merger?

6        RA. But we are --

7        RQ. But we're -- (speaking simultaneously.)

8            THE COURT REPORTER:  One at a time.

9            THE WITNESS:  Please.

10   BY MR. NEWMAN:

11       RQ. We are talking about a merger in which your

12   competitor agreed to pay -- to cover a $1.5 billion

13   debt to pay this dividend; right?

14       RA. The merger agreement gave us a right to pay a

15   special dividend if we chose to.  And that same -- that

16   same merger agreement, once they announced the merger.

17   All of the future cash flow of the company if the

18   merger closes and obtains the regulatory approval to

19   close, they will be getting auto of the cash flow of

20   the company between them.  So I don't -- I think that

21   you have to again look at the financial -- that you

22   can't say what you said without saying the second part

23   which is they received the cash flows of the company

24   from the date of the announcement of the merger.

25       RQ. So it all goes together; it's one big

1    agreement; right?

2        RA. It is not one big agreement.  It's two

3    completely separate decisions.

4        RQ. So if they're completely separate decisions

5    why is your getter agreeing to pay $1.5 billion of your

6    debt so you can cash it out to your shareholders?

7        RA. A because over the time frame in which this

8    merger is being evaluated, I am generating positive

9    cash flow.  But regardless, my -- our merger agreement

10   did not tell me that I was going to be returning

11   capital to my shareholders.  When I was contacted and

12   made aware that there could be a possible interest in

13   acquiring our company, we told them that it was our

14   intent to return capital to our shareholders and there

15   was no need for a discussion if that was not something

16   that we were going to have a right to do, to which they

17   said -- they agreed that if that was something that was

18   a right that we expected, that was part of a

19   negotiation.  But we were going to be returning capital

20   to our shareholders regardless, and these two decisions

21   were independent of one another as it related to the

22   Albertsons board.

23            MR. NEWMAN:  That's all I have,

24   Your Honor.

25            THE WITNESS:  Thank you.

1          It's nice to please meet you, Mr. Newman.

2              MR. HASSI:  This is Ted Hassi I have some

3      redirect.

4              THE COURT:  Okay.

5

6                      EXAMINATION

7

8      BY MR. HASSI:

9          RQ. Let's start at the beginning, Ms. McCollam

10     because I don't think you were asked -- you talk a

11     little bit about your role as president, but just

12     briefly describe your duties at Albertsons?

13         RA. Yes.  I'm responsible for overseeing all of

14     corporate strategy and I am responsible for all of

15     financial functions or the company.  I run the

16     company's technology organization.  I supply chain

17     organizations, and real estate.  So in my president

18     title I have toes operating functions as well as my

19     chief financial officer role.

20         RQ. And when did you join Albertsons?

21         RA. I joined the company in September 2021.

22         RQ. And before joining the company, had you ever

23     been the CFO of a public company before?

24         RA. I have been.  Twice before.  I was the CFO of

25     Best Buy from 2012 to 2016.  And I was the CFO of

1    Williams-Sonoma from 2000 until 2012.  And I was the

2    chief operating officer at will I don't means Sonoma

3    and the chief administrative officer at best buy.

4        RQ. Two and it sounds like in the time you were

5    the CFO at William Sonoma you saw a downturn for --

6        RA. Absolutely.  I was leading -- I was in that

7    role as chief operating and chief financial officer

8    when the 2008 recession hit.

9        RQ. You have lived through a significant financial

10   event.

11       RA. I did.  And William Sonoma for those of you

12   who are not familiar with the company, William Sonoma

13   is a company that operated in selling home furnishings

14   in the high end home space which is where the

15   pandemic -- I mean, the -- of 2008 recession hit the

16   hardest in the home space.

17       RQ. Do you serve or have you served on the boards

18   of any over companies?

19       RA. I have.  I've served on the boards of Whole

20   Foods.  I served on the board of Del Monday toy foods.

21   I served on the boards or Advanced Auto Parts and

22   Chewy, and I currently serve on the board of Stitch Fix

23   and Signatours.

24       RQ. Now, you mentioned in your responses to

25   Mr. Newman a review of strategic alternatives.  Can you

1    just explain to the Court:  Why did Albertsons want to

2    return capital to the shareholders?

3        RA. The companies performance had been very strong

4    for several years and the company actually had not

5    returned any capital to its shareholders for several

6    years, for many years.  And the company saw that there

7    was -- obviously we were growing substantial cash

8    balances.  We were generating excess cash flow, and the

9    company believed that to create -- to continue to fuel

10   growth and to create value for the shareholders, that

11   the company should explore all of its strategic

12   alternatives.

13       RQ. And when did the abort of Albertsons consider

14   returning capital to its shareholders?

15       RA. We actually started that discussion in around

16   the time November 21st, in November of 2021.

17       RQ. And in what ways of returning capital did the

18   board consider as it considered it did this review of

19   strategic alternatives?

20       RA. Yeah, the company looked at looking at

21   minority investments in the company, both remaining as

22   a public company, possibly as a private company.  The

23   company looked at monetizing some of its real estate,

24   if that was advantageous to do so.  The company of

25   course the sale of the company, the acquisition of the

1    company was considered.  And then capital return

2    strategies were mentioned in the press release and

3    those would have included a tender offer of the

4    company's shares or possible dividend.  Those are the

5    two main vehicles in capital return strategies.  The

6    company approached this to look at all strategic

7    alternatives and the company at that time had not made

8    a decision about which one.

9         They all needed to be explored in order to

10   create the most value.  It was important that we

11   explored all of the alternatives and we made that point

12   to occur shareholders and in our February 28th press

13   reels to the shareholders.

14      RQ. Okay.

15         MR. HASSI:  And Your Honor may I publish

16   that press release it's Exhibit 44 it's tally on the

17   state's exhibit list.

18         THE COURT:  You may.

19         MR. HASSI:  Ms. Martin, can you bring up

20   Exhibit 44, please.

21      And could you just --

22         THE COURT:  Expand that.  There you go.

23   BY MR. HASSI:

24      RQ. Could you identify this document, Ms.

25   McCollam?

1          RA. Yes.  This is the if he can 28th, 2022

2    strategic alternatives press release that I referred to

3    a couple times in my testimony here.

4          RQ. And is it your testimony that a dividend such

5    as a special dividend or a tender offer were included

6    in the types of financial transactions or strategic

7    transactions the company might be thinking about as

8    part of this review?

9          RA. Yes.  If you look at the second sentence of

10   the press release, it starts with the word "The review

11   will include.  An assessment of various balance sheet

12   optimization and capital return strategies."  Those

13   capital return strategies of dividends tend to offer

14   potential strategic or financial transactions.  A

15   strategic transaction is an example could be an

16   acquisition like the Kroger acquisition or a financial

17   transaction would be under a financial transaction

18   could be could be a minority investment from a private

19   equity firm, it could be restructuring a balance sheet

20   transaction could have been a restructuring of the

21   company in a possible take pride transaction.

22          8so it was very comprehensive, and on balance

23   sheet optimization, that also could have included the

24   real estate.

25          MR. HASSI:  Your Honor, I offer Exhibit 44

1    into evidence.

2         MR. NEWMAN:  No objection.

3         MS. PFAFFENROTH:  No objection,

4    Your Honor.

5         THE COURT:  Exhibit 44 is admitted without

6    objection.

7         (Exhibit 44 received.)

8    BY MR. HASSI:

9        RQ. You mentioned real estate monetization and you

10   used a term earlier in your testimony about a sale

11   leaseback.  Can you just explain to the Court what a

12   sale leaseback transaction is?

13       RA. Yes.  There are real estate investment trusts

14   investors, private investors, et cetera, that own

15   substantial amounts or real estate, and they own them

16   and then they lease those -- that real estate to their

17   various companies it could be us it could be to anyone.

18   So you sale the real estate to them and then they lease

19   it back to you at a negotiated rent.  That's what a

20   sale leaseback transaction is.

21        As part of the strategic alternatives review,

22   we did an appraisal of our real estate, and that was

23   one of the alternatives we mentioned.

24       RQ. Okay.

25        Mr. Newman seemed to be concerned about you

1    selling stores.  If you were to do a sale lease back

2    transaction, would you have to sell your stores to do

3    that?

4        RA. The stores are part of our assets.  We also

5    own office building.  We own Doctor, centers.  We could

6    have sold other things.  But even if we had considered

7    it, you could -- you would -- you would you could have

8    sold stores and leased those stores back.  It's very

9    common in retail for retail companies to go that.

10   However, we opted not to address our real estate as

11   part of the strategic alternatives.

12       RQ. But if you did a sale leaseback transaction

13   involving say Albertsons stores on the West Coast,

14   would those stores go dark?

15       RA. No those stars don't go dark that's what I was

16   explaining to Mr. Newman.  You sell the store and then

17   you now don't own it anymore, and someone else owns it.

18   You negotiate a rent deal and you continue to operate

19   the store.

20       RQ. You were asked a number of questions related

21   to the risk factors by Mr. Newman in the 10-K?

22       RA. Yes.

23       RQ. I want you to take a quick look at that and

24   put them in context.

25           Can you take a look at Exhibit 59, please --

1    RA. Yes.

2    RQ. -- which is already in evidence.

3    RA. Yes.

4    RQ.

5         MR. HASSI:  And Your Honor since this is

6    in evidence may this be published, Exhibit 49 -- at 59,

7    excuse me.  It's also on the list.

8         THE COURT:  It looks like they have

9    already done it.

10        Exhibit 59 you can go ahead.

11   BY MR. HASSI:

12        RQ. Would you begin with the risk factors that I

13   believe begin on page 14?

14        RA. Okay.

15        All right.

16        RQ. And I just want to walk through.  So I see on

17   page 14 -- risk factors that start on page 14.  Could

18   you tell us where those risk factors end?

19        RA. Yes.  The risk factors end on page 37.

20        RQ. So if I'm doing my math right, that's 23 odd

21   pages of risk factors in here?

22        RA. That is correct.

23        RQ. And are you -- are these predictions that

24   these risks will come to pass Albertsons?

25        RA. They are not.  As I said to Mr. Newman, these

1    are risks that could happen, and it is important for us

2    to the public company to ensure that we are informing

3    our investors when they buy our stock of things that

4    could happen, that could impact the value of that

5    stock.

6        RQ. Okay.

7            And let's go back to page 16, if you will.

8    The middle of the page, Ms. Martin.

9            There's a risk factor here.  We may not be

10   able to enter into strategic transactions, investments

11   or partnerships in the future on terms acceptable to us

12   or at.

13           What does this specific risk factor referring

14   to, if you will?

15       RA. This risk factor is referring to transactions

16   that you may be approached on or that you may be

17   considering, but there is no guarantee that these are

18   actually going to happen.  So it's making sure that

19   shareholders realize that just because you might be

20   negotiating a transaction, considering the strategic

21   alternatives, et cetera you can actually commence it or

22   that you can actually in the case of a merger close it.

23   So they're warning them if they have an idea that this

24   was going to happen it ma I not happen?

25       RQ. And this refers back to the February 28th,

1    2022, announcement about strategic alternatives that

2    you were considering; is that correct?

3        RA. Yes.  That is correct.  This risk factor was

4    enhanced because of that announcement.  This was issued

5    after that, and it was enhanced after that because we

6    needed to be sure that our shareholders concern that

7    while we were seeking strategic alternatives transfers

8    not a given that we would actually be able to identify

9    or ex-computer it the strategic alternatives.

10       RQ. Okay.

11       For the record what period of time does this

12   form 10-K cover for Albertsons?

13       RA. This covers the entire year of fiscal '21.

14   Our fiscal year is not a calendar year, so it could

15   have been from early February of 2020 up until

16   February of 2021.  I'm is I'm sorry.  '22.

17       RQ. You can set that to the side.

18       Going back to the strategic alternatives that

19   Albertsons was exploring, did you hire any advisors to

20   assist you in exploring these strategic alternatives?

21       RA. Yes, we did.  We hired Goldman Sachs, and we

22   hired Credit Suisse.

23       RQ. I want to show you Exhibit 16?

24       MR. HASSI:  Your Honor may I publish

25   Exhibit 16, if redacted version of it?  Again this was

1    on the state's list.

2              THE COURT:  Sure you can.  Go ahead.

3    BY MR. HASSI:

4       RQ. Can you identify for the Court what Exhibit 16

5    is?

6       RA. Yes.  Which is an update on strategic

7    alternatives prepared by Goldman Sachs and

8    Credit Suisse that was presented to the board of

9    directors of Albertsons on June 10th of 2022.

10             MR. HASSI:  And Your Honor I offer

11   Exhibit 16 into evidence.

12             MR. NEWMAN:  No objection.

13             THE COURT:  Kroger?

14             MS. PFAFFENROTH:  No objection,

15   Your Honor.

16             THE COURT:  All right.  Exhibit 16 is

17   admitted without objection.

18             (Exhibit 16 admitted).

19   BY MR. HASSI:

20      RQ. If we can go to page 76.  I'm going to use the

21   Bates numbers on the bottom right-hand corner.

22      RA. Okay.

23      RQ. Can you just tell what you say this page

24   represents?

25      RA. Yes.  This page is a visual version of what I

1    just described a few moments ago related to the

2    comprehensive list of strategic alternatives that the

3    company considered.  And I don't -- I won't read

4    through them.  I think I -- Mr. Newman reiterated those

5    to your previously.

6        RQ. And how much capital was Albertsons

7    considering returning to its shareholders at this time

8    in June of 2022.

9        RA. At the bottom of the page, number 7, we were

10   looking at returning -- we were circling a

11   $4 and a half billion return of capital to our

12   shareholders.

13       RQ. Let's go to page 85, if you will, of this

14   document.  Can you tell us what that page represents?

15       RA. Yes.  This page is an analysis of the choices

16   when we talk about capital return strategies, which I

17   mentioned earlier, being a dividend or a tender offer

18   sharing purchase, those are -- you can use those

19   somewhat simultaneously.

20       This was an analysis done by Goldman Sachs and

21   Credit Suisse on the two alternatives, and it was a

22   scoring of the pros and the cons of either of those

23   alternatives.

24       RQ. And can you explain to the Court what a tender

25   offer is?

1        RA. Yes.  It is an offer to our shareholders to

2    buy their stock at an agreed-upon price in these

3    documents that agreed upon price would have been the

4    average price in the pub market for an average of 20

5    days.  They call that the BW ck, and we could offer to

6    buy their shares back to a certain number of shares at

7    a fixed price.

8        RQ. Now, on this page you're comparing a tender

9    offer versus special dividend.  Can you tell us why

10   you're considering these two specific alternatives?

11       RA. Yes.  Realistically under the return of

12   capital to shareholders, those are the two -- those are

13   base which the two alternatives related to that one

14   specific alternative.  And both of these had pros and

15   cons, per se.  And so we were evaluating whether or not

16   it would be in our best interest for our shareholders

17   to do a special dividend or a tender offer.

18       RQ. Could you do a tender offer and announce the

19   merger at the same time?

20       RA. We could not.

21       RQ. Could you explain why not?

22       RA. Yes, we could not do a tender offer as part of

23   a merger because once the merger is announced, and the

24   regulatory process begins which is almost immediate,

25   and any time you have material nonpublic information,

1    in other words, you know that there is information that

2    an investor, if they knew it, they might mike a

3    different decision on their investment.  So as -- let

4    me try to give an example of that.

5         Let's say that at this time our stock was

6    trading around $30.  And if at that time, at this time

7    we did not -- this is June 10th.  We did not have any

8    knowledge of what an offer from Kroger might be; right?

9    That didn't happen until later.  However, let's just

10   say that we knew that someone was going to buy the

11   company at a higher price.  You can't offer to by their

12   shares knowing that there's a higher price available.

13   That's material nonpublic information.

14        In the case of a merger, we every day would

15   have information about the regulatory process.  And if

16   it was bad or good it could change an investors

17   decision, and therefore we had to pivoted to a special

18   dividend if there had been another transaction

19   associated with this, we had to pivot back to the

20   special dividend even if on a standalone basis we would

21   have pro federal the tender offer.

22       RQ. Now, you just talked about prefer ago timider

23   offer, and I want to ask when the idea of a special

24   dividend first came up in this review of strategic

25   transactions what with was your reaction to Albertsons

1    paying a special dividend?

2        RA. Yes.  I was absolutely committed that a better

3    alternative was a tender offer.

4        RQ. And can you explain perhaps using this page

5    why a tender offer in Albertsons' case was a better

6    alternative for returning capital to its shareholders?

7        RA. Yes.

8            Yes, I can.  If you take a look at the fourth

9    box on the page it says "Strength perception of active

10   overhanging management."

11           So let me explain what that is.

12           Out of a hundred percent of our shares that

13   are outstanding at Albertsons, a very large percentage

14   of them are he would by a very small number of

15   investors.  And nearly 70 percent of them.  That's how

16   material that was.  And the public shareholders who had

17   a much smaller piece of that were always worried from a

18   value point of view, from a share price point of view,

19   that one of those shareholders might decide to start

20   selling those shares into the public markets.  And that

21   could materially reduce the price in the public market

22   of our stock.

23           So you might be looking at Yahoo or Google or

24   however you get Bloomberg, looking at the stock price,

25   and they put their shares on the market, and the stock

1    drops 20 percent.

2           People on this call may say well, you know,

3    how often does that happen?  And it just happened to

4    our shareholders.  We have a large shareholder starting

5    earlier in the year start monetizing and it took our

6    stock price down 20 percent.  So now public investors

7    were hesitant to want to reengage not having visibility

8    to that dynamic.  So to the extent this is perceptual,

9    of course; and it has to happen in order to happen but

10   to the extent we could address that we felt that that

11   was helpful.

12          Also from a rating agency perspective you can

13   see a question mark on the second line which says

14   structure to support ratings outcomes.  And the rating

15   agencies also saw the large concentration of our

16   shareholder base to be a point of analysis, of further

17   analysis.

18          So we felt it could help us in both ways.

19   It's perceptual.  You cannot measure this financially,

20   but perceptually the tender offer would have lend us in

21   our communications with our public shareholders.  So

22   absent the securities limitation of doing that the

23   securities law limitations doing a tender offer along

24   with a merger we would have done a tender offer versus

25   a special dividend had we not gone into the merger.

1      RQ. Is and as the company was considering a

2   special dividend or a tender offer, what are the

3   economic effects?  Let's use $4 billion.  What are the

4   economic effects of the company on a $4 billion special

5   dividend versus a $4 billion tender offer?

6      RA. Either way we should have been spending

7   $4 billion.  We would have paid a dividend of

8   $4 billion or we would have repurchased shares of

9   $4 billion.  The cash flow cash how you would have

10  funded it, none of that would have changed.  They had

11  the same eventual same economic impact as the

12  $4 billion dividend.

13     RQ. Okay.

14        Let's jump to page 91, if we could.

15        This says at the top of the page "Repurchase

16  tender offer launched only if key we discussions

17  terminated request presidents.

18        First who is Kiwi?

19     RA. Kiwi is Kroger and.

20     RQ. Can you explain this statement, repurchase

21  tender launched only if Kiwi discussion is terminated?

22     RA. Yes.   This is the securities litigation --

23  the securities regulation issue in a graph format.

24  What this was explaining to the board was while we just

25  analyzed a special dividend and a tender offer, the

1    tender offer would only be available to us in the event

2    we were a stand alone public company and not involved

3    in a merger.

4         So we would only be able to do the tender

5    offer assuming that the negotiations with Kroger

6    ceased?

7      RQ. We have heard at this point in time you were

8    considering a return of capital in the

9    $4- to $5 billion range?

10     RA. Yes.

11     RQ. Can you item us what steps Albertsons took to

12   get comfortable with that large of return of cap to its

13   shareholders?

14     RA. Yes.  We put together a very large

15   comprehensive these your plan reviewed with our plan

16   several times of getting significant input into it from

17   as many sources as we could in order to put together a

18   very comprehensive three-year plan.

19        We went through that three-year plan process

20   very early in the year.  This would have been

21   January time frame.  And then throughout this into I

22   process, numerous times, we continued to revisit that

23   three-year plan and pressure test it because around us

24   there had been changes happening in the macro

25   environment speaking to Mr. Newman's comments earlier,

1    obviously there are things that we have to pay

2    attention to in the macro environment and what was

3    happening with the debt markets, interest rate, the

4    macro, recession, inflations, all those things.

5         So we continued to pressure test it with that

6    lens, and initially we were looking at somewhere in the

7    neighbor of $4 to $5 billion.  If you go back to the

8    document that we just saw, and we don't need to go back

9    there, but I said in that box 7, we had at that time

10   gone to a $4.5 billion number recommendation if we did

11   a repurchase and tender offer and to be conservative,

12   Mr. Newman.

13        And then -- and we can talk later about where

14   we evolved to after that.

15      RQ. Let -- you mentioned a these your plan.  Let's

16   just take a quick look at page 96 I know much of this

17   will be redacted for the public but can you identify

18   what we see on Bates page 96?

19      RA. Yes.  This is -- in this board deck, this is

20   the true and corrected cash flows and the balance sheet

21   of the company and the company's three-year plan at

22   that time in June with the recommended -- with the pro

23   forma of what it would look like if we returned four

24   and a half billion dollars to our shareholders through

25   a repurchase for a dividend at that point it's just

1    about the quantum.

2        RQ. And whether it were $4.35 billion special

3    dividend or $4.35 billion tender offer, did you do an

4    analysis of the effect on your previous existing

5    three-year plan at this point in time on how that

6    dividend might affect that three-year p0lan?

7        RA. Yes, we did, and that's what this reflects.

8    It walks through in the center of the document the

9    various -- the new security debt, when we would do, the

10   share repurchase, the amounts were all there, and then

11   it brought us down to our ending cash.  It looked at

12   our debt leverage ratios we looked at all of that and

13   we discussed that with our board of directors with our

14   three-year plan as the basis for the protections to

15   ensure that the dividend for share repurchase -- the

16   return of capital.  I think it's better here to just

17   talk about return of capital to our shareholders, that

18   the return of capital was in fact a decision that we

19   felt extremely confident in making.

20       RQ. And with respect to your three-year plan,

21   would the $4.5 billion return of capital require you to

22   make adjustments in that three-year plan, for example,

23   decreasing Capex spend spending less oh ever wages were

24   there any adjustments you felt you would have to make

25   to you could return that wash to your shareholders?

1        RA. No.  Our first and top priority has always

2     been to invest in the company and the strength of

3     company and in that three eye plan since I've mentioned

4     it previously, on the Capex line, if you were reading

5     that Capex and you could see it, what you would see is

6     that it consistently from 2022 through the three year

7     plan we were consistently investing over $2 billion in

8     capital in the company.

9          And with that said what is not on the schedule

10    or what you wouldn't have on the schedule is that the

11    highest investment in capital the company made was in

12    2021.  That was $1.6 billion.  Not only were we

13    continuing to invest in the levels we had invested in

14    in the past to drive the exceptional performance of the

15    company, we were stepping it up almost 25 percent to

16    the next level in order to continue to invest in the

17    company.

18          MR. HASSI:  Let's go to exhibit -- well,

19    you're, may I public Exhibit 31?  These are the

20    June 10th board meetings -- board minute and is I

21    believe these two were on the state's exhibit list no

22    objection to?

23          THE COURT:  You may.

24    BY MR. HASSI:

25        RQ. And can you identify this document for us?

1      RA. Yes.  These are the minutes of the June 10th

2   board meeting that I just was reviewing documents from.

3      RQ. Okay.

4         MR. HASSI: Your Honor, I offer Exhibit 31

5   into evidence.

6         MR. NEWMAN:  No objection.

7         MS. PFAFFENROTH:  No objection,

8   Your Honor.

9         THE COURT:  Exhibit 31 is admitted without

10  objection.

11        (Exhibit 31 admitted.)

12        MR. HASSI:  Thank you, Your Honor.

13  BY MR. HASSI:

14     RQ. To you tell us what the person of the

15  June 10th board meeting was?

16     RA. The purpose of the word meeting was to give

17  the board an update on the company's strategic

18  alternatives process.

19     RQ. And if you go to -- again I'll refer to the

20  base range page 1539.

21     RA. Okay.

22     RQ. The do you see at the top of the page there's

23  a paragraph that talks about Mr. Roe?  Who is Mr. Roe?

24     RA. Mr. Roe is one of lead advisors at Goldman

25  Sachs.

1      RQ. And he noted that the company's advisor -- how

2   much did you know that the company's advisors were

3   focused on in terms of a capital return at this point

4   in time in June of 2022?

5      RA. Yeah, in the second sentence of the second

6   paragraph it says Mr. Roe noted a capital return in the

7   range of 4.3 to $4.7 billion.

8      RQ. Okay.

9         You can set that aside.

10        Why didn't the board announce a tender offer

11  or for that matter a special dividend at this point in

12  June of 2022?

13     RA. Because at that time we were in merger

14  discussion with Kroger.  And as I mentioned earlier, on

15  the capital return strategy, because of the perceptual

16  investor issues related to the overhang, we were still

17  preferring a share repurchase versus a special

18  dividend.  This isn't about the amount of money we were

19  putting out at the company, it was about how we would

20  put that money out.

21        So we could not at this time, we -- unless we

22  announced publicly that we were in the merger

23  discussion with Kroger which we had no idea whether

24  this transaction would go forward we hadn't even had an

25  our first written offer at this point there would be no

Rough Draft of Evidentiary Hearing                                    12/7/2022

1    way we would be talking about this publicly, so we

2    could not amount a tender offer at that point in time

3    because of the material nonpublic information that we

4    held.

5            So, again, at this time, we would have been

6    offering -- I think we have established what material

7    nonpublic information is, and we clearly have it and we

8    could not have announced a tender offer without making

9    it public that we were having conversations with

10   Kroger.

11       RQ. So why not pay a dividend to your shareholders

12   then?

13       RA. Because as we evaluated earlier in that

14   document, if we were going to be moving forward as a

15   stands alone company we would have pivoted to the

16   tender -- we could have very likely pivoted to the

17   tender offer.  We preferred the tender offer for the

18   nonfinancial aspects of the tender offer.

19       RQ. Okay.

20           And with respect to a merger, does a merger

21   for example the merger agreement with Kroger does that

22   help with this other hang issue?

23       RA. It does.  It solves the overhang issue.

24       RQ. Can you explain?

25       RA. Yes.

1           If we get regulatory approval for the merger,

2    Kroger will be buying a hundred percent of all of the

3    outstanding shares of Albertsons.  Therefore, Kroger

4    will own all of the shares and Kroger does not have a

5    concentration of large shareholders like we do.

6        RQ. You can put that to the side.

7           You mentioned at this point in time you did

8    not have your first written offer from Kroger.  Do you

9    recall whether you received that first written offer

10   from Kroger?

11       RA. Yeah, I believe the first offer was dated

12   June 25th.

13       RQ. And the Court has already seen that offer

14   letter, but was Kroger made aware by Albertsons that

15   Albertsons was considering returning capital to its

16   shareholders?

17       RA. Yes, they were.  I explained to Mr. Newman

18   that when we were first contacted through the

19   investment banks by Kroger, we instructed them to

20   inform Kroger that the company had been planning for a

21   capital return to its shareholders, and that it was --

22   that we expected to be able to continue to execute

23   against that despite discussions about a possible

24   merger.

25       RQ. Okay.

1           And did Kroger -- did Kroger when it made an

2     offer acknowledge the idea that Albertsons

3     was considering returning capital to shareholders?

4           RA. They did.  If the June 25th letter, they

5     specifically addressed Albertsons direction that it was

6     planning on returning capital to Swiss shareholders,

7     but they went on to say that if Albertsons returned the

8     capital to the shareholders, that they would be

9     reducing their purchase price dollar for dollar for

10    every dollar that they paid to the shareholders.

11          RQ. In the interest of time I'm going to jump

12    ahead.

13          Did Albertsons ultimately enter into a merger

14    agreement with Kroger?

15          RA. We did entire into a merger agreement with

16    Kroger?

17          RQ. When did you enter into a merger agreement

18    with Kroger?

19          RA. On October 13th, 2022.

20          RQ. Between the first offer in June and into a

21    merger agreement in October were there discussions

22    between Albertsons and Kroger about the special

23    dividend?

24          RA. There were.  There were Kent you'll discussion

25    about the reduction in the purchase price associated

1    with what every special dividend was to be paid if

2    Albertsons chose to pay it that the purchase price

3    would be reduced dollar for dollar for that quantum.

4        RQ. And was that reduction in the purchase price

5    addressed from the merger agreement?

6        RA. It was addressed in the merger agreement in

7    Section 6.1 of the merger agreement it specifically

8    states that the purchase price would be reduced dollar

9    for dollar if the company paid a special dividend.  And

10   it's also mentioned in the operating covenants within

11   the merger agreement that it gives us the right to pay

12   a special special up to $4 billion if the company

13   cheeses to do so.

14        The reason it has to be mentioned in the

15   operating covenants is the operating covenants

16   basically state in a merger situation that you will

17   continue to operate the company in the ordinary course

18   of business.  And a special dividend is just that.  It

19   is a special dividend and it is not in the ordinary

20   course of business.  So it had to be called out that we

21   would have a right if we chose to do it and the other

22   portion of the merger agreement on the how much they

23   were going to pay for the company, that had to be

24   adjusted as well to reflect that if we need a decision

25   to pay a special dividend whether it was 0, 4 billion

1    or anything in between that the acquisition price would

2    be reduced dollar for dollar on whatever amount the

3    company might choose do return to its shareholders.

4        RQ. And just to be clear does the merger agreement

5    require Albertsons to pay a special dividend?

6        RA. Absolutely not.

7        RQ. Let's talk about the October 13th -- strike

8    that.

9        Was there a board meeting to discuss the

10   merger?

11       RA. There was.

12       RQ. And when did that take place?

13       RA. On October the 13th.

14       RQ. And did you participate in what period

15   meeting?

16       RA. I did.

17       RQ. Did the board make any decisions in that

18   meeting?

19       RA. They did.  The first topic of discussion in

20   the board meeting was the merger with Kroger.  And the

21   board ultimately after discussion approved the merger

22   with Kroger.

23       Subsequent to that decision, the company then

24   reviewed the decision on a return of capital to

25   Albertsons shareholders through a special dividend and

1    the board then privileged a special dividend to our

2    shareholders for $4 billion.

3        RQ. I would like to show you --

4            MR. HASSI:  And Your Honor may I publish

5    what has been marked as Exhibit 102?  Those are minutes

6    from the October 13th board meeting?

7            THE COURT:  You may publish 102 and I want

8    to remind you the court reporter has been going for

9    about an hour and 40 minutes, so we're going to need to

10   take our break soon.  And my clerk is also entitled to

11   her 15 minutes.

12           MR. HASSI:  Understood, Your Honor.  Just

13   let me know if you want me to stop now or keep going

14   through these minutes.

15           THE COURT:  Is there a natural point in

16   your questioning that is good to stop soon.

17           MR. HASSI:  I think after -- I won't spend

18   long on these minutes and I think after that if that

19   would be okay.

20           THE COURT:  Okay.

21           MR. HASSI:  Thank you, Your Honor.

22           THE COURT:  Go ahead.

23   BY MR. HASSI:

24       RQ. Do you recognize this document?

25       RA. Yes.  These are the minutes of the

1    October 13th, 2022, Albertsons board meeting.

2              MR. HASSI:  Your Honor, I offer 102 in

3    evidence.

4              MR. NEWMAN:  Objection.  Hearsay.

5              MR. HASSI:  Your Honor, I'm happy to lay a

6    foundation for the business exception record --

7              (Speaking simultaneously.)

8         MR. HASSI: -- if that is necessary.

9              THE COURT:  It seems like it's likely to

10   be covered, but go ahead and lay your foundation since

11   there's an objection.

12             MR. NEWMAN:  Well, Your Honor, to make

13   things easier we con see it's a business record while

14   hearsay within it, and it is incomplete.  So, ER 106.

15   That's part of the problem.

16             THE COURT:  Are there pages missing?

17             MR. HASSI:  No, Your Honor.  There are

18   redactions because as the minutes reflect counsel were

19   present at those meeting, and counsel gave legal

20   advice.  We have redacted it and at the state's request

21   we provided a privilege log to them that indicates

22   exactly that fact.

23             THE COURT:  Okay.  An unredacted version

24   has been provided in this case?

25             MR. HASSI:  No, Your Honor because it's an

1    issue of privilege.  So we --

2           THE COURT:  I wasn't saying you were wrong

3    I just wanted to make the record clear that the state

4    doesn't have an unredacted version; right.

5           MR. HASSI:  They do not, no, Your Honor.

6           MR. NEWMAN:  Nor does the (speaking

7    simultaneously.)

8           MR. HASSI:  -- for the privilege, only that

9    it's privilege.

10          THE COURT:  Well, I mean, I guess if it

11   comes down to it, Albertsons could submit it to me for

12   in camera review and I can make a determination whether

13   or not these portions are privileged.  But for purposes

14   or spreading with sharing right now, I mean, the state

15   is conceding that this is a business record.  So I'm

16   less concerned about that.

17          In terms of its completeness, the portions

18   that are redacted are being withheld based on the

19   attorney-client privilege, based on representations

20   that Albertsons's counsel that they reflect the add

21   voice of Albertsons' attorneys and so top move this

22   along I'm going to overrule the state's objection.

23   I'll find out if Kroger has an objection.

24          MS. PFAFFENROTH:  No objection,

25   Your Honor.

1     THE COURT:  All right.  I'll admit 102.

2     And if the state wants to press the issue, which the

3     State is welcome to, I can do an in-camera review in

4     the next day and determine whether or not I agree with

5     the -- with the redactions that were done based on the

6     attorney-client privilege.

7          MR. NEWMAN:  Your Honor, to be clear, it

8     looks like counsel was present for the whole thing.

9     And there are redactions that the defense got to pick

10    which parts they're going to show to the Court, and it

11    excluded parts they're not going to show to the Court,

12    and the state doesn't know what is hidden behind them.

13         They had an opportunity to (inaudible Zoom

14    audio) this discussion before and didn't, but going

15    into it now, you can't unring a bell.  And the state

16    will have an opportunity to cross on it.

17         In short, the defense has chosen the parts

18    they want to put in front of the court and have hidden

19    the parts they want to hide from the court, and the

20    state doesn't know what is behind them and has gotten

21    no explanation of what is behind them.  That's why rule

22    106 exists.

23         THE COURT:  I don't know if that's quite

24    why 106 exists.  It might cover the situation, but I

25    don't think that's the entire purpose of that rule.

1        But anyhow, Mr. Newman does make a descent

2    point that counsel was present for the entire thing.

3    Why does this not come across as drastic as picking and

4    choosing which portion is privileged.  And if the

5    privilege applies to total, you can't do a partial

6    waiver.  It's either a waiver or it's not.  You can't

7    use it as a sword and a shield.

8        MR. HASSI:  Your Honor we don't intend use

9    it as a sword and a shield, and I promise we don't

10   intend to wave the privilege.  We are prepared to

11   provide an in-camera section.  But if I could just

12   explain the redactions represent legal advice that was

13   provided to the board.  Yes, there were people

14   including myself who were Brent at that board meeting,

15   but what has been redacted is legal advice.  And if you

16   were to turn to, for example, the second page at the

17   bottom there's a large redacted portion, and it says

18   "following Mr. Mr. Prokop's presentation."

19       Mr. Prokop is a lawyer with Jenner & Block who

20   had just provided legal advice to the board at that

21   meeting and so we redacted that legal advice.  We did

22   not redact for example the banker the fact that the

23   bankers on the next page presented their fairness

24   opinion just because there were lawyers present.  We

25   understand the fact I was present in the room doesn't

1    necessarily make it privileged here any more than it

2    does in to this room here today.

3             THE COURT:  Well, let me ask you this:

4    Jenner & Block wasn't representing Credit Suisse;

5    right?

6             MR. HASSI:  No, they were representing the

7    company.

8             THE COURT:  And they weren't representing

9    Goldman Sachs?

10            MR. HASSI:  They were not.

11            THE COURT:  How does the presence of

12   non-clients not waive in the attorney-client privilege

13   to the advice that was give?  During a meeting that

14   non-clients attended?

15            MR. HASSI:  Because those -- those people

16   are providing advice to the company and to the

17   companies lawyers to assist them in reaching a

18   transaction.

19         Your Honor, in interest in time, I'm happy to

20   just ask questions without the document.  We can

21   provide a copy in camera and deal with this later I'm

22   conscious we're short on time here.

23            THE COURT:  And this may be the only time

24   we have witnesses for this for the foreseeable future

25   why don't you just withdraw Exhibit 102 and we'll just

1    move forward with other testimony.

2           And by the way now it's 2:47 I want to give my

3    wonderful court reporter a chance to rest her fingers.

4           So we're going to take our 15 minute break

5    now, guys.

6           (Pause in the proceedings.)

7           THE COURT:  We're back on the record,

8    folks.  I want to make sure folks know it's 3:03 we're

9    ending with this witness today?

10          MR. HASSI:  I'm sorry.  We'll finish this

11   witness today there's another witness after this.  The

12   expert, Mr. Smith.

13          THE COURT:  What time did you think we

14   were going to go to today?

15          MR. HASSI:  Your Honor, we thought we were

16   going to go to 4:00 and we have been taking thing out

17   of the examination to move things along.

18          THE COURT:  Yeah, no, I agree with you I

19   agree we're going to 4:00 but where agree with you

20   we're going to be able to get through this witness and

21   a whole other one by 4:00.

22          I don't know how that's possible unless there

23   are very few questions for an expert.

24          MR. HASSI:  We're not to ones calling

25   Mr. Smith.  The state is.  I don't know how long they

1    have planned with him.

2         MS. WILLIAMS:  Your Honor, I'm Ms. Williams,

3    if I can speak briefly.  I was the one who was going to

4    be examining Mr. Smith, and my examination is quite

5    short.  I believe it will be about ten minutes,

6    possibly less.

7         But if we don't have time to call Mr. Smith,

8    if we only the have time to finish with Ms. McCollam,

9    the state understands that as well.

10        THE COURT:  We'll see how it goes.  I

11   won't take up more time talking about it.  I just was a

12   little concerned about what time it was.

13        So anyhow, back to the redirect of

14   Ms. McCollam.

15        MR. NEWMAN:  Your Honor, before we go back

16   to redirect, Your Honor, we were in the middle -- I was

17   having trouble with my space bar unmuting, but you

18   admitted Exhibit 102, and then we had a discussion

19   about the --

20        THE COURT:  It's been withdrawn.

21   Exhibit 102 is equity withdrawn, Mr. Newman.

22        MR. NEWMAN:  I understand you asked the

23   defense to withdraw it I don't know if they did.  I

24   want to make sure that is the case, that it is

25   withdrawn and no longer admitted.

1          MS. BALCH:  We'll withdraw 102.  102 is

2    withdrawn.

3          THE COURT:  Yeah, it's been withdrawn.

4    BY MR. HASSI:

5       RQ. Ms. McCollam, at the board meeting was the

6    board informed that the special dividend was

7    independent from the merger agreement?

8       RA. Yes.  They were.  Actually, in the board

9    minutes it's noted that the two --

10         MR. NEWMAN:  Objection to hearsay,

11   Your Honor.

12         THE WITNESS:  I was --

13         THE COURT:  Ms. McCollam, if you can

14   answer the question without referencing the board

15   minutes, it's going to go a lot faster.

16         THE WITNESS:  Thank you.

17         MR. NEWMAN:  Well, Your Honor, I'm going

18   to object to the statement whether or not it is in the

19   board minutes.

20         THE WITNESS:  Fair enough.

21         THE COURT:  Okay.

22         Go ahead, Mr. Hassi.  What's next?

23         MR. HASSI:  I didn't understand what the

24   objection was too, Your Honor, but I'll move on.

25         THE COURT:  The objection is to hearsay.

1    She was about to say what was discussed at the meeting,

2    so to the extent you want it admitted for the truth of

3    the matter, that would seem to be hearsay, and there

4    might be an exception that applies, but none jumps out

5    at me.

6    BY MR. HASSI:

7        RQ. What did you tell the board at the meeting

8    with respect to the company's ability to pay the

9    special dividend?

10           MR. NEWMAN:  Objection.  Hearsay.

11           THE WITNESS:  (Speaking simultaneously.)

12    We could bay the special --

13           THE COURT:  Hold on, Ms. McCollam.

14    Ms. McCollam, I apologize.  It's still hearsay.  It's

15    an out of court statement being admitted for the truth

16    of the matter.  It doesn't matter that the person that

17    said it is the one that's testifying.  It's still out

18    of court.  It's still hearsay.

19    BY MR. HASSI:

20        RQ. Ms. McCollam, did the board, upon advice of

21    its advisors and its management including yourself,

22    approve the special dividend after a thorough meeting

23    on October 13th?

24        RA. Yes.

25           MR. NEWMAN:  Your Honor I'm going to

1    object hearsay again, and also point out it seems like

2    some advisors are attorneys for which the defense is

3    asserting attorney-client privilege.

4            MR. HASSI:  Your Honor, this is an action

5    taken by the company to vote you unanimously in favor

6    of special dividend.  Indeed it was announced in a

7    press release the .* that the state has used.  This is

8    not a controversial fact.  It's a decision by the

9    exacerbate.  It's not hearsay.  It's a vote.

10           THE COURT:  The problem is that you're not

11   just introducing the fact of what their vote was.

12   You're saying did they do it on advice of their

13   advisers and so that's kind of a become doorway of

14   getting in hearsay.  So if you want to say what did the

15   board approve?  Go for it.  If you want to introduce at

16   the same times that led to back on the record to

17   approve it those statements are likely hearsay.

18           MR. HASSI:  Thank you.

19   BY MR. HASSI:

20       RQ. Did the board approve the special dividend?

21       RA. Yes, they did.

22       RQ. Were they announced?

23       RA. Yes, they were.

24       RQ. If the merger transaction doesn't close does

25   the dividend still get paid?

1      RA. Absolutely.

2      RQ. And if the board had voted against the special

3   dividend --

4      RA. Yes.

5      RQ. -- would the company still have gone forward

6   with the merger?

7          MR. NEWMAN:  Objection, speculation.

8          THE WITNESS:  Actually it's not

9   speculation.  When we declared the dividend we had the

10   legal liability to pay the dividend under Delaware law.

11          THE COURT:  I'm going to overrule the

12   objection.

13   BY MR. HASSI:

14      RQ. October 13th, if the board had not opted to

15   approval the merger, would the company still have

16   issued a special dividend.

17          MR. NEWMAN:  Objection.  Speculation.

18          MR. HASSI:  It's not speculation,

19   Your Honor, the company made planned they had

20   alternatives we discussed that maroons and alternatives

21   I want to court to understand what alternative to the

22   special dividend the company might have done.

23          THE COURT:  The question is the board did

24   not approve the merge would Albertsons have proceeded

25   with the special dividend?

1          MR. HASSI:  Yes, Your Honor.

2          THE COURT:  I'll allow the question.

3          MR. NEWMAN:  May I make a record?

4          THE COURT:  Sure.

5          MR. NEWMAN:  This witness can't speak on

6     behalf of what the board would vote for or not.  It's

7     up to board that's why they vote.  This is absolutely

8     speculation on what the board would have voted on.

9          THE COURT:  I'm going to let her answer

10    and then I'll let -- I'm going to let her answer and

11    then I'm going to let Mr. Hassi establish the

12    foundation for her knowledge, and if it's not

13    sufficient, then I'm the trier of fact in this case and

14    I'll disregard it.

15         But I want to know if she has an answer the

16    and then I want to know what the basis for that answer

17    is.

18         THE WITNESS:  Yes, Your Honor.  The board

19    had the merger not been approved as I mentioned

20    earlier, there were two methods under which we could

21    return capital to our shareholders.  The dollar amount

22    would not be different.  And the money leaving the

23    company would not be different.  It would have been --

24    we could have done a dividend or we could have done a

25    tender offer.

1        If we had not approved the merger, we would

2    have pivoted and my recommendation as the CFO of the

3    company to the board would have been to announce a

4    tender offer at the quantum.

5        THE COURT:  And that's entirely consistent

6    with the documents I've seen so far.  I'll allow that

7    testimony.  That's the key thing, though, right?  If

8    the board didn't approve the merger, you would not have

9    again ahead with the special dividend.

10        THE WITNESS:  We would have potentially

11    pivoted to a tender offer at the same quantum.  We

12    would still be paying out $4 billion.

13        THE COURT:  I understand.

14        MR. HASSI:  Thank you.

15    BY MR. HASSI:

16    RQ.  Has the decision to pay a $4 billion dividend

17    caused you to make any changes in the three-year plan

18    we discussed earlier?

19    RA.  Absolutely not.

20    RQ.  As we sit here today, the dividend has been

21    enjoined has that caused any harm to Albertsons or its

22    investors?

23        MR. NEWMAN:  Objection.  Relevance.

24        THE COURT:  What was the objection,

25    Mr. Newman?

1          MR. NEWMAN:  Relevance.

2          MR. HASSI:  I thought that ** of the

3    company was an element to their case, Your Honor.

4    Perhaps I'm wrong about that.

5          MR. NEWMAN:  An element of our case is --

6          (Speaking simultaneously.)

7          MR. NEWMAN:  -- consumers.

8          THE COURT:  (Speaking simultaneously.)

9    I'm sorry, Mr. Newman, for some reason, I'm having a

10   very hard time with the audio for yours -- when you

11   speak, Mr. Newman.  I'm not sure what the problem is.

12   Can you say that again, sir?

13         MR. NEWMAN:  My objection is to relevance

14   and whether or not the shareholders of the company are

15   harmed doesn't have anything to do with the state's

16   enforcement of the Consumer Protection Act and

17   antitrust laws.  Essentially the defense's argument is

18   if you don't let us violate the Consumer Protection

19   Act, our shareholders will be harmed.  It's not

20   relevant.

21         MR. HASSI:  And Your Honor that is not our

22   argument.  But in issuing a preliminary injections

23   Your Honor needs to balance the harms and there are --

24   the state has claimed that the sky would fall if this

25   dividend is paid, and on the other side of that you

1   have to consider the harms to the shareholders who were

2   supposed to have been paid already and to the company

3   who has made a legal commitment to pay those

4   shareholders.

5          THE COURT:  (Speaking simultaneously.)

6              MR. NEWMAN:  Your Honor, a company can't

7   make a legal commitment to violate the Consumer

8   Protection Act.

9              THE COURT:  Whether or not there's a

10  Consumer Protection Act violation is something that I

11  think is not for the company to decide or for the AGs

12  to decide.  It's usually for the trier of fact to

13  decide; right?

14             MR. NEWMAN:  Correct.  And it has nothing

15  to do with whether or not the shareholders of the

16  company will be harmed.

17             THE COURT:  If harm is one of the things

18  that the Court is supposed to -- or whoever the trier

19  to fact is supposed to balance, then to you want why

20  you would disregard some harm and not others (speaking

21  simultaneously.)

22             MR. NEWMAN:  (Speaking simultaneously.)

23             THE COURT:  Go ahead.

24             MR. NEWMAN:  Because the harm consumers

25  are facing, by the loss of this money, it's not

1    recoverable, is not balanced against whether or not a

2    hedge fund gets their money.

3            MR. HASSI:  Your Honor, it's absolutely

4    the case if you balance the harm to both sides of the

5    injunction and that includes the public shareholders

6    large and small, individuals and the larger ones, all

7    of whom ho have been denied their money because

8    Mr. Newman and the state seeking to prevent the payment

9    of that injunction, and if they continue, those people

10   will not receive their dividend that was promised on

11   November 7th.

12           THE COURT:  I'm going to overrule the

13   objection and I'll give it the weight I feel it

14   deserves.  Go ahead.  Let's move along.

15           THE WITNESS:  Yes.  So let's speak to

16   individual shareholders.  While there are funds

17   associated with the ownership of our stock, I suspect

18   that half the people on this --

19           MR. NEWMAN:  Objection.  It sounds like

20   she is about to speculate when she started with "I

21   suspect."

22           THE WITNESS:  Okay.  Thank you for the

23   correction, Mr. Newman.

24       Investor -- we have -- we actually have

25   feedback from an investor, and here is their situation.

1    Here is what --

2              MR. NEWMAN:  Objection.  Hearsay.

3              THE COURT:  (Speaking simultaneously.)

4              THE WITNESS:  (Speaking simultaneously.)

5    Judge Schubert, I will just explain what happens to a

6    shareholders if that is something that you would

7    accept.

8              THE COURT:  Unless you have firsthand

9    knowledge of it --

10             THE WITNESS:  I do.

11             THE COURT:  I'm not going to allow it.

12   I'm sorry.

13             THE WITNESS:  (Speaking simultaneously.)

14      Actually, this is a fact.

15             THE COURT:  You saw it personally?  You

16   were personally there with whatever harm happened?  You

17   saw it personally?

18             MR. HASSI:  Your Honor, I'll withdraw the

19   question and I'll ask it.

20             THE COURT:  All right.

21   BY MR. HASSI:

22      RQ. What was the effect on the company's share

23   price on the record date for this special dividend?

24      RA. On the record date of the dividend, because

25   the dividend is a legal obligation to be paid, the New

1    York Stock Exchange and you're giving away assets of

2    the company when you do a dividend, the stock price

3    went, yes eel use an example to use math easy, the

4    stock price was $27.  The dividend was $6.85.  The next

5    day, the stock was $20.15.  A person that owned the

6    share on October 23rd, that share was only worth $20.15

7    the next day because that shareholders was supposed to

8    have received a check for $6.58 that never came.

9         So their assets have been reduced by $6.85.

10   If they got their statement from their bank that is

11   holding their shares, they have theoretically lost

12   money on their statements.

13      RQ. And what harm has the company experienced,

14   Albertsons experienced as a result of its inability to

15   pay a dividend?

16      RA. The company announced the payment of a

17   dividend.  We are a Delaware corporation.  We met all

18   of the tests of paying a dividend.  And now we have not

19   paid the shareholders.  The public market is very

20   important for Albertsons.  For the last two years we

21   have worked tirelessly to develop relationships and to

22   develop confident -- to create confidence in company as

23   a new public company.

24        We have only been a public company now for two

25   years.  And we have now told them we were going to pay

1    a dividend, a substantial dividend as described by

2    Mr. Newman and we have not paid it.  And in the future,

3    if we end up without -- if the merge does not

4    consummate because we do not receive regulatory

5    approval, we are going to have to operate as an

6    independent public company.  And at some point may need

7    to access the capital markets in order to secure

8    capital.

9         As they have now lost confidence and they have

10   been put through this as a result of this, it is

11   possible that they will not take a risk on Albertsons

12   again in the future.  Whenever you invest in a new

13   company there's always a risk.  I don't think anyone

14   envisioned this kind of risk and we have lost

15   credibility.

16      RQ. Thank you.

17         MR. HASSI:  Your Honor I have a few brief

18   questions I would like to ask in closed session related

19   to a sealed document and material, nonpublic

20   information.

21         THE COURT:  Does this relate to a document

22   I previously sealed.

23         MR. HASSI:  Yes, Your Honor, it does.

24         THE COURT:  All right.  Well, as before, I

25   will ask if anyone present if they object.

1          (No response.)

2          THE COURT:  Hearing nothing I'm going to

3    rely on my mire analysis of the reasons and national

4    for sealing this document would apply to questions

5    about this document and we'll go ahead and seal this

6    proceeding at this time by moving nonparties to the

7    breakout room.  So it will take a few minutes.

8          You folks can look through the remaining

9    folks and see if there are any remaining covered --

10   that should not be here I guess is an easier way to say

11   it let me know so we can move forward if everyone is

12   here who is supposed to be here.















23          THE COURT:  All right.  I have some

24    questions for this witness.  But they are not questions

25    that need to be sealed so we can bring everyone else

1    back in.  It looks look everybody is coming back in.

2          Ms. McCollam can you hear me okay.

3          THE WITNESS:  Yes, I can hear you fine,

4    Your Honor.

5          THE COURT:  All right.

6          So, 2.5 billion on the distribution, the

7    special distribution, is from cash reserves, correct?

8          THE WITNESS:  That's correct.

9          THE COURT:  Why did Albertsons let so much

10   money accrue in their cash reserves?  Why didn't they

11   disburse some of these funds on an incremental basis

12   earlier.

13         THE WITNESS:  Yeah, the company recently

14   went public in 2020 and the company continued to out

15   perform its own projections every quarter.  And with

16   that, the company continued to assess the best uses of

17   that cash.  Because first and foremost every company

18   considers whether or not there are other possible rope

19   opportunities that you would pursue in which case you

20   would not return cash to your shareholders.  You would

21   make sure that you invested as much as you possibly can

22   in the business and then once you have concluded that

23   you have optimized all of the investments you have made

24   in the business and that you don't have others that

25   would have a better outcome, it's then you start to

1    evaluate whether or not you would want to return that

2    cash to its shareholders.

3          So in our case, we had increased our capital

4    spending materially.  That's our investments and our

5    stores and e-commerce and services and all of the

6    things Mr. Newman mentioned and we took that up from

7    1.6 billion as I mentioned up to over $2 billion for

8    the next three years.

9          That's coming off numbers in the mid

10   $1.5 billion range and in some years only a billion, so

11   we invested as much as we could invested in wages to

12   Mr. Newman's point, we made substantial wage increases

13   et cetera.  So once we exhausted those, it then came

14   time to start evaluating whether or not it was time in

15   the company's lifestyle to take that excess cash and

16   return it to our shareholders and that was the review

17   that we undertook starting in February or 2022 that

18   ended up taking substantially longer than we

19   anticipated because of the negotiations with Kroger

20   being over a very extended period of time.

21          THE COURT:  Okay.  Do any of your

22   competitors make these kind of significant special

23   dividends in the billions.

24          THE WITNESS:  They do.  I can't speak to

25   every competitor and what they do but most recently

1    there's been some noteworthy very large dividends.

2    Costco announced a $10 a share dividend not too long

3    ago.  And they have actually done that several times it

4    looks like they do it about every three years or so

5    they start to accumulate cash I'm sure they go through

6    the same review all public companies do which is to

7    say, I can invest, I can open more stores, I can do all

8    the things I can do.

9            And once they have exhausted those, then they

10   start to return that cash to their shareholders so that

11   announcement was relatively recent.  You would have

12   overs that return it -- remember I told you there's two

13   ways to return cash.

14           One is through share repurchase and one is

15   through special dividens, and it depends on what

16   bargaining trying to solve.  Walmart just recently

17   announced a $20 billion share repurchase program which

18   is a return of capital to shareholders.  That was just

19   announced in the last short period of time maybe in the

20   last quarter or so.

21           So special dividends, as I understand it, they

22   are common dividends, the normal quarterly dividend

23   that Mr. Newman referred to earlier are very common.

24   Special dividends only seek to happen probably let's

25   estimate maybe 10 percent of the time.  And it's always

1    in a circumstance where the company is accumulated

2    large amounts or excess cash and they then consider the

3    alternatives like we did.

4            THE COURT:  The merger is supposed to

5    close when?

6            THE WITNESS:  The merger has a time

7    frame -- an end time frame of two years, and it is

8    possible there are different time frames at 15 months

9    assessments on where the regulatory process is.  But it

10   is a very extended time frame because of the required

11   regulatory process, the FTC process of course.

12           THE COURT:  And you would agree you would

13   know more about the financial state of Albertsons two

14   years from now than you do now about what the state is

15   two years from now.

16           THE WITNESS:  Of course.  In hindsight I

17   know a lot more things.

18           THE COURT:  Right.  So why front load this

19   payment?  Why not simply have this payment in two years

20   if it's separate from the merger and you just say, "Hey

21   things went great the merger is about to happen, now

22   let's disburse this $4 billion, we know there's no

23   problem affording it, it didn't impact competition at

24   all, everything went swimmingly.

25           Sounds like a good time to make the payment

1    the merger is about to go through.  Wait not wait two

2    years when you know everything rather than do it when

3    you don't know what the next due years is going to

4    happen.

5         THE WITNESS:  Yeah, so first of all, the

6    merger and the return or capital to our shareholders as

7    I discussed throughout the testimony today were in the

8    linked.  The decision to return capital to our

9    shareholders had started to be discussed in November of

10   2021.

11        And when you do not have more compelling use

12   of capital, for a company that has shareholders,

13   particularly public -- including public companies, it

14   is appropriate to pay back that money to the -- to give

15   that money back to the shareholders.  It's their return

16   on their investment in the capital that they invested

17   in the company.  So we were going to return this.  This

18   is not -- as we have stated earlier, this is not

19   related to the merger.  This was a financial decision

20   by the company that actually got delayed by the merger.

21   And the company had intended to do this and it is

22   appropriate, financially prudent for us at this point

23   in time to return that cash to our shareholders.

24        So it happens only to the linked to the closer

25   of the merger because the merger price, $34.10 will be

1    reduced by this amount because we are giving away

2    assets that they agreed to buy.  It has to be reduced

3    or it would be a bad financial, decision for them.

4         But it has -- the decision to return the

5    capital is a completely independent decision and we had

6    committed that we would return capital short or not

7    long-term to our shareholders so we feel that a

8    short-term return is appropriate.

9         THE COURT:  I did a poor job of asking

10   that question because I didn't ask anything about

11   lineage or anything else.  My point is you will no more

12   about what happens over the next two years two years

13   from now than you know now; right?

14        THE WITNESS:  Yes.

15        THE COURT:  Okay.  And so because you

16   don't know what is going to happen over the next two

17   years and because you're going through unprecedented

18   merger, why not wait before you disburse 2.5 billions

19   of your cash reserves and go 1.5 billion into further

20   debt until you know how the next two years shakes out,

21   not linking the two things, just noting you're about to

22   go through unprecedented times for Albertsons of

23   merging with a competitor.

24        You don't know everything you'll know two

25   years from now, so why not wait to years from now to

1    disburse these special dividends instead of doing it

2    now when there's so much that is unknown that is

3    unprecedented in the history of your company that is

4    going to take place for the next two years.

5         Does that better phrase the company?

6         THE WITNESS:  Yes, it does.

7         From that perspective, as I said, these are

8    excess cash flows and the company is projected to

9    continue to generate significant excess cash flows.

10   And it is not a good use of assets of cash assets to

11   just keep accumulating on the balance sheet.

12        So if you go back, Judge Schubert, to the

13   schedule, if I can make a -- recall the schedule I

14   showed you to you that showed the cash balance -- or I

15   mentioned to you or I pointed to the cash line and said

16   that over the next these years in our plan, that our

17   cash balance will be back at 3.8 billion.

18        If I did nothing now, I am going to continue

19   to build this balance.  I'm going to have 4 and a half

20   billion and then I'm going to have 7 billion.  I'm

21   going to be carrying excessive excess catch on my

22   balance sheet if I don't start returning it to my

23   shareholders.

24        You asked me why am I not accumulating it now

25   and not returning it.  It's to get that confidence in

1    the operating cash flows and the business model of the

2    company, and now that we have that, we are very

3    confident dent in our ability to return this cash to

4    our shareholders and we need to get started returning

5    the cash to our shareholders absent another business

6    growth opportunity and that's a why we're doing it now.

7            THE COURT:  Why not just disburse

8    2.5 billion of your cash reserves to keep the cash

9    reserves lower.  Why are you going into additional debt

10   at this time given all of the unknowns that you don't

11   know that could take place in the next two years.  Good

12   answer on the cash reserves you don't want to

13   accumulate too much.  I don't think the math is utility

14   right you'll get up to 7 billion, but I understand why

15   that might warrant disbursing 2.5.  But why go into

16   debt for an additional 1.5?

17           THE WITNESS:  Yes.  So these are -- these

18   are infrequent events, and if we are going to do a

19   special dividend, we want to do a quantum -- an amount

20   that is meaningful to our investors.

21           And again from a liquidity point of view, I

22   have $7 million of liquidity available to me, and I

23   still have after I pay this $3 billion of liquidity,

24   the lowest debt leverage that I've had in the history

25   of operating our company, and we believe that that is

1    an absolutely realistic amount to return our

2    shareholders for the investments that they made in our

3    company over the years.

4              THE COURT:  Disbursing $2.5 billion would

5    just not be enough bang for the buck?  You need to go

6    into debt 1.5 million [sic] to make it worth it?

7              THE WITNESS:  Short term.  Very short

8    term.

9              Remember, I'm going to generate $3 and half

10   billion of cash flow in the next 12 months.  Already --

11             THE COURT:  That's your expectation.

12             THE WITNESS:  Pardon me?

13             THE COURT:  Who knows what will happen,

14   right?

15             THE WITNESS:  (Speaking simultaneously.)

16             THE COURT:  That's your expectation.  Who

17   knows what will happen.

18             THE WITNESS:  Yes, that is my expectation.

19             THE COURT:  But again, it's -- the reason

20   you want to go into 1.5 billion dollars of debt is that

21   returning 2.5 billion to your investors in the form of

22   a special dividend is just not worth it?

23             THE WITNESS:  I don't want to say it's not

24   worth it.  But the financial analysis we performed and

25   looking at our projections over the next three years,

1   that was the amount that we felt very comfortable with

2   at this point in time.  Remember originally we were

3   looking at 4 to 5 billion Judge Schubert I mentioned

4   that early on.  And we landed at a $4 billion number

5   and we're very comfortable with that number so that is

6   the recommendation I made to my board of directors.

7   BY MS. GRIFFIN:

8      RQ.

9          THE COURT:  You landed on 4 billion

10  instead of 4.5 billion and I heard from Kroger later

11  today they would have walking if your special dividend

12  was more than 4 billion; right?

13         THE WITNESS:  Ing yes.  But if you look at

14  the documents, if you continue to walk through the

15  dirty of our recommendation, our recommendation was at

16  4.5 billion in the ** G 10 document that you looked at.

17         By August 10th we had already reduced our --

18  my recommendation to your point, to 4.25 billion.  I

19  think that's one of the exhibits.  And again, they --

20  when in the discussions they were happy at 4 billion --

21  4 billion, 4 billion 250, these increments to your

22  point.  We were fine with that.  It was a substantial

23  return of capital to our shareholders.  They are going

24  to have to wait for two years.

25         And Judge Schubert, another thing to remember

1    is our stock is publicly traded.  The stock -- they're

2    going to get $34.10 two years from now.  There is a

3    present having of that amount; correct?  In other words

4    that is future money.  And they're going to have to

5    wait -- sit on our stock for two years hoping this

6    transaction gets regulatory approval and receive that

7    money two years from now and they're getting no

8    returned on that money per se; right?  Because the max

9    our stock can be no matter how low we perform will be

10   $34.10?

11        THE COURT:  Okay.  I want to make sure:

12   From your point of view there were kind of two doors

13   that Albertsons could take.  There was a tender offer

14   door to disburse this money through a stock buy back

15   and then the other door is a special dividend; right?

16        THE WITNESS:  Yes.

17        THE COURT:  But you only walk through the

18   special dividend door if it's part of a merger;

19   correct?

20        THE WITNESS:  That's correct.

21        THE COURT:  Well, if the Court enjoys the

22   $4 billion special dividends does that have any impact

23   on the merger going forward?

24        THE WITNESS:  None.

25        THE COURT:  I'm sorry.  I didn't hear

1    that.

2              THE WITNESS:  It does not, no:  No.  No.

3    It --

4              THE COURT:  Okay.

5              THE WITNESS:  The two decisions are not

6    linked.

7              THE COURT:  I'm checking my notes.  Give

8    me a second here, please.

9              THE WITNESS:  Of course.

10             THE COURT:  You mentioned a fair amount

11   about lease backs, sale to lease backs and the value of

12   Albertsons' assets in the real property that it owns.

13             THE WITNESS:  Yes.

14             THE COURT:  Would Albertsons enter into a

15   sale lease back if it was doing financially well?

16             THE WITNESS:  It would not.

17             THE COURT:  So the sale lease back --

18             THE WITNESS:  (Speaking simultaneously.)

19        Let me say this.

20             THE COURT:  I that you would you were

21   sorry.

22             THE WITNESS:  I apologize.

23        It depends on the assets.  There are some

24   assets that there's a time that you might want to own

25   them and there's times that you may not want to own

1    them, take an offer building as an example, how many

2    people, how many days a week do people come to work et

3    cetera et cetera.

4         Now, you wouldn't lease it back you might sell

5    the asset.  This is always a financial analysis.  But

6    we made the decision that despite going through a

7    tremendous effort to get a real estate appraisal, we

8    did not -- we made a decision that we would not be

9    pursuing a sale leaseback of our real estate assets at

10   this time.

11        THE COURT:  Okay.  And remember we were

12   talking about -- you were talking -- I wasn't, I was

13   just sitting here listening about Exhibit 31 the

14   reference to an overhang?

15        THE WITNESS:  Yes.

16        THE COURT:  And there was a reference in

17   that regard that the special dividend would not solve

18   the common stock overhang issue without another

19   transaction in tandem with a special distribution?

20        THE WITNESS:  Yes, that is correct.

21        THE COURT:  A reference to another

22   transaction, that means merger doesn't it.

23        THE WITNESS:  Yes.  That was a transaction

24   we had in mind because of negotiations that were

25   transpiring.

1          THE COURT:  Was there any other

2     transaction that could solve that situation in tandem

3     with a special dividend other than at a merger.

4          THE WITNESS:  It would be difficult to

5     think -- it would be difficult to think of it because

6     of the nature of the material nonpublic information at

7     all times.  But if we had not been in a simultaneous

8     alternatives being considered at the same time, we

9     would have probably pivoted to the ender often.

10          There's one thing that hasn't been asked

11     about, Your Honor that might also be interesting to

12     you.  That when we pay the special dividend, one of the

13     things it does for us, while it doesn't completely

14     solve the problem --

15          MR. NEWMAN:  Your Honor I'm struggling

16     with my mute button.  I'm going oh object there's noes

17     a question penning.

18          THE WITNESS:  Oh, I'm sorry.

19          THE COURT:  Ms. McCollam the question now

20     pending is what were you about to tell me?

21          THE WITNESS:  One of the things that we

22     are facing as a company which I mentioned is that when

23     we did the IPO in June of 2020, our investors, the five

24     large sponsors were locked up for two years.  And their

25     lockup was going to end on June 30th, 2022.  When we

1    could not announce our strategic alternative, they

2    agreed voluntarily to lock up again because they knew

3    the fear that could create for our shareholders.  So

4    they locked up until September 10th, 2022, because they

5    believed that we would be finished with our

6    negotiations with Kroger.

7         Then, we were not finished with the

8    negotiations with Kroger, and they agreed once again

9    voluntarily because of this perception issue of the

10   overhang, to lock up again until October 18th, 2022.

11   And we did finalize our discussions with Kroger.  But

12   in -- in relation to this, they had locked up again.

13   The investors agreed once again that if they received

14   the -- if we -- when we pay the special dividend, that

15   their shares will be locked up again for a period of

16   time and that they will -- that will continue to keep

17   the public market investors feeling that there is not

18   going to be an excessive amount of shares put on the

19   market at one point in time, which would then take the

20   stock price down materially.

21        So coming along with this for those five

22   sponsors, the ones that have been mentioned here

23   previously, the funds, so to speak, they will be locked

24   up for a period of time again, and that is always good

25   for public investors.

1            THE COURT:  How was it, then, that that

2    one stockholder was able to sell in I think you said

3    around February of this year and the stock dropped you

4    said 20 percent.  How did that happen if they were all

5    locked up.

6            THE WITNESS:  They were a different type

7    of investor.

8            That is a different type of investor.  They

9    were a preferred shareholder.  They were not a common

10   share hole holder.  We had a small amount of preferred

11   shares in the company that came in around the time of

12   the IPO.  And that was a preferred shareholder that

13   sold their entire interest out in a short period of

14   time, which had a material impact on our stock price.

15           And now our preferred share holdings are quite

16   small, but the preferred -- the preferred -- this is --

17   that was the situation that we were in previously, and

18   it was the stock price literally went down nearly

19   20 percent, and it really spooked the public investors

20   as you can imagine.

21           THE COURT:  And obviously if the five or

22   so those major investors agree on the lock in that

23   benefits automatic five of them right it's going to

24   keep the stock higher.

25           THE WITNESS:  Yes.  Yes, it does, but they

1     also don't get to participate in the markets dynamics.

2     Stocks don't specifically trade on company dynamics.

3     They trade also on macro type news.  And our investors

4     when they were locked up there was a time before those

5     shares got put on the market, Judge Schubert our stock

6     was $37 a share and they were all locked up and they

7     could not sell.

8              THE COURT:  Okay.  And I think -- I want

9     to see if we have time for the expert I think maybe

10    people can stay a few minutes after 4:00 I don't want

11    to take up more time, but I do have a quick question

12    for you that you may not be able to answer.

13         I don't want to have you answer in relation to

14    any legal advice that you received.  But you talked

15    about the analysis that went into this including the

16    obligation that Delaware law would make on Albertsons'

17    to follow through with this special dividend.  As part

18    of that analysis did you consider the possibility that

19    a court would enjoin your special dividend?

20             THE WITNESS:  Absolutely not.  It is -- it

21    is so unprecedented I never envisioned that.  And at

22    the end of this quarter as I mentioned when we close

23    other books we will be booking a liability for

24    4 billion dollars.  We have no choice.

25             THE COURT:  All right.  And is there any

1    other court that is considering enjoining this special

2    dividend we besides the current one.

3              MR. HASSI:  Your Honor, if I could answer

4    that.

5          Your Honor is familiar with the proceedings in

6    Washington, DC.  Last Thursday, the state AG's filed a

7    motion for a preliminary injunction.  We submitted a

8    status conference statement on Monday and what the

9    Court has decided to do is our papers opposing that

10   preliminary injunction motion are due tomorrow by the

11   end of the day, and three state AGs' papers are due

12   Friday.  And we expect the Court to decide fairly

13   rapidly thereafter.

14         There's no new information.  It's a redo of

15   the TRO that the Court has already denied.  I could be

16   wrong about this and obviously people let the Court

17   know as we get more information about that.

18             THE COURT:  Okay.  Fair enough.  That's --

19   I don't have a problem with you answering versus -- it

20   was kind of a more legal based question anyway I was

21   just curious about how right Albertsons was about how

22   many legal or how many lawsuits might be filed in

23   relation to the special dividend.

24         So anyway, does anyone have any follow-up

25   questions based on what I have asked?  Mr. Newman this

1    was essentially your witness do you have any follow-up

2    questions.

3         MR. NEWMAN:  I do, Your Honor and I

4    understand by asking them I probably wavering our

5    calling Mr. Smith.

6         THE COURT:  You'll get your ten minutes.

7    I'll give you your ten minutes as long as Ms. Seitz can

8    stand and stretch her fingers for a few minutes, I bet

9    she'll be able do go a little bit passed four.  I can

10   see by her really happy expression she's fine with

11   that.

12        So go ahead, Mr. Newman.

13

14             FURTHER EXAMINATION

15   BY MR. NEWMAN:

16        RQ. You've talked about returning capital to

17   shareholders; right?

18        RA. Yes.

19        RQ. And that you understand they invested and

20   they -- you want to give them something back for their

21   investment; right?

22        RA. I want to be a good financial steward or

23   investor assets and where we have invested, and all of

24   my alternatives to grow the company, et cetera, it --

25   then you seek to return those assets to the investors,

1    yes.

2        RQ. But this is not mom and pop investors in their

3    kitchen.  A majority of the company is owned by hedge

4    funds, is it not?

5        RA. It is not.  Hedge funds?

6        RQ. A majority of the company is owned by private

7    equity; right?

8        RA. Yes.  The majority of the company is owned by

9    private equity but --

10       RQ. And they --

11           (Speaking simultaneously.  Unreportable

12   crosstalk.)

13       RA. -- the private equity firms are actual

14   investors.

15       It is not five people.  It is funds that have

16   many investors.

17   BY MR. NEWMAN:

18       RQ. Those private equity firms hand pick the

19   board; right?

20       RA. There are independent members of our board and

21   there are private equity -- and there are private

22   equity appointed members of our board.

23       RQ. The private equity firms get to pick who is on

24   the board.  They have a majority of the shares; right?

25       RA. They do have the shares but there is an

1    independent board with independent thinking and that

2    is -- that's what a public company has and I have very

3    confidential in stating the board members that

4    independent are very independent.  So these private

5    equity firms don't have any sway in getting you to give

6    them some money through a special dividend.  Management

7    made the recommendation, and I would tell you that from

8    my observation, our board operates as a public company

9    and throughout this process Mr. Newman, if you look at

10   the documents, the key to this every capital return

11   strategy we reviewed was that every shareholder would

12   benefit equally including the public shareholders,

13   anybody that owns the shares of the company besides

14   them, and everything was pro rata.  There was no

15   preference in anything that we looked at.  There was no

16   pressure -- any preference, for anything that did not

17   benefit all shareholders equally.  We have very large

18   shareholders that are public funds Fidelity is a public

19   fund.  They are our largest -- one of our largest

20   shareholders as well.  And Fidelity is not -- is not an

21   entity.  It is millions of small investors who invest

22   in Fidelity funds.  These are real people that have

23   small amounts of money and they have been enjoined

24   along with the big private equity firms.

25        RQ. Private equity firms have a substantial say in

1    how much is getting paid out; right?

2        RA. They do not.

3        RQ. Okay.

4        RA. The management made the recommendation.  This

5    was done based on our three-year plan, our financial

6    projections, and management made that recommendation,

7    Mr. Newman.

8        RQ. Okay.

9            You compared yourself to Costco when Judge

10   Schubert asked you about has anybody else done a

11   special dividend like this and you said oh, Costco;

12   right?

13       RA. They have announced very large did I have

14   dividends, yes.

15       RQ. Yeah.  Costco made those dividends out of

16   cash; right?

17       RA. Yes.

18       RQ. They didn't borrow money to pay that dividend;

19   right?

20       RA. I haven't looked at the -- I didn't look at

21   the stricture of the Costco dividend so I'll trust you

22   if you looked it up.

23       RQ. And Costco has an A plus credit rating don't

24   they?

25       RA. They do.

1      RQ. How is Albertsons doing on the credit raiding?

2      RA. Yes, we have a BB investment rating in

3   comparison to them.  And we are on a positive watch.

4   One of the reasons, Mr. Newman --

5      RQ. All I asked for was -- all I asked for was --

6         (Speaking simultaneously.  Unreportable

7   crosstalk.)

8         THE WITNESS:  Fair enough.

9         (Speaking simultaneously.  Unreportable

10  crosstalk.)

11        THE WITNESS:  -- equal to Costco.

12  BY MR. NEWMAN:

13     RQ. But Costco is one of your competitors; right?

14     RA. Absolutely.

15     RQ. And they have a bigger share over all they're

16  a bigger share not market than Albertsons does?

17     RA. Costco is a very -- they -- remember Costco

18  sells many thing we do not sell we're in if food

19  business.

20     RQ. Okay.

21        I wanted to make sure I got that out because

22  that came up the other day about how they were bigger

23  during some testimony in front of the Senate.

24        So they're not a direct competitor.  Is that

25  what I'm hearing you say?

1      RA. I consider Costco and a portion of the Costco

2    that is in the food business is a direct competitor as

3    anyone, and they are a formidable competitor.

4      RQ. They are.  And they are not borrowing money to

5    pay dividends they're keeping it in the store and using

6    cash to pay dividends; right?

7      RA. As I said, Mr. Newman, I can't speak to

8    Costco's financial structure.

9      RQ. And if Albertsons used cash instead of

10   borrowing minute to pay dividends they would be more

11   competitive too; right?

12     RA. Again, Mr. Newman, we had this -- we talk

13   about this.  I believe that based on the financial

14   projections of the company we are using a portion of

15   the liquidity and access to capital that we have to pay

16   the dividend, and I have no concern at all about the

17   payment of this dividend and our competitive

18   positioning in the market.

19     RQ. You would be more competitive if you didn't

20   borrow money to pay money to your shareholders; right?

21     RA. That's not necessarily true because my money

22   is sitting on the balance sheet earning sub-interest

23   returns, and it is not actively working for our

24   shareholders or for the company.  As long as --

25     RQ. It could be, though.

1        RA. Pardon me?

2        RQ. It could be.  If you didn't give it to the

3    shareholders, it could be working for the company.

4        RA. I invested in all of the competitively things

5    that have a return to the company that we believe keep

6    us in the competitive position and we are continuing to

7    gain market share.

8        RQ. When Costco -- one more difference.  When

9    Costco announced that I shall special dividend, they

10   didn't do it after negotiating the number with their

11   competitors right?

12       RA. Again, I'm not an expert on Costco.  I've not

13   heard of any Costco mergers recently.

14       RQ. Judge Schubert asked you a question about why

15   did you let so much money build up in the company.  Do

16   you remember that question?

17       RA. Yes, I do.

18       RQ. And I missed the year that Albertsons went

19   public.

20       RA. June of 2020.

21       RQ. So about two years ago and they started

22   building up this fund --

23       RA. Yes.

24       RQ. -- during this time right?

25       RA. Yes.

1      RQ. You said that -- and I'm paraphrasing because

2  I didn't say it word for word that companies focused on

3  growth during that time don't return money to their

4  shareholders; right?

5      RA. Yes.  The company continued to invest much

6  more heavily than it had in the past.  And continued to

7  grow it business optimize how it ran its business, et

8  cetera, and throw off excess cash each year with

9  projections now and numbers of customers et cetera, as

10  they gain market share to help solidify future

11  projections.  The company is dealing more and more

12  competent in it's projection and capability while we

13  continue to beet our projections quarter --

14      RQ. But to be clear, you said yes to companies who

15  were focused on growth don't return money to their

16  shareholders?

17      RA. No, I did not say that.  I said you look at --

18      RQ. I --

19          (Speaking simultaneously.  Unreportable

20  crosstalk.)

21      RA. -- and when you have -- it's a balance.  We

22  are still investing in growth.  Remember, I told you

23  that we're investing $2 billion.  We have increased our

24  investments in the company for the three years of the

25  three-year plan.  So Mr. Newman, I have gone through

1   that and I don't want to consume the Court's time.  I

2   would be happy to go through it again with you, but I

3   think that was in my testimony.

4          MR. NEWMAN:  That's all I have,

5   Your Honor.

6          MR. HASSI:  Your Honor, can I ask one

7   brief follow up?

8

9              FURTHER EXAMINATION

10  BY MR. HASSI:

11     RQ. Ms. McCollam, is the --

12         THE COURT:  Sure.

13  BY MR. HASSI:

14     RQ. --  independent?

15     RA. Yes.

16         MR. HASSI:  Thank you.

17         THE COURT:  That may be the first time an

18  attorney has said can I ask one question and they ask

19  one question.  That was -- you get points for that

20  alone.

21      Does Kroger have any questions for this

22  witness based on anything at this point?

23         MS. PFAFFENROTH:  No, Your Honor.  Thank

24  you.

25         THE COURT:  All right.

1          Thanks Ms. McCollam.  I believe you're

2    executed as this point.

3          Is the expert online?

4          THE WITNESS:  Thank you Judge Schubert.

5          MR. SMITH:  I'm right.

6          THE COURT:  That was quite the zoom in on

7    Mr. Smith.  That was pretty cool, actually.

8          All right.  So who is calling Mr. Smith?

9          Who's witness?

10         Well, let me swear him in first and then we'll

11   get to that.

12         Dr. Smith, can you please raise your hand.

13

            DAVID C. SMITH,

14
            having been first duly sworn by the
15
      Certified Court Reporter was deposed as follows:
16

17

18         THE COURT:  All right.  You can put your

19   hand down.

20         MS. WILLIAMS: Your Honor --

21         THE COURT:  Yeah, go ahead.

22         MS. WILLIAMS:  My apologies, Your Honor.

23   Holly Williams for the State of Washington.

24   Your Honor, we withdraw calling Mr. Smith, and

25   the State rests the hearing for the day.

1       Thank you.

2               THE COURT:  Okay.

3               Does anyone else have any other witnesses to

4       call?

5               MR. ASCHER:  Your Honor, this is Stephen

6       Ascher from Jenner & Block.  And I was going to handle

7       Professor Smith.  I do think Professor Smith could

8       answer -- help answer a couple of the questions that

9       you asked Ms. McCollam, and if the Court is willing to

10      sit for another five or ten minutes I can ask a few

11      targeted questions.

12              MS. WILLIAMS:  Your Honor, just from the

13      state's perspective --

14              THE COURT REPORTER:  Ms. Williams, are you

15      objecting?

16              MS. WILLIAMS:  -- I would say this was our

17      hearing.  We move the Court to ask do offer witnesses.

18      We have now said we have given where we are in the day

19      withdrawing calling Mr. Smith.  So we don't think it

20      would be necessary for anybody to question him since it

21      was our motion for testimony and we've now withdrawing

22      that.

23              That said, if the Court is going to allow the

24      other parties to question Mr. Smith, then the state

25      would ask for an opportunity to ask him questions an as

1    well.

2              THE COURT:  Well, I would never only give

3    one side an opportunity to question a witness, so of

4    course I would do it for both.

5              If -- if the state is not calling him anymore,

6    I mean, I will confess now I'm curious to know what

7    Dr. Smith would say, especially if he's answering

8    questions that I've asked.  But I don't know that if

9    it's easier to do that in a supplemental declaration

10   and then in which case the state can't ask any

11   questions about what he is saying.

12             So it may be advantageous but I want to be

13   sensitive I was joking with her a little bit

14   previously, but Ms. Seitz has been going all day long

15   here, and I don't want to have my court reporter burned

16   out.

17             How are you doing Ms. Seitz?  No pressure.

18   Seriously, we can end at 4:08, no problem.  You have

19   put in a huge amount of work today.

20             (No response.)

21             THE COURT:  We can also try to schedule a

22   short hearing just for Dr. Smith tomorrow at 1, for

23   example, I might have an opening.

24             COURT REPORTER SEITZ:  Court reporter the

25   only thing I would have to say is that I do ferry back

1    and forth between here and Kitsap County.  My ferry

2    leaves at 5.  But other than that, I am on the clock

3    until 4:30.  So I can keep going, though.  My hands

4    won't fall off.

5           THE COURT:  So if you go another 15, 20

6    minutes are you still going to be able to make your

7    ferry.

8           (Nonverbal response.)

9           THE COURT:  Okay.  You're nodding in the

10   affirmative.

11          I want to know what Dr. Smith is going to say,

12   especially -- I'm not trying to pat myself on the back

13   but if it relates to my questions, I'm all ears.

14          And then of course Ms. Williams I'll give you

15   a chance to answer.  But let's be real sensitive to the

16   court reporter's time.  And I won't take up more time

17   making at a point.

18          So Mr. Ascher why don't you go ahead and ask

19   your questions and I'll give Ms. Williams a chance to

20   follow up.

21          MR. ASCHER:  Thank you, Your Honor.

22          And I won't be able to match Mr. Hassi's

23   brevity, but I'll do my best.

24

25                  EXAMINATION

1    BY MR. ASCHER:

2       RQ. Good afternoon, Professor Smith.

3       RA. Good afternoon.

4       RQ. And you're a professor of corporate finance;

5    correct?

6       RA. Yeah, I'm the Virginia Bankers Association

7    professor of finance at the University of Virginia.

8       RQ. And what is your special expertise?

9       RA. My expertise is in corporate finance,

10   corporate capital raising, with a special emphasis in

11   corporate debt, corporate credit.

12      RQ. And Professor Smith can you explain why

13   sometimes companies decide to return cash to their

14   shareholders?

15      RA. Sure.  The shareholders, the investors provide

16   money to the company with the idea that they're going

17   to get paid that back that money plus some extra return

18   the way you return provider return capital to

19   shareholders is through dividend or share repurchases.

20      RQ. And under what circumstances does it make

21   sense for a company to return cash to its shareholders

22   rather than use the liquidity in its ongoing business?

23      RA. Mr. Ascher, can you repeat the -- the first

24   part of that question?

25      RQ. I said under what circumstances -- why would

1    it ever make sense for a company to give cash to an its

2    shareholders rather than use that liquidity for its

3    ongoing business?

4        RA. Okay.

5            Well, I think -- and Ms. McCollam talk about

6    this as well.  The way that we think about how

7    dividends are paid in the corporate finance world is

8    that the company should use as much of its internally

9    generated cash flows to meet its investments needs to

10   continue to grow and be successful.

11           Once it has generated enough cash to meet

12   those needs, that include operating expenses that

13   includes investments, and becoming a better company

14   improving the customer experience and so forth wince

15   you have enough catch to cover those any cash that

16   comes in excess of that, and if you have any debt paid

17   on the debt or make payment to debt holders any excess

18   cash should go to shareholders.

19       RQ. Why?  Why is it better for the shareholders to

20   have the money than the company itself?

21       RA. Well, the primary reason is that once you're

22   accumulating so much cash that you don't have a use for

23   that cash and it's just sitting in a bank account

24   somewhere, that cash is not being put to work.  And

25   it's much better at that point than to return that cash

1    to the shareholders and allow them to decide how that

2    money will be reinvested.

3        RQ. And one of the other questions related

4    questions that Judge Schubert asked was why did it make

5    sense for Albertsons to finance the special dividend

6    not only out of its access cash but also out of its

7    borrowing.  And first of all is it unusual for a

8    company to finance a return of capital to its

9    shareholders partly out of debt?

10       RA. No, it's not unusual at all for a company to

11   rely on debt financing to fund a dividend payment.  And

12   just do keep in mind here, Albertsons, the amount of

13   debt they're using relative to their ability to repay

14   their debt is actually very small.  The company has low

15   leverage.  It's still going to have low leverage after

16   it makes the dividend payment.  So relative to other

17   companies that use debt to fund dividends, Albertsons

18   is isn't using much at all.

19       RQ. And why is it not unusual for companies to

20   borrow money to return capital to their shareholders?

21   Why would that ever make sense from a corporate finance

22   perspective?

23       RA. Well, because, and I think Ms. McCollam

24   touched on this as well, there's -- when you generate

25   enough liquidity that you would like to make a payout

1    at that point in time you don't necessarily wants to

2    pay out the cash you have.  If you have available of

3    resources from say a debt source like this ABL

4    financing, you pay that amount out and get that back to

5    the shareholders particularly if you're a company like

6    Albertsons that is confident that analysts are

7    confident are going to generate enough cash to pay that

8    down doubt and continue to grow its liquidity again.

9        RQ. The final point I want to make, Professor

10   Smith, I would like to put on the screen what has been

11   marked as Exhibit 105 to show a graphic that I think

12   may be helpful to court.

13           And if with we can turn to the second page of

14   Exhibit 105?

15           THE COURT:  Mr. Newman, do you have any

16   objection -- or sorry, Ms. Williams, do you have any

17   objection to showing Exhibit 105?  It sounds like it's

18   a demonstrative exhibit.

19           MR. ASCHER:  It is, Your Honor.

20           MS. WILLIAMS:  No objection, Your Honor.

21           THE COURT:  All right.

22       Go ahead and show -- you've already shown 105.

23       Go ahead and show 105.

24           MR. ASCHER:  Apologies if we jumped the

25   gun, Your Honor.

1          THE COURT:  It's all right.  No worries.

2    BY MR. ASCHER:

3       RQ. Professor Smith, I'm showing you what has seen

4    been marked as the second page of Exhibit 105, which is

5    title Albertsons liquidity as is well in excess of all

6    industry peers and will remain in line with industry

7    peer average after paying special dividend.

8          Let's just take this step-by-step Professor

9    Smith.  What is the horizontal bars?  What do they

10   represent?

11      RA. The horizontal bars are measures of liquidity

12   as a percentage of revenue across companies that are

13   peer -- industry peers to Albertsons essentially other

14   companies that sell groceries as part of their

15   business.  And the bars plot how much liquidity is on

16   their balance sheet as a percentage of their revenue.

17   The blue bars are the peers and the green bars are

18   Albertsons.

19      RQ. Okay.

20          And so let's take that step-by-step Professor

21   Smith.

22          What is included in liquidity in this chart?

23      RA. So liquidity is common --

24          THE COURT:  I'm sorry to interrupt, Mr.

25   Ascher.  The chart is really clear.  I've already got

1    it.  We're pressed for time.  So I already understand

2    what the chart says.  Can we move on tho the next

3    topic?  And if you don't have one, can I give Ms.

4    Williams a chance to question him?

5            MR. ASCHER:  No further questions, Your

6    Honor.

7            THE COURT:  Thanks.

8        Ms. Williams?

9            MS. WILLIAMS:  Thank you, Your Honor.

10

11            EXAMINATION

12   BY MS. WILLIAMS:

13     RQ. Good afternoon, Dr. Smith.

14        I just have a few questions to go through with

15   you.  I'll try to keep it as brief as I can.

16        You were asked by Albertsons to provide an

17   economic assessment of whether issuing the special

18   dividend will impact Albertsons' ability to compete,

19   its liquidity and its ability to raise capital.  I'm

20   quoting from you are I don't declaration.  Is that

21   correct?

22     RA. Yes.

23     RQ. And in a nutshell, whether or not paying this

24   special dividend would make Albertsons less

25   competitive; is that right?

1        RA. Well, less competitive would it alter its

2   liquidity and would it still be able to raise external

3   capital.  All three.

4        RQ. And you looked at a set of documents in order

5   to do that assessment that's listed in Appendix C to

6   your declaration?

7        RA. That's correct.

8        RQ. Are there any other documents you consider

9   that are not listed in appendix C?

10       RA. No.

11       RQ. Okay.  Thank you.

12          I'm not going to go through asking you

13   questions about all of those documents.  But many of

14   them were Albertsons public documents --

15          THE WITNESS:  And the Court, I just want

16   to apologize.  I'm not doing this zooming in and out.

17   It's some auto feature in this room.  With apologies.

18          Go ahead.  I'm sorry.

19          THE COURT:  I didn't think that you were

20   doing it and you weren't trying to give us all vertigo.

21   I didn't think that was you.  It's -- I'm trying not to

22   make it humorous.

23          Go ahead, Ms. Williams.

24          MS. WILLIAMS:  Thank you.  Thank you,

25   Your Honor, thank you Dr. Smith.

1    BY MS. WILLIAMS:

2        RQ. You reviewed several documents internal and

3    some public documents from Albertsons that contained

4    projections -- that contained historical financial

5    informations and then projections about their future

6    performance; is that correct?

7        RA. Yes.  The projections of future performance

8    wither based on public information essentially analysts

9    forecasts.

10       RQ. And so you're relying on the forecasts those

11   documents you didn't independently do your own future

12   forecast; is that right?

13       RA. That's correct.

14       RQ. And those projections are making assumptions

15   about conditions going forward; is that correct?

16       RA. I would assume so.  They're consensus

17   projections so they're sort of the sort of mean or

18   median of projections across a group of equity analysts

19   essentially.

20       RQ. Okay.

21           And so the projections, if circumstances

22   change, what happens in the future may be different

23   than what is in those projections; correct?

24       RA. That's correct.

25       RQ. All right.

1          You date at paragraph 20 of your declaration

2     that you have studied non- investment grade firms that

3     engage in if dividend recapitalization.

4          Did any of those firms issue a special

5     dividend in connection with the merger?

6          RA. I don't know.

7          RQ. As far as you recall, did any of those firms

8     issue a dividend in connection with a merger?

9          RA. So, by definition, those dividend

10    recapitalizations were dividends that were issued.  And

11    I think most of them -- I didn't look entirely, so to

12    be specific, but most of those dividend

13    recapitalizations that is financing to pay a dividend

14    are followed by a large dividend that would be similar

15    to a special dividend.

16         RQ. Okay.  Thank you.

17         Operationally I was going to show you some

18    exhibits, but I think in the interest of time I'm not

19    going to do that.  So I'll try to just briefly ask you

20    a question.

21         One of the articles that you reviewed was

22    Moody's article that was released when Albertsons

23    recently had its speculative grade liquidity rating

24    changed SGL 1 to SGL2.

25         Do you recall reviewing that document?

1          RA. Yes.

2          RQ. And there is -- am I correct there's four

3    categories?  1 is the highest and 4 is the lowest

4    within that rating range?  So they were moved from the

5    number 1 spot to the number 2 spot for this speculative

6    grade liquidity rating?

7          RA. Yes.

8          RQ. And there was an cart among your materials

9    that said that consideration for that rating includes

10   looking at internal sources, external sources, covenant

11   compliance and alter gnat sources of liquidity such as

12   asset sales; is that right?

13         RA. That sounds right.

14         RQ. And so one of the reasons that was listed in

15   Moody's article for why it was changed, the liquidity

16   rating was changed from SGL 1 to SGL 2 was because they

17   were going to have a lower cash balance and reduced

18   resolver availability following payment of the special

19   dividend.  Is that right?

20         RA. Yes.  So just to be clear, they go from the

21   very highest category to the next category down, which

22   is I think called good.  And I think the Moody's Los

23   Angeles that goes along with that still expresses

24   confidence that the company is going to be able to meet

25   its ongoing obligations from internally generating cash

1   flow and liquidity.  And I think they also mentioned

2   that they don't see any danger that the company would

3   violate a covenant.

4       RQ. Thank you.

5           Do you know whether the Moody's rating

6   considered any restrictions that the merger agreement

7   places on what Albertsons can do while the merger

8   agreement is pending -- while the merger review is

9   pending, pardon me.

10      RA. I don't know for sure.

11      RQ. Okay.

12          You had a chart included in your declaration,

13  Figure 5.  I believe it's on page 32 of your

14  declaration.  And I won't bother showing it to you in

15  the interest of time.  I just want to confirm with you

16  that chart was showing leverage loan market issuances.

17          Can you just in layman's terms tell the court

18  what leverage loan market issuances are?

19      RA. Sure.  Leverage loan market issuances are

20  essentially loans to companies that are non- investment

21  grade.  And it's going to distinguish between the high

22  yield bond market which is also borrowing that's done

23  to companies that are non-investment grade that are

24  done through bonds instead of loans.

25          RQ. And that chart in Figure 5, which the Court

1    can look at later on its own or we can refer to on

2    Friday during the hearing, that chart shows that in

3    recessions or economic downturns, in 2009 and 2020 and

4    then again now in 2022, those loan issuances go down --

5        RA. Yes.

6        RQ. -- is that correct?

7        RA. That is correct.

8        RQ. In a deep recession like in 2009, it went down

9    quite significantly.  I think it went down from like

10   400 issuances at the high in 2006 down to 40 in 2009;

11   is that correct --

12       RA. Yes.

13       RQ. -- as far as you recall?

14       RA. Yes, that's correct.

15       RQ. Thank you.

16           You also reviewed Albertsons' February 26th,

17   2022, SEC form 10-K; is that correct?

18       RA. I did.

19       RQ. And in that 10-K, a.m. states that it as

20   controlled company and the entities that control it may

21   have conflicts of interest with other stockholders in

22   the future; is that correct?

23       RA. I believe it does have language to that effect

24   in the risk factor section.

25       RQ. And it also indicates yes in that risk factor

1    section about being a controlled company.  It also

2    indicates that the entities that control Albertsons

3    control 75 percent of Albertsons' common stock and are

4    able to control election of Albertsons' directors and

5    determine its management policy and corporate

6    transactions; correct?

7        RA. I don't know if that's exactly the language

8    but I'll take it given the time as a given that --

9        RQ. My apologize I was going to put it up to show

10   you but in the interest of time I'm reading thing to

11   you which is not ideal.

12           So one more time I'm going to read something

13   to I don't you that I would have asked you to read from

14   the document itself but within those risk factors,

15   Albertsons states "We expect the economic environment

16   to remain uncertain as we navigate the current

17   geopolitical environment, the Covid-19 pandemic, labor

18   challenges, supply chain constraints, and current

19   inflationary environment including increasing energy

20   and commodity prices.

21           You would agree those are risks that

22   Albertsons is facing?

23        RA. Potentially, yes.

24        RQ. And Albertsons went on to state such risks is

25   uncertainties could cause actually results to differ

1    materially from those expressed or foe cast by us.

2        Do you agree with that statement?

3        RA. I grew that's in the risk factor section.

4        RQ. And I'm actually asking a slightly different

5    section.  I'm asking if you agree that because of those

6    risks and uncertainties their forecasts could

7    materially differ with actual future circumstances?

8        RA. They could.  I do want to -- since a lot of my

9    research is focussed on gathering data from 10-Ks and

10   10-Qs.

11       I do want to mention and talk a little bit

12   about the risk factor section because it's been used a

13   lot today.

14       I've read hundreds if not thousands --

15       RQ. I appreciate that, Dr. Smith.  I don't have

16   any questions about that for you.  So I do have one

17   more question for you before we go on.

18       The chart that Mr. Ascher showed to you that

19   was showing the comparisons or different companies to

20   Albertsons, several of those companies were not grocery

21   retail stores they were larger big box stores like

22   Costco or Walmart.  I don't have it in front of me so I

23   don't remember all of them but they were not all

24   grocery retail stores; correct?

25       RA. I think they all had a major grocery component

1    but as Ms. McCollam Costco and Walmart sell other thing

2    besides groceries.

3        RQ. Okay.

4            And my apologies because I don't have these in

5    front of me to refer you to but there are several

6    charts and data you considered from Albertsons for the

7    projections you discussed in your report.  And that

8    data I believe was from the period 2019 to 2022; is

9    that correct?

10       RA. Can you just hone in on what you're -- where

11   in the report you're talking about?

12           THE COURT:  You have three minutes, guys.

13   I'm going to let the court reporter go at 4:30.

14           MS. WILLIAMS:  My apologies.  There was

15   demonstrative exhibits that -- and Mr. Ascher referred

16   to one of them.  There were some other charts in that

17   demonstrative, and they were for the time period 2019

18   to 2022, but I don't have the page number in front of

19   me.

20   BY MS. WILLIAMS:

21       RQ. I was just asking do you recall if that's the

22   time period you reviewed data for or if you reviewed

23   any data prior to 2019?

24       RA. I also reviewed data prior to 2019.

25       RQ. Do you know how far back the data you reviewed

1    went?

2        RA. Just to check sort of the path that Albertsons

3    was on, I've gone as far back as 2016, 2015.

4            MS. WILLIAMS:  Okay.  Thank you.

5        No more questions.  Thank you, Dr. Smith.

6            THE COURT:  Mr. Ascher, anything further?

7            MR. ASCHER:  Your honor, if I may, I have

8    one final question.

9            THE COURT:  And I'm sorry.  Ms.

10   Pfaffenroth, did you have any questions for this

11   witness?

12           MS. PFAFFENROTH:  No, Your Honor.

13           THE COURT:  All right Mr. Ascher, you have

14   one question.

15           MR. ASCHER:  Thank you.

16

17           FURTHER EXAMINATION

18   BY MR. ASCHER:

19       RQ. Professor Smith, is a company like Albertsons

20   more susceptible or less susceptible to a recession

21   than other companies?

22       RA. A company like Albertsons is less is it

23   susceptible to an economic downturn.  In fact, they

24   can -- a company like Albertsons in the consumer

25   staples industry can do well during an economic

1    downturn.

2         And Albertsons is expected to by -- through --

3    you know, by analysts in the marks.

4         MR. ASCHER:  Thank you, Your Honor.

5         No further questions.

6         THE COURT:  All right.

7         Thanks everyone.

8         We're going to end now and let the court

9    reporter make her ferry.  And I will see you guys on

10   Friday.  What time are we getting together?  I'm sure

11   it's on my calendar but is it 1:00 or 1:30.

12         (No audible response.)

13         THE COURT:  1:00?

14         MS. WILLIAMS:  I believe it's 1:00,

15   Your Honor.

16         THE COURT:  I'll see you guys for oral

17   argument at 1:00.

18         All right.

19         Have a good day.  I'll see you then.  Take

20   care.  Guys.

21         (End of proceedings at 4:29 p.m.)

22              -o0o-

23         (Reporter clarification.)

24

25